UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEPHEN KEEFE,
      Plaintiff

vs.

LOCALS 805, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION,
AFL-CIO, et. al.
      Defendants

) Docket No. 04-CV-11340DPW

### DEFENDANTS' ANSWER

Defendants Local 805, Local 800 and Local 799, International Longshoremen's Association answer reserving and expressly relying on their rights to file appropriate motions directed at the Complaint's sufficiency or merits.

### FIRST DEFENSE

1. Paragraph 1 is descriptive and does not require an answer.

2. Paragraph 2 is admitted.

3. Paragraphs 3, 4, and 5 are admitted.

4. Paragraph 6 is admitted.

5. Paragraph 7 is admitted.

6. Paragraph 8 is denied.

7. Paragraph 9 is admitted.

8. Paragraph 10 is admitted.

9. Paragraph 11 is admitted.

10. Paragraph 12 is admitted and it is further answered that he was also employed by JTC as a management employee and that he worked fewer hours as a Longshoreman by choice and at his own convenience.

11. Paragraph 13 is admitted.

12. Paragraph 14 is admitted.

13. Paragraph 15 is answered thus: Its first sentence is admitted except that words quoted are not contained in the letter cited. Its second sentence is denied.

14. Paragraph 16 is answered thus. Its first sentence is admitted; its second sentence is denied.

15. Paragraph 17 is admitted.

16. Paragraph 18 is admitted.

17. Paragraph 19 is admitted.

18. Paragraph 20 is admitted.

19. Paragraph 21 is admitted.

20. Paragraph 22 is admitted.

21. Paragraph 23 is admitted.

22. Paragraph 24 is admitted.

23. Paragraph 25 is admitted.

24. Paragraph 26 is admitted and is further answered as follows: The Port of Boston Hiring Hall Rules establish and regulate the "gang system".

25. Paragraph 27 is admitted as framed and it is further answered that plaintiff was employed by J.T. Clark & Sons., Inc. as a management employee.

26. Paragraph 28 is denied.

27. Paragraph 29 is admitted.

28. Paragraph 30 is answered thus: Plaintiff's Complaint in C.A.01CV10194DPW is a self-evident document.

29. Paragraph 31 is admitted.

30. Paragraph 32 is answered thus: It is admitted that counsel for defendant Local 805 deposed plaintiff on January 7, 2003. The deposition transcript is a self-evident document.

31. Paragraph 33 is denied.

32. Paragraph 34 is denied.

33. Paragraph 35 is denied.

34. Paragraph 36 is denied.

35. Paragraph 37 is denied.

36. Paragraph 38 is denied.

37. Paragraph 39 is denied.

38. Paragraph 40 is denied.

## COUNT I

39. Paragraph 41 asserts a legal conclusion and does not require a response; if response is required, it is denied.

## COUNT II

40. Paragraph 42 asserts a legal conclusion and does not require a response; if response is required, it is denied.

## COUNT III

41. Paragraph 43 asserts a legal conclusion and does not require a response; if response is required, it is denied.

## COUNT IV

42. Paragraph 44 asserts a legal conclusion and does not require a response; if response is required, it is denied.

## COUNT V

43. Paragraph 45 asserts a legal conclusion and does not require a response; if response is required, it is denied.

## COUNT VI

44. Paragraph 46 asserts a legal conclusion and does not require a response; if response is required, it is denied.

## SECOND DEFENSE

45. Plaintiff's Complaint fails to state claims upon which relief can be granted.

## THIRD DEFENSE
## (AFFIRMATIVE DEFENSE)

46. On April 7, 2003, Plaintiff's counsel wrote the International Union President a letter stating the same allegations asserted in this complaint and requesting an investigation. Counsel's letter is appended as Exhibit 1 and incorporated here by reference.

47. The International Union conducted a detailed and thorough review of the letter's allegations .

48. ON December 11, 2003, the International Union's President reported the findings of the International Union's investigation. The International Union President's report is appended as Exhibit 2 and incorporated here by reference. Exhibit 2 states in part:

> I do appreciate your having shared with me the claims/beliefs that you and your client harbored concerning the operations of the Hiring Hall Rules Committee and for giving me the opportunity to look into them. I can assure you that if any irregularity, including the "harassment and retaliation" that you allege, had been detected, I would be taking prompt and resolute measures to correct or halt the situation, as the case

may be, in the same manner that you full well know that I have repeatedly done to set aright prior actions adversely affecting your client. However, the results of this demanding and meticulous investigation do not bear out your contentions. To the very contrary; if the Committee had acted otherwise, it could have been accused of favoritism and inconsistency in administering the Rules.

49. The International Union's findings and conclusions rejecting the identical claims alleged in this action are binding on plaintiff and entitled to judicial deference.

## RELIEF REQUESTED

50. Defendants Local 805, 800 and 799 International Longshoremen's Association requests this relief:

(A) Entry of Judgement in favor of Defendants dismissing all counts of Plaintiff's and awarding Defendants the costs and reasonable attorneys fees.

LOCALS 805, 800, and 799
INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO

By its attorney

_____
John F. McMahon, Esquire
BBO # 338360
ANGOFF, GOLDMAN, MANNING,
   WANGER & HYNES, P.C.
45 Bromfield Street – 8th Floor
Boston, MA 02108
(617) 723-5500

DATED: August 16, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of Defendants' Answer was served upon the attorney(s) of record for each other party by mail/hand on August 16, 2004.

Date: August 16, 2004

_____
John F. McMahon, Esquire

EXHIBIT 1

# Scott A. Lathrop & Associates

Scott A. Lathrop, P.C.
Beatrice T. Heveran, Esq.

**ATTORNEYS-AT-LAW**

slathrop@LathropLawOffices.com
www.LathropLawOffices.com

122 Old Ayer Road
Groton, MA 01450
Phone: (978) 448-8234
Fax: (978) 448-8244

Monday, April 07, 2003

John Bowers
President
International Longshoremen's Association
17 Battery Place, Suite 930
New York, NY 10004-1261

Re: Stephen Keefe & Local 805

Dear Mr. Bowers:

Please be advised that I represent Stephen Keefe, as long-standing member of the International Longshoremen's Association. I am writing to ask the International to intervene in an ongoing problem with Local 805.

As you may recall, in 1999 prior counsel for Mr. Keefe asked the International to investigate the reasons why Local 805 had refused Mr. Keefe's request for a transfer to Local 805. As a result, on May 24, 1999, you wrote to Local 805 asking it to provide in writing the reason for Local 805's refusal. (Exhibit 1 attached hereto).

After receiving and reviewing Local 805's reasons for its refusal, you wrote to Local 805 on August 27, 1999, indicating that it had failed to provide sufficient reason to warrant the denial of Mr. Keefe's transfer of local union membership. You also directed Local 805 to immediately comply or face appropriate disciplinary action. (Ex. 2)

When Local 805 did not comply, on November 17, 1999, you appointed a Committee to conduct a hearing on the matter. (Ex. 3)

On December 28, 1999, the Committee filed its Report in which it recommended that if Local 805 did not admit allow Mr. Keefe to transfer by January 15, 2000, Local 805 should be put in trusteeship. (Ex. 4)

As it occurred, Local 805 did final permit Mr. Keefe to transfer to that Local on or about January 15, 2000. However, since that date Local 805 and its Rules Committee has continued to harass and discriminate against Mr. Keefe by placing him in lower Gangs than he should be. As a result, on February 1, 2001, I filed a complaint on Mr. Keefe's behalf in Federal District Court here in Boston, Massachusetts, against Local 805.

I am writing to you now to apprise you of further harassment and discrimination by Local 805 that we believe is best addressed by your office. Here are the details.

ENCLOSURE 1

On September 29, 2000, the Rules Committee by a vote of 5 to 3 (finally) allowed Mr. Keefe to move from Gang 12 to Gang 11. As the time the Chairman of the Rules Committee asked Mr. Keefe if he had another job. Mr. Keefe's response was that he had only another income like a lot of other Union members here do. Mr. Keefe also signed a social security form that allowed the Rules Committee to investigate whether Mr. Keefe had another job.

Mr. Keefe then spent the next two years in Gang 11. In October, 2002, he moved into Gang 10. The problems start thereafter (when the Federal Court ruled against Local 805).

In February, 2003, the Rules Committee held a meeting about Mr. Keefe's Gang status -- without ever informing Mr. Keefe. The Rules Committee suspended Mr. Keefe for six months and put him back in Gang 12 for supposedly having another job. (Mr. Keefe continues to have another income, not another job, and the Rules Committee members know this.)

In March, 2003, the Rules Committee held another meeting. We understand that the Rules Committee did this after being advised that it could not hold a meeting without notifying Mr. Keefe. This time the Committee voted 5 to 3 to put Mr. Keefe back in Gang 10 after a 60 day suspension. Again, the supposed rationale is that Mr. Keefe has another job.

Believe it or not, the Rules Committee then held a third meeting later in March, 2003. Mr. Keefe was not given any notice of this meeting. And it is our understanding that this meeting was called at a time when persons who had voted previously for Mr. Keefe would be out of town. Not surprisingly, the "rump" Rules Committee again suspended Mr. Keefe for 6 months and put him back in Gang 12.

We protest this continuing form of harassment and retaliation. We ask that the International investigate this matter, especially inasmuch as the Rules Committee, including the current Chairman of the Rules Committee and his relatives, have other jobs and incomes (such as family businesses, rental income, pensions and cash paying jobs) while still enjoying the benefits of Gangs 1 - 9.

Thank you in advance for your attention to this matter.

Very truly yours,

*[signature]*

Scott A. Lathrop

cc: Stephen Keefe

2

EXHIBIT 2

Case 1:04-cv-11340-DPW     Document 3     Filed 08/16/2004     Page 9 of 13



# INTERNATIONAL LONGSHOREMEN'S ASSOCIATION • AFL-CIO

17 BATTERY PLACE, SUITE 930, NEW YORK, NEW YORK 10004-1261 • (212) 425-1200 • FAX (212) 425-2928 • FAX (212) 809-6826

John Bowers
President

December 11, 2003

Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450

    **Re:**    <u>Stephen Keefe & Local 805</u>

Dear Mr. Lathrop:

    On October 22, 2003, you were advised by the International's counsel that the investigation that you requested that I make of gang placements and related issues in the Port of Boston was extended in order to afford a thorough review of the circumstances surrounding the changes in your client's status. I directed particular inquiries into the events which are the subjects of the allegations set forth in your letter of April 7, 2003. I recently received and reviewed the comprehensive report and supporting documentation assembled by my representative. It has been reviewed by our counsel for regularity and sufficiency.

    The investigation shows that Mr. Keefe, along with other members of Gangs 1 through 11 in the port, was required to sign a "pledge" in accordance with the Hiring Hall Rules drafted by the Rules Committee and adopted by the membership-at-large. It declared that he was available to work as longshoremen "on a full time basis and working at this craft exclusively" (*sic*). The avowed purpose of the Rules was to assure that those individuals who are committed to working in the industry as the source of their livelihoods would have the opportunity to make a living *as well as* to make the necessary hours to qualify for their health and other benefits and in order to maintain a steady and reliable workforce. Indeed, Mr. Keefe himself has acknowledged that longshore work in the Port of Boston had been decreasing. As he put it in the course of his testifying in Federal Court in the case of *Keefe v. Local 805*, on February 6, 2002, " . . . there are fewer opportunities for Gangs 1 through 12 and non-union, non-ILA persons to work in the Port of Boston in the past couple of years." The Rules permitted a penalty of a 6-month suspension upon disclosure of a violation of the pledge and, thereafter, placement in Gang 12 wherein those persons who acknowledged that they have outside jobs were assigned. As and when the individual could verify that he (or she) no longer

ott A. Lathrop, Esq.
_cember 11, 2003
Page - 2 -

held another job, then he could begin the prescribed process for moving to Gang 11 — and on from there.

The investigator required and obtained memoranda, notices, etc., to substantiate that the relevant Hiring Rules have been implemented and enforced in a firm and organized manner this resulted in disclosing several violators who were penalized and then placed as already indicated. Furthermore, the investigation indicated, contrary to your assertion, that neither the Chairman of the Rules Committee nor any other members of Gangs 1-9 also hold jobs outside of the industry. In June, 2002, the membership by an overwhelming vote determined that even holding an outside part-time job would violate the pledge. Notices were posted in the hiring hall and at all work sites as well on the local's answering machine informing workers and callers that the amended rule was being enforced. If you or your client has information to support a claim that the Rule, as amended, is not being implemented as to particular people, then it should be furnished to the Rules Committee for its prompt investigation.

Prior to signing-off on his pledge, on May 25, 2000, Mr. Keefe had submitted a letter from John T. Clark & Son, with whom he was known to have once been affiliated in a management position. The letter from John T. Clark, dated May 24, 2000, stated that "Mr. Stephen Keefe is not a management employee of John T. Clark & Sons of Boston, Inc." and that he is employed by Clark "on a casual basis as a longshoreman working at Connolly Container Terminal." On the basis of that representation, indicating the he *only* worked at the craft and that his *only* other source of income was from a trust, he was permitted to sign the pledge and to "go out of the window" (*i.e.*, be dispatched) with Gang 11.

Significantly, Mr. Keefe's removal from Gang 11 was *not* based upon his having sources of income *other than* from holding a job outside the industry. There is no indication in the hiring hall rules or in any other evidence turned up by the investigation that anything other than having another job, whether full-time or part-time, would violate the pledge. The pledge itself refers only to "working at this craft exclusively" and to *no other disqualification*. Rather, it is now clear to me that what happened to Mr. Keefe came after the Rules Committee learned in early 2003 that in the course of a deposition — or testimony — that Mr. Keefe gave in the Federal District Court case he admitted that he still was employed by John T. Clark while the President of that company also testified that Keefe was receiving wages of $5,000 a month and full benefits, *not* as a member of the craft but rather as a "consultant."

Accordingly, Mr. Keefe *was* summoned to appear before the Rules Committee at a meeting held on February 6, 2003 at 12 noon at the hiring hall. This was done by means of a written notice, which was mailed to Mr. Keefe on January 28, 2003. Such notices are shown to be a routine procedure followed by the Rules Committee in conducting these

_. Lathrop, Esq.
December 11, 2003
Page - 3 -

investigations. The notice informed Mr. Keefe, by then in Gang 10, that the Committee found that he was in violation of not honoring the pledge that he signed and that his failure to appear at the hearing could result in a sanction. Nevertheless, when the Committee met on February 6, Mr. Keefe failed to appear. Based upon the foregoing uncontroverted information furnished to the Committee, he was removed from Gang 10 and he was suspended for 6 months. Mr. Keefe was sent a second notice by the Committee to appear on March 5, 2000, at which he might appeal his suspension.

The investigation further shows that at the meeting of March 5, Mr. Keefe *did* appear to appeal the Committee's earlier ruling. He alleged that he was in fact working for John T. Clark as a consultant. He claimed that the previous Rules Committee "knew" of his employment and yet allowed him to move from Gang 12 to Gang 11. When Mr. Keefe admitted that he was still employed, he stated that he was going to resign his position because he wanted to stay in Gang 10. The Committee appeared inclined to reinstate him in Gang 10 *provided* that he would furnish proper documents to prove that he no longer worked outside the industry, in which case he would be put back in his gang in April, 2003. Accordingly, Mr. Keefe was given still a further notice to appear before the Committee on March 20, 2003.

The mailings in due course of the above three meeting notices to Mr. Keefe have been confirmed by Chairman Picard. Indeed, Mr. Keefe signed a certified mail receipt for the notice on February 28, 2003 and I have no reason not to believe that the others similarly were received.

At the March 20 meeting, which was called strictly to discuss Mr. Keefe's situation, the Committee also interviewed previous Rules Committee members to find out why Mr. Keefe was moved to Gang 11 when he had outside employment. The earlier Rules Committee's members stated that they had relied on the May 24, 2000 letter from John T. Clark because they read it to indicate that he did not hold an outside job with that company including in its management. As that letter shows, there was nothing in it to show the prior Rules Committee other than that he worked at the craft as "a casual." That was the only "employment" that was evident from the letter to the 2000 Committee and, of course, such employment was inside — *not* outside — the industry. Accordingly, this was not (as you put it) a "rump" committee; and it *did* have the benefit of hearing from members of the earlier committee but had not been afforded the proof promised by Mr. Keefe at the March 5 session.

The Committee concluded that Mr. Keefe was not being straightforward with the previous Committee when he stated at the time that he was only receiving "income from a trust," which would not disqualify him, and that the letter that he had produced to the Committee in 2000 did not give the whole story. It also concluded that, like all other longshoremen in the port industry, he had full knowledge of the rules and of the consequences

Scott A. Lathrop, Esq.
December 11, 2003
Page - 4 -

for being found to work outside the industry. In sum, they found that Mr. Keefe had signed off on his pledge back in May, 2000, but had failed to honor it.

The Committee determined, based upon its actions and those of the prior Committee, which had suspended each individual who had signed a pledge who was later found to have a job outside of the industry, that it was bound by this past practice and that it had to be consistent in administering these rules for all members similarly-situated. That is, the Committee decided that in all fairness it was incumbent upon it to treat Mr. Keefe in the same manner that it had dealt with gang members in these circumstances on earlier occasions. A motion was made and passed to rescind the earlier vote taken on March 5, 2003. It suspended Mr. Keefe for 6 months before he could return to the industry in Gang 12 and be allowed to work his way back up again after he resigns his outside position.

I do appreciate your having shared with me the claims/beliefs that you and your client harbored concerning the operations of the Hiring Hall Rules Committee and for giving me the opportunity to look into them. I can assure you that if any irregularity, including the "harassment and retaliation" that you allege, had been detected, I would be taking prompt and resolute measures to correct or halt the situation, as the case may be, in the same manner that you full well know that I have repeatedly done to set aright prior actions adversely affecting your client. However, the results of this demanding and meticulous investigation do not bear-out your contentions. To the very contrary; if the Committee had acted otherwise, it could have been accused of favoritism and inconsistency in administering the Rules.

Very truly yours,

John Bowers
President

cc:   Mr. Albert Cernadas, Exec. Vice-Pres., ILA, AFL-CIO
      Mr. Robert E. Gleason, Sec. Treas., ILA, AFL-CIO
      Mr. Gerald Owens, Gen. Org., ILA, AFL-CIO
      Mr. Harold J. Daggett, Asst. Gen. Org., ILA, AFL-CIO
      Mr. Richard P. Hughes, Jr., Sec.-Treas., ACD, ILA, AFL-CIO
      Mr. William R. McNamara, Vice-Pres., ILA, AFL-CIO
      Mr. Bernard J. O'Donnell, Pres., L. 805, ILA, AFL-CIO
      Mr. Joseph Picard, Rules Committee of Port of Boston
         % 496 Summer Street, So. Boston, MA 02210
      Gleason & Mathews, P.C.