# Exhibit L



INTERNATIONAL LONGSHOREMEN'S ASSOCIATION • AFL-CIO

17 BATTERY PLACE, SUITE 930, NEW YORK, NEW YORK 10004-1261 • (212) 425-1200 • FAX (212) 425-2928 • FAX (212) 809-6826

John Bowers
*President*

December 11, 2003

Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450

**Re:** Stephen Keefe & Local 805

Dear Mr. Lathrop:

On October 22, 2003, you were advised by the International's counsel that the investigation that you requested that I make of gang placements and related issues in the Port of Boston was extended in order to afford a thorough review of the circumstances surrounding the changes in your client's status. I directed particular inquiries into the events which are the subjects of the allegations set forth in your letter of April 7, 2003. I recently received and reviewed the comprehensive report and supporting documentation assembled by my representative. It has been reviewed by our counsel for regularity and sufficiency.

The investigation shows that Mr. Keefe, along with other members of Gangs 1 through 11 in the port, was required to sign a "pledge" in accordance with the Hiring Hall Rules drafted by the Rules Committee and adopted by the membership-at-large. It declared that he was available to work as longshoremen "on a full time basis and working at this craft exclusively" (*sic*). The avowed purpose of the Rules was to assure that those individuals who are committed to working in the industry as the source of their livelihoods would have the opportunity to make a living *as well as* to make the necessary hours to qualify for their health and other benefits and in order to maintain a steady and reliable workforce. Indeed, Mr. Keefe himself has acknowledged that longshore work in the Port of Boston had been decreasing. As he put it in the course of his testifying in Federal Court in the case of *Keefe v. Local 805*, on February 6, 2002, ". . . there are fewer opportunities for Gangs 1 through 12 and non-union, non-ILA persons to work in the Port of Boston in the past couple of years." The Rules permitted a penalty of a 6-month suspension upon disclosure of a violation of the pledge and, thereafter, placement in Gang 12 wherein those persons who acknowledged that they have outside jobs were assigned. As and when the individual could verify that he (or she) no longer



held another job, then he could begin the prescribed process for moving to Gang 11 — and on from there.

The investigator required and obtained memoranda, notices, etc., to substantiate that the relevant Hiring Rules have been implemented and enforced in a firm and organized manner this resulted in disclosing several violators who were penalized and then placed as already indicated. Furthermore, the investigation indicated, contrary to your assertion, that neither the Chairman of the Rules Committee nor any other members of Gangs 1-9 also hold jobs outside of the industry. In June, 2002, the membership by an overwhelming vote determined that even holding an outside part-time job would violate the pledge. Notices were posted in the hiring hall and at all work sites as well on the local's answering machine informing workers and callers that the amended rule was being enforced. If you or your client has information to support a claim that the Rule, as amended, is not being implemented as to particular people, then it should be furnished to the Rules Committee for its prompt investigation.

Prior to signing-off on his pledge, on May 25, 2000, Mr. Keefe had submitted a letter from John T. Clark & Son, with whom he was known to have once been affiliated in a management position. The letter from John T. Clark, dated May 24, 2000, stated that "Mr. Stephen Keefe is not a management employee of John T. Clark & Sons of Boston, Inc." and that he is employed by Clark "on a casual basis as a longshoreman working at Connolly Container Terminal." On the basis of that representation, indicating the he *only* worked at the craft and that his *only* other source of income was from a trust, he was permitted to sign the pledge and to "go out of the window" (*i.e.*, be dispatched) with Gang 11.

Significantly, Mr. Keefe's removal from Gang 11 was *not* based upon his having sources of income *other than* from holding a job outside the industry. There is no indication in the hiring hall rules or in any other evidence turned up by the investigation that anything other than having another job, whether full-time or part-time, would violate the pledge. The pledge itself refers only to "working at this craft exclusively" and to *no other disqualification*. Rather, it is now clear to me that what happened to Mr. Keefe came after the Rules Committee learned in early 2003 that in the course of a deposition — or testimony — that Mr. Keefe gave in the Federal District Court case he admitted that he still was employed by John T. Clark while the President of that company also testified that Keefe was receiving wages of $5,000 a month and full benefits, *not* as a member of the craft but rather as a "consultant."

Accordingly, Mr. Keefe *was* summoned to appear before the Rules Committee at a meeting held on February 6, 2003 at 12 noon at the hiring hall. This was done by means of a written notice, which was mailed to Mr. Keefe on January 28, 2003. Such notices are shown to be a routine procedure followed by the Rules Committee in conducting these

investigations. The notice informed Mr. Keefe, by then in Gang 10, that the Committee found that he was in violation of not honoring the pledge that he signed and that his failure to appear at the hearing could result in a sanction. Nevertheless, when the Committee met on February 6, Mr. Keefe failed to appear. Based upon the foregoing uncontroverted information furnished to the Committee, he was removed from Gang 10 and he was suspended for 6 months. Mr. Keefe was sent a second notice by the Committee to appear on March 5, 2000, at which he might appeal his suspension.

The investigation further shows that at the meeting of March 5, Mr. Keefe *did* appear to appeal the Committee's earlier ruling. He alleged that he was in fact working for John T. Clark as a consultant. He claimed that the previous Rules Committee "knew' of his employment and yet allowed him to move from Gang 12 to Gang 11. When Mr. Keefe admitted that he was still employed, he stated that he was going to resign his position because he wanted to stay in Gang 10. The Committee appeared inclined to reinstate him in Gang 10 *provided* that he would furnish proper documents to prove that he no longer worked outside the industry, in which case he would be put back in his gang in April, 2003. Accordingly, Mr. Keefe was given still a further notice to appear before the Committee on March 20, 2003.

The mailings in due course of the above three meeting notices to Mr. Keefe have been confirmed by Chairman Picard. Indeed, Mr. Keefe signed a certified mail receipt for the notice on February 28, 2003 and I have no reason not to believe that the others similarly were received.

At the March 20 meeting, which was called strictly to discuss Mr. Keefe's situation, the Committee also interviewed previous Rules Committee members to find out why Mr. Keefe was moved to Gang 11 when he had outside employment. The earlier Rules Committee's members stated that they had relied on the May 24, 2000 letter from John T. Clark because they read it to indicate that he did not hold an outside job with that company including in its management. As that letter shows, there was nothing in it to show the prior Rules Committee other than that he worked at the craft as "a casual." That was the only "employment" that was evident from the letter to the 2000 Committee and, of course, such employment was inside — *not* outside — the industry. Accordingly, this was not (as you put it) a "rump" committee; and it *did* have the benefit of hearing from members of the earlier committee but had not been afforded the proof promised by Mr. Keefe at the March 5 session.

The Committee concluded that Mr. Keefe was not being straightforward with the previous Committee when he stated at the time that he was only receiving "income from a trust," which would not disqualify him, and that the letter that he had produced to the Committee in 2000 did not give the whole story. It also concluded that, like all other longshoremen in the port industry, he had full knowledge of the rules and of the consequences

for being found to work outside the industry. In sum, they found that Mr. Keefe had signed off on his pledge back in May, 2000, but had failed to honor it.

The Committee determined, based upon its actions and those of the prior Committee, which had suspended each individual who had signed a pledge who was later found to have a job outside of the industry, that it was bound by this past practice and that it had to be consistent in administering these rules for all members similarly-situated. That is, the Committee decided that in all fairness it was incumbent upon it to treat Mr. Keefe in the same manner that it had dealt with gang members in these circumstances on earlier occasions. A motion was made and passed to rescind the earlier vote taken on March 5, 2003. It suspended Mr. Keefe for 6 months before he could return to the industry in Gang 12 and be allowed to work his way back up again after he resigns his outside position.

I do appreciate your having shared with me the claims/beliefs that you and your client harbored concerning the operations of the Hiring Hall Rules Committee and for giving me the opportunity to look into them. I can assure you that if any irregularity, including the "harassment and retaliation" that you allege, had been detected, I would be taking prompt and resolute measures to correct or halt the situation, as the case may be, in the same manner that you full well know that I have repeatedly done to set aright prior actions adversely affecting your client. However, the results of this demanding and meticulous investigation do not bear-out your contentions. To the very contrary; if the Committee had acted otherwise, it could have been accused of favoritism and inconsistency in administering the Rules.

Very truly yours,

John Bowers

John Bowers
*President*

cc: Mr. Albert Cernadas, Exec. Vice-Pres., ILA, AFL-CIO
Mr. Robert E. Gleason, Sec. Treas., ILA, AFL-CIO
Mr. Gerald Owens, Gen. Org., ILA, AFL-CIO
Mr. Harold J. Daggett, Asst. Gen. Org., ILA, AFL-CIO
Mr. Richard P. Hughes, Jr., Sec.-Treas., ACD, ILA, AFL-CIO
Mr. William R. McNamara, Vice-Pres., ILA, AFL-CIO
Mr. Bernard J. O'Donnell, Pres., L. 805, ILA, AFL-CIO
Mr. Joseph Picard, Rules Committee of Port of Boston
℅ 496 Summer Street, So. Boston, MA 02210
Gleason & Mathews, P.C.

VOL. I
PAGES 1-124
EXHIBITS 1-20

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.: 04-CV-11340DPW

* * * * * * * * * * * * * *

STEPHEN KEEFE,

PLAINTIFF,

VS

LOCALS 805, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, ET. AL,

DEFENDANTS.

* * * * * * * * * * * * * *

DEPOSITION OF STEPHEN KEEFE, taken on behalf of the Defendants, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Bernadette J. D'Alelio, Notary Public and Court Reporter within and for the Commonwealth of Massachusetts, at the Offices of Mullen & McGourty, 52 Temple Place, Boston, Massachusetts, on May 8, 2006, at 10:01 a.m., as follows:



b0577dc6-8512-41eb-8233-1851e631ba92

you know if it is kept at the union hall or any other building?
A. The last time I saw a constitution was from 1998 or something, '94.
Q. That was before you were a member of 805, right?
A. (Witness nodding.)
Q. Prior to being a member of 805, you were a member of another longshoremen's union, weren't you?
A. Yes.
Q. That was up in Portsmouth, New Hampshire?
A. Yes.
Q. What local was that?
A. Local 1947.
Q. Had you ever been summoned before the rules committee or any hearing officer in 1947 while you were a member there?
A. Not that I recall. I don't think they had a rules committee.
Q. Prior to filing this litigation, Civil Action Number 0411340, did you pursue an appeal of the rules committee's decision with the



union?
A. For my suspension?
Q. Yes.
A. I didn't know I could appeal.
Q. On April 7, 2003, your attorney wrote a letter to Mr. Bowers, the president of the international; is that right?
A. Yes.
Q. And that letter was a complaint made on your behalf to Mr. Bowers about your suspension; is that right?
A. Yes.
Q. Prior to that letter being sent to Mr. Bowers, had you pursued any appeal within the union, either to the district council or any other body in accordance with the constitution?
A. I didn't know you could.
Q. Prior to filing this civil action, had you pursued any appeal of your suspension within the union, either to the district council or any other body pursuant to the constitution?
A. Say that again, please?



MR. MAHONEY: Can you read that back, please, Bernadette?
(Question read.)
A. I didn't know you could.
Q. Do you recall when we were talking about Exhibit 5 earlier, which are the hiring hall rules?
A. Yes.
Q. We were previously talking about the hiring hall rules in regard to the pledge sheet. Do you recall that?
A. Yes.
Q. What I want to focus your attention now on is Rule 25. You t
Tell me if I read this incorrectly. I will try to do it upside down.
"All members who have a grievance must go through proper channels first before bringing a lawsuit against the ILA or any local."
Did I read that correctly?
A. Yes.
Q. "(The channels are as follows: First, they must go through their local; next, New



England Dock & Marine Council or Atlantic District Council; and then the international.)"
Did I read that correctly?
A. Yes.
Q. And these are the hiring hall rules that were in effect in 2003 at the time of your suspension; isn't that right?
A. Yes.
Q. And prior to filing this lawsuit, did you make any request to the New England Dock & Marine Council or the Atlantic District Council appealing your suspension?
A. I never read that rule. I didn't know I could. If I did, I would have went that avenue.
Q. Your attorney did write to the president; is that right?
A. Yes.
Q. And you received Mr. Bowers' response, the president's response, in December 2003; isn't that right?
A. Yes.
Q. And was it after you received President Bowers' response that you then filed





b0f77de6-8512-41ab-9233-1851c631ba92