# MULLEN & McGOURTY
## COUNSELORS AT LAW

52 TEMPLE PLACE 4TH FLOOR
BOSTON, MASSACHUSETTS 02111

TELEPHONE (617) 338-9200
TELEFAX (617) 338-9225

July 31, 2006

United States District Court
For the District of Massachusetts
Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210
ATTN: Clerk's Office

RE:  **Stephen Keefe v. Locals 805, 800, 799, International Longshoremen's
     Association, AFL-CIO, et al
     United States District Court
     District of Massachusetts
     Docket No.: 04-CV-11340DPW**

Dear Sir or Madam:

    In connection with the above-matter, enclosed please find the following
documents:

     1.    Defendants', Locals 805, 800, 799, International Longshoremen's
           Association, AFL-CIO's Statement of Undisputed Facts;
     2.    Memorandum of Law in Support of Defendants', Locals 805, 800, 799,
           International Longshoremen's Association, AFL-CIO's Motion for
           Summary Judgment; and
     3.    Certificate of Service

    Kindly file in your usual manner, and kindly ensure that all future notices and
correspondence are addressed to the undersigned. Should you have any questions, please
do not hesitate to contact this office.

Thank you for your attention to this matter.

                                        Very truly yours,

                                        Michael L. Mahoney

CC:   Scott A. Lathrop, Esq.

Enclosures
MLM

United States District Court
District of Massachusetts

| | |
|---|---|
| Steven Keefe, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| Locals 805, 800, 799, | ) |
| International Longshoremen's | ) |
| Association, AFL-CIO, et.al. | ) |
| Defendants | ) |

Docket No. 04-CV-11340DPW

## Defendants', Locals 805, 800, 799, International Longshoremen's Association, AFL-CIO's Statement of Undisputed Facts

1. The Plaintiff, Stephen Keefe (hereinafter "Keefe"), alleges a violation of the Union Members Bill of Rights (29 U.S.C. § 411 & 529) by the defendants, Locals 805, 800, and 799, International Longshoremen's Association ("ILA"), AFL-CIO. [See Plaintiff's Complaint, hereinafter Exhibit A ("Ex. A")].

2. In 1993, Keefe, a member of Local 1947 of the ILA, moved from New Hampshire to Massachusetts, and became a supervisor in his family-owned stevedore and terminal operating business known as John T. Clark & Sons ("JTC"). [Ex. A].

3. In August of 1998, due to Massport's failure to renew JTC's lease, Keefe requested a transfer of his ILA membership from Local 1947 in Portsmouth, New Hampshire, to Local 805 in East Boston, Massachusetts. [Ex. A].

4. In a letter from the President and Recording Secretary of Local 805, dated November 1, 1998, Keefe was informed that Local 805's executive board had rejected Keefe's transfer request. [Ex. A].

5. After writing Local 805 requesting that they reconsider their decision, in March of 1999, Keefe's attorney wrote directly to President Bowers of the ILA, alleging that Local 805 did not have sufficient reason to deny Keefe's transfer application. [Ex. A].

6. On August 27, 1999, President Bowers directed Local 805 to accept Keefe's transfer request immediately. [Ex. A].

1

7.      Having received no response from Local 805, President Bowers appointed a committee to investigate Local 805's denial of Keefe's transfer request.

8.      On December 22, 1999, President Bowers notified Local 805 that they had until January 15, 2000 to accept Keefe's transfer or they would face disciplinary action. [Ex. A]. On or about January 15, 2000, Local 805 accepted Keefe's transfer request. [Ex. A].

9.      Upon his transfer to Local 805, the ILA Hiring Hall for the port of Boston, Massachusetts, governed Keefe's union-gang placement. [Ex. A]. The ILA Hiring Hall for the Port of Boston was operated jointly by Local 805, 800, and 799 by a Rules Committee composed of nine members, three from each Local. [Ex. A].

10.     Following Keefe's initial transfer to Local 805, the Rules Committee placed Keefe in Gang 12. [Ex. A].

11.     Gang 12, the lowest and last gang dispatched from the Hiring Hall, consisted primarily of "two jobbers", i.e. Longshoremen who held second jobs and did not work exclusively at the Longshore trade. [Ex. A].

12.     Any union member that wished to move from Gang 12 to Gang 11 (or higher), must sign a pledge sheet and appear before the Rules Committee with sufficient proof that they were working exclusively at the craft of Longshoremen. [See Hiring Hall Work Rule #36, and corresponding May 8, 2006 Keefe deposition testimony, hereinafter Exhibit B ("Ex. B")].

13.     On May 25, 2000, Keefe signed the Union Pledge Sheet, in which he agreed to work exclusively as a longshoreman, and acknowledged that he had received and was subject to all of the Hiring Hall work rules. [See Locals #799, #800, and #805 I.L.A. Pledge Sheet, and corresponding May 8, 2006 Keefe deposition testimony, hereinafter Exhibit C ("Ex C")].

14.     In addition to signing the pledge, the Rules Committee received a letter from the President of JTC indicating that Keefe was employed on a casual basis as a longshoreman by JTC. [See JTC Letter, dated 5/24/00, and corresponding May 8, 2006 Keefe deposition testimony, hereinafter Exhibit D ("Ex D")].

15.     Following Keefe's signing of the pledge, in October of 2000, the Rules Committee placed Keefe in Gang 11. [Ex. A].

16.     Keefe brought suit in 2001 in the United States District Court, District of Massachusetts, against Locals 805, 800, and 799, in which he alleged, that

by not initially accepting his application for transfer, the Locals breached Article XV of the ILA Constitution. [Ex. A].

17.    On February 6, 2002, counsel of Locals 805, 800, and 799 deposed Keefe in the 2001 litigation. [See Deposition of Stephen Keefe, dated 2/6/02, hereinafter Exhibit E ("Ex. E")]. At this deposition, Keefe admitted that on May 24, 2000, the date that the President of JTC wrote the letter to the Rules Committee on Keefe's behalf, that Keefe was still doing other work in addition to working as a longshoreman for JTC. [Ex E, pg. 53].

18.    Nonetheless, subsequent to the February 2002 deposition, in October 2002, Keefe was moved into Gang 10. [Ex. A].

19.    On January 7, 2003, counsel for Locals 805, 800, and 799 again deposed Keefe. [Ex. A; see also Deposition of Stephen Keefe, dated 1/7/03, hereinafter Exhibit F ("Ex F")].

20.    At this second deposition, Keefe admitted that as of May 24, 2000, through the date of the current deposition (January 7, 2003) that he remained on the JTC payroll for assignments other than longshore work. [Ex F, pg. 10-11].

21.    Keefe also admitted that as of January 7, 2003, he continued to receive health insurance from JTC. [Ex F pg. 11].

22.    Furthermore, Keefe's W-2s indicated that Keefe was on the JTC retirement plan, and that he reported a total amount of gross wages of $283,704.79 received from JTC for the years 2000 through 2003. [See Keefe's W-2s for the years 2000 through 2003 and corresponding May 8, 2006 Keefe deposition testimony, hereinafter referred to as Exhibit G ("Ex. G)].

23.    After learning of Keefe's additional and ongoing employment with JTC, at the end of January 2003, the Rules Committee notified Keefe that it would be conducting a hearing for Keefe to show cause as to why he should not be suspended and placed into Gang 12 for violation of Hiring Hall rule #36. [See Hearing Summons, dated 2/6/03, and corresponding May 8, 2006 Keefe deposition testimony, hereinafter referred to as Exhibit H ("Ex. H")].

24.    The summons detailed the specific charges against Keefe, the purpose of the hearing, and the time, date, and location of the hearing. Id.

25.    At the May 8, 2006 deposition, Keefe admitted that he received the above-mentioned summons. Id.

26.     Due to Keefe's absence at the February 6, 2003 hearing, and thus his failure to show cause, the Rules Committee voted to suspended Keefe for six months, upon which he would then be placed in Gang 12. [See Suspension Letter, and corresponding deposition testimony, hereinafter referred to as Exhibit I ("Ex. I"); see also Hearing Summons, dated March 5, 2003, and corresponding deposition testimony, hereinafter referred to as Exhibit J ("Ex. J")].

27.     On February 16, 2003, the Rule Committee sent via certified mail, the suspension letter and summons to Keefe. Id.

28.     A certified mail receipt indicates that Keefe received and signed for the above-mentioned suspension letter and hearing summons on February 18, 2003. [See Certified Mail Receipt, dated February 18, 2003, and corresponding deposition testimony hereinafter referred to as Exhibit K ("Ex. K")].

29.     Keefe attended the March 5th hearing, at which the Rules Committee voted to reinstate Keefe into Gang 10, conditioned on Keefe supplying the Rules Committee with additional proof that he was working exclusively as a longshoreman. [See Letter from ILA President Bowers to Attorney Lathrop, and corresponding deposition testimony, hereinafter referred to as Exhibit L ("Ex. L")].

30.     On March 12, 2003, Keefe was mailed a third summons, ordering him to appear at the March 20, 2003 hearing, where he was to supply any relevant paperwork indicating that he was currently working exclusively as a longshoreman. [See Hearing Summons, dated 2/6/03, hereinafter referred to as Exhibit M ("Ex. M"); see also Ex. L].

31.     Due to Keefe's failure to supply the Rules Committee with any documentation to prove he was working exclusively as a longshoreman at the March 20, 2003 hearing, the Rules Committee voted to reinstate Keefe's suspension through August 6, 2003. [Ex. L].

32.     Upon the conclusion of Keefe's six-month suspension, he was reinstated and placed into Gang 12 on August 6, 2003, and then placed in Gang 11 on August 10, 2003 [See Defendants Answers and Objections to Plaintiff's Second Set of Interrogatories, pg.5, hereinafter referred to as Exhibit N ("Ex. N")].

33.     Prior to the initiation of this lawsuit, the only form of protest Keefe had made to the Rules Committee's suspension was through a letter sent to ILA President Bowers from Keefe's attorney on April 7, 2003. [See Letter from Attorney Lathrop to President Bowers, dated April 7, 2003, and

corresponding deposition testimony hereinafter referred to as Exhibit O ("Ex. O")].

34.     In response to this letter, President Bowers wrote Attorney Lathrop a detailed letter that explained Keefe's violation of the Hiring Hall Rules, the three hearing notices that were mailed to Keefe, and the Committees subsequent investigation and hearings conducted in regard Keefe's violation. [Ex. L].

35.     Article XIX, Section 1 of the ILA Constitution indicates, that prior to bringing a lawsuit against ILA or any local, all union members must first go through proper channels within the union. [See Union Constitution, Article XIX, and corresponding deposition testimony hereinafter referred to as Exhibit P ("Ex. P")].

36.     Nonetheless, Keefe has brought suit against Local 805, 800, and 799, alleging that his suspension and the Locals' procedural safeguards were in violation of 29 U.S.C. § 411(a)(4), 29 U.S.C. § 411(a)(5), and 29 U.S.C. § 529. [Ex. A].

Dated: July 31, 2006

Respectfully submitted,
The Defendant,
By their attorney

Michael L. Mahoney
Mullen & McGourty
52 Temple Place, 4th Floor
Boston, MA 02111
(617) 338-9200
BBO# 557562

United States District Court
District of Massachusetts

| | |
|---|---|
| Steven Keefe, | ) Docket No. 04-CV-11340DPW |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| Locals 805, 800, 799, | ) |
| International Longshoremen's | ) |
| Association, AFL-CIO, et.al. | ) |
| Defendants | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS', LOCALS 805, 800, 799, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO'S MOTION FOR SUMMARY JUDGMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate because the pleadings, depositions, and answers to interrogatories show that there is no genuine issue of material fact, and that Locals 805, 800, and 799 are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Here, the entire record reveals that a rational trier of fact could not find for the plaintiff, because the plaintiff has failed to make a sufficient showing of the essential elements of the case that the plaintiff has the burden to prove. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Supreme Court has advised that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Id at 327 (quoting Fed. R. Civ. P. 1). The Court has warned that "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses

tried, but also for the rights of persons opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."

Id. The Court has made it clear that the trial judge has an obligation to prevent factually

unsupported claims and defense from proceeding to trial. Id.

## II.    LEGAL OVERVIEW

The plaintiff, Stephen Keefe, brought this suit against Locals 805, 800, and 799 alleging

violations of Title I and Title VI of the Labor-Management Reporting and Disclosure Act

(LMRDA), 29 U.S.C. § 411(a)(4)[1], 29 U.S.C. § 411(a)(5)[2], and 29 U.S.C. § 529[3].  Although

LMRDA was enacted to protect union members from abuse by union officials, the legislative

history of the Act shows that "[t]he LMRDA was not intended to permit courts to rewrite union

constitutions or to 'prescribe detailed procedures and standards for the conduct of union

business.'" Laborers' International Union of North America, AFL-CIO v. National Post Office

Mail Handlers, Watchmen, Messengers and Group Leaders Division of the Laborers'

International Union of North America, AFL-CIO, 880 F.2d 1338, 1395 (D.C. Cir. 1989) (quoting

S. Rep. No. 187, 86th Cong., 1st Sess. 7, U.S. Code Cong. & Admin. News 1959, p. 2323

(1959)). The Supreme Court has been clear, that "[r]esponsible union self-government demands,

among other prerequisites, a fair opportunity to function." National Labor Relations Board v.

---

[1] The relevant portion of 29 U.S.C. § 411(a)(4) states, "PROTECTION OF THE RIGHT TO SUE – No labor
organization shall limit the right of any member thereof to institute an action in any court . . . . *Provided*, That such
member may be required to exhaust reasonable hearing procedures (but not to exceed a four month lapse of time)
within such organization, before instituting legal or administrative proceedings against such organization or any
officer thereof . . . .

[2] The relevant portion of 29 U.S.C. § 411(a)(5) states, "SAFEGUARDS AGAINST IMPROPER DISCIPLINARY
ACTION – No member of any labor organization may be . . . suspended . . . by such organization or by any officer
unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his
defense; (C) afforded a full and fair hearing.

[3]The relevant portion of 29 U.S.C. § 529 states, "It shall be unlawful for any labor organization . . . or other
representative of a labor organization . . . to fine, suspend, expel, or otherwise discipline any of its members for
exercising any right to which he is entitled under the provisions of this Act.

Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO, and Its Local 22, 391 U.S. 418, 429 (1968) (Harlan, J., Concurring) (citing to Destroy v. American Guild of Variety Artists, 286 F.2d 75, 79 (2ⁿᵈ Cir. 1961).  In the present case, summary judgment is warranted on four grounds: (1) the plaintiff failed to exhaust the reasonable hearing procedures that were explicitly detailed in the ILA Constitution; (2) The plaintiff has admitted that at no point did Locals 805, 800, 799 or the ILA limit the plaintiff's right to institute a court action in any manner; (3) The plaintiff admitted that his suspension was a direct result of his knowing and willful violation of Hiring Hall Rule #36; and (4) The plaintiff admitted he was provided sufficient due process in regard to any action taken by the Rules Committee.

## III.   ARGUMENT

### A.   Plaintiff's Failure to Utilize Internal Union Remedies Bars the LMRDA Claims

Three factors guide federal courts when determining whether to require a union member to seek redress from the union prior to initiating court proceedings: (1) whether union officials are so hostile that the employee could not hope to obtain a fair hearing on his claim; (2) whether the internal union appeals procedure would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks; and (3) whether the exhaustion of internal union remedies would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. Clayton v. International Union, United Auto, 451 U.S. 679, 689 (1981).  It is without contention that the plaintiff failed to utilize any union remedies in the period since Locals 805, 800, and 799 allegedly unlawfully suspended and failed to provide the plaintiff with sufficient due process.  In Clayton, the Supreme Court noted that the policy of requiring exhaustion, is "strictly limited to disputes arising over internal union matters such as those involving the interpretation and application of a union constitution." Id.  The dispute in the

present case is an exclusively internal union matter, for the entire dispute is based upon a

determination of whether or not the plaintiff violated a Hiring Hall Committee Rule. [Ex. I].

"[T]he policy of deferring judicial consideration of internal union matters does not extend to

those issues 'in the public domain and beyond the internal affairs of the union.'" Clayton, 451

U.S. at 689 (citing to NLRB v. Marine Workers, 391 U.S. 418, 426 n. 8 (1968). Here, the dispute

does not relate to any issue "in the public domain", and therefore the plaintiff is required to

exhausted the union remedies. Id.

**B.      The Plaintiff Cannot Prove Clayton's "Three Factors"**

**1.      Union Officials Were Never Hostile to Keefe**

Not only does the plaintiff's dispute relate to an exclusively internal union matter, but

none of the three factors outlined above are present. First, even assuming there was any hostility

towards the plaintiff from union officials or union members, such hostility does not rise to the

level to excuse the plaintiff's failure to exhaust union remedies. See Doty v. Sewall, 908 F.2d

1053, 1061 (1st Cir. 1990). (Upholding the district court's determination that further exhaustion

of union remedies was not required based partially on the plaintiff's showing of repeated

physical and verbal assaults from local union members). Nonetheless, at no point during the

Rules Committee's investigation of the plaintiff were there any physical or verbal assaults of any

manner. [See May 8, 2003 deposition testimony of Stephen Keefe, pgs 31-32, hereinafter

referred to as Exhibit Q ("Ex. Q")]. The plaintiff's responses at his May 6, 2006 deposition

prove that neither the union nor any union members were ever hostile towards the plaintiff. Id.

More specifically, the plaintiff was questioned as follows,

> Q: Have you ever had a conversation with any member of the
> union about your suspension?
> A: No

4

> Q: Have you ever had any conversation with any member of the
> rules committee who were on the rules committee in 2003 about
> your suspension?
> A: I don't even remember who was on the rules committee in 2003
> Q: When I ask you that question, do you understand that I'm
> asking you, not about anything that may have been said at a
> hearing, but outside a hearing process?
> A: Yes

Id.  The broad assertions regarding the Rules Committee's conduct made by the plaintiff in his

complaint are not sufficient to withstand summary judgment.  Winter v. Local Union No. 639

Affiliated with the International Brotherhood of Teamsters and Maloney Concrete Company, 569

F.2d 146, 150 (1977).  "In order to survive a motion for summary judgment under [Fed.R.Civ.P.

56(e)], a party 'may not rest upon mere allegations . . . . Plaintiff here has set forth no specific

facts showing that there is a genuine issue regarding union hostility towards him, and hence

regarding the futility of exhausting available union remedies." Id.  Like the plaintiff's assertions

in Winter that the "union's conduct was 'politically motivated, in bad faith, and discriminatory'",

here, the plaintiff only makes general allegations of discriminatory treatment from the Rules

Committee. [Ex. A].

        Additionally, it would be an anomaly to suggest that the Rules Committee was hostile to

the plaintiff, while at the same time voting to postpone the plaintiff's suspension, keep him on

the payroll, and provide him with an additional hearing so he could submit evidence that he was

not in violation of the Hiring Hall Rules. [See Ex. L]  Furthermore, Keefe was not treated

differently than any other union member that was found not working exclusively as a

longshoreman. [Ex N, pgs. 3-6]. Since the adoption of the Hiring Hall Rules, eight members

have been suspended from Hiring Hall dispatching and referrals for violations of the Rules and

their working at the craft exclusively pledges. Id. Even greater proof that the Rules Committee

was not hostile towards the plaintiff is shown by the fact, that out of the eight suspended

members, the plaintiff was the only one of the eight who triggered a Rules Committee

investigation by his own doing. Id. Whereas the majority of the suspensions were triggered by a

Private Investigator's report commissioned by the Rules Committee, the plaintiff's suspension

was based on his own statements, taken under oath at his January 7, 2003 deposition, where he

admitted that he was employed as "a consultant on the office payroll of JTC". [Ex. F].

Therefore, union officials were not hostile so as to prevent the plaintiff from receiving a fair

hearing on his claim.

### 2. The Union's Internal Procedures would have Provided the Plainff with the Full Relief he is Seeking

Second, the internal union procedures would have provided the plaintiff with the full

relief the plaintiff was seeking. [Ex. P]. Had the plaintiff appealed the decision of the Rules

Committee, and provided the necessary documentation at any level of appeal to show that he was

working exclusively as a longshoreman, he would have been reinstated immediately. [Ex. L].

Therefore, the plaintiff should have exhausted his administrative remedies and attempted to

obtain the relief sought in this case administratively. Clayton, 451 U.S. at 689 (citing to NLRB v.

Marine Workers, 391 U.S. 418, 426 n. 8 (1968). In purported defense of his failure to appeal the

Rules Committee's decision, the plaintiff claims that he was ignorant of the internal union

appeals procedures. [See May 8, 2003 deposition testimony of Stephen Keefe, pgs 119-121,

hereinafter referred to as Exhibit. R ("Ex. R")]. However, ignorance is not a defense; a union

member is charged as a matter of law with knowledge of his union's constitution. See Henry v.

Community Resource Center, INC. and National Health & Human Service Employees Union

Local 1199, 1996 U.S. Dist. LEXIS 6414 (S.D.N.Y. 1996) citing to Miller v. General Motors

Corp., 675 F.2d 146, 149-150 (7th Cir. 1982) ("plaintiff 'had a duty to know his union appeal

rights'"); Newgent v. Modine Mfg. Co., 495 F.2d 919, 928 (7th Cir. 1974) ("'Necessarily

6

implied in the obligation [to exhaust] is the duty to become aware of the nature and availability of union remedies.'"); <u>Tran v. Tran</u>, 847 F. Supp. 306, 311 (S.D.N.Y. 1994); ("'A plaintiff/employee, as a union member, is presumed to be familiar with internal grievance procedures set forth in the Union constitution . . . '").  Furthermore, the plaintiff was represented by counsel at the time of the Rules Committee's decision. [Ex. R]. As such, the plaintiff's failure to exhaust union remedies due to his own ignorance is even more inexcusable here, where he had an attorney assisting him, and neither himself nor his attorney familiarized themselves into the union's appeal procedures. <u>Wozniak v. International Union</u>, 842 F.2d 633, 636 (2nd Cir. 1988) (holding that the Union had not mislead the plaintiff regarding union procedures because the plaintiff was represented by counsel with the training and ability to read and understand a union constitution). Moreover, as this court is acutely aware, this litigation is not the plaintiff's first foray with the defendants. The plaintiff's litigation experience makes his failure to exhaust his administrative remedies fatal to his pursuit of this action.

### 3. The Internal Union Procedures would not have Unreasonably Delayed the Plaintiff's Opportunity to Obtain a Judicial Hearing

Third, the union's internal appeals procedure would not have unreasonably delayed the plaintiff's opportunity to obtain a judicial hearing on the merits of his claim. Plaintiff offers no facts that suggest a resort to internal union remedies would have likely exceeded four months, a period far less than any court adjudication would take. Indeed the plaintiff's own actions, or lack thereof, after the six-month suspension concluded, contradict any claimed urgency in the lawsuit. [See May 8, 2003 deposition testimony of Stephen Keefe, pgs 50-52, hereinafter referred to as Exhibit S ("Ex. S"), where the plaintiff admits that he was placed back in Gang 11 on August 6, 2003, and yet only earned a total of $708.50 as a result of union work for the entire year. The only reasonable inference is that the plaintiff decided to voluntarily forgo union placement

opportunities following the conclusion of his suspension]. Moreover, the lawsuit was not filed

until January 2004, some fifteen months after the suspension was imposed. Given this significant

passage of time, there is no factual basis for any allegation that the plaintiff had to file suit, rather

than exhaust his administrative remedies.

Accordingly, inasmuch as the plaintiff's dispute is an exclusively internal union matter,

and the union satisfies the three factors requiring the plaintiff to utilize their internal union

remedies, the LMRDA claims should be dismissed, due to his failure to exhaust his

administrative remedies. Clayton, 451 U.S. at 689 (citing to NLRB v. Marine Workers, 391 U.S.

418, 426 n. 8 (1968).

**C.      The Defendants Never Limited the Plaintiff's Right to Institute a Court
        Action in Any Manner.**

The plaintiff claims that by suspending him and returning him in Gang 12, the defendants

"limited his right to bring suit" as protected by 29 U.S.C. § 411(a)(4). [Ex. A, pg. 7, Counts I-

III]. Essentially, the plaintiff's argues that his suspension was in retaliation for his first suit

against the defendants, and that the suspension thereby "limited his right to bring suit." Id.

However, even assuming the plaintiff's suspension was invalid, the plaintiff's and his attorney's

own statements on his behalf prove, that the suspension in no way limited the plaintiff's right to

bring suit. The plaintiff's attorney, in his April 7, 2003 letter to ILA President John Bowers,

stated:

> As it occurred, Local 805 did final[ly] permit Mr. Keefe to transfer
> to that Local on or about January 15, 2000. However, since that
> date Local 805 and its Rule Committee has continued to harass and
> discriminate against Mr. Keefe by placing him in lower Gangs than
> he should be. As a result, on *February 1, 2001*, I filed a complaint
> on Mr. Keefe's behalf in Federal District Court here in Boston,
> Massachusetts, against Local 805.

. . . .

> On September 29, 2000, the Rules Committee by a vote of 5 to 3
> allowed Mr. Keefe to move from Gang 12 to Gang 11 . . . . Mr.
> Keefe then spent the next two years in Gang 11. In *October 2002*,
> he moved into Gang 10. The problems start thereafter (when the
> Federal Court ruled against Local 805).[4]

[Ex. O, (emphasis added)]. The plaintiff's attorney's letter reveals that the plaintiff was promoted

on two occasions after his initial lawsuit was filed. Id. It would seem quite illogical to assert, that

the union "limited his right to bring suit" by subsequently promoting him during the pending

litigation. The plaintiff's attorney attempts to attribute his suspension to the Federal Court's

ruling against the defendant's motion to dismiss in October 2002. Id. However, this assertion is a

misrepresentation of what actually occurred. The Rules Committee did not initiate any

proceedings or investigations against the plaintiff until after he voluntarily admitted that he was

in violation the Hiring Hall Work Rules and his Exclusively at the Craft Pledge in his January 7,

2003 deposition. [Ex F; see also Ex. L].

Furthermore, in 1995 the First Circuit Court of Appeals was confronted with the issue of

determining whether actions taken by the Service Employees International Union, limited the

Local unions right to sue, in violation of <u>29 U.S.C. § 411(a)(4)</u>[5]. <u>Service Employees International

Union, AFL-CIO v. Local 1199 N.E., SEIU, AFL-CIO, CLC</u>, 70 F.3d 647 (1st Cir. 1995). In

<u>Service</u>, a dispute arose between a local union and the International, which eventually led to the

Local's refusal to pay its per capita taxes to the International. Id at 649. Immediately following a

suit brought by International against the Local, several members of the Local sued both the Local

---

[4] The attorney's statements in this letter are admissions of Keefe because, "(1) the attorney is . . . the [Keefe's] agent with regard to the making of the statement; (2) the statement concerns a matter of the attorney's employment; [and] (3) the statements are adopted adopted by [Keefe]." <u>Wechsler v. Hunt Health Systems, Ltd.</u>, 2003 WL 22764545 (citing to <u>United States v. Margiotta</u>, 662 F.2d 131, 142-143 (2nd Cir. 1981).

[5] Although the dispute in the <u>Service Employees International Union</u> was between the International and the Local; whereas here, the dispute is between the local and a union member, for the purposes of <u>29 U.S.C. § 411(a)(4)</u>, the analysis is the same and the distinction is of no relevance. See <u>American Postal Workers v. M. Frank</u>, 968 F.2d 1373, 1375 (1st Cir. 1992) (applying the test of organizational standing to sue to the case of a Local asserting the rights of its members under the LMRDA).

and International for rescission of a contract between the Local and International "on the grounds

that the contract was entered into without fully informing the members . . . ." Id at 650.  In

regards to the International suit against the Local, the District Court ordered arbitration, and the

arbitrator found, inter alia; that the Local was liable to the International for per capita taxes, but

"reserved decision on various remedial issues, including . . .late fees . . . in order to give the

parties a chance to reach a negotiated resolution." Id. During the subsequent negotiations, the

International "refused to negotiate over a reduction in or a reasonable payment schedule for the

per capita taxes or a waiver of the late fees, unless the Local arranged for the withdrawal of the

[Local members'] lawsuit . . . ." Id at 653.

    The Court held, that because the per capita taxes [were] routine, non-negotiable

payments, to which the International [was] entitled to, and "failure to negotiate or reschedul[e]

them [could not] . . . be said to be a penalty on the right to sue." Id at 654. However, the Court

decided, because the International routinely waives late fees in other cases, that "the subsequent

refusal to grant a waiver of [the] late fees as the International usually has done, unless the suit

was withdrawn," might have been a violation of 29 U.S.C. § 411(a)(4), if it was done in an

attempt to coerce the union members to withdraw their suit. Id.  Like the per capita taxes which

were routine and never waived, suspensions for failure to work exclusively as a longshoreman

are also non-negotiable and have been applied consistently to anyone found violating the Hiring

Hall Rules. [Ex. N, pgs. 3-6].

    Accordingly, inasmuch as Locals 805, 800, 799 and the ILA have never limited the

plaintiff's right to bring suit in any manner, the LMRDA claim should be dismissed.

**D.      The Plaintiff's Suspension was the Direct Result of His Knowing and Willful Violation of Hiring Hall Rule 36.**

**1.      The Plaintiff Admitted his Violation of Union Regulations**

10

The plaintiff claims that the Rules Committee suspended him for exercising his right to bring suit under 29 U.S.C. § 411(a)(4) and suspended/disciplined him without providing him with sufficient due process, thereby violating 29 U.S.C. § 529. [Ex. A, Counts I-VI].[6] Although similar, the distinction between the plaintiff's claims under 29 U.S.C. § 411(a)(4) and 29 U.S.C. § 529 merits explanation. The plaintiff's claim under 29 U.S.C. § 411(a)(4) alleges that his suspension limited his right to sue. Whereas the plaintiff's claim under 29 U.S.C. § 529 alleges that his suspension/discipline was in retaliation for the plaintiff exercising his right to bring suit under 29 U.S.C. § 411(a)(4).

However, by the plaintiff's own admission, his suspension was not in retaliation for his initial lawsuit.  At the plaintiff's May 8, 2006 deposition, the plaintiff admitted that in May 2000, he signed the Union pledge affirming that he was working exclusively as a longshoreman. [Ex. C]. In addition to signing the pledge, at the same time the plaintiff also submitted a letter from JTC indicating that he working only working with JTC on a casual basis as a longshoreman. [Ex. D]. However, Keefe's W-2 from 2002 indicates that he earned $76, 362 from JTC, [Ex. G], and Keefe expressly stated that his suspension had nothing to do with his previous lawsuit, but rather for a violation of Hiring Hall Rules. [See May 8, 2003 deposition testimony of Stephen Keefe, pgs 87-88, hereinafter referred to as Exhibit T ("Ex. T")]. The plaintiff was questioned, and testified as follows:

> Q: So your understanding of the reason for your suspension was
> that the rules committee held – determined that you had another
> job; is that fair to say?
> A: Yes
> Q: And we already went through all the John T. Clark W-2s. In
> 2003 you already admitted that you did receive W-2 income from
> John T. Clark; isn't that right?
> A: Yes

---

[6] See Supra p. 17 for a discussion of 29 U.S.C. § 411(a)(5); i.e. the due process claim.

. . . .
Q: [Y]ou understand that you reported the money you received to
the federal and state government as income that you earned from
working at John T. Clark; is that right?
A: Correct
. . . .
Q: [Y]ou know the difference between income received from a
stock distribution rather than income. You're familiar with that,
right?
A: Yes

Id. The distinction the plaintiff attempts to make; that he wasn't doing any work for the income

he received at JTC, and therefore did not have another job, it an attempt to circumvent the intent

of the rule. [Ex. L]. ILA President Bower's letter indicates that "[t]he avowed purpose of the

Rules was to assure that those individuals who are committed to working in the industry as the

source of their livelihoods would have the opportunity to make a living as well as to make the

necessary hours to qualify for their health and other benefits and in order to maintain a steady

and reliable workforce." Id. The material fact is not that the plaintiff may not have worked for

the money he received from JTC, but rather the money he received from JTC was *reported as*

*earned income,* and opposed to unearned income. [Ex. T]. By claiming that he had a "no-show

job", the plaintiff is attempting to defeat the purpose of the rule; because the "source of his

livelihood" was not from working exclusively as a longshoreman. The Rules Committee's

interpretation that Keefe's position with JTC was in violation of the Hiring Hall Rules is

reasonable, and should therefore be upheld. Millinery Workers' Union Local 55/56 of United

Hatters, Cap & Millinery Workers' Intern. Union v. United Hatters, Cap & Millinery Workers'

Intern. Union, 495 F. Supp. 60, 62 (1980). "[C]ourts should . . . accept the correctness of

reasonable, lawful interpretations by the union's authorized officials of the Constitution and By-

Laws. Id (citing to English v. Cunningham, 282 F.2d 848, 850 (D.C. Cir. 1960). Just as the Rules

12

Committee had suspended other members not working exclusively at the craft, the application of

the Hiring Hall Rules to Keefe was equally consistent and reasonable. [Ex. N, pgs. 3-6].

**2.    The Plaintiff's Suspension is not Defined as Discipline**

The plaintiff's suspension does not fall within the statutorily defined meaning of the term

discipline. Macaulay v. Boston Typographical Union No. 13, 474 F.Supp. 344, 346 (D. Mass.

1979). The court held that "[u]nion action which adversely affects a member is 'discipline' only

when (1) it is undertaken under the color of the union's right to control the member's conduct in

order to protect the interests of the union or its membership, and (2) it directly penalizes him in a

way which separates him from comparable members in good standing." Id. Macaulay provides a

similar fact pattern to the present case.    In Macaulay, the plaintiff had his union status

reclassified due to his failure to seek a sufficient level of work, which caused him to lose his

priority status within the union. Id at 345. Thus there will be certain union actions undertaken

which may "adversely affect' a member, but still do not constitute discipline as proscribed by

statute. Id. Further the Macaulay court stated, the "plaintiff has offered no evidence that he has

been directly penalized or singled out from other comparable members for special treatment. The

union has fairly applied a reasonable union regulation . . . ." Id.

Like the plaintiff in Macaulay, here, Keefe was not treated differently than any other

member found in violation of the Hiring Hall Rules. [Ex. N, pgs. 3-6]. Additionally, at his May

8, 2006 deposition Keefe admitted knowing that a violation of the Hiring Hall Rules could result

in a six-month suspension. [See May 8, 2003 deposition testimony of Stephen Keefe, pg. 38,

hereinafter referred to as Exhibit U ("Ex. U")]. The plaintiff was asked, and responded as

follows:

> Q: "Rule 37 of the hiring hall work rules for Local 799, 800, and
> 805 permits a six-month suspension from a gang or steady job for a

13

member's violation of his pledge or due to his failure to appear
before the rules committee when summoned." You admitted that to
be a correct statement; is that right?
A: Yes

Id.

Accordingly, inasmuch as the plaintiff's suspension was the direct result of his knowing

and willful violation of the Hiring Hall Rules, the LMRDA claim should be dismissed.

### E.    The Rules Committee Adhered to the Due Process Requirements of the LMRDA at all Relevant States of its Investigation and Suspension of the Plaintiff.

It is well settled in this Circuit, that when a union seeks to suspend one of its members it

may do so provided it follows the requirements of the LMRDA, 29 U.S.C. § 411(a)(5). Stein v.

Mutual Clerks' Guild of Massachusetts, Inc., 560 F.2d 486, 491 (1st Cir. 1977). Namely, the

union must, (1) serve the member with written specific charges; (2) give the member a

reasonable time to prepare a defense; and (3) afford the member a full and fair hearing. Id. The

defendant's motion for summary judgment should be granted because based on the record in this

case no reasonable jury find that the Rules Committee violated any provision of law; or that the

Rules Committee did anything other than adhere to its constitution in charging the plaintiff and

suspending him from membership in the ILA. In this case the Rules Committee properly drafted

specific written charges against the plaintiff; served the charges on the plaintiff with due notice

in advance of the hearing on the charges; permitted the plaintiff to testify and present evidence

during the Rules Committee hearing; and based its decision on substantial evidence which

warranted the plaintiff's six-month suspension. [See Exhibits H, J, M, and L].

### 1.    The Plaintiff Admits he was Served with Specific Charges of Misconduct Warranting Suspension

14

To satisfy the requirements of the LMRDA, charges made against a union member must provide sufficient detail of the conduct forming the basis of the suspension. International Brotherhood of Boilermakers v. Hardeman, 401 U.S. 233, 244-245 (1971) (holding that union charges of discipline satisfy the LMRDA provided that the union member is given "specific" information about discipline). The attached hearing summonses irrefutably prove that the plaintiff was served with specific charges of misconduct on three separate occasions. [Exhibits H, J, and M]. Any argument by the by the plaintiff that he did not receive written notice of the charges is futile. A certified mail receipt, signed by the plaintiff on February 18, 2003 proves that he received a copy of the hearings summons. [Ex. K]. This summons, received by the plaintiff two weeks before the scheduled hearing, stated:

> THE COMMITTEE SUMMONS YOU ON THIS DATE OF
> MARCH 5, 2003 AT 12 NOON TO APPEAR AT THE HIRING
> HALL. THE PURPOSE OF THIS HEARING HIS FOR YOU TO
> SHOW JUST CAUSE AS TO WHY YOU SHOULD NOT BE
> SUSPENDED AND PLACED INTO GANG #12. PLEASE
> BRING WITH YOU ANY RESIGNATION AND RETIREMENT
> PAPERS, TAX RETURNS OR ANY DOCUMENTS THAT YOU
> DEEM PERTINENT. WE HAVE FOUND YOU TO BE IN
> VIOLATION OF NOT HONORING THE PLEDGE THAT YOU
> SIGNED.

[Ex. J]. Here, the plaintiff was provided with clear charges that informed him of the basis for the Rules Committee's suspension.

Assuming arguendo, plaintiff's assertion that he never received the Rules Committee's notice of the February 6, 2003 hearing is true, it still does not rise to the level of a violation of due process. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 319 (1950). "[N]otice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all . . . . We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable." Id. Here, the Rules Committee sent each

15

notice via mail, to the plaintiff's address, and therefore has satisfied due process. Id. "However it may have been in former times, the mails today are recognized as an efficient and inexpensive means of communication." Id.  Thus, the defendants were under no obligation to send the charges to the plaintiff via certified mail. Moreover, the plaintiff admitted having the same address for over twenty years. [Ex I deposition testimony, pg. 94]. The charges were mailed to that address on three occasions. [Ex. L].  Further, even if the plaintiff did not receive the first notice, he appeared on March 5, 2003, and therefore the fact of receipt of the charges is not material. Consequently the plaintiff cannot establish any violation of this provision of the LMRDA.

> **2.     The Plaintiff was Given a Reasonable Amount of Time to Prepare his Defense**

Although the plaintiff initially stated in his complaint, that he was not given a reasonable amount of time to prepare his defense [Ex. A], his subsequent admission at his May 8, 2006 makes this issue moot. The plaintiff was asked, and responded,

> Q: And you got the [March 5, 2003 hearing notice] on February 18th; is that right?
> A: Yup.
> Q:  That is about two weeks prior to the meeting?
> A: Yes
> Q: Do you contend that two weeks' notice is an unreasonable amount of time for you to be summoned to a meeting?
> A: No

[See May 8, 2003 deposition testimony of Stephen Keefe, pg. 108, hereinafter referred to as Exhibit V ("Ex. V")]. Furthermore, the ILA Constitution, Article XVIII, Section 3 provides for, and the plaintiff received a minimum of five days prior notice of the time, date, and location of the Rules Committee hearing. [Ex P]. Union officers are entitled to latitude in applying their own rules. Hardeman, 401 U.S. at 243. Here, two weeks notice to the plaintiff is reasonable in light of

16

the specific charges filed against him. If it is true, as the plaintiff states that he was always

working exclusively as a longshoreman it should have been very simple for him to defend this

contention at the Rules Committee hearing. For all the Rules Committee requested, and he would

have had to supply, was any documentation that indicated that he was no longer working at JTC.

[Ex. J].

### 3. The Plaintiff was Given a Full and Fair Hearing as Defined Under the LMRDA

The First Circuit has made clear that the essential requisite for a fair hearing is an

unbiased tribunal. Stein, 560 F.2d at 491 A review of the Rules Committee Meeting Minutes and

ILA President Bower's letter to the plaintiff's attorney demonstrate that the plaintiff received a

full and fair hearing. [Ex. L, pgs. 2-4]. Although the plaintiff was not present at the February 6,

2003 Rules Committee hearing, he was present at the March 5, 2003 hearing where he was given

an opportunity to respond to the charges against him. Id. At the March 5, 2003 hearing, the

plaintiff stated that he was working for JTC as a consultant, and that he was going to resign his

position because he wanted to remain in Gang 10. Id. Based on the plaintiff's statement, the

Rules Committee voted to stay his suspension and reinstate him into Gang 10, provided that he

furnish documents to prove that he no longer worked outside the industry. Id. Ultimately, after

three hearings, the plaintiff failed to provide the Rules Committee with any documentation to

prove he was working exclusively at the craft, and the Rules Committee reinstated his

suspension on March 20, 2003. Id. The Rules Committee's willingness to temporarily stay the

plaintiff's suspension and provide the plaintiff with three hearings to defend himself indicates

that the Rules Committee was not biased towards the plaintiff in any manner. In Stein, the First

Circuit Court of Appeals held that where the union's attorney takes part in the union member's

hearing, an inherent risk of bias is present. Stein, 560 F.2d at 491. Here, the plaintiff's hearings

17

were conducted in a neutral and detached manner, with only members of the Rules Committee present. [Ex. L]. Consequently, the plaintiff received a full and fair hearing, with an adequate opportunity to present his defense, thus satisfying the requirement of the LMRDA.

**4.    The Rules Committee's Decision was Based upon Substantial Evidence**

Unions are free to define what conduct warrants discipline under their rules and regulations and to determine appropriate penalties. Hardeman, 401 U.S. at 243-244. The decision of the Rules Committee to suspend the plaintiff was based on specific testimony of the plaintiff at his January 7, 2003 deposition, and the plaintiff's failure to provide any documentation to prove he was working exclusively at the craft. [Ex. L]. Indeed, the March 20, 2003 hearing was called specifically to discuss why the previous Rules Committee moved the plaintiff to Gang 11 when he had outside employment, and to allow the plaintiff to present documentation indicating he was not working outside the craft. Id. Earlier Rules Committee members stated that they had relied on the May 24, 2000 letter from JTC, which they believed was proof that he did not hold a job outside the craft. Id. Based on the testimony of previous Rules Committee members, the current Rules Committee concluded that the plaintiff was not being honest with the previous Committee, and like all other longshoremen, he had knowledge of the rules and potential consequences if found in violation of his exclusivity pledge and violation of Hiring Hall Rules. Id. After finding sufficient evidence to prove the plaintiff was not working exclusively as a longshoreman (i.e. his own deposition testimony), and the actions taken by previous Rules Committees which had suspended any member found working outside of the craft, the current Rules Committee determined that it was "bound by this past practice and that it had to be consistent in administering these rules for all members similarly-situated." Id.

Consequently, the plaintiff's suspension was based on substantial evidence and not in violation of the LMRDA. Hardeman, 401 U.S. at 243-244

### IV.    CONCLUSION

For all the forgoing reasons and authority and upon all papers submitted in this action, Locals 805, 800, 799, and the ILA's motion for summary judgment should be granted.

Dated: July 31, 2006

Respectfully submitted,
The Defendant,
By their attorney,

Michael L. Mahoney
Mullen & McGourty
52 Temple Place, 4th Floor
Boston, MA 02111
(617) 338-9200
BBO# 557562

## CERTIFICATE OF SERVICE

I, Michael L. Mahoney, hereby certify that I have served a true copy of the within document this 31 day of July, 2006, via electronic mail and via first class mail, postage prepaid upon the following:

Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450

Michael L. Mahoney