Exhibit A



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

*********************************************

STEPHEN KEEFE,
   Plaintiff

v.

LOCAL 805, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, LOCAL 800, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, and LOCAL 799, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO,
   Defendants

**COMPLAINT**

04 CV 11340 DPW

*********************************************

1.  This is an action for violation of the Union Members Bill of Rights (29 U.S.C. §§411 & 529).

2.  Plaintiff Stephen Keefe is an individual who resides in Green Harbor, Massachusetts.

3.  Defendant Local 805, International Longshoremen's Association, AFL-CIO (hereinafter known as "Local 805") is a labor organization as that term is defined for the purposes of 29 U.S.C. §§411 & 529, being headquartered in East Boston, Massachusetts.

4.  Defendant Local 800, International Longshoremen's Association, AFL-CIO (hereinafter known as "Local 800") is a labor organization as that term is defined for the purposes of 29 U.S.C. §§411 & 529, being headquartered in South Boston, Massachusetts.

5.  Defendant Local 799, International Longshoremen's Association, AFL-CIO (hereinafter known as "Local 799") is a labor organization as that term is defined for the purposes of 29 U.S.C. §§411 & 529, being headquartered in Charlestown, Massachusetts.

6.  Keefe has been a member of the International Longshoremen's Association ("ILA") over the

1

past 23 years.

7. In 1993 Keefe moved to Massachusetts from New Hampshire and became a supervisor in a family-owned business called John T. Clark & Sons, ("JTC"), a stevedore and terminal operator at Conley Terminal in Boston, Massachusetts. In 1998 Massport did not renew the lease of JTC, thereby reducing the amount of family-owned work available to Keefe.

8. Beginning in May, 1998, Keefe reported to the Local 805 hiring hall almost daily for dispatch as a fill-in Longshoreman at the lower end of the seniority roster.

9. On August 10, 1998, Keefe, citing Article XV ("Transfer of Membership") of the ILA Constitution, wrote to Vice-President William P. McNamara and ACD Vice-President Edward Connolly, concerning a transfer of his ILA membership from Local 1947 in Portsmouth, New Hampshire, to Local 805 in East Boston, Massachusetts. Keefe was a member in good standing of Local 1947, and he requested that an official transfer card be supplied to him. Keefe also forwarded from Local 1947 a letter that certified that Keefe was a "paid-up member of I.L.A. Local 1947 in good standing for the past 23 years;" and that there "are no charges against him, nor have their ever been charges against him since he has been a member of Local 1947."

10. Article XV ("Transfer of Membership") of the ILA Constitution provided, at Section 1, that any member in good standing may transfer his membership from one ILA local union to another "provided he is working at the trade covered by the local, and is eligible for membership in and complies with the provisions respecting transfers of the local union to which he seeks to be transferred."

11. In August, 1998, Brother Keefe was a member in good standing of Local 1947 and had no

charges pending against him.

12. Prior to, upon and following Keefe's application for transfer to Local 805, he was working as a Longshoreman in the Port of Boston, namely, within the trade covered by Local 805 and its collective bargaining agreements.

13. On October 15, 1998, Keefe again wrote to Vice-Presidents McNamara and Connolly inquiring about the status of his request for a transfer of membership.

14. By letter dated November 1, 1998, the President and Recording Secretary for Local 805 advised Keefe that at a meeting on September 29, 1998, Keefe's application was considered by Local 805's Executive Board and was referred to the membership body for action. The letter also stated that the members unanimously voted not to accept Keefe's transfer "at this time."

15. In apparent response to a later letter from Keefe, Vice-President McNamara on December 9, 1998, recommended to Local 805 that Keefe's application again be brought before the Executive Board and membership of Local 805 "as soon as possible, ostensibly for reconsideration." Local 805, however, took no action in response to this recommendation.

16. On March 1, 1998, Keefe's attorney, James T. Masteralexis, Esq., wrote to Local 805, requesting reconsideration of its decision not to accept Keefe's transfer. Local 805 took no action in response to this request.

17. When no response was received, Atty. Masteralexis on April 22, 1999, wrote directly to President Bowers of the ILA, contending that Local 805 did not have good and sufficient reasons for denying Keefe's application for transfer.

18. By letter of May 24, 1999, President Bowers requested the President and Business Agent of

Local 805 to immediately provide him in writing the reason for Local 805's rejection of Keefe's transfer application.

19. Local 805's Executive Board shortly thereafter sent a response to President Bowers in which it put forth its contentions for its rejection of Keefe's transfer application.

20. On August 27, 1999, President Bowers advised the officials of Local 805 that after reviewing the reasons set forth by the Local's Executive Board, the International found no sufficient basis for denial of Keefe's transfer. Bowers informed them that the International directed Local 805 to accept Keefe's transfer or, if it failed to comply immediately, that he would bring appropriate disciplinary action against Local 805.

21. Having received no further response from Local 805, President Bowers appointed a Committee to investigate the circumstance of Local 805 denying Keefe's application for a transfer.

22. On December 22, 1999, the Committee appointed by President Bowers found that Local 805 did not have good and sufficient reasons for denying Keefe's application for transfer and recommended that President Bowers give Local 805 until January 15, 2000, to reconsider and accept Keefe's application for membership without qualification.

23. On or about January 15, 2000, Local 805 finally accepted Keefe's application for membership.

24. The ILA Hiring Hall for the port of Boston, Massachusetts, is operated jointly by Local 805, Local 800 and Local 799 by a Rules Committee that has a total of nine members, three members from each of the three Locals.

25. On or about January 15, 2000, the Rules Committee, placed Keefe in Gang 12.

26. At all relevant times there was a gang system at the Hiring Hall. Gang 12 is the lowest and last gang dispatched from the Hiring Hall. Gang 12 by definition consisted of "two jobbers," that is, those Longshoremen who at the same time held second jobs and who did not work exclusively at the Longshore craft.

27. Like other Gang 12 members, Keefe held another "job" during this period, namely Keefe had a "job" at JTC, a family owned business. During this period, four persons worked at JTC, Keefe and his two brothers -- Timothy and Joseph -- along with a William Horohoe.

28. During this period Keefe had no specific duties; to earn his "salary" all Keefe had to do was to make himself available if JTC needed him. His only specific assignment was to try to develop a work history on the waterfront in order for JTC to better position itself if it had any consulting work to do.

29. On or about October 1, 2000, the Rules Committee placed Keefe in Gang 11.

30. On or about February 1, 2001, Keefe, brought suit in United States District Court, District of Massachusetts, against Local 805, Local 800 and Local 799, C.A. No. 01-10194, alleging, inter alia, that by not accepting Keefe's application for membership on or near August 10, 1998, the Locals breached Article XV of the ILA Constitution and caused Keefe to lose substantial income and benefits.

31. In October, 2002, Keefe move into Gang 10.

32. On January 7, 2003, Keefe was deposed by counsel for the Local 805, Local 800 and Local 799 in the above referenced case. At that time counsel for Local 805, Local 800 and Local 799 examined Keefe with regard to the fact that during 2001 Keefe had received income from JTC.

33. In February, 2003, the Rules Committee held a meeting about Keefe's Gang status without ever informing Keefe. The Rules Committee suspended Keefe for six months and put him back in Gang 12 for supposedly having another job. Keefe continues to have another income from JTC, not another job, and the Rules Committee members know this.

34. In March, 2003, the Rules Committee held another meeting. Upon information and belief, the Rules Committee did this after being advised that it could not had a meeting without notifying Keefe. This time the Committee voted 5 to 3 to put Keefe back in Gang 10 after a 60 day suspension. Again the supposed rationale was that Keefe had another job with JTC.

35. The Rules Committee held a third meeting later in March, 2003. Keefe was not given any notice of this meeting. Upon information and belief this meeting was called at a time when persons who had voted previously for Keefe would be out of town. The Rules Committee against suspended Keefe for 6 months and put him back in Gang 12.

36. Members of the Rules Committee, including the current Chairman of the Rules Committee and his relatives, have other jobs and incomes (such as family business, rental income, pensions and cash paying jobs) while still enjoying the benefits of Gangs 1-9.

37. Other Union members have other jobs and incomes (such as family business, rental income, pensions and cash paying jobs) while still enjoying the benefits of Gangs 1-9.

38. The Rules Committee suspended Keefe and put him back in Gang 12 in retaliation for Keefe having brought suit against the Local 805, Local 800 and Local 799 to force them to accept his application for membership and pay for his damages.

39. The Rules Committee disciplined Keefe without serving him with written specific charges,

giving him a reasonable time to prepare his defense, and affording him a full and fair hearing.

40. Keefe has been damaged financially by being suspended and by being put back in Gang 12.

## Count I

41. By suspending Keefe and placing him back in Gang 12, Local 805 violated 29 U.S.C. §§411(a)(4) and 529.

## Count II

42. By suspending Keefe and placing him back in Gang 12, Local 800 violated 29 U.S.C. §§411(a)(4) and 529.

## Count III

43. By suspending Keefe and placing him back in Gang 12, Local 799 violated 29 U.S.C. §§411(a)(4) and 529.

## Count IV

44. By disciplining Keefe without serving him with written specific charges, giving him a reasonable time to prepare his defense, and affording him a full and fair hearing, Local 805 violated 29 U.S.C. §§411(a)(5) and 529.

## Count V

45. By disciplining Keefe without serving him with written specific charges, giving him a

reasonable time to prepare his defense, and affording him a full and fair hearing, Local 800 violated 29 U.S.C. §§411(a)(5) and 529.

### Count VI

46. By disciplining Keefe without serving him with written specific charges, giving him a reasonable time to prepare his defense, and affording him a full and fair hearing, Local 799 violated 29 U.S.C. §§411(a)(5) and 529.

**WHEREFORE** plaintiff demands:

    A. Judgment against the defendants;

    B. An order directing Local 805, Local 800 and Local 799 to place Keefe within Gang 10;

    C. All lost moneys and benefits;

    D. Compensatory damages;

    E. Punitive damages;

    F. Attorney's fees;

    G. Interest and costs; and

    H. Any other remedy this Court deems meet and just.

Stephen Keefe
By his attorney

*Scott A. Lathrop*

Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

Dated:   June 16, 2004

PLAINTIFF DEMANDS A JURY TRIAL