7:5
82-89

# In The Matter Of:

*Stephen Keefe   v.*
*Local 805, et al*

---

*Stephen Keefe*
*February 6, 2002*

---

*O'Brien & Levine Court Reporting Services*
*1287 Commonwealth Avenue*
*Boston, MA  02134*

Original File 1-670.ASC, 98 Pages
Min-U-Script® File ID: 0488994355

**Word Index included with this Min-U-Script®**

Stephen Keefe v. Local 805, et al
Case 1:04-cv-11340-DPW    Document 24-4    Filed 08/25/2006    Page 2 of 18
Stephen Keefe
February 6, 2002

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No.: 01CV10194DPW

STEPHEN KEEFE,
    Plaintiff,
vs.
LOCAL 805, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO,
LOCAL 800, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO,
and LOCAL 799, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO,
    Defendants.

DEPOSITION OF STEPHEN KEEFE, a witness called on behalf of the Defendant pursuant to the Massachusetts Rules of Civil Procedure, before Mary P. Peacock, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts at the offices of Angoff, Goldman, Manning, Wanger & Hynes 24 School Street, Boston, Massachusetts, on February 6, 2002, commencing at 10:05 a.m.

## Page 2

APPEARANCES:
ANGOFF, GOLDMAN, MANNING, WANGER & HYNES
24 School Street
Boston, Massachusetts 02108
617-723-5500
BY: JOHN MCMAHON, ESQ.

SCOTT A. LATHROP & ASSOCIATES
122 Old Ayer Road
Groton, Massachusetts 01450
978-448-8234
BY: SCOTT A. LATHROP, ESQ.

ALSO PRESENT:
James Langan, Jr.

## Page 3

INDEX

| Witness | Page |
|---|---|
| STEPHEN KEEFE | |
|   By Mr. McMahon: | 6 |

## Page 4

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | Notes | 5 |
| 2 | Letter Dated 8/10/98 | 5 |
| 3 | Letter Dated 10/16/98 | 5 |
| 4 | Letter Dated 11/16/98 | 5 |
| 5 | Letter Dated 11/1/98 | 5 |
| 6 | Letter Dated 12/7/98 | 5 |
| 7 | Letter Dated 3/1/99 | 5 |
| 7A | Letter Dated 4/22/99 | 5 |
| 8 | Letter Dated 12/28/99 | 5 |
| 9 | Letter Dated 5/7/00 | 5 |
| 10 | Letter Dated 5/16/00 | 5 |
| 11 | Letter Dated 5/24/00 | 5 |
| 12 | Certifications | 6 |
| 13 | Hiring Hall Work Rules | 5 |
| 14 | Letter Dated 5/24/00 | 5 |
| 15 | Letter Dated 1/8/02 | 5 |
| 16 | Complaint | 5 |
| 17 | Letter Dated 11/1/01 | 5 |
| 18 | Letter Dated 8/6/00 | 62 |

(THE ORIGINAL EXHIBITS ARE PROVIDED IN THE ORIGINAL TRANSCRIPT.)

## Page 5

[1] PROCEEDINGS
[2] (Exhibit No. 1 through 17 [3] marked for identification.)
[4] MR. MCMAHON: Reserve all motions except [5] objections as to form and objections as to the [6] attorney-client privilege.
[7] MR. LATHROP: Well, that would be —
[8] that's fine, and motions to strike will be reserved [9] until the time of trial.
[10] MR. MCMAHON: Okay.
[11] MR. LATHROP: I would like also to do the [12] waiving the notary and signing under the pains and [13] penalties of perjury.
[14] MR. MCMAHON: Waive before a notary but we [15] will not waive the reading and the signing.
[16] MR. LATHROP: I meant to say that my [17] client will sign it under the pains and penalties of [18] perjury as opposed to signing it in front of a [19] notary.
[20] MR. MCMAHON: Yes.
[21] MR. LATHROP: Thank you very much. [22] Anything else?
[23] MR. MCMAHON: Yes, what about the time for [24] presentation —

## Page 6

[1] MR. LATHROP: We had stipulated in the [2] depositions I took on Monday that if the deponent [3] does not read and sign it within forty-five days of [4] presentation that the signing and reading will be [5] deemed automatically waived.
[6] So once I send it to you you have to read and [7] sign it quickly.
[8] Anything else?
[9] MR. MCMAHON: That's it.
[10] STEPHEN KEEFE, the witness, [11] having been duly cautioned and sworn, testified upon [12] his oath as follows:
[13] EXAMINATION BY MR. MCMAHON:
[14] Q: State your name, please.
[15] A: Steven Keefe.
[16] Q: And your address?
[17] A: Post Office Box 726, Green Harbor, Massachusetts.
[18] Q: And your age, sir?
[19] A: Fifty.
[20] Q: Your education?
[21] A: High school and two years of college.
[22] Q: Did you have any military service?
[23] A: No.
[24] Q: Have you ever been convicted of a crime?

## Page 7

[1] A: Yes.
[2] Q: When?
[3] A: 1986, I think.
[4] Q: And what was the offense?
[5] A: Conspiracy.
[6] Q: And what was the nature of the conspiracy?
[7] A: Conspiracy to defraud the government.
[8] Q: And what Court?
[9] A: U.S. District Court, Bangor, Maine.
[10] Q: Were you incarcerated?
[11] A: Yes.
[12] Q: How long?
[13] A: Five years.
[14] Q: What was the nature of the, quote, defrauding the [15] government, unquote?
[16] A: Smuggling marijuana.
[17] Q: Tell me about your employment from 1980 until the [18] present time.
[19] A: I have been employed by John T. Clark.
[20] Q: And did you work for John T. Clark in Portsmouth, New [21] Hampshire?
[22] A: Yes.
[23] Q: And what years?
[24] A: '76 to the present.

## Page 8

[1] Q: What is John T. Clark?
[2] A: A stevedore, terminal operators.
[3] Q: At one point did John T. Clark own a terminal?
[4] A: No.
[5] Q: Did it lease a terminal?
[6] A: Yes.
[7] Q: What terminal?
[8] A: Connolly Terminal.
[9] Q: And is that in South Boston?
[10] A: Yes.
[11] Q: Did you work as a time keeper in Portsmouth for [12] John T. Clark?
[13] A: Yes.
[14] Q: And you are a member of ILA Local 1947 while employed [15] as a time keeper at John T. Clark?
[16] A: Yes.
[17] Q: Now, at some time did you come to work for John T. [18] Clark as a supervisor?
[19] A: Yes.
[20] Q: When did you do that, sir?
[21] A: Around '96 to '98.
[22] Q: Was John T. Clark Company a Keefe family-owned [23] business?
[24] A: I don't know.

## Page 9

[1] Q: Were there any other members of your family employed [2] by John T. Clark while you were employed?
[3] A: Yes.
[4] Q: And which members of your family?
[5] A: My brother Timmy and Joe.
[6] Q: And in what positions were they employed?
[7] MR. LATHROP: What period of time?
[8] MR. MCMAHON: I'm talking about the period [9] 1996 to 1998.
[10] A: What is there —

Stephen Keefe
February 6, 2002
Case 1:04-cv-11340-DPW   Document 24-4   Filed 08/25/2006   Page 3 of 18
Stephen Keefe v.
Local 805, et al

[11] Q: What were their positions?
[12] A: One would be Vice President, I think, and the other [13] one would be Vice President.
[14] Q: Both Vice Presidents?
[15] A: Yes.
[16] Q: Were you ever a corporate officer in John T. Clark?
[17] A: No.
[18] MR. LATHROP: Could I suggest to the [19] witness that you have to always answer verbally and [20] do not answer by motions.
[21] If you have a question about your answer the [22] court reporter can only record your verbal answers.
[23] I'm sorry, go ahead.

Page 10

[1] BY MR. MCMAHON:
[2] Q: Also if you wish to consult with counsel about my [3] questions if they are unclear, feel free. Be [4] comfortable. All right?
[5] A: Yes.
[6] Q: What were your duties at John T. Clark in the period [7] 1996 to 1998?
[8] A: Supervisory work.
[9] Q: And who did you supervise?
[10] A: Longshoremen.
[11] Q: Did you work on the ships on the dock?
[12] A: Mm-hm.
[13] MR. LATHROP: When I suggest that you [14] verbally say "yes" then whatever it is — however you [15] phrase that, again, so there is no confusion on the [16] record as to the nature of your response.
[17] A: Okay.
[18] Q: Now, at some time did the relationship between the [19] Massachusetts Port Authority and John T. Clark [20] change?
[21] A: Yes.
[22] Q: Would you describe the change in that relationship?
[23] A: I'm not privy to that. I don't know.
[24] Q: As a result of that change in the relationship

Page 11

[1] between John T. Clark and Mass. Port were you laid [2] off from John T. Clark?
[3] A: No.
[4] Q: Do you still work for John T. Clark in any capacity [5] other than a longshoreman?
[6] A: Yes.
[7] Q: In what capacity do you work for John T. Clark [8] presently in any capacity other than as a [9] longshoreman?

[10] A: Do payrolls.
[11] Q: Tell us what you mean by "doing payrolls."
[12] A: When the payroll comes up I put — I turn the [13] computer on and put the hours in the computer.
[14] Q: Is that a job within the bargaining units of Local [15] 805, 800 and 799?
[16] A: Not that I know.
[17] Q: Are you paid for that work?
[18] A: Yes.
[19] Q: And have you done that work continuously from 1998 to [20] the present time?
[21] A: No.
[22] Q: When did you cease doing that?
[23] A: I would say eighteen months ago.
[24] Q: So you are not currently performing any work other

Page 12

[1] than long-shore work for John T. Clark. Is that [2] correct?
[3] A: Yes.
[4] Q: Are your brothers Tim and Joe still employed at John [5] T. Clark?
[6] A: Yes.
[7] Q: And are they employed in the same capacity that they [8] were previously employed as Vice Presidents?
[9] A: My brother is sick. He hasn't been to work in — I [10] don't know how long.
[11] Q: I'm sorry to hear that.
[12] A: And my other brother is in the office, yes.
[13] Q: Who is Mr. Horohoe?
[14] A: He was President of John T. Clark.
[15] Q: Is he currently the President?
[16] A: I think he's retired.
[17] Q: Who is the President of John T. Clark now?
[18] A: I don't know.
[19] Q: Now, in May of 1998, approximately, did you begin to [20] report to the ILA Hiring Hall?
[21] A: Yes.
[22] Q: For dispatch as a casual longshoreman?
[23] A: Yes.
[24] Q: Did you keep notes of each time that you reported?

Page 13

[1] A: A lot of times I did.
[2] Q: Did you examine any documents in preparation for your [3] deposition today?
[4] MR. LATHROP: I assume you mean other than [5] documents that may have been generated by myself.

[6] BY MR. MCMAHON:
[7] Q: Other than documents that would have been generated [8] by Mr. Lathrop.
[9] A: No.
[10] Q: Did you review any documents which were generated by [11] Mr. Lathrop?
[12] A: Yes.
[13] Q: Without describing the content of the documents would [14] you describe the nature of those documents?
[15] MR. LATHROP: I would feel more [16] comfortable if I would offer the stipulation that I [17] presented my client with documents pertaining to [18] standard depositions unrelated to this case.
[19] MR. MCMAHON: So stipulated.
[20] BY MR. MCMAHON:
[21] Q: Mr. Keefe, is this an example of the kinds of notes [22] or the type of note that you maintained beginning on [23] or about May of 1998 when you went to the hiring —
[24] MR. LATHROP: "This" being Exhibit 1?

Page 14

[1] MR. MCMAHON: Deposition Exhibit 1.
[2] A: Yes.
[3] Q: Now, the first entry, "June 16, 1998, not hired [4] nonunion person before me relatives before union [5] members."
[6] Now, you were a member of Local 1947. [7] On June 16th did you believe that your [8] membership in Local 1947 entitled you to a priority [9] in hiring?
[10] A: No.
[11] Q: Let me ask you to look at the second page of [12] Deposition Exhibit 1.
[13] A: (Witness complying.)
[14] Q: And a note, July 29, 1998, who was Mr. Swales?
[15] A: He was a delegate for the Union.
[16] Q: Is he now deceased?
[17] A: Yes.
[18] Q: The note says you argued with who, Kevin Manning?
[19] A: Yes.
[20] Q: And you argued your point that, "I am in the Union."
[21] A: Yes.
[22] Q: Did you believe that your membership in ILA Local [23] 1947 entitled you to go out before any other nonunion [24] member?

Page 15

[1] A: Yes.
[2] Q: Now, that note is dated July 29, 1998. What action [3] did you take after July 29, 1998 with respect to your [4]

Stephen Keefe v.
Local 805, et al.
Case 1:04-cv-11340-DPW    Document 24-4    Filed 08/25/2006    Page 4 of 18
Stephen Keefe
February 6, 2002

membership in any ILA Local Union?

[5] A: I don't recall.

[6] (Exhibit No. 2 Marked [7] For Identification.)

[8] BY MR. MCMAHON:

[9] Q: Mr. Keefe, did you send such a letter to Mr. McNamara [10] and Mr. Edward Cummings?

[11] A: Yes.

[12] MR. LATHROP: Could we — with all due [13] respect, could we identify this is Exhibit 2 you [14] presented to him?

[15] MR. MCMAHON: Deposition Exhibit 2, a [16] letter dated August 10, 1998 to Mr. William McNamara [17] and Mr. Edward Connolly.

[18] BY MR. MCMAHON:

[19] Q: And that letter requested a transfer card, is that [20] not so, pursuant to the ILA constitution?

[21] A: Yes.

[22] Q: And the third paragraph also requests that [23] Mr. McNamara and Connolly notify the dispatchers at [24] the ILA Hiring Hall, 496 Summer Street, Boston,

Page 16

[1] Massachusetts 02210, that I am an ILA union member [2] and as such I should be hired prior to non ILA union [3] persons to fill in jobs out of the Hiring Hall on a [4] daily basis.

[5] A: Yes.

[6] MR. LATHROP: Actually that's the 4th [7] paragraph, is it not?

[8] MR. MCMAHON: 4th paragraph, I'm sorry.

[9] BY MR. MCMAHON:

[10] Q: Was that the subject of your dispute with Kevin [11] Manning on July 28th and July 29th?

[12] A: No.

[13] Q: Did Kevin Manning tell you it didn't matter that you [14] were a member of ILA Local 1947?

[15] A: I don't recall what he said.

[16] Q: Did you receive a response from either Mr. McNamara [17] or Mr. Connolly to your August 10th letter?

[18] A: Yes.

[19] Q: What was the date of that response?

[20] A: I don't recall.

[21] (Brief break.)

[22] (Exhibit No. 3 marked [23] for identification.)

Page 17

[1] BY MR. MCMAHON:

[2] Q: Mr. Keefe, I show you a letter dated October 15, 1998 [3] which has been marked as Deposition Exhibit 3. Is [4] that your signature?

[5] A: Yes.

[6] Q: And you sent that letter to Messieurs McNamara and [7] Connolly?

[8] A: Yes.

[9] Q: And, again, the last sentence reminds Messieurs [10] McNamara and Connolly of your request to notify the [11] dispatchers at the ILA Hiring Hall that, "I am an [12] International Longshoremen's Association Union Member [13] and as such I should be hired prior to non ILA union [14] persons for fill in jobs out of the Hiring Hall on a [15] daily basis." Did I read that correctly?

[16] A: Yes.

[17] Q: And the last sentence of the third paragraph reads, [18] in part, "I would again request your cooperation in [19] instructing the dispatchers at the Hiring Hall that I [20] am a member of the International Longshoremen's [21] Association, (ILA,) and accordingly I should be hired [22] prior to non ILA Union persons to fill in jobs on a [23] daily basis."

[24] A: Yes.

Page 18

[1] Q: Now, you made that request to these gentlemen in your [2] August 10, 1998 letter, and again in your October 15, [3] 1998 letter.

[4] Would you explain to me the basis for your claim [5] that you're entitled to a priority over all other [6] persons?

[7] MR. LATHROP: Objection as to the form of [8] the question.

[9] You may answer if you can.

[10] A: Say the question again?

[11] Q: Let me try to rephrase it.

[12] You told — you asked Mr. McNamara and [13] Mr. Connolly on two occasions, on October 10, 1998, [14] and again on October 15, 1998, that they instruct the [15] dispatchers that you should be hired prior to any non [16] ILA member to fill in on daily jobs. Am I correct on [17] that?

[18] A: Yes.

[19] Q: Now, I want to know the reason that was your — [20] strike that.

[21] I want to know the basis for your insistence [22] that they notify the dispatchers that you were an ILA [23] member and were to be given priority over non ILA [24] members in the dispatching of jobs.

Page 19

[1] A: I'm a dues-paying member.

[2] Q: Of Local 1947?

[3] A: Yes.

[4] Q: Is there any document anywhere that you can identify [5] that said as a member of Local 1947 you were entitled [6] to priority over non ILA members, persons not members [7] of any ILA local when dispatching fill-ins?

[8] A: Say that again?

[9] Q: What is the basis for your claim that you were [10] entitled to this priority as a member of Local 1947 [11] to a priority over non ILA members in dispatching [12] jobs from hiring them?

[13] MR. LATHROP: I'll object to the form of [14] the question.

[15] A: I'm a dues-paying member.

[16] Q: So in your own mind the fact that you were paying [17] dues to Local 1947 entitled you to be dispatch over [18] nonunion persons using the services of the Hiring [19] Hall?

[20] A: Yes.

[21] Q: Did you ever receive a response to your letters of [22] August 10th and October 15th, 1998?

[23] A: From —

[24] Q: Either Mr. McNamara or Mr. Connolly?

Page 20

[1] A: I think I did, but I don't know where they are.

[2] Q: This is 4.

[3] A: (Witness complying.)

[4] Q: Mr. Keefe, I show a letter dated November 18, 1998 [5] which has been marked as Deposition Exhibit 4.

[6] Did you receive that letter?

[7] A: Yes.

[8] MR. LATHROP: Attorney McMahon, can I ask [9] a question about this?

[10] MR. MCMAHON: Sure.

[11] MR. LATHROP: The document itself [12] references certain other letters attached. Do you [13] have those letters?

[14] MR. MCMAHON: I have them. I did not make [15] them part of the exhibit, but I would be happy to [16] present copies to you.

[17] MR. LATHROP: But can we just stipulate [18] that therefore at least according to the face of the [19] letter that it is not a complete document in the [20] sense of the document that was sent to Mr. Keefe?

[21] MR. MCMAHON: That's correct.

[22] MR. LATHROP: Okay, thank you.

[23] BY MR. MCMAHON:

[24] Q: Now let's go to the 4th Paragraph.

Page 21

[1] A: (Witness complying.)

[2] Q: Mr. McNamara explained here — explained to you what [3] Mr. Manning had told him about Manning's refusal to [4] dispatch you out of the hall based on

your 19 — [5] Local 1947, am I correct?
[6] A: Yes.
[7] Q: Now, for many years prior to your appearance on or [8] about May of 1998 were non ILA members being [9] dispatched out of the Hiring Hall?
[10] MR. LATHROP: If he knows.
[11] BY MR. MCMAHON:
[12] Q: If you know.
[13] A: I don't know that.
[14] Q: Well, you prepared the payroll you told us at John T. [15] Clark during the period of, say, 1996 to 1998.
[16] A: Yes.
[17] Q: And is that payroll divided into ILA members and [18] casual longshoremen who are not ILA members?
[19] A: No.
[20] Q: When you went to the hall for the first time in April [21] of 1998 were there other ILA — strike that — other [22] nonunion people who were using the services of the [23] hall?
[24] MR. LATHROP: Object to the form of the

Page 22

[1] question.
[2] A: Yes.
[3] Q: So there were other nonunion persons who came to the [4] hall looking for work?
[5] A: Yes.
[6] Q: And they had been coming for some time, isn't that [7] true?
[8] MR. LATHROP: If he knows.
[9] A: I don't know that.
[10] Q: So the first day you showed up at the Hiring Hall [11] there were other nonunion individuals looking for [12] work?
[13] A: Yes.
[14] Q: And that was the first day they showed up?
[15] MR. LATHROP: How would he know?
[16] A: I don't know that.
[17] Q: Mr. Keefe, I show you a letter which is dated [18] November 1, 1998 and addressed to Messieurs McNamara [19] and Connolly. Did you receive a copy of that letter?
[20] A: I think I did.
[21] Q: And did you receive it as an attachment to Deposition [22] Exhibit 3 — I'm sorry, Deposition Exhibit No. 4?
[23] A: I think so.
[24] Q: Mr. Keefe, I show you a letter dated December 7, 1998

Page 23

[1] addressed to Mr. William McNamara which has been [2] marked as Deposition Exhibit No. 6.
[3] Is that your signature?
[4] A: Yes.
[5] Q: And you were disputing the reasons given for Local [6] 805's rejection. Am I correct?
[7] A: Yes.
[8] Q: Did you engage counsel to pursue your application for [9] a transfer to Local 805?
[10] A: Yes.
[11] Q: And was that Attorney James Masteralexis?
[12] A: Yes.
[13] Q: When did you engage Attorney Masteralexis?
[14] A: I don't remember the exact date.
[15] Q: Have you seen a copy of this document previously?
[16] A: Which one are we talking about?
[17] Q: Deposition Exhibit No. 7.
[18] A: Yes.
[19] Q: If you look at Page 2 it refers to a late February [20] 1999 date in late February. Is that February of 1999 [21] when Mr. Keefe hired Attorney Masteralexis to pursue [22] the matter?
[23] MR. LATHROP: I'm sorry, where are you [24] looking?

Page 24

[1] MR. MCMAHON: Right here.
[2] MR. LATHROP: You're actually looking at a [3] different document than what we have in front of us.
[4] MR. MCMAHON: I apologize.
[5] MR. LATHROP: That's the document that we [6] have in front of us, Exhibit 7, and that is a letter [7] from James T. Masteralexis, that's why I think we're [8] looking for that reference to our February date and [9] couldn't find it on Exhibit 7, so —
[10] MR. MCMAHON: Thank you.
[11] BY MR. MCMAHON:
[12] Q: Now, Mr. Masteralexis is disputing the reasons given [13] to Local 805 for rejecting your membership. Am I [14] correct?
[15] A: Yes.
[16] Q: Now, the last paragraph of Attorney Masteralexis' [17] letter refers to an appeal pursuant to Article 19 of [18] the constitution and then actions at both the [19] National Labor Relations Board or Federal Court, am I [20] correct?
[21] MR. LATHROP: It's actually the next to [22] the last paragraph.
[23] MR. MCMAHON: You're right.
[24] A: Yes.

Page 25

[1] Q: You were aware as of March 1, 1999 that there were [2] issues arising under the National Labor Relations Act [3] pertaining to your request for a transfer from Local [4] 1947 to Local 805, weren't you?
[5] MR. LATHROP: Objection to the form of the [6] question.
[7] A: What issues? I don't understand.
[8] Q: Well, Mr. Masteralexis refers to actions of the [9] National Labor Relations Board, you received a copy [10] of this letter, am I correct?
[11] A: Yes.
[12] Q: And I take it that that letter would have alerted you [13] that you had a potential claim at the National Labor [14] Relations Board?
[15] MR. LATHROP: Objection to the form of the [16] question.
[17] A: I don't have a claim at the National Labor Relations [18] Board.
[19] Q: Listen to me very carefully.
[20] Did this letter refer to a claim potentially at [21] the National Labor Relations Board?
[22] MR. LATHROP: I'm going to object. I [23] don't want to have to object.
[24] Obviously he didn't know Mr. Masteralexis'

Page 26

[1] intent, but Mr. Keefe can testify as to his [2] understanding as to what that phrase means.
[3] MR. MCMAHON: All right, that's a very [4] good way of putting it, Scott.
[5] Let me ask you for your understanding of the [6] phrase "then actions at both the National Labor [7] Relations Board or Federal Court."
[8] A: I don't know what he is getting at.
[9] Q: But one of the issues that — strike that.
[10] One of the circumstances that led you to apply [11] to Local 805 was to get a priority in dispatching out [12] of the hall, isn't that correct?
[13] MR. LATHROP: Objection to the form.
[14] A: No.
[15] Q: Why did you want to apply to Local 805 as opposed to [16] Local 800 or Local 799?
[17] A: Just picked Local 805.
[18] MR. LATHROP: I'm sorry, what did you say?
[19] A: I just picked 805.
[20] Q: Is your brother a member of one of the local unions?
[21] A: Yes.

Stephen Keefe v.
Local 805 et al
Case 1:04-cv-11340-DPW    Document 24-4    Filed 08/25/2006    Page 6 of 18
Stephen Keefe
February 6, 2002

[22] Q: And which brother and which local?
[23] A: Timmy, and he is —
[24] Q: Is that Local 800?

Page 27

[1] A: South Boston Local.
[2] Q: That's Local 800, isn't it?
[3] A: Yes.
[4] (Exhibit No. 7A marked [5] for identification.)
[6] Q: Mr. Keefe, I show you a letter dated April 22, 1999 [7] which has been marked as Deposition Exhibit No. 7A.
[8] Have you previously seen a copy of that letter?
[9] A: Yes.
[10] Q: And were you cc'd on that letter, or blank cc'd, or [11] blind copied?
[12] A: Yes.
[13] Q: Can you turn to Page 3.
[14] A: (Witness complying.)
[15] MR. LATHROP: Sorry, what page?
[16] MR. MCMAHON: Page 3.
[17] A: (Witness complying.)
[18] Q: Were the contents of the last paragraph on Page 3 [19] beginning in 1993 accurate as of April 22, 1999?
[20] MR. LATHROP: I'm sorry, could I have that [21] again? I didn't hear you.
[22] What was your question?
[23] BY MR. MCMAHON:
[24] Q: Are the contents of the last paragraph beginning in

Page 28

[1] 1993 "Keefe began working as a supervisor, etcetera, [2] in his family-owned business, John T. Clark & Sons at [3] Connolly terminal."
[4] MR. LATHROP: To the extent he knows.
[5] BY MR. MCMAHON:
[6] Q: Are they accurate to the extent that you know?
[7] A: Yes.
[8] Q: Now, the first sentence refers to "family-owned [9] business." Does that help you in responding to my [10] earlier question as to whether John T. Clark was a [11] family-owned business?
[12] A: What are you asking me?
[13] Q: Was it a family-owned business?
[14] A: I don't know.
[15] Q: But you just told me that the paragraph which I asked [16] you to read was accurate.
[17] MR. LATHROP: To the extent he knew.
[18] BY MR. MCMAHON:
[19] Q: To the extent you know.
[20] MR. LATHROP: But he says he doesn't know [21] this one.
[22] BY MR. MCMAHON:
[23] Q: But Mr. Masteralexis apparently knew that it was a [24] family-owned business —

Page 29

[1] A: What's the question?
[2] Q: There is no question in front of you.
[3] It refers to, "Because of the virtue of [4] elimination of his job at John T. Clark Keefe began [5] going to Local 805 Hiring Hall in May of 1998. Keefe [6] often would be selected for work but often nonunion [7] members were hired instead of Keefe."
[8] Did you understand that to reflect your [9] complaint to Mr. Manning on July 29th of 1998 that [10] you had a priority as a member of Local 1947 over all [11] other people who were not ILA members?
[12] MR. LATHROP: Objection.
[13] BY MR. MCMAHON:
[14] Q: If he dispatched from the hall?
[15] MR. LATHROP: Objection to the form.
[16] A: Could you state that again, please?
[17] Q: The sentence reads, "Keefe often would be selected [18] for work but often nonunion members were hired [19] instead of Keefe."
[20] Now, you believed that as a member of Local [21] 1947 ILA you were entitled to a priority over all non [22] ILA members using the services of the Hiring Hall for [23] jobs in the port of Boston. Am I correct?
[24] A: Priority?

Page 30

[1] Q: Yes.
[2] A: No.
[3] Q: A preference? Did you believe if they were non ILA [4] members present at the hall that you as a member of [5] Local 1947 should be dispatched, i.e., given a job [6] before nonunion members?
[7] A: As a dues-paying member —
[8] Q: Yes.
[9] A: I should have went to work.
[10] Q: And Mr. Masteralexis said it's consistant that as a [11] dues-paying member you should have gone to work, is [12] that correct?
[13] A: Yes.
[14] Q: Now, at the time, we're going back, now, staying with [15] Deposition Exhibit No. 7A, to May of 1998, when you [16] began reporting to the hall looking for work were you [17] aware at that time of the gang system at the Hiring [18] Hall?
[19] A: Yes.
[20] Q: You were aware that there was a Gang 12?
[21] A: My first — no, not my first time there, no.
[22] Q: Did you become aware that there was a Gang 12, 11, [23] and 10?
[24] A: Yes.

Page 31

[1] Q: And did you become aware of the Gangs 1 through 9 [2] that rotated when work was available?
[3] A: Yes.
[4] Q: Did you understand that the Gang 12 consisted of the [5] so called two jobers?
[6] A: Yes.
[7] Q: And by "two jobers" I mean members of Local ILA 805, [8] Local 800, and Local 799 who did not work exclusively [9] at the long shore craft?
[10] A: Yes.
[11] Q: You know, for example, there might be a Boston Fire [12] Fighter who was a member of one of the three locals [13] and worked his Boston fire job and also worked out of [14] the hall. Are you aware of such a person?
[15] A: Say that again?
[16] Q: Are you aware of such a person that fits the [17] description of what I gave you?
[18] A: Yes.
[19] Q: And is he still in Gang 12?
[20] A: I don't know.
[21] Q: What is his name?
[22] A: I don't know.
[23] Q: But you are aware that there is a Boston Fire [24] Fighter —

Page 32

[1] A: I'm aware that there are people that have two jobs.
[2] Q: And have they been working out of the hall longer [3] than you have as a gang — as Gang 12 members?
[4] MR. LATHROP: His understanding?
[5] A: I don't know.
[6] Q: You don't know.
[7] I'm going to take just a moment to look at [8] something.
[9] MR. LATHROP: Sure.
[10] (Brief break.)
[11] BY MR. MCMAHON:
[12] Q: Mr. Keefe, do you know a Daniel F. Hurley?
[13] A: I know who he is.
[14] Q: Do you know what gang he is in?

[15] A: No.
[16] Q: Was he working at the port out of the Hiring Hall [17] prior to May of 1998, if you know?
[18] A: I don't know that.
[19] Q: Mr. Keefe, I show you what is marked as Deposition [20] Exhibit No. 8.
[21] A: (Witness complying.)
[22] Q: It is a letter dated December 28, 1999 signed by an [23] Edward L. Brown, Sr.
[24] A: Yes.

Page 33

[1] Q: Did you receive a copy of that letter and its [2] attachment?
[3] A: Yes.
[4] Q: Are you familiar with the contents of the attachment?
[5] A: Yes.
[6] Q: To the best of your knowledge today are the contents [7] accurate?
[8] MR. LATHROP: Object to the form.
[9] MR. MCMAHON: Well, I'll rephrase it.
[10] MR. LATHROP: You're talking about a [11] document that is —
[12] A: I would have to go over it.
[13] MR. LATHROP: — thirteen pages in length.
[14] MR. MCMAHON: Take time to go over it.
[15] A: (Witness complying.)
[16] MR. LATHROP: I would assume the same to [17] the extent that he knows?
[18] MR. MCMAHON: To the extent that he [19] knows.
[20] A: Yes.
[21] Q: So it is accurate?
[22] A: Yes.
[23] Q: I would like you to turn to Page 8.
[24] A: (Witness complying.)

Page 34

[1] Q: And it reads in part — by the way, what is this [2] document?
[3] MR. LATHROP: I take it you're referencing [4] the attachment?
[5] MR. MCMAHON: The attachment.
[6] A: I don't know.
[7] Q: Okay.
[8] A: The committee's report.
[9] Q: Findings and recommendations of an ILA Committee [10] appointed by President Bowers to determine the issue [11] of your application to Local 805 and Local 805's [12] refusal to accept the transfer?
[13] A: Yes.
[14] Q: Am I correct?
[15] A: Yes.

[16] Q: Now, if you turn to Page 8 it reads in part, "In this [17] respect it was stated and Brother Keefe acknowledged [18] that he was credited with 949 hours of work during [19] the 1998 contract year, a figure which conceivably [20] may have exceeded those obtained by some members of [21] Local 805 and of other locals in the area. In fact, [22] you did receive 900 — you were — a credit of 949 [23] hours of work?
[24] A: Yes.

Page 35

[1] Q: And did that give you a year of port seniority, if [2] you know?
[3] A: At that time?
[4] Q: Yes.
[5] A: No.
[6] Q: How many years of port seniority are you currently [7] credited for as of today?
[8] A: Three, I think.
[9] Q: So if you're credited with three can't we surmise [10] that in 1999 you worked sufficient hours to get one [11] year of port seniority?
[12] A: At the time that this was written?
[13] Q: Yes.
[14] A: No, because I hadn't gotten my transfer yet.
[15] Q: But you still had port seniority based on 949 hours?
[16] A: No.
[17] Q: I would like you to turn to what is Page 13 on the [18] attachment.
[19] A: (Witness complying.)
[20] MR. LATHROP: May I suggest there are [21] multiple Page 13's?
[22] MR. MCMAHON: Yes, they are the signatures [23] of the members of the committee.
[24] MR. LATHROP: To be clear, which one are

Page 36

[1] you referring to?
[2] MR. MCMAHON: Pick any one of them or all [3] of them.
[4] MR. LATHROP: Can we agree we will look at [5] the first one, the unsigned one?
[6] MR. MCMAHON: And that is an exact copy of [7] the assigned ones.
[8] MR. LATHROP: I would assume so, but I [9] haven't gone through it.
[10] I'm sorry, you have a question?
[11] MR. MCMAHON: Yes, I'll pose the question [12] now.
[13] BY MR. MCMAHON:
[14] Q: Finding a Recommendation 3, "Irrespective of whether [15] Brother Keefe's application goes forward in [16] accordance with recommendations 1 and 2 above that [17] his additional demand for "priority" or "preference," [18] in hiring over nonunion members, including on basis [19] of his past record of employment as a [20] longshoremen-member of Local 1947, be rejected, and [21] the committee so recommended."
[22] MR. LATHROP: Is there a question?
[23] BY MR. MCMAHON:
[24] Q: Yes, did the committee recommend?

Page 37

[1] A: Yes.
[2] Q: Now, this report is dated December 28th, 1999.
[3] At some time were you informed that Local 805 [4] was complying with the recommendations of the [5] committee?
[6] A: Yes.
[7] Q: Who informed them?
[8] A: I don't recall.
[9] Q: Was it Vice President McNamara?
[10] A: I don't remember.
[11] Q: When were you told that the committee recommendation [12] was being accepted by Local 805?
[13] A: With this, I think (indicating).
[14] Q: Did you receive it in writing or verbally?
[15] A: I received this (indicating), and this is how I found [16] out that I would be accepted, I guess.
[17] Q: Well, these were recommendations which if not [18] accepted would have led to trusteeship by the [19] International Long Shore Association over Local 805, [20] correct?
[21] A: Yes.
[22] Q: But it would not be the imposition of the trusteeship [23] over Local 799 or Local 800, am I correct?
[24] A: Yes.

Page 38

[1] Q: Local 805 accepted the recommendation, "yes" or "no."
[2] A: Yes.
[3] Q: And I'm asking you again to form your memory. How [4] did you find out that Local 805 —
[5] A: I don't remember.
[6] Q: Were you sworn into Local 805?
[7] A: Yes.
[8] Q: Did you appear at a meeting for an interview by the [9] executive board and officers of Local 805?
[10] A: I went to a meeting. I was sworn in at a meeting.
[11] Q: One or two meetings?

[12] A: One meeting I got sworn in.
[13] Q: And do you recall the date of that meeting?
[14] A: I think it was in October some time.
[15] Q: Are you sure it isn't March of 1999?
[16] A: I got sworn in?
[17] Q: Yes, at a meeting of —
[18] A: I think it was when the new year started in October [19] or September.
[20] Q: Well, we're going to skip way ahead and get it on the [21] record.
[22] MR. LATHROP: I'm sorry, what number is [23] that?
[24] MR. MCMAHON: That's deposition Exhibit

Page 39

[1] No. 16. We went way ahead, but we will come back to [2] it at an appropriate time.
[3] BY MR. MCMAHON:
[4] Q: Mr. Keefe, do you recognize deposition Exhibit 16?
[5] A: Yes.
[6] Q: That's the complaint in this case, isn't it?
[7] A: Yes.
[8] Q: Now I would like you to turn to Page 4.
[9] A: (Witness complying.)
[10] Q: Paragraph 24.
[11] A: (Witness complying.)
[12] Q: Which reads "On or about January 15, 2000, Local 805 [13] finally accepted Keefe's application for membership."
[14] Does that refresh your recollection as to when [15] the transfer application was accepted by Local 805?
[16] A: Yes, you asked me about getting sworn in. I got [17] sworn in in October.
[18] MR. MCMAHON: Can we take just a moment?
[19] (Brief break.)
[20] BY MR. MCMAHON:
[21] Q: How many meetings of local — back on the record, [22] please.
[23] How many meetings of Local 805 have you [24] attended?

Page 40

[1] A: One.
[2] Q: And is that the meeting at which you were sworn in?
[3] A: Yes.
[4] Q: And you think it was October of 2000?
[5] A: Yes, the beginning of the year, their year.
[6] Q: We'll come back to that later.

[7] But you were aware in January of 2000 that your [8] transfer into Local 805 had been accepted by Local [9] 805?
[10] A: Yes.
[11] Q: Were you placed in a work gang after Local 805 [12] accepted your transfer?
[13] A: Yes.
[14] Q: You were placed in Gang 12?
[15] A: Yes.
[16] Q: Am I correct?
[17] A: Yes.
[18] Q: So you were working in Gang 12 as of January 2000?
[19] MR. LATHROP: Objection to the form of the [20] question.
[21] BY MR. MCMAHON:
[22] Q: Were you a member of Gang 12 —
[23] A: Yes.
[24] Q: — as of January 2000 and at the same time working

Page 41

[1] out of the hall?
[2] A: Yes.
[3] Q: So you were being dispatched as a member of Gang 12?
[4] A: Yes.
[5] Q: And then you had your priority over all other [6] nonunion persons once you were in Local 805 and Gang [7] 12, isn't that correct?
[8] A: What do you mean by "priority"?
[9] Q: You were going dispatched before all other non ILA [10] members once you were in Gang 12?
[11] A: I was in Gang 12.
[12] Q: When you reported to the hall for work were there [13] none ILA members also reporting for work?
[14] MR. LATHROP: What time frame are we now?
[15] MR. MCMAHON: In January of 2000.
[16] A: I don't remember.
[17] Q: Well, you knew that Brian Manning was not an ILA [18] member. Is that correct?
[19] A: Yes.
[20] Q: And was Brian Manning during the period, let's say [21] January 2000 and up-to-date, being dispatched out of [22] the hall for work?
[23] A: I would say so, yes.
[24] Q: And weren't you being dispatched before Brian Manning

Page 42

[1] when you were a member of Gang 12?
[2] A: Yes, I was in Gang 12.
[3] Q: Now, one of the complaints that you had made is that [4] Brian Manning, the nephew of Kevin Manning, was being [5] dispatched before you when you were a member of Local [6] 1947. Am I correct?
[7] A: Yes.
[8] Q: So now you become a member of Local 805 and you're in [9] Gang 12 and you're being dispatched ahead of Brian [10] Manning by virtue of your placement in Gang 12?
[11] A: Yes.
[12] Q: Was another person accepted into membership of Local [13] 805 at about the same time that you were accepted?
[14] A: Yes.
[15] Q: What's his name?
[16] A: Trainer, I think his name is.
[17] Q: When was Trainer initiated into the Union?
[18] A: I think it was October.
[19] Q: Was Mr. Trainer moved from Gang 12 to Gang 11 shortly [20] after the initiation?
[21] A: I think so, yes.
[22] Q: And in fact I would like to show you a document which [23] is marked as Deposition Exhibit 15 and Interrogatory [24] 3.

Page 43

[1] MR. MCMAHON: Scott, let me get you one.
[2] BY MR. MCMAHON:
[3] Q: Again, out of order, I show you deposition Exhibit 15 [4] which are your Answers to the Defendant's [5] Interrogatories.
[6] A: (Witness complying.)
[7] Q: And I would refer you to Page 2, Interrogatory 3.
[8] A: (Witness complying.)
[9] Q: Your answer in part is, "The night I was initiated [10] into the Union another man was also initiated. He [11] was moved from Gang 12 to Gang 11 in just a matter of [12] days."
[13] So is it your understanding that Mr. Trainer [14] went into Gang 11 a few days after the night you were [15] initiated — you and he were initiated into the [16] Union?
[17] A: Yes.
[18] Q: So if I showed you the date of Mr. Trainer's [19] placement in Gang 11 would that refresh your [20] recollection as to when you were admitted?
[21] A: Yes.
[22] Q: And if I tell you that Mr. Trainer was transferred to [23] Gang 11 in February or March of 2000 would that do [24] anything to your memory of the date that you were

Stephen Keefe
February 6, 2002
Case 1:04-cv-11340-DPW   Document 24-4   Filed 08/25/2006   Page 9 of 18
Stephen Keefe v.
Local 805, et al

**Page 44**

[1] initiated?
[2] MR. LATHROP: Are you representing [3] that — are you representing that as a fact that Mr. Trainer [4] was moved into that gang on February or March of [5] 2000?
[6] MR. MCMAHON: Yes.
[7] MR. LATHROP: Because it has not been [8] obviously established in the record.
[9] MR. MCMAHON: It will be.
[10] MR. LATHROP: Well, why don't you do that [11] first and then see if it refreshes his mind.
[12] MR. MCMAHON: I'm talking about an old [13] record.
[14] MR. LATHROP: Then I'm objecting to the [15] form of the question. It's not a fact in evidence.
[16] BY MR. MCMAHON:
[17] Q: Well, Mr. Keefe, would it be fair to say that the [18] night you were initiated into the Union can be [19] determined by looking at when Trainer was placed in [20] Gang 11?
[21] A: No.
[22] Q: The night I was initiated — let me ask you another [23] way.
[24] When did you become aware that Trainer was in

**Page 45**

[1] Gang 11?
[2] A: I don't know the exact date.
[3] Q: Were you aware in March and April that — of 2000 [4] that Trainer was in Gang 11?
[5] MR. LATHROP: Objection to the form of the [6] question.
[7] A: I don't know.
[8] Q: Now, at some time were you presented with the Hiring [9] Hall Rules?
[10] A: Yes.
[11] Q: When?
[12] A: I think at a Hiring Hall Rules Committee meeting.
[13] Q: Do you recall when that meeting occurred?
[14] A: No.
[15] Q: Okay, can I have that back and we can put it in [16] order, because we have some other questions.
[17] A: (Witness complying.)
[18] Q: Mr. Keefe, I show you what has been marked as [19] Deposition Exhibit 9, a letter dated May 7th, 2000.
[20] A: (Witness complying.)
[21] Q: Yes?
[22] A: Yes.
[23] Q: And have you seen a copy of that

letter before?
[24] A: Yes.

**Page 46**

[1] Q: And it's a letter from Attorney Masteralexis to [2] Messieurs Flaherty and Partee, President and Business [3] Agent, respectively, of Local 805.
[4] A: Yes.
[5] Q: It's dated May 7th, 2000, isn't it?
[6] A: Yes.
[7] Q: I want you to look at the third sentence of the first [8] paragraph.
[9] A: (Witness complying.)
[10] Q: It reads that "Keefe was sworn to Local 805 in March [11] 2000 on the same day as another person."
[12] A: Yes.
[13] Q: Does your attorney's reference to March 2000 change [14] your testimony that you were sworn in in October of [15] 2000?
[16] A: It does now. I thought I was sworn in in October.
[17] Q: But you now know and acknowledge that you were sworn [18] in in March of 2000?
[19] A: Yes.
[20] Q: The next sentence reads, "The other person was [21] assigned to "Gang 11," which is the gang that persons [22] appropriately should go to when they have the least [23] seniority in the port of Boston." Is that correct?
[24] A: That's what it says, yes.

**Page 47**

[1] Q: It says, "Mr. Keefe has not yet been assigned to a [2] gang," but in fact you had been assigned to Gang 12?
[3] A: Yes.
[4] Q: And you knew that at that time, March, 2000?
[5] A: Yes.
[6] MR. LATHROP: March, 2000 or May 7th, [7] 2000?
[8] MR. MCMAHON: No, in March, 2000 Mr. Keefe [9] knew that he was assigned to Gang 12.
[10] BY MR. MCMAHON:
[11] Q: Is that correct?
[12] A: Yes.
[13] Q: Do you know if Mr. Trainer appeared before the Rules [14] Committee in March of 2000?
[15] A: I don't know.
[16] Q: Were you aware in March, 2000 that movement from Gang [17] 12 to Gang 11 required an appearance before the [18] Hiring Hall Rules Committee?
[19] A: No.
[20] MR. LATHROP: Objection to the form.
[21] BY MR. MCMAHON:
[22] Q: At some time did you receive a copy of the Hiring [23] Hall rules?
[24] A: Yes.

**Page 48**

[1] Q: When did you receive a copy?
[2] A: I don't know what date.
[3] Q: Mr. Keefe, I show you what has been marked as [4] Deposition Exhibit 10.
[5] A: (Witness complying.)
[6] Q: A letter dated May 16, 2000 to you from James L. [7] Langan?
[8] A: Yes.
[9] Q: Did you receive a copy of this letter?
[10] A: Yes.
[11] Q: Do you know which letter Mr. Langan is referring to [12] in this first paragraph?
[13] A: No.
[14] Q: Were you receiving a check from John T. Clark at that [15] time?
[16] A: Yes.
[17] Q: And for what were you receiving that check?
[18] A: Work.
[19] Q: Was it work for work other than long-shore work?
[20] A: Yes.
[21] Q: What was that work?
[22] A: Just doing various things at the office.
[23] Q: So you got a longshore check for your work on the [24] docks and the ships and you got a check from John T.

**Page 49**

[1] Clark?
[2] A: Yes.
[3] Q: So in affect you were a two jober?
[4] A: No.
[5] Q: Well, you were doing some work for John T. Clark in [6] the office, am I correct?
[7] A: Yes.
[8] Q: What was the nature of that work?
[9] A: Various things.
[10] Q: Such as, you can give us an explanation, I'm sure.
[11] A: I did some computer work.
[12] Q: How frequently did you receive those checks for work [13] other than as a longshoreman?
[14] A: Monthly.
[15] Q: And did you work each week at the John T. Clark [16] office?

Case 1:04-cv-11340-DPW   Document 24-4   Filed 08/25/2006   Page 10 of 18
Stephen Keefe
Local 805, et al. v.
February 6, 2002

Page 50

[17] MR. LATHROP: From what period of time?
[18] MR. MCMAHON: We're talking about the [19] period from January, 2000 to May, 2000.
[20] A: Yes.
[21] Q: So Mr. Langan was accurate in his statement that you [22] were receiving a check from John T. Clark for non [23] longshore work, and on this letter of May 16, on the [24] second to the end paragraph?

Page 51

[1] A: What paragraph?
[2] MR. MCMAHON: It's this one, second from [3] the bottom.
[4] MR. LATHROP: Are you referencing the [5] quote, you still receive a check from John T. Clark, [6] end quote?
[7] A: Yes.
[8] Q: That's accurate?
[9] A: Yes.
[10] Q: Now, after you received Mr. Langan's letter, and I [11] assume you did receive it, if I didn't ask you?
[12] A: Yes.
[13] Q: Did you have any discussions with Mr. Langan about [14] your placement in a gang?
[15] A: What month or when are we talking about?
[16] Q: About May of 2000.
[17] A: I don't recall.
[18] Q: But this was an important factor in your life, the [19] placement in a gang. Am I correct?
[20] A: Yes.
[21] Q: You received Mr. Langan's letter, it informed you, [22] did it not, that he or other members of the Rule [23] Committee were available to discuss your placement in [24] gangs?

[1] A: Yes.
[2] Q: Did you have a discussion with Mr. Langan after you [3] received this letter?
[4] A: No.
[5] Q: On this very important issue?
[6] A: No.
[7] Q: Did you have a discussion with any other member of [8] the Rules Committee?
[9] A: I had a discussion with Gerard Partee.
[10] Q: And tell us what you said to Gerard and what Gerard [11] said to you.
[12] A: I asked him how I go about going to the Rules [13] Committee or how it works and he told me that he has [14] nothing to do with it.

Page 52

[15] Q: He was not a member of the Rules Committee, is that [16] correct?
[17] A: I'm not sure if he was or not.
[18] MR. LATHROP: I'm not sure if Mr. Keefe [19] finished his answer.
[20] MR. MCMAHON: I'm sorry.
[21] MR. LATHROP: He may have.
[22] A: He had nothing to do with it and that was it.
[23] Q: But Mr. Langan told you that he was the Chairman of [24] the Joint Rules Committee and he was available to

[1] discuss Hiring Hall Rules Committee issues with you, [2] didn't he?
[3] A: Yes.
[4] Q: And you never went to Mr. Langan?
[5] A: No.
[6] Q: Why didn't you go to Mr. Langan?
[7] A: I don't know why.
[8] Q: You knew who the members of the Rule Committee were, [9] did you not?
[10] A: When are we talking?
[11] Q: As of May 16, 2000.
[12] A: I knew some of them.
[13] Q: And you never went to any of them to talk about this [14] issue of your placement in a gang, isn't that [15] correct?
[16] A: Yes.
[17] Q: Mr. Keefe, I show you what has been marked as [18] Deposition Exhibit No. 11, a letter dated May 24, a [19] week and a day after the date of Mr. Langan's letter [20] which is Exhibit 10, and have you seen this letter [21] before?
[22] A: Yes.
[23] Q: Did you go to Mr. Horohoe to obtain that letter?
[24] A: Yes.

Page 53

[1] Q: Who told you to go to Mr. Horohoe to obtain that [2] letter?
[3] MR. LATHROP: Objection to the form.
[4] A: I don't remember who told me to.
[5] Q: Did someone tell you to get the letter?
[6] A: I don't remember.
[7] Q: But in fact on May 24 you were working as a [8] longshoreman and also doing other work for John T. [9] Clark, isn't that true?
[10] A: Yes.
[11] Q: Are you still doing work for John T. Clark other than [12] longshore work?
[13] A: No.
[14] Q: Mr. Keefe, I show you a document dated May 25th, [15] 2000. Is that your

signature?
[16] A: Yes.
[17] Q: And did you date the document?
[18] A: Yes.
[19] Q: On May 25th, 2000?
[20] A: Yes.
[21] Q: And that's the Hiring Hall certification?
[22] A: Yes.
[23] Q: And it's — it states that, "I pledge on my honor [24] that I am available on a full-time basis and working

Page 54

[1] at this craft exclusively."
[2] A: Yes.
[3] Q: Were you still continuing as of May 25th, 2000 to do [4] it, work for John T. Clark & Sons other than [5] longshore work?
[6] A: No.
[7] Q: It also states, "I have knowledge that I have [8] received a copy of all hired hall work rules." Is [9] that correct?
[10] A: Yes.
[11] Q: As of May 25th, 2000 did you have a copy of the [12] Hiring Hall Rules?
[13] A: Yes.
[14] Q: Did you present Deposition Exhibit No. 11 to anyone [15] on or about May 25th, 2000?
[16] A: I don't know.
[17] Q: At some time did you show Deposition Exhibit No. 11 [18] to Vice President McNamara?
[19] A: I don't know.
[20] Q: Mr. Keefe, I show you a document which has been [21] marked as Deposition Exhibit No. 13.
[22] MR. LATHROP: Can you stipulate the [23] writing at the bottom?
[24] MR. MCMAHON: The writing on the bottom is

Page 55

[1] my note. This item is the Manning Deposition Exhibit [2] No. 1 and the Jim Langan Deposition Exhibit No. 2.
[3] MR. LATHROP: Thank you.
[4] BY MR. MCMAHON:
[5] MR. MCMAHON: And we can further stipulate [6] that this is a document that has been produced by the [7] plaintiff as part of — I'm sorry, it was not.
[8] We can handle that in a moment.
[9] (Brief break.)
[10] BY MR. MCMAHON:
[11] Q: Mr. Keefe, I'm showing you a document which is [12] entitled "ILA Work Rules," and it runs from 28 to 36, [13] and it has 1290ZSK62.

[14] A: (Witness complying.)
[15] Q: Do you recognize that document?
[16] A: Yes.
[17] MR. LATHROP: For the record I'll [18] stipulate that this is my format of Bate Stamp [19] indicating of when I produced it and who was produced [20] in it.
[21] MR. MCMAHON: I will put that back.
[22] (Brief break.)
[23] BY MR. MCMAHON:
[24] Q: This Exhibit 13, the Hiring Hall Work Rules?

Page 56

[1] A: Yes.
[2] Q: And you received a copy of those rules in May of [3] 2000?
[4] A: Yes.
[5] Q: Is that correct?
[6] A: Yes.
[7] Q: Let me ask you to look at Rule 36.
[8] A: (Witness complying.)
[9] Q: By the way, at the time that you received Exhibit 13 [10] did you review the rules?
[11] A: Yes.
[12] Q: And did you see Rule 36?
[13] A: Yes.
[14] Q: And the rule reads, "If a member wishes to move from [15] Gang 12 to Gang 11 they must sign a pledge sheet and [16] appear before the Rules Committee." Is that correct?
[17] A: Yes.
[18] Q: And you were aware of that as of at least May of [19] 2000?
[20] A: Yes.
[21] Q: And you were aware that the Rules Committee was a [22] joint committee of locals 799, 800 and 805, is that [23] correct?
[24] A: Yes.

Page 57

[1] Q: It also goes on to advise that "The member must bring [2] sufficient proof of working exclusively at the [3] craft." Am I correct?
[4] A: Yes.
[5] Q: Was Exhibit 11 presented by you to anyone as proof [6] that you were working exclusively at the craft?
[7] A: Say that again?
[8] Q: Was Exhibit 11, Mr. Horohoe's letter, presented by [9] you to anyone as proof that you were working [10] exclusively at the craft?
[11] A: I don't know.
[12] Q: That letter is dated the day before Exhibit 12 which [13] you signed on May 25th, 2000?

[14] A: Yes.
[15] Q: Is there any relationship between Exhibits 11 and 12?
[16] A: I don't know.
[17] Q: So this just appeared on May 24th?
[18] A: Appears where?
[19] Q: Did you go to Mr. Horohoe and ask him for this [20] letter?
[21] A: No.
[22] Q: Do you know how this letter was generated by Mr. [23] Horohoe?
[24] A: No.

Page 58

[1] Q: You never asked him to produce this letter for you?
[2] A: No.
[3] Q: Did you ever obtain a copy of this letter on or about [4] May 25th, 2000?
[5] A: I don't know. Not that I recall, no.
[6] Q: Now, did you ever appear before the Rules Committee?
[7] A: Yes.
[8] Q: How many times did you appear before the Rules [9] Committee?
[10] A: I don't remember.
[11] Q: Was it more than once?
[12] A: I think so, yes.
[13] Q: Did you attend a Rules Committee meeting with [14] International Vice President McNamara?
[15] A: I don't know what you mean.
[16] Q: Did you attend a meeting in the company of [17] International Vice President McNamara?
[18] A: You mean was he at the meeting?
[19] Q: Yes.
[20] A: Yes.
[21] Q: When did that meeting occur?
[22] A: I don't remember.
[23] Q: Do you recall if it was in June of 2000?
[24] A: It might have been.

Page 59

[1] Q: Were you asked at that meeting if you wished to move [2] from Gang 12 to Gang 11?
[3] A: I don't remember.
[4] Q: Do you recall Mr. Langan speaking to you about moving [5] from Gang 12 to Gang 11 at that meeting?
[6] A: I don't recall that.
[7] Q: Do you recall Mr. Mark Connolly asking you at that [8] meeting if you wished to move from Gang 12 to [9] Gang 11?
[10] A: I don't remember.
[11] Q: Do you remember responding to Mr. Langan and to [12] Mr. Connolly that

you did not wish to move from Gang [13] 12 to Gang 11 at that time?
[14] A: I don't remember.
[15] Q: So you have no memory whatsoever of that meeting?
[16] A: No, I remember being there, I remember McNamara being [17] there. I don't remember what was said.
[18] Q: You don't remember what was said to you?
[19] A: No.
[20] Q: You don't remember who said anything at that meeting?
[21] A: There was a bunch of talk, I don't remember what was [22] said.
[23] Q: Do you remember if that meeting occurred shortly [24] after May 25th of 2000?

Page 60

[1] A: You said it was in June, right?
[2] Q: Yes.
[3] A: Then it was in June.
[4] Q: So you would accept that that meeting, the first [5] meeting, was in June?
[6] A: I think so, yes.
[7] Q: Mr. Keefe, I show you a letter dated May 24, 2000.
[8] Have you ever seen a copy of that letter?
[9] A: I don't think so.
[10] Q: Is one of the persons copied Attorney Masteralexis?
[11] A: Yes.
[12] Q: Now, we have that letter which is dated May 24, we [13] have Mr. Horohoe's letter which is also dated May 24 [14] on his Deposition Exhibit No. 11, and then we have [15] the Pledge Sheet of Certification, Deposition Exhibit [16] No. 12, which you signed on May 25th, 2000.
[17] So is it fair to say that there were a number [18] of things happening concerning your placement of Gang [19] 12 to Gang 11 on May 24th and May 25?
[20] A: What kind of things?
[21] Q: Well, you had President Bower's Letter that you say [22] you have not seen but apparently was copied to Mr. [23] Masteralexis —
[24] MR. LATHROP: Well, he can't identify it

Page 61

[1] despite its legitimacy, I —
[2] MR. MCMAHON: I'll have to remember that [3] phrase.
[4] MR. LATHROP: Yes.
[5] BY MR. MCMAHON:
[6] A: What?
[7] Q: Things were happening in May and

Stephen Keefe v.
Local 805, et al.
Case 1:04-cv-11340-DPW    Document 24-4    Filed 08/25/2006    Page 12 of 18
Stephen Keefe
February 6, 2002

[8] June concerning your application — strike that — your movement from Gang [9] 12 to Gang 11. Isn't that true?
[10] A: What things? I don't understand.
[11] Q: Well, there was a letter which is Deposition Exhibit [12] No. 11, Mr. Horohoe's letter, and then there is your [13] pledge sheet which is Deposition Exhibit No. 12.
[14] A: Two letters, you're saying?
[15] Q: Let me come back to Deposition Exhibit No. 12.
[16] Did you present this to anyone?
[17] A: No — I don't know.
[18] Q: Do you know if this is a Hiring Hall Rules Committee [19] document?
[20] A: Yes.
[21] Q: Did you give it to any member of the Hiring Hall [22] Rules Committee?
[23] A: They gave it to me.
[24] Q: Who did you give it back to?

Page 62

[1] MR. LATHROP: If any.
[2] BY MR. MCMAHON:
[3] Q: Who did you return — you signed it — did you sign [4] it in someone's presence?
[5] A: I must have signed it on May 25th at that meeting.
[6] Q: In whose presence?
[7] A: Whoever was at the meeting.
[8] Q: At some time did Attorney Masteralexis write a demand [9] in August of 2000 that you be immediately placed in [10] Gang 11?
[11] A: Let me see the letter. I don't remember.
[12] Q: Let's take a brief recess since we have been at this [13] for two hours.
[14] (Brief break.) [15] (Exhibit No. 18 Marked [16] For Identification.)
[17] BY MR. MCMAHON:
[18] Q: Mr. Keefe, I show you what has been marked, again, [19] out of order, Deposition Exhibit No. 18.
[20] A: (Witness complying.)
[21] Q: And there is a letter from Attorney Masteralexis to [22] Robert Flaherty, President, and Gerard Partee, [23] Business Agent, Local 805.
[24] A: (Witness complying.)

Page 63

[1] Q: Did you receive a copy of that letter?
[2] A: Yes.
[3] Q: That letter is dated again, August 6th, 2000?
[4] A: Yes.
[5] Q: And that is after the meeting of the Rules Committee [6] which we have just been talking about which you [7] attended with Mr. McNamara?
[8] MR. LATHROP: Was that a question?
[9] A: I didn't attend it with Mr. McNamara. Mr. McNamara [10] happened to be there amongst other people.
[11] Q: And that letter is dated after that meeting, isn't [12] that true?
[13] A: Yes.
[14] Q: And it was a demand that you be placed in Gang 11 by [15] Wednesday, August 16, 2000.
[16] A: That's what it says, yes.
[17] Q: And you knew as of the date August 6th that the rules [18] required — the Hiring Hall Rules required that you [19] appear before the Rules Committee.
[20] A: Yes.
[21] Q: Now, in September did you attend a meeting of the [22] Rules Committee?
[23] A: Yes.
[24] Q: And how did it come about that you attended that

Page 64

[1] meeting? Did you ask or were you asked to attend the [2] meeting?
[3] A: I don't know how it came about.
[4] Q: Where was the meeting held?
[5] A: At the Hiring Hall, I think.
[6] Q: Who was present at the meeting?
[7] A: Some of the Rules Committee members, myself.
[8] Q: Did you bring any documents to the meeting?
[9] A: What kind of documents?
[10] Q: Any documents of any kind.
[11] A: I don't think so.
[12] Q: Tell us your recollection of what happened at that [13] meeting. In terms of what your participation was or [14] interaction with the members of the —
[15] A: I don't think I did have any interaction. They had [16] some type of vote and they put me in Gang 11, I [17] think.
[18] Q: Did you ever present income tax returns?
[19] A: No.
[20] Q: Did you ever present any documents to the Rules [21] Committee?
[22] A: I don't think so.
[23] Q: And the only document that deals with this issue of [24] exclusively of the craft is your documents consist

Page 65

[1] and we can — I'll go back and start that one over.
[2] Would it be fair to say that the documents that [3] existed as of the time of that letter were your [4] pledge sheet saying you were working exclusively at [5] the craft, and Mr. Horohoe's letter?
[6] A: I don't know if Mr. Horohoe's letter was there.
[7] Q: But you were admitted to Gang 11 — when did you go [8] into Gang 11?
[9] A: That's — October.
[10] Q: October 3, 2000?
[11] A: Yes, October — that's October, yes.
[12] Q: Now, let me ask you to look, again, at letters marked [13] as Exhibit 15.
[14] A: (Witness complying.)
[15] MR. MCMAHON: Do you have a copy?
[16] MR. LATHROP: I have a copy.
[17] MR. MCMAHON: Okay.
[18] BY MR. MCMAHON:
[19] Q: And let's go to Page 2. It's the answers to your [20] Interrogatories and it reads "Interrogatory 3, the [21] night I was initiated into the Union another man was [22] also issued."
[23] We now agree that you were initiated in March [24] 2000, is that correct?

Page 66

[1] A: Yes.
[2] Q: And, again, the other man is who?
[3] A: Trainer.
[4] Q: Trainer.
[5] And Trainer was moved from Gang 12 to Gang 11 [6] in just a matter of days.
[7] You have no knowledge as to whether Mr. Trainer [8] appeared before the Rules Committee or provided [9] documents such as tax returns to the Rules Committee, [10] is that correct?
[11] A: No.
[12] Q: And then it reads "I should have received the same [13] treatment." Why should you have received the same [14] treatment?
[15] A: An as a Union member.
[16] Q: So you're saying that you should have been moved from [17] Gang 11 to Gang 12 simply because you were now a [18] member of 805?
[19] MR. LATHROP: Are you asking for —
[20] BY MR. MCMAHON:
[21] Q: Without appearing before the Rules Committee?
[22] MR. LATHROP: Are you asking for his [23] personal opinion?
[24] MR. MCMAHON: His personal opinion.

Page 67

[1] A: You just said from Gang 11 to Gang [2] 12.

Page 67

[2] Q: From Gang 12 to Gang 11.
[3] A: Say it again.
[4] Q: In your answer to the Interrogatory you reference [5] Trainers movement from Gang 12 to Gang 11 in a few [6] days after both of you were initiated at the March, [7] 2000 Local 805 meeting. Is that a fair statement?
[8] A: Yes.
[9] Q: And it says, "I should have received the same [10] treatment."
[11] A: Yes.
[12] Q: So you should have been moved automatically in your [13] mind from Gang 12 to Gang 11?
[14] A: I should have been treated fair.
[15] Q: So you don't think you were treated fair as of March, [16] 2000 when you were not automatically progressed from [17] Gang 12 to Gang 11?
[18] A: No, I don't think I was treated fair.
[19] Q: Tell us why you don't think you were treated fair. [20] Use as much time as you want.
[21] A: I don't think I was treated fair.
[22] Q: How?
[23] A: I just don't.
[24] Q: You don't think you were treated fair, but by whom?

Page 68

[1] A: The Union.
[2] Q: Well, let's —
[3] A: The Hiring Hall.
[4] Q: You don't think you were treated fairly by the Hiring [5] Hall Rules Committee?
[6] A: Yes.
[7] Q: And in fact your complaint about the Hiring Hall [8] Rules Committee treating you unfairly goes back to [9] May of 1998?
[10] A: Yes.
[11] Q: When you were claiming a priority?
[12] A: Yes.
[13] Q: So that once you were initiated into Local 805 in [14] March of 2000 in your mind it was unfair not to [15] immediately move you to Gang 11?
[16] A: Yes.
[17] Q: And that was the contention that Mr. Masteralexis [18] made in his several letters to the Hiring Hall [19] identified — strike that — to Mr. Partee and Mr. [20] Flaherty and to President Bowers is that correct, [21] that you should be moved?
[22] A: I don't know.
[23] Q: Now, again, coming back to Answer 3, you're [24] claiming — strike that.

Page 69

[1] You say, "The only factor that I know that [2] distinguished me from anyone else is the fact that I [3] have taken legal action."
[4] Mr. Trainer in your mind had not taken any [5] legal action, is that correct?
[6] A: I don't think so.
[7] Q: But the legal action that you're referencing in the [8] answer is what legal action?
[9] A: The whole situation.
[10] Q: And that was the situation starting —
[11] A: From day number one.
[12] Q: In August of 1998 up through the committee report?
[13] A: Yes.
[14] Q: That is the legal action?
[15] A: Yes.
[16] Q: That whole detailed process?
[17] A: Yes.
[18] Q: So is it your claim that the Hiring Hall Rules [19] Committee and the Local 805, Local 800 and Local 799 [20] discriminated against you because you took legal [21] action to enforce the transfer card article of the [22] International Constitution?
[23] A: Yes.
[24] Q: Now, again, I go to Page 3.

Page 70

[1] A: (Witness complying.)
[2] Q: Interrogatory 5, you're asked to "Explain Paragraph [3] 30 of the complaint by not immediately placing Keefe [4] in Gang 11, Local 805 bridged the ILA Constitution in [5] the Hiring Hall Work Rules and caused Keefe to lose [6] substantial income and benefits."
[7] And then you refer to Answers No. 3 and 4 above, [8] right?
[9] A: Yes.
[10] Q: Now, I want you to look at a copy of the ILA [11] Constitution.
[12] Or I should ask have you looked at it?
[13] A: Yes.
[14] Q: And would you identify for me the article and the [15] section that you're referencing in your complaint?
[16] MR. LATHROP: To the best of his personal [17] knowledge?
[18] BY MR. MCMAHON:
[19] Q: To the best of your personal knowledge.
[20] And I will give you a copy and you can take a [21] few minutes to review it.
[22] (Brief break.)
[23] BY MR. MCMAHON:
[24] Q: Have you had an opportunity to review the ILA

Page 71

[1] International Longshoreman Constitution?
[2] A: Yes.
[3] Q: And is there any provision which you cite — can cite [4] to support your claim that by not immediately placing [5] you in Gang 11, Local 805 breached the ILA [6] Constitution in hiring work rules?
[7] A: No.
[8] Q: Now I need to consult.
[9] MR. LATHROP: Well, let me say the [10] following.
[11] We had said earlier that you're asking him his [12] personal opinion.
[13] MR. MCMAHON: His personal opinion?
[14] MR. LATHROP: Not legal opinion.
[15] MR. MCMAHON: Yes.
[16] (Brief break.)
[17] BY MR. MCMAHON:
[18] Q: Mr. Keefe, would you look at Page 19?
[19] A: (Witness complying.)
[20] Q: Article 11, Section 5.
[21] A: (Witness complying.)
[22] Q: And I want to read Section 5 into the record rather [23] than burden us with another copy of that [24] constitution."

Page 72

[1] Section 5 reads "A member of the ILA, shall be [2] entitled to apply for work under the jurisdiction of [3] any other local than the one of which he is a member [4] without taking a withdrawal card from the local where [5] he holds membership. Whenever a member of one local [6] comes under jurisdiction of another local he may be [7] required to pay to such local the same dues as of [8] paid to the membership there of."
[9] Have I read that correctly?
[10] A: Yes.
[11] Q: Now, while you were a member of Local 1947 you were [12] applying for work within the jurisdiction of Locals [13] 805, 800 and 799, am I correct?
[14] A: Yes.
[15] Q: And you did that without taking a withdrawal card [16] from Local 1947, is that correct?
[17] A: Yes.
[18] Q: When you were working within the jurisdiction of [19] locals 805, 800 and 799, were you required to pay the [20] dues paid by members of Local 800, 799, and 805?
[21] A: I paid dues to Local 1947 to the ILA —
[22] Q: Did you pay dues to Local 799 or Local 800 or Local [23] 805?

Local 805, et al
Case 1:04-cv-11340-DPW    Document 24-4    Filed 08/25/2006    Page 14 of 18
Stephen Keefe
February 6, 2002

[24] A: No.

Page 73

[1] Q: Were you charged a service fee for your use of the [2] Hiring Hall?

[3] A: Maybe. I don't know.

[4] Q: Now, in your answers to the Interrogatories, Exhibit [5] 15, you were asked to, "Describe your Interrogatory 8 [6] beginning on Page 4." You were asked to, "Describe [7] fully your participation in the Hiring Hall Rules [8] Committee meeting on June 22, 2000, including in your [9] response, the names of all persons present during [10] that participation, and the words spoken aloud to you [11] about each person present and what you spoke aloud to [12] each person present at the committee."

[13] Your answer was, "I did not attend the June 22, [14] 2000 meeting because I was away at the time."

[15] A: I thought I was. My answer is wrong.

[16] Q: Your answer is wrong?

[17] A: Yes.

[18] Q: Now, again, I want you to come back to the [19] interrogatory.

[20] When you participated in the Rules Committee [21] meeting in June who were the persons present?

[22] A: I don't recall.

[23] Q: Do you recall what you said to any person or what any [24] person said to you?

Page 74

[1] A: No.

[2] Q: So it's entirely lost to your memory as to what [3] happened at that meeting?

[4] MR. LATHROP: Objection to the form.

[5] BY MR. MCMAHON:

[6] Q: Do you have any recollection of any —

[7] A: I was outside most of the meeting. They were the [8] ones that conferred.

[9] Q: You were inside for part of it?

[10] A: At the beginning of the meeting I was inside.

[11] Q: Was Bill — was Vice President McNamara there with [12] you?

[13] A: Was he at the meeting?

[14] Q: At the meeting when you were at the meeting?

[15] A: He was at the meeting. He wasn't there with me.

[16] Q: I understand, but was he at the meeting at the same [17] time that you were at the meeting?

[18] A: At the June 22nd he could have been. I don't know.

[19] Q: Now, going to Page 6, Interrogatory No. 12, you were [20] asked to itemize all economic damages claimed by you [21] against each defendant including a computation of the [22] lost wages and benefits each year on or after May 1, [23] 1998.

[24] Your answer is, "I lost approximately $175,000

Page 75

[1] in lost wages and benefits. The following is a [2] breakdown of this estimate by years, 1998, $25,000; [3] 1999, $50,000; 2000, $50,000; 2001, $50,000."

[4] Now, would you explain to me how you calculated [5] the estimate for 1998 of $25,000?

[6] A: Lost wages?

[7] Q: Would that be the wages of a person in Gangs 1 [8] through 9?

[9] A: No.

[10] Q: How did you come up with the figure $25,000?

[11] A: The days that I should have got hired and I didn't [12] get hired.

[13] Q: Do you have a list of all of the days that you should [14] have been hired?

[15] A: I have partial lists — those — the notes that I [16] had — that you had seen before.

[17] Q: And are there any other notes?

[18] A: No.

[19] Q: And in 1998 you were contending that you should have [20] been hired as a member of Local 1947 before all other [21] none ILA Union members?

[22] A: Yes.

[23] Q: And likewise in 1999 you were contending that you [24] should have been hired before —

Page 76

[1] A: Yes.

[2] MR. LATHROP: Are you saying it's his only [3] contention?

[4] MR. MCMAHON: No, one of his contention.

[5] MR. LATHROP: One of his contentions.

[6] BY MR. MCMAHON:

[7] Q: Now, how did you estimate the figures given in your [8] answer?

[9] A: The days that I went to the hall and other people got [10] hired before me, nonunion people, and the many days [11] that I went home.

[12] Q: But the committee in its report rejected your demand [13] for a priority hiring, isn't that true?

[14] A: They rejected it, yes.

[15] MR. MCMAHON: Oh, Scott, thank you.

[16] MR. LATHROP: We're back.

[17] MR. MCMAHON: Yes.

[18] MR. MCMAHON: Somewhere on this table is [19] Exhibit 16.

[20] A: I have Exhibit 15.

[21] MR. LATHROP: This is the complaint.

[22] BY MR. MCMAHON:

[23] Q: You have before you Exhibit 16 which is your [24] complaint in this case?

Page 77

[1] A: Yes.

[2] Q: Turn to Page 5.

[3] A: (Witness complying.)

[4] Q: Paragraph 26.

[5] A: (Witness complying.)

[6] Q: And it reads, "On or about January 15, 2000 the Rules [7] Committee in violation of the Hiring Hall Rules [8] placed Keefe in the lowest gang he could, Gang 12." [9] Did I read that accurately?

[10] A: Yes.

[11] Q: "Under the Hiring Hall Rules Keefe should have been [12] placed in Gang 11."

[13] Have I read that accurately?

[14] A: Yes.

[15] Q: Which Hiring Hall Rule required your placement in [16] Gang 11 as asserted in your complaint?

[17] A: I don't know.

[18] Q: Would you review Deposition Exhibit 13.

[19] A: (Witness complying.)

[20] Q: And particularly Rule 36 on Page 4.

[21] A: (Witness complying.)

[22] Q: And that reads, "If a member wishes to move from [23] Gang 12 to Gang 11 they must sign a pledge sheet and [24] appear before the Rules Committee."

Page 78

[1] A: Yes.

[2] Q: "They must bring sufficient proof that they are [3] working exclusively at the craft, such as notarized [4] retirement or resignation papers, tax returns or any [5] other documents that are pertinent. That burden of [6] proof rests with the bargaining unit member." Is [7] that correct?

[8] A: Yes.

[9] Q: But you did not appear before the Rules Committee [10] until June of 2000 and you didn't sign a pledge sheet [11] until May of 2000.

[12] A: Yes.

[13] Q: And your actions in signing a pledge sheet and [14] appearing before the Rules Committee were consistant [15]

with Rule 36, am I correct?

[16] A: Yes.

[17] Q: Well, why in your complaint do you contend that under [18] the Hiring Hall Rules you should have been placed in [19] Gang 11 on or about January 15th, 2000?

[20] MR. LATHROP: You're asking for his [21] personal opinion again?

[22] MR. MCMAHON: Yes, his personal opinion.

[23] A: Because I should have been treated like any other [24] members.

Page 79

[1] Q: But other members had to appear before the Rules [2] Committee, correct, under the terms of the rule?

[3] A: Yes.

[4] Q: And is it your personal position that upon being [5] sworn in you should have been automatically placed in [6] Gang — strike that, I'm sorry, I misstated facts.

[7] You were placed in Gang 12 on or about January [8] 15th, 2000?

[9] A: Yes.

[10] Q: You contend that on or about January 15th, 2000 you [11] should have been placed in Gang 11, isn't that [12] correct?

[13] A: Or there after, yes.

[14] Q: But there were Hiring Hall Rules that required you to [15] appear before the Rules Committee. Is that true?

[16] A: Yes, I know that now.

[17] Q: And you knew that in May of 2000?

[18] A: I asked my delegate who I thought would — might [19] know.

[20] Q: And who was the delegate?

[21] A: Gerard Partee.

[22] Q: Again in Paragraph 26 it reads, " The Rules Committee [23] did this in retaliation for Keefe having taken action [24] against Local 805 forced him to accept his

Page 80

[1] application for membership."

[2] Are you contending that the Rules Committee [3] discriminated against you by placing you in Gang 12 [4] because you had taken legal action to compel your [5] transfer to Local 805?

[6] A: Yes.

[7] Q: Now, what is the basis for your claim that the Rules [8] Committee did this?

[9] A: I'm not a lawyer, I don't —

[10] Q: Is there any information or facts — strike that.

[11] Are there any facts which in your mind support [12] the statement that the Rules Committee did this in [13] retaliation for Keefe having taken action against [14] Local 805, this day and placement in the lowest gang, [15] Gang 12?

[16] A: No.

[17] Q: No facts?

[18] A: No, not as of now I don't. As I said, I'm not a [19] lawyer, I don't know.

[20] Q: Is it your contention that Local 799, 800 and 805 [21] should have placed you in Gang 11 in January of 2000?

[22] A: Maybe not in January but thereafter, yes.

[23] Q: When thereafter?

[24] A: I don't know, whenever they should have.

Page 81

[1] Q: But your complaint says that on January 15, 2000 the [2] Rules Committee in violation of the Hiring Hall Rules [3] placed you in the lowest gang it could, Gang 12.

[4] A: Yes.

[5] Q: And under the rules you should have been placed in [6] Gang 11, am I correct?

[7] A: Say that again?

[8] Q: Your complaint asserts in Paragraph 26 that the Rules [9] Committee on January 15th in violation of its rules [10] placed you in the lowest gang it could, 12.

[11] A: Yes.

[12] Q: But under the rules it goes on to say you should have [13] been in Gang 11.

[14] A: Yes.

[15] Q: And you knew you were in Gang 12 in January of 2000?

[16] A: Yes.

[17] Q: And you knew that was Gang 11?

[18] A: Yes.

[19] Q: And you finally admit to being acquainted with the [20] rules in May of 2000?

[21] A: Yes.

[22] Q: And you're contending that the Hiring Hall Committee [23] and the locals breached the Hiring Hall Rules by not [24] putting you in Gang 11 in January of 2000?

Page 82

[1] A: Yes.

[2] Q: Has, in your experience, work in the port of Boston [3] decreased in the past two years, longshore work?

[4] A: Yes.

[5] Q: And there are fewer opportunities for Gangs 1 through [6] 12 and nonunion, non ILA persons, to work in the port [7] of Boston in the past couple of years?

[8] A: Yes.

[9] Q: Again, how much port seniority do you have?

[10] A: Three years, I think.

[11] Q: How many hours a year must a longshoreman work in [12] order to obtain a year of seniority?

[13] A: I think it's 400.

[14] MR. LATHROP: Is this the infamous [15] Exhibit 17?

[16] MR. MCMAHON: Yes.

[17] BY MR. MCMAHON:

[18] Q: Mr. Keefe, I show you what has been marked as [19] Deposition Exhibit No. 17.

[20] A: (Witness complying.)

[21] Q: It is a document production in lieu of a document [22] subpoena.

[23] MR. MCMAHON: Can we stipulate to that?

[24] MR. LATHROP: That's certainly my

Page 83

[1] understanding.

[2] MR. MCMAHON: By the Boston Shipping [3] Association.

[4] BY MR. MCMAHON:

[5] Q: Now, let me ask you first, there are a number of [6] names, the President, Vice President, Treasurer and [7] Secretary, Assistant Treasurer of the Boston Shipping [8] Association listed on the document.

[9] A: Yes.

[10] Q: And is the Stephen M. Keefe your brother?

[11] A: Yes.

[12] Q: And he is the same person who was the Vice President [13] or management employee of John T. Clark?

[14] A: Yes.

[15] Q: Now, who is Patrick Considine? Do you know if he was [16] a member of any one of the locals?

[17] A: He was in the Union.

[18] Q: How about Thomas Vesey?

[19] A: I think in the Union.

[20] Q: How about Daniel Doyle?

[21] A: What about him?

[22] Q: Do you know if he is in the — one of the three [23] locals?

[24] A: I don't think so.

Page 84

[1] Q: How about Brian Manning?

[2] A: I don't think so.

[3] Q: How about Richard McCreevan?

[4] A: I don't think so.

[5] Q: How about Keith McDonough?

[6] A: I don't think so.

Local 805, et al
Case 1:04-cv-11340-DPW    Document 24-4    Filed 08/25/2006    Page 16 of 18
Stephen Keefe
February 6, 2002

Page 85

[7] Q: Is Joseph Swales the son of the deceased Joseph [8] Swales?
[9] A: I don't know.
[10] Q: Do you know Joseph Swales?
[11] A: No.
[12] Q: But you do know all of the other persons in that [13] list?
[14] A: Yes.
[15] Q: Now, is Page 1 your work history?
[16] A: Yes.
[17] MR. LATHROP: Since this is a document [18] produced by the Boston Shipping Association lets make [19] clear this is a representation.
[20] MR. MCMAHON: Yes.
[21] MR. LATHROP: A representation as to what [22] his work is.
[23] BY MR. MCMAHON:
[24] Q: And is that an accurate representation of your work

Page 86

[1] history?
[2] A: Yes.
[3] Q: Now the work history shows that in calendar years [4] '99, 2000, 2001 you made more than — worked more [5] than 400 hours in each of those years?
[6] A: Yes.
[7] Q: Brian Manning, which is Page 5.
[8] A: (Witness complying.)
[9] Q: Now, is that the same Brian Manning that you [10] contended was the beneficiary of nepotism in [11] dispatching?
[12] A: Yes.
[13] Q: And Brian Manning is not a member of Local 799 or of [14] Local 800 or Local 805, is that correct?
[15] A: No.
[16] Q: It's not correct?
[17] A: He isn't.
[18] Q: He is not a member?
[19] A: No.
[20] Q: Okay.
[21] A: As far as I know, no.
[22] Q: Okay.
[23] Now, during calendar year 2000, assuming that [24] these are accurate figures, it would show that Brian

Page 86

[1] Manning worked a little more than eleven hundred [2] hours.
[3] Assume that's accurate.
[4] A: Yes.
[5] Q: Now, during the period of the year 2000 you were in [6] Gang 12 and then went to Gang 11. Am I correct?
[7] A: Yes.
[8] Q: So you would have priority being dispatched out over [9] Brian Manning?
[10] A: Yes.
[11] Q: But Brian Manning in the calendar year 2000 had [12] little more than eleven hundred hours?
[13] A: Yes.
[14] Q: And in the same period you had 496.5 hours?
[15] A: Yes.
[16] Q: Would it be fair to say that you did not appear on [17] the days that Brian Manning was dispatched out?
[18] A: Yes.
[19] Q: And suddenly in calendar year 2001 you have almost [20] 870 hours. Am I correct?
[21] A: Yes.
[22] Q: Yet Mr. Manning has 1,167 hours. Look at the sheet [23] and assume that's accurate.
[24] A: Yes.

Page 87

[1] Q: Would it be fair to say that Mr. Manning was [2] dispatched out on days that you didn't appear for [3] work?
[4] A: Yes.
[5] Q: So effectively you can control the number of hours [6] that you worked by choosing to appear or not appear [7] at the hiring as a member of Gang 12 and Gang 11?
[8] A: Yes, that particular year I got into a car accident [9] and I didn't show for work a lot.
[10] Q: Which year, sir?
[11] A: Pardon me?
[12] Q: Which year?
[13] A: 2000.
[14] Q: So for the year 2000 there was a substantial period [15] of time in which you were disabled from working in [16] the longshore industry?
[17] A: Yes.
[18] Q: What was that period of time?
[19] A: Through the winter.
[20] Q: Give me the months.
[21] A: I don't know. I would have to go back in the [22] records.
[23] Q: When did the accident occur?
[24] A: I would have to go back and —

Page 88

[1] Q: Now, as a longshoreman what work do you do? Just [2] describe what — tell me for example what is a car [3] job?
[4] A: You go and unload the car ship.
[5] Q: So a ship comes in with x number of Subaru's or x [6] number of Nissan's, or whatever else?
[7] A: Yes.
[8] Q: And literally a car job is you get on the ship, you [9] get the car and you drive the car off and park it?
[10] A: Yes.
[11] Q: What is a container job?
[12] A: You go and unload the container ship.
[13] Q: And are there other cargo than cars and containers on [14] vessels coming into the port?
[15] A: Are there other what?
[16] Q: Other cargo?
[17] A: Coming into the port?
[18] Q: Yes.
[19] A: No.
[20] Q: So the only thing you're working on are containers [21] and the cars?
[22] MR. LATHROP: Objection to the form of the [23] question.

Page 89

[1] BY MR. MCMAHON:
[2] Q: When you're working as a longshoreman —
[3] A: Yes.
[4] Q: — did you ever work as a time keeper?
[5] A: No.
[6] Q: That's a steady job?
[7] A: Yes.
[8] Q: Did you ever work as a crane operator?
[9] A: No.
[10] Q: That's a steady job?
[11] A: Yes.
[12] Q: What is your understanding of what steady jobs are?
[13] A: Somebody who is working steady, forty hours or [14] whatever.
[15] Q: But those are regular jobs where a person goes to the [16] station, doesn't come to the hall, goes to the [17] station and goes to work?
[18] A: Yes.
[19] Q: Now, what is a 5th wheel driver?
[20] A: Somebody who drives a container around.
[21] Q: Have you ever driven a container around?
[22] A: Yes.
[23] Q: And is that a steady job for some people?
[24] A: No — maybe — yes, I think it is.

Page 90

[1] Q: What other jobs are available for you to work as a [2] longshoreman?
[3] A: I don't know what you mean.

**Page 91**

[4] Q: Well, you talked about containers, you talked about cars, you talked about being a driver for the containers. Are there any other jobs?
[7] A: There is a couple of more jobs, yes.
[8] Q: Odd jobs?
[9] A: Pardon me?
[10] Q: What other jobs are there?
[11] A: An up job.
[12] Q: What is an up job and a down job?
[13] A: Taking the containers on and latching the containers.
[14] Q: Latching them in the trucks?
[15] A: No, just unlatching them off the vessel.
[16] Q: Off the —
[17] A: Yes.
[18] Q: Are there line handler jobs?
[19] A: Not in this union.
[20] Q: Not in Local 799, 805 or 800?
[21] A: No.
[22] Q: In fact line haulers do what?
[23] A: They tie up the ship.
[24] Q: And that's a separate local, isn't it?

**Page 92**

[1] A: Yes.
[2] Q: Did you ever go to that local looking for work?
[3] A: No.
[4] Q: Now, you are aware that the ILA ESA Hiring Hall is an exclusive Hiring Hall?
[6] A: Yes.
[7] Q: And what is your understanding of the term exclusive Hiring Hall?
[9] A: Union Hiring Hall, ILA, longshoreman.
[10] Q: Well, can you go and get a job, a car job, or a container job without going through the hall?
[12] A: Yes.
[13] Q: How do you do that?
[14] A: You get a phone call.
[15] Q: From where?
[16] A: One of the delegates.
[17] Q: From the Hall?
[18] A: From the Hall.
[19] Q: So all that work goes through the hall?
[20] A: Yes.
[21] Q: You just can't go up to the stevedore company and say, well, here I am, hire me for the day?
[23] A: No, I don't think so.
[24] Q: You have to go through the hall?

**Page 93**

[1] A: Yes.
[2] Q: Now, how many stevedore companies are there in Boston?
[4] A: Two.
[5] Q: Where are they?
[6] A: John T. Clark and P&O.
[7] Q: P&O?
[8] A: Yes.
[9] Q: ITO, not P&O.
[10] A: That's what I thought.
[11] Q: And is it the same kind of work for John T. Clark and ITO?
[13] A: Yes, Union work, yes.
[14] Q: And it's all on Mass. Port facilities?
[15] A: Yes.
[16] Q: I just want to be sure I understand this.
[17] Your complaint has been from May of 1998 from January of 2000 that that — your membership in Local 1947 entitled you to a preference over persons not having Union membership in getting jobs out of —
[21] MR. LATHROP: We asked this again, this is the only contention.
[23] BY MR. MCMAHON:
[24] Q: That you should have gone out before any nonunion

**Page 94**

[1] person?
[2] A: Yes.
[3] MR. LATHROP: Again, this is with the — we have gone over this before. You're not saying this is the only contention?
[6] BY MR. MCMAHON:
[7] Q: What other contentions are you claiming?
[8] MR. LATHROP: In this lawsuit.
[9] MR. MCMAHON: In this lawsuit.
[10] MR. LATHROP: He is not claiming that contention at all in this lawsuit. He historically claimed it.
[13] Q: In this lawsuit are you contending that your placement in Gang 12 on January 15th, 2000 was a discriminatory and retaliatory act by the Hiring Hall Rules Committee?
[17] A: No, not from August '98.
[18] Q: But was — from August '98?
[19] A: Yes.
[20] Q: Let's go back to this lawsuit.
[21] Let's go to January 2000. Is it your contention that the failure to place you in Gang 11 was retaliatory and discriminatory by the defendant's in this case?

**Page 95**

placement in Gang 12 in January of 2000?
[4] A: Not in January of 2000.
[5] Q: When did you become aware of that?
[6] A: After that I asked — I told you I asked the delegate what do I have to do to, you know, go before the Rules Committee.
[9] Q: But you knew that you were in Gang 12?
[10] A: Yes, I was in Gang 12.
[11] Q: And you knew you were in Gang 12 on January of 2000?
[12] A: Yes, I was in Gang 12.
[13] (Brief break.)
[14] BY MR. MCMAHON:
[15] Q: Mr. Keefe, I want to come back to the complaint which is, I think, Exhibit 16. You have it there?
[17] A: (Witness complying.)
[18] Q: Who are the persons in Local 805 as set forth in your complaint of Count 1, Paragraph 29 where the action for Local 805 breached Article XV of the ILA Constitution?
[22] A: The president, delegate, whoever was on the Rules Committee for 805.
[24] Q: In August 10, 1998?

**Page 96**

[1] A: Yes.
[2] Q: What were the Rules Committee?
[3] A: Not the Rules Committee August 10th, no, just the President and the Vice President Delegate.
[5] Q: Again, we're going to go to Count 2, it says, "By not immediately placing Keefe in Gang 11 Local 805 breached the ILA Constitution and the Hiring Hall Work Rules. Similarly, Count 331, by not immediately placing Keefe in Gang 11, Local 800 breached the ILA constitution in Hiring Hall Work Rules, and similarly if Count 4, Paragraph 32, by not immediately placing Keefe in Gang 11, 799 breached the ILA constitution in Hiring Hall workers."
[14] Yet the failure to not immediately place you in Gang 11 according to your complaint occurred on or about January 15th, 2000 coming back to Paragraph 26 on Page 5, is that correct?
[18] A: Yes.
[19] Q: No further questions, thank you, sir.
[20] MR. LATHROP: Thank you very much.

CERTIFICATE
COMMONWEALTH OF MASSACHUSETTS
COUNTY OF MIDDLESEX
I, Mary P. Peacock, a Professional Shorthand

Stephen Keefe v. Local 805, et al
Case 1:04-cv-11340-DPW  Document 24-4  Filed 08/25/2006  Page 18 of 18
Stephen Keefe
February 6, 2002

Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that STEPHEN KEEFE, the witness whose examination is hereinbefore set forth, was duly sworn by me and that such examination is a true and accurate record, to the best of my knowledge, skills, and ability of the testimony given by such witness.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 17th day of February, 2002.

Mary P. Peacock, Notary Public
My Commission Expires:
November 29, 2007

Page 97

ERRATA SHEET DISTRIBUTION INFORMATION
DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Scott Lathrop, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to John McMahon, Esquire, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for Errata Sheet distribution information.

Page 98

PLEASE ATTACH TO THE DEPOSITION OF STEPHEN KEEFE
CASE: KEEFE VS. LOCAL 800
DATE TAKEN: 2/6/02

ERRATA SHEET

Please refer to Page 97 for errata sheet instructions and distribution instructions.

PAGE    LINE    CHANGE            REASON

I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this _____ day of _____, 2002.

STEPHEN KEEFE