Stephen Keefe 1/7/2003
Stephen Keefe v. Local 805, et al.

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3                         CIVIL ACTION NO. 01-10194-DPW
 4      - - - - - - - - - - - - - - - - - - -
 5      STEPHEN KEEFE,                       :
 6                   Plaintiff,              :
 7      V.                                   :
 8      LOCAL 805, INTERNATIONAL             :
 9      LONGSHOREMEN'S ASSOCIATION AFL-CIO,  :
10      LOCAL 800, LOCAL 799,                :
11                   Defendants.             :
12      - - - - - - - - - - - - - - - - - - -
13            Deposition of STEPHEN F. KEEFE, a witness
14      called by counsel for the Defendants, taken pursuant to
15      the applicable provisions of the Federal Rules of Civil
16      Procedure, before Rosemary F. Grogan, a Registered
17      Professional Reporter, CSR No. 112993, and Notary
18      Public in and for the Commonwealth of Massachusetts, at
19      the offices of Angoff, Goldman, Manning, Wanger &
20      Hynes, 45 Bromfield Street, Boston, Massachusetts, on
21      Tuesday, January 7, 2003, commencing at 11:40 a.m.
22
23            O'BRIEN & LEVINE COURT REPORTING SERVICES
24                         (617) 254-2909
```

Page 2:

```
 1  APPEARANCES:
 2  Representing the Plaintiff:
 3    SCOTT A. LATHROP
 4    122 Old Ayer Road
 5    Groton, MA 01450
 6    (978) 448-8234
 7    (Fax) (978) 448-8244
 8    BY: SCOTT A. LATHROP, ESQUIRE
 9
10  Representing the Defendants:
11    ANGOFF, GOLDMAN, MANNING, WANGER & HYNES, P.C.
12    45 Bromfield Street
13    Boston, MA 02108
14    (617) 723-5000
15    Fax (617) 742-1615
16    BY: JOHN F. McMAHON, ESQUIRE
17
18  Also present:
19    James Langan
20    Richard Flaherty
21    Timothy Keefe
22
23
24
```

Page 3:

```
             INDEX
WITNESS                        PAGE NO.
STEPHEN KEEFE (Vol. II)
BY MR. McMAHON                    4

     TRANSCRIPT MARKED CONFIDENTIAL
STEPHEN KEEFE                  PAGE NO.
BY MR. McMAHON                   24


           EXHIBITS
NO.    DESCRIPTION              PAGE NO.
19   Notes                         13
20   Letter dated 11/1/01 and      21
     Attachment
21   1999 W-2 Earnings             23
22   2001 W-2 Earnings             27
23   Copy of Container Royalty Check  30
     (Attorney McMahon retained Exhibits)
```

Page 4:

 1   STEPHEN KEEFE, Deponent, having been duly
 2   sworn, deposes and states as follows:
 3
 4   EXAMINATION BY MR. McMAHON:
 5
 6   BY MR. McMAHON:
 7   Q. Mr. Keefe, you are the plaintiff in this
 8   case?
 9   A. Yes.
10   Q. And what is your present residence address?
11   A. 17 Marion Street, Green Harbor,
12   Massachusetts.
13   Q. What is your current hourly rate as a
14   longshoreman?
15   A. $27, I think.
16   Q. Is that the top rate?
17   A. No.
18   Q. Is it close to the top rate?
19   A. I don't know what the top rate is.
20   Q. And it's about $27 an hour?
21   A. Yes.
22   Q. You had previously testified that effective
23   as of the date of Exhibit 11 in your deposition, that
24   you were only on the payroll of the John T. Clark and

Page 5:

 1   Company on a casual basis as a longshoreman; is that
 2   correct?
 3       MR. LATHROP: Objection. Are you asking
 4   about his memory of his prior testimony --
 5       MR. McMAHON: Yes.
 6       MR. LATHROP: -- or just asking him again?
 7       MR. McMAHON: I'm asking him again.
 8   A. Repeat the question.
 9       MR. McMAHON: Could the question be read
10   back, please?
11       (Record Read)
12   A. For the longshore work, yeah.
13   Q. But you were also on the office payroll as
14   of May 24, 2000; is that correct?
15   A. Yes.
16   Q. And you continue to be on the office
17   payroll right up to today?
18   A. Correct.
19   Q. And you are available to perform such work
20   as may be assigned to you by John T. Clark other than
21   longshore work?
22   A. Correct.
23   Q. Have you been paid vacation pay by the
24   Boston Shipping Association?

Page 6

1   A. Yes.
2   Q. And for what years were you paid?
3   A. Vacation pay, last year, I was paid, and
4   one other prior year. I don't know what year it was.
5   Q. And was that because you had sufficient
6   longshore hours accumulated in a year prior to the year
7   of payment that you became entitled to vacation pay?
8   A. Yes.
9   Q. Did you receive vacation pay in 1999?
10  A. I don't know what year it was that I
11  received the other vacation pay.
12  Q. Mr. Keefe, I show you a document — I'm
13  sorry, I only have one copy available. -- dated
14  November 1, 2001, which is a letter from Boston
15  Shipping Association to me which includes work records
16  of a number of individuals. You are one of the
17  individuals.
18      And I show you the second page. Does that show
19  in 1999, you had 900 plus hours in qualifying vacation
20  pay?
21  A. Yes.
22  Q. And you would have received vacation pay in
23  the year 2000; is that correct?
24  A. Yes.

Page 7

1   Q. You also received another vacation pay
2   recently?
3   A. This year.
4   Q. Were you paid holiday pay?
5   A. When?
6   Q. This year.
7   A. Yes.
8   Q. Were you paid holiday pay for the year?
9       MR. LATHROP: Can you be specific? When
10  you say, This year, are you --
11      MR. McMAHON: Strike that. Let me rephrase
12  the question.
13  BY MR. McMAHON:
14  Q. Did you receive holiday pay for holidays in
15  the year 2000?
16  A. No.
17  Q. Did you receive holiday pay for the year
18  2001?
19  A. No.
20  Q. Did you receive holiday pay for the year
21  2002?
22  A. Yes.
23  Q. And was that because you had worked
24  sufficient hours in order to be eligible for holiday

Page 8

1   pays?
2   A. Yes.
3   Q. In fact, did you ask a business agent for
4   Local 805 to intervene on your behalf to the Boston
5   Shipping Association to obtain holiday pay?
6   A. No.
7   Q. Who gave you the holiday paycheck?
8   A. The business agent.
9   Q. Did you have any prior discussions with the
10  business agent about the holiday paycheck?
11  A. Yes, I'm entitled to it.
12  Q. And were you told you were entitled to it?
13  A. Yes.
14  Q. And he went and got it for you; is that
15  correct?
16  A. Yeah, that's what he's supposed to do.
17  Q. And did he have to complain on your behalf
18  to the B.S.A. that you were eligible for the holiday
19  pay?
20  A. I was eligible.
21  Q. Did he go to the B.S.A. and obtain --
22  A. I don't know how that's done.
23  Q. But you went and told him you were eligible
24  for the holiday pay?

Page 9

1   A. He should have given me a check without me
2   going to him and telling him and I was eligible.
3   Q. You made a complaint to him?
4   A. I didn't complain. I asked him.
5   Q. You asked him about it?
6   A. Because I was eligible for it.
7   Q. And he went and got the holiday pay; is
8   that correct?
9   A. Who?
10  Q. The business agent.
11  A. Yes.
12  Q. Now, during the year 2000, were you
13  disabled from working in the longshore industry?
14  A. I had gotten into a car accident.
15  Q. Did that car accident occur in the parking
16  lot of a hiring hall?
17  A. No, I don't think so.
18  Q. Did an incident occur in the parking lot of
19  a hiring hall in which you required intervention of
20  emergency medical technicians?
21  A. I don't know what you're talking about.
22  Q. Was there an incident in the hiring hall
23  parking lot in which public emergency personnel had to
24  deal with a condition that you were in?

### Page 10

1  A. No.
2  Q. Mr. Keefe, I would like to show you page 53
3  of your deposition on February 6th, 2002. And I want
4  you to read at page 53 into the record, lines 7 through
5  13.
6     MR. LATHROP: I'm sorry, what page was
7  that?
8     MR. McMAHON: 53, 7 through 13. I want to
9  get the transcript so I'll have it for me as well. Off
10 the record for a moment.
11    (Off Record Discussion)
12    MR. McMAHON: Back on the record, please.
13 BY MR. McMAHON:
14 Q. On page 53 in the prior transcript, I
15 asked: But in fact on May 24, 2000, you were working
16 as a longshore and also doing other work for
17 John T. Clark, isn't that true? Your answer was, Yes.
18    You were then asked: Are you still doing work
19 for John T. Clark other than longshore work? Your
20 answer was, No.
21    However, in fact, as of May 24, 2000, and right
22 up until today you're on the office payroll of
23 John T. Clark; isn't that true?
24 A. Yes.

### Page 11

1  Q. And you were available to do work as it's
2  assigned to you by John T. Clark Company; isn't that
3  true?
4  A. Yes.
5  Q. Again, if you would look at page 54, and
6  lines three to four, and it's poorly phrased for which
7  I apologize.
8     The question reads: Were you still continuing as
9  of May 25 to do it, work, for John T. Clark & Sons
10 other than longshore work? And your answer was, No.
11 Am I correct?
12 A. Yes.
13 Q. And again, you're on the office payroll of
14 John T. Clark for assignments other than longshore work
15 even up until today; isn't that true?
16 A. Yes.
17 Q. Are you aware that in order to be in
18 Gang 11 you must be working exclusively at the
19 longshore pier in Boston?
20 A. Yes.
21 Q. Now, are you still receiving health
22 insurance from John T. Clark and Company?
23 A. Yes.
24 Q. Are you eligible for the health insurance

### Page 12

1  provided through the B.S.A., I.L.A. contracts?
2  A. I didn't get a thousand hours. I think
3  it's a thousand hours.
4  Q. But you still receive the equivalent health
5  coverage?
6  A. From?
7  Q. From John T. Clark and Company.
8  A. I don't understand the question.
9  Q. Do you receive health insurance from the
10 John T. Clark Company?
11 A. Yes.
12 Q. What is the plan?
13 A. I don't know right offhand.
14 Q. Is that the same plan that your brother,
15 Timothy, is on?
16 A. It could be, yes.
17 Q. Do you have the card with you?
18 A. No.
19 Q. Now, at various times you reported to the
20 hiring hall in 1998 and 1999. Did you make notes of
21 each time you reported to the hiring hall?
22 A. Yeah.
23 Q. And are those notes part of your production
24 of documents earlier in this case?

### Page 13

1  A. Whatever you have there. (Indicating)
2     MR. McMAHON: May this be marked as -- You
3  want to continue with the same numbers?
4     MR. LATHROP: Yes, why don't you.
5     MR. McMAHON: This will be Deposition
6  Exhibit No. 19.
7     (Exhibit 19 Marked for Identification)
8  BY MR. McMAHON:
9  Q. Mr. Keefe, before I inquire, you have a
10 document before you and have had it since the
11 deposition began.
12    Can you identify that document?
13 A. It's for my lawyer.
14 Q. Can you describe the nature of the
15 document?
16 A. It's my W-2s.
17 Q. And you were requested earlier to produce
18 your W-2s; isn't that correct?
19 A. I don't remember.
20 Q. We'll get to that in a few minutes.
21    Mr. Keefe, you have before you Deposition Exhibit
22 19. Do you have any other notes other than the notes
23 that are reflected in SK 101 through SK 135 concerning
24 your appearance for work at the hiring hall?

Stephen Keefe 1/7/2003
Stephen Keefe v. Local 805, et al.

14

1   A. No.
2   Q. And can we stipulate that these are
3   documents that were produced by you in connection with
4   the union's request for production of documents, and in
5   fact the SK and numbers thereafter are Mr. Lathrop's
6   Bates stamp?
7       MR. LATHROP: That's my version of the
8   Bates stamp, yes.
9   BY MR. McMAHON:
10  Q. Now, looking again at SK 101 of Deposition
11  Exhibit 19, can you tell me the date of that item?
12      (Witness reviewing document)
13  A. No.
14  Q. Is that your handwriting on the item, Kevin
15  Manning called; three non-union men before me, lost pay
16  in hours?
17  A. Yes.
18  Q. On each occasion that you lost pay in
19  hours, did you make a note?
20  A. Yeah.
21  Q. And how much pay and how many hours did you
22  lose here?
23  A. I don't know.
24  Q. If you, again, look at SK 103, which is the

15

1   next sheet, would you agree with me that reads July 22,
2   1999?
3   A. Up there? (Indicating)
4   Q. Yes.
5   A. Yeah.
6   Q. And it states in your handwriting, I
7   believe, Lose four hours pay?
8   A. I think that's probably — could have been
9   an old slip that I had in my car. I don't know if
10  that's that particular day or not.
11  Q. So it continues to read, Non-union man
12  hired before me. He got first gang. So assume on that
13  day you got called on the 2nd?
14  A. Yes.
15  Q. And how many hours would you have worked on
16  the 2nd?
17  A. Maybe four hours.
18  Q. Was that as a fill-in or just a regular
19  gang assignment?
20  A. Fill-in.
21  Q. Now, SK 102, which is actually the third
22  sheet of Deposition Exhibit 19, refers to lost eight
23  hours pay. Is that July 21, 1999?
24  A. I don't know.

16

1   Q. Can you read it?
2   A. Yes, it is July 21st, but it could have
3   been an old slip that I had in my car.
4   Q. So that the comments that are here, are
5   not — do not necessarily mean you lost pay on the
6   dates that are on the slips; am I correct?
7   A. Right.
8   Q. If you look at SK 104, it refers to
9   non-union men called before me, JS and KM were
10  dispatchers; am I correct?
11  A. Right.
12  Q. And in fact on that day did you get a job?
13  A. I don't know.
14  Q. And again, this may be something you wrote
15  on a slip with something in your car?
16  A. Right.
17  Q. And has no bearing whatsoever on the date?
18  A. On this particular date?
19  Q. Yes.
20  A. Not that I know of, no.
21  Q. And again, if we go to SK 105, that seems
22  to be dated February 10, 1999, Non-union man called
23  before me, JS and KM were the dispatchers.
24      And again, you're telling us, so that I'm clear,

17

1   that this was a slip which may have been in your car
2   and you just made a note on it?
3   A. It could have been. This might be the slip
4   that I got.
5   Q. But you're not sure. Do you know if you
6   were hired on February 10th, 1999?
7   A. Yeah.
8   Q. Look at SK 106. Again this is an
9   assignment slip, and it repeats your complaint that a
10  nonunion man was hired before me; got the last job.
11      So you got a full day's work on that day?
12  A. I don't know if I got a full day's work.
13  Q. You got a job? Got the last job?
14  A. Yeah.
15  Q. Go to 107. Called me first. You got a
16  job; am I correct?
17  A. Yeah.
18  Q. 108, which appears to be a February 1999
19  date, Got a job; am I correct?
20  A. Yeah.
21  Q. SK 109, Got a job; am I correct?
22  A. What are you asking me?
23  Q. Did you get a job on that day?
24  A. Yep.

**Page 18**

1  MR. LATHROP: Can we go off the record?
2  (Off Record Discussion)
3  MR. LATHROP: We can stipulate that on a
4  day of assignment sheet that he got a job, he got that
5  assignment that day. I can stipulate. We don't need to
6  establish that.
7  BY MR. McMAHON:
8  Q. Now, do these reflect all of the days that
9  you appeared looking for work at the hall?
10  A. No.
11  Q. Do you have any record of the days that you
12  appeared looking for work?
13  A. No.
14  Q. So other than these assignment slips, you
15  have no document that you can look at and say, I was at
16  the hall, I had my hand up, and I wasn't selected to
17  work; am I correct?
18  A. No.
19  Q. What document do you have?
20  A. No, you're asking me if I have any
21  documents, I don't.
22  Q. So you have nothing to prove when you were
23  at the hall?
24  A. No.

**Page 19**

1  Q. What's the process when you go in the hall
2  by which a dispatch slip is filled out?
3  A. They call the gangs in, and whatever gang
4  you're in, you go to the window and get a job.
5  Q. Is there any document which would show that
6  on a particular date you were present at the hall
7  looking for a job other than a dispatch slip?
8  A. No.
9  Q. So, in effect, you can't prove the days
10  that you were at the hall looking for a job in 1998 or
11  1999 --
12  MR. LATHROP: Objection.
13  Q. -- and didn't get a job?
14  MR. LATHROP: Objection to the form.
15  MR. McMAHON: I'll restate it.
16  BY MR. McMAHON:
17  Q. During 1998 and 1999, were there occasions
18  when you appeared at the hall and did not get a job?
19  A. Yes.
20  Q. Do you have any record of what those dates
21  are?
22  A. No.
23  Q. Is there any document to your knowledge
24  which would show what days you were at the hall?

**Page 20**

1  A. No.
2  Q. When you come to the hall and look for work
3  as a casual, do you report to anyone?
4  A. No.
5  Q. Do you just stand there and wait to be
6  selected?
7  A. Yes.
8  Q. Were you often selected during the period
9  1998 and 1999 for work?
10  A. Yes.
11  Q. Did you work 949 in 1999?
12  (Witness reviewing document)
13  A. Yes.
14  Q. How many hours did you work in 2000?
15  MR. LATHROP: Let the record reflect
16  Mr. Keefe is simply looking at the document you handed
17  to him earlier.
18  MR. McMAHON: I provided to him.
19  A. 466 and a half hours.
20  Q. During 2000, you were a member of Gang 12;
21  am I correct?
22  A. Yes.
23  Q. And would you look and see the number of
24  hours Brian Manning worked in 2000?

**Page 21**

1  (Witness reviewing document)
2  A. They're not here.
3  Q. In the year 2000, did Mr. Manning, Brian
4  Manning, work 1100 plus hours?
5  A. Yes.
6  Q. And in fact, you have priority for
7  dispatching over Mr. Manning during the year 2000; is
8  that correct?
9  A. Yes.
10  Q. Now, again --
11  MR. LATHROP: Are we going to mark this as
12  an exhibit? I think to the extent you are relying upon
13  it, I would ask that it be marked as an exhibit.
14  MR. McMAHON: Sure; that can be Deposition
15  Exhibit 20.
16  (Exhibit 20 Marked for Identification)
17  BY MR. McMAHON:
18  Q. Mr. Keefe, you have before you what is now
19  Deposition Exhibit 20. And I believe it shows on its
20  second page, your total hours in '01 as 869.5; am I
21  correct?
22  A. Yes.
23  Q. So I take it, you did not make hours for
24  vacation or holiday pay in the year 2001?

Stephen Keefe 1/7/2005
Stephen Keefe v. Local 805, et al.

22

1   A.   Vacation.
2   Q.   You made vacation, but not holiday; is that
3 correct?
4   A.   Right.
5   Q.   And that's because you didn't work a number
6 of hours? And you can control the number of hours you
7 work as a longshoreman by the frequency of your
8 appearances at the hall looking for work; isn't that
9 true?
10   A.   Yes.
11   Q.   How many hours did you work in '02?
12   A.   I don't know. I don't have that.
13   Q.   Was it fewer hours than you worked in '01?
14   A.   I don't know. I don't have the -- I don't
15 know how many hours I worked.
16   Q.   But in '01, you were worked fewer hours
17 than Brian Manning; is that correct?
18   A.   Yes.
19   Q.   Yet, you have a priority in '01 over
20 dispatch as between you and Brian Manning; isn't that
21 correct?
22   A.   Yes, but Brian Manning could have got phone
23 calls after everybody left or whatever -- however, it
24 works down there.

23

1   Q.   But in any event, would that suggest that
2 you appeared fewer times looking for work than Brian
3 Manning?
4   A.   No, not necessarily.
5       MR. McMAHON: Could this be marked as
6 Deposition Exhibit 21, please?
7       (Exhibit 21 Marked for Identification)
8 BY MR. McMAHON:
9   Q.   Mr. Keefe, I show you what has been marked
10 as Deposition Exhibit 21, which is marked Confidential,
11 April 27, '02, SK 5.
12       MR. McMAHON: I assume we can stipulate
13 that's your version of the Bates stamp?
14       MR. LATHROP: Yes, and we also marked the
15 Confidential. So can we mark this part of the
16 deposition as being confidential?
17       MR. McMAHON: As confidential, and the
18 gentlemen will sign a confidentiality agreement and
19 I'll give you copies of it.
20       MR. LATHROP: That's fine.
21       * * *
22
23
24

24

1           CONFIDENTIAL
2
3 BY MR. McMAHON:
4   Q.   Mr. Keefe, in 1998, you received a W-2 from
5 John T. Clark & Son showing Social Security wages of
6 $12,375.04.
7       Was that for longshore casual work?
8   A.   Which one are you referring to? In the
9 bottom one or the top?
10   Q.   This one, the bottom one. (Indicating)
11   A.   The bottom one is longshore work.
12   Q.   And again, if I go to the second page,
13 which is SK 6, it shows another W-2 from
14 I.T.O. Corporation of New England in the amount of
15 $1,658.30. Is that also longshore work?
16   A.   Yes.
17   Q.   Now, is ITO Corporation another stevedore
18 company?
19   A.   Yes.
20   Q.   And John T. Clark and Company was a
21 stevedore company?
22   A.   Yes.
23   Q.   Now, again, if I look on the top of the
24 document, the first page, it also is a W-2 for 1998,

25

1 and it shows reported W-2 wages of $76,362.
2       Was that money paid to you as a person on the
3 office payroll of John T. Clark during 1998?
4   A.   Yes.
5   Q.   Without belaboring the point, let me ask
6 you to look at SK 3 of the same exhibit, and that
7 reflects a gross pay of, again, $76,362 reported W-2
8 wages, John T. Clark.
9       And that's payment to you off the office payroll?
10   A.   Yes.
11   Q.   And if I look below, it shows reported W-2
12 wages of $21,579.85 on a W-2 issued from John T. Clark.
13 Is that for casual longshore work?
14   A.   Yes.
15   Q.   If I look at the 1999 second sheet, it
16 refers to a W-2 from I.T.O. Corporation in the amount
17 of $3,678.50.
18       And is that for casual longshore work?
19   A.   Yes.
20   Q.   So it's fair to say you made approximately
21 $25,000 in longshore work on a casual basis in 1999?
22   A.   Yes.
23   Q.   And in addition to that, you were paid
24 $76,362 off the office payroll --

## Page 26

1  A. Yes.
2  Q. -- from John T. Clark?
3  A. Yes.
4  Q. Again, if I refer to the 2000 W-2 earnings
5  summary, the top -- and that's on SK 1 in reverse order
6  when it came in.
7      That refers, again, to a gross pay of $76,362 off
8  the office payroll? Top of the sheet, sir.
9  (Indicating)
10 A. Yes.
11 Q. It also shows another W-2 from
12 John T. Clark and Company with gross pay of $13,585.50,
13 and a second W-2 from L.T.O. showing gross pay of
14 $2603.50.
15    Are the $13,500 figure and the $2600 figure
16 earnings on longshore work on a casual basis?
17 A. Yes.
18 Q. And you were in Group 12 at that time; am I
19 correct?
20 A. Yes.
21 Q. Now, do you have any other W-2s with you?
22 A. Yes.
23 Q. May I see them, please?
24    (witness proffering document)

## Page 27

1  BY MR. McMAHON:
2  Q. Do you have your 2002 W-2 statement?
3  A. No.
4      MR. McMAHON: We'll make copies of this. I
5  want to make it an exhibit.
6      MR. LATHROP: Obviously, I'm not in a
7  position to mark confidential on it.
8      MR. McMAHON: We'll treat it the same way.
9  I have no problem with that. Okay?
10     MR. LATHROP: Okay.
11     (Short Recess)
12     MR. McMAHON: Can this be marked as
13 Deposition Exhibit 22?
14 BY MR. McMAHON:
15 Q. Mr. Keefe, I show you what has been marked
16 as Deposition Exhibit 22. And again, let me ask you to
17 turn to the last page.
18    In that compilation it refers to a W-2 issued by
19 B.S.A. Central Records Bureau, Inc., and wages of
20 $1,000. Do you know what those wages represent?
21 A. A vacation check.
22 Q. Let's go to the next page. And that's a
23 W-2 for the year 2001 from John T. Clark and Company in
24 gross pay of $19,435.74?

## Page 28

1  (Witness reviewing document)
2  A. Yes.
3  Q. And that's for longshore work?
4  A. No.
5  Q. What is that for?
6  A. Office work.
7  Q. Well, if we go to the 2001 sheet, the top
8  one that refers to a gross pay of --
9  A. No, that's for longshore work.
10 Q. That's for longshore work the $19,400?
11 A. Yes.
12 Q. And then Northeast P and O Ports, N.E.,
13 Inc., is that also longshore work in the amount of
14 $4,421.50?
15 A. Yes.
16 Q. So in effect, you made approximately
17 $23,000 wages and a $1,000 in vacation pay, and $24,000
18 in longshore work in 2001; is that correct?
19 A. Yes.
20 Q. And you were a member of Group 12, Group 11
21 during 2001; is that correct?
22 A. Yes.
23 Q. Now, at the same time you were getting
24 $76,362 for office work from John T. Clark & Sons; am I

## Page 29

1  correct?
2  A. Yes.
3  Q. Now, are you still getting medical
4  insurance coverage? I may have asked that --
5  A. Yes.
6  Q. -- from John T. Clark & Son?
7  A. Yes.
8  Q. Are you a participant in the B.S.A., I.L.A.
9  retirement fund?
10 A. Yes.
11 Q. And for how long have you been a
12 participant?
13 A. I don't know.
14 Q. Had you received container royalty fund
15 payments?
16 A. Yes.
17 Q. You received one payment?
18    MR. LATHROP: To date?
19    MR. McMAHON: To date.
20 A. Three, I think.
21 Q. Are you due another one?
22 A. Yes.
23 Q. Have you gone to someone to complain about
24 the fact that you're due one?

Stephen Keefe 1/7/2003
Stephen Keefe v. Local 805, et al.

### Page 30

1  A. To complain, no.
2  Q. Did you inquire of someone about the
3  container royalty fund?
4  A. Someone came to me.
5  Q. And who came to you?
6  A. Bernie O'Donnell.
7  Q. And Bernie O'Donnell is the president of
8  Local 805?
9  A. Yes.
10 Q. And he's also the East Coast ACD president?
11 A. Yes.
12      MR. McMAHON: Well, I want you to look at
13 that.
14      MR. LATHROP: I think I've seen that.
15      MR. McMAHON: I want you to look at that
16 again. We'll make a copy of it and make it an exhibit.
17 BY MR. McMAHON:
18 Q. Mr. Keefe, I'm glad to present you with the
19 container royalty fund check.
20 A. Thank you.
21 Q. In the sum of --
22      MR. McMAHON: Let me make a copy of it and
23 make that an exhibit as well.
24      (Exhibit 23 Marked for Identification)

### Page 31

1  BY MR. McMAHON:
2  Q. Mr. Keefe, do you recognize Deposition
3  Exhibit 23 as a container royalty fund check?
4  A. Yes.
5  Q. Would that check bring you up to date on
6  all container royalty payments due to you?
7  A. Yes.
8       MR. McMAHON: And note that I had delivered
9  the original check in the amount of -- whatever Exhibit
10 23 is, to Mr. Keefe with apologies. We thought it was
11 being handled it a different way.
12 BY MR. McMAHON:
13 Q. Are you paid container royalty funds for --
14 in the next year after the year in which they were
15 earned?
16 A. Yes.
17 Q. So the check that is Exhibit 23 reflects
18 hours in contract year '01 as opposed to '02; am I
19 correct?
20 A. Yes.
21 Q. And the contract year is actually October
22 through September; am I correct?
23 A. Yes.
24 Q. So this reflects hours worked in some

### Page 32

1  amount for the period, October 1, 2000 through
2  September 30th, 2001; am I correct?
3  A. No.
4  Q. Would you --
5  A. I think it's the year October through
6  September 2002.
7  Q. October 2001 through September 2002?
8  A. Right.
9  Q. Now, again, in 2002, you were paid on the
10 office payroll of John T. Clark in the amount of
11 $76,000 plus; am I correct?
12 A. 2002?
13 Q. Yes.
14 A. I don't have that in front of me.
15 Q. Were you paid that amount?
16 A. I don't know.
17 Q. Were you paid from the office payroll in
18 2002?
19 A. Yes.
20 Q. And what amount monthly were you paid?
21 A. I'll have to check. I don't know.
22 Q. Would it be the same monthly amount that
23 you were paid in 2001 and 2000?
24 A. It might have been. I don't know. I'll

### Page 33

1  have to look.
2  Q. Would it be in the same approximation of
3  $76,362 reflected in Exhibit 22, page one?
4  A. I'll have to -- when I get home, I'll have
5  to look. I'll look and see.
6  Q. But we agree that there is another paycheck
7  coming to you from John T. Clark in the year 2002,
8  other than a check for longshore work?
9  A. Another check?
10 Q. A paycheck --
11 A. No.
12 Q. -- off the office payroll?
13 A. From 2002?
14 Q. Yes.
15 A. No.
16 Q. So you received -- you were not on the
17 office payroll in the year 2002?
18 A. Yes.
19 Q. You were on the office payroll?
20 A. Yes.
21 Q. And did you receive a check from the office
22 payroll?
23 A. Yes, I just don't know how much it was for
24 that year.

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

## Page 34

1  Q. Was it significantly different than the
2  same office payroll check in prior years?
3  A. I have to check. I don't know off the top
4  of my head.
5      MR. McMAHON: May I have a moment? We may
6  be finished. Let me take a moment and consult.
7      (Short Recess)
8  BY MR. McMAHON:
9  Q. I have a correction to make with respect to
10 Exhibit 23. It is my understanding that this check is
11 for the contract year, October 1, '98 through September
12 30, '99.
13 A. I don't know. I'm just -- I'm just going
14 by what the date is on here.
15     MR. McMAHON: That was my understanding
16 from the business agent.
17 A. Is there any interest on this or anything
18 when was this for?
19 Q. There is going to be battle you should get
20 anything, but we'll face that later.
21 A. What is this for?
22 Q. It's for October 1, '98 through September
23 30, '99.
24     MR. McMAHON: Nothing further.

## Page 35

1      MR. LATHROP: I have nothing.
2      (Deposition concluded at 12:50 p.m.)

## Page 36

            CERTIFICATION

    I, Rosemary F. Grogan, a Registered Professional
Reporter and Notary Public duly commissioned and
qualified in and for the Commonwealth of Massachusetts,
do hereby certify that STEPHEN KEEFE came before me
this 7th day of January, 2003, at Boston,
Massachusetts, and was by me duly sworn to testify to
the truth as to his knowledge touching and concerning
the matters in controversy in this cause; that he was
thereupon examined upon his oath and said examination
reduced to writing by me; and that the statement is a
true record of the testimony given by the witness, to
the best of my knowledge and ability.
    I further certify that I am not a relative or
employee of counsel/attorney for any of the parties,
nor a relative or employee of such parties, nor am I
financially interested in the outcome of this action.
    IN WITNESS WHEREOF, I have set my hand and affixed
my notarial seal this 11th day of January, 2003.

            _____
            Rosemary F. Grogan, RPR
            CSR No. 112993
My Commission Expires:
January 29, 2004

## Page 37

        ERRATA SHEET DISTRIBUTION INFORMATION
        DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

        ERRATA SHEET DISTRIBUTION INFORMATION
    The original of the Errata Sheet has been
delivered to Scott A. Lathrop, Esquire. When the
Errata Sheet has been completed by the deponent and
signed, a copy thereof should be delivered to each
party of record and the Original forwarded to John F.
McMahon, Esquire, to whom the original deposition
transcript was delivered.

            INSTRUCTIONS TO DEPONENT
    After reading this volume of your
deposition, please indicate any corrections or changes
to your testimony and the reasons therefor on the
Errata Sheet supplied to you and sign it. DO NOT make
marks or notations on the transcript volume itself.
Add additional sheets, if necessary. Please refer to
the above instructions for errata sheet distribution
information.

Stephen Keefe 1/7/2003
Stephen Keefe v. Local 805, et al.

38

1    SIGNATURE PAGE / ERRATA SHEET
2    RE: Stephen Keefe Vs. Local 805, et al.
3    DEPOSITION OF: Stephen Keefe - Vol. II  1/7/03
4         I, STEPHEN KEEFE, do hereby certify that I
5    have read the foregoing transcript of my testimony and
6    it is a true and correct record of my testimony to the
7    best of my knowledge and belief. Any corrections are
8    noted below.
9    PAGE   LINE(S)   READS   SHOULD READ
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18        Signed under the pains and penalties of
     perjury this _____ day of _____, 2003.
19
20   _____
     STEPHEN KEEFE           DATE
21
          Subscribed and sworn to before me this
22   _____ day of _____, 2003.
23   _____
     Notary Public
24   My Commission Expires: _____

11 (Page 38)