Page 1

VOL. I
PAGES 1-124
EXHIBITS 1-20

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.:  04-CV-11340DPW

* * * * * * * * * * * * * *

STEPHEN KEEFE,

PLAINTIFF,

VS.

LOCALS 805, INTERNATIONAL

LONGSHOREMEN'S ASSOCIATION,

AFL-CIO, ET, AL,

DEFENDANTS.

* * * * * * * * * * * * * *

DEPOSITION OF STEPHEN KEEFE, taken on

behalf of the Defendants, pursuant to the

applicable provisions of the Federal Rules of

Civil Procedure, before Bernadette J. D'Alelio,

Notary Public and Court Reporter within and for

the Commonwealth of Massachusetts, at the

Offices of Mullen & McGourty, 52 Temple Place,

Boston, Massachusetts, on May 8, 2006,

at 10:01 a.m., as follows:

---

Page 2

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF PLAINTIFF:
 4   SCOTT A. LATHROP, ESQ.
 5   122 Old Ayer Road
 6   Groton, Massachusetts 01450
 7   (978)448-8234
 8
 9   ON BEHALF OF DEFENDANTS:
10   MICHAEL L. MAHONEY, ESQ.
11   Mullen & McGourty
12   52 Temple Place, 4th Floor
13   Boston, Massachusetts 02111
14   (617)338-9200
15
16   ALSO PRESENT:
17   WILLIAM SULLIVAN
18
19
20
21
22
23
24
```

---

Page 3

```
 1        EXAMINATION INDEX
 2   DEPOSITION OF:       STEPHEN KEEFE
 3   DIRECT BY MR. MAHONEY:          5
 4
 5        EXHIBIT INDEX
     NO.                    PAGE
 6
     1  2003 W-2            11
 7
     2  Answers to Admissions    20
 8
     3  IRS Form            26
 9
     4  Complaint           31
10
     5  Hall Work           37
11
     6  Pledge Dated 5/25/00    39
12
     7  Letter Dated 5/24/00    41
13
     8A  W-2 for 2000       43
14
     8B  W-2 for 2000       43
15
     9A  W-2 for 2001       43
16
     9B  W-2 for 2001       43
17
     10A  W-2 for 2002      43
18
     10B  W-2 for 2002      43
19
     11A-R  2002 W-2        49
20
     11C  W-2 Wage Summary      49
21
     12  Letter Dated 4/7/05    76
22
     13  Letter Dated 4/7/03    78
23
24
```

---

Page 4

```
 1        EXHIBITS CONTINUED
 2   14  Letter Dated 12/11/03       78
 3
     15  Letter Dated 2/6/03        94
 4
 5   16  Rules              94
 6
     17  Certificate         94
 7
 8   17  Certificate         94
 9
     18  Letter             94
10
11   19  Letter             94
12
     20  Letter             94
13
14
15
16
17
18
19
20
21
22
23
24
```

DUNN & GOUDREAU

Page 5

1     PROCEEDINGS
2         STEPHEN KEEFE, the deponent,
3   having been satisfactorily identified and duly
4   sworn by the Notary Public, was examined and
5   testified as follows:
6       DIRECT EXAMINATION BY MR. MAHONEY:
7       Q.  Good morning, sir.  My name is Mike
8   Mahoney.  I represent the defendants in this
9   action.
10        I'm going to ask you several questions
11  over the next few minutes.  If you don't
12  understand any of my questions, just ask me to
13  rephrase them or repeat them, and I will be
14  happy to do that.
15        If you need to take a break to speak
16  with your attorney at any time, let me know,
17  and I'll accommodate you.  However, you cannot
18  take a break while there is a question
19  pending.
20        I would suggest that you answer my
21  questions verbally, because if you nodded in
22  agreement or shook your head in disagreement,
23  that wouldn't be reflected on the record as an
24  answer.

Page 6

1         Do you understand that?
2     A.  Yes.
3         MR. MAHONEY:  Usual
4   stipulations?
5         MR. LATHROP:  I assume they are
6   the usual, yes.
7         MR. MAHONEY:  I will waive
8   notarization.  He will read and sign?
9         MR. LATHROP:  That's fine.
10        MR. MAHONEY:  Thirty days.
11  Anything else?
12        MR. LATHROP:  That's fine.
13        BY MR. MAHONEY:
14    Q.  Sir, please state your name for the
15  record.
16    A.  Stephen Keefe.
17    Q.  What is your current address?
18    A.  17 Marion Street, Green Harbor,
19  Massachusetts.
20    Q.  With whom do you live there?
21    A.  My wife and one son.
22    Q.  Do you own or rent that house?
23    A.  I own it.
24    Q.  What is your date of birth?

Page 7

1     A.  1/9/52.
2     Q.  And your social security number?
3     A.  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.
4     Q.  Mr. Keefe, can you give me a thumbnail
5   sketch of your educational background starting
6   with high school education?
7     A.  I graduated from Boston English.
8     Q.  In what year?
9     A.  '69, '70 or so.
10    Q.  Any education after high school?
11    A.  Some college courses, nothing major.
12    Q.  Any degrees after high school?
13    A.  No.
14    Q.  Where did you attend college?
15    A.  I attended college in Pennsylvania.  I
16  took college courses.  I don't even remember
17  the name of it.
18    Q.  Are you currently employed?
19    A.  Yes.
20    Q.  Who do you work for?
21    A.  I'm a member of the union.  I work for
22  Columbia Coastal.
23    Q.  What type of a company is Columbia
24  Coastal?

Page 8

1     A.  They are a stevedoring company.
2     Q.  How long have you been employed by
3   Columbia Coastal?
4     A.  Since 1998, I think.
5     Q.  Have they always been called Columbia
6   Coastal?
7     A.  They were Port something, I think,
8   before.
9     Q.  Well, you said that you were employed
10  by Columbia Coastal since 1998.  I see that in
11  the W-2s that you produced today, we have a W-2
12  from 2004 from Columbia Coastal.  Prior to
13  that -- there is one for 2003, one for 2002.
14  There isn't one for 2001.
15    A.  It was P&O Ports in 2001.  That is
16  another company, P&O Ports.
17    Q.  P&O Ports is a company that preexisted
18  Columbia Coastal?
19    A.  That is just another company that I
20  worked for.
21    Q.  How many hours a week do you work
22  currently for Columbia Coastal?
23    A.  It varies.  It could be four.  It
24  could be 40.  It could be 60.  It varies.

2  (Pages 5 to 8)

Page 9

1 Q. Are you placed for employment at
2 Columbia Coastal by the union?
3 A. Yes.
4 Q. What gang are you currently in, in the
5 union?
6 A. Gang 10.
7 Q. I see that you do not have a W-2 from
8 Clark in 2004; is that correct?
9 A. No.
10 Q. My statement is correct, you don't
11 have a W-2 from Clark? You agree with me?
12 A. No, I wasn't working then.
13 Q. Is John T. Clark & Son still in
14 business?
15 A. No.
16 Q. When did they go out of business, if
17 they went out of business?
18 A. I think when P&O Port took over as the
19 paying agent, whatever year that was.
20 Q. For the Port of Boston?
21 A. Yes.
22 Q. So given that you don't have a W-2 for
23 2004 from Clark, but you do have a W-2 from
24 2003 from Clark, it's your best memory that

Page 10

1 John T. Clark & Company was not in business in
2 2004 as the paying agent for the Port of
3 Boston?
4 A. Correct.
5 Q. Did John T. Clark -- strike that.
6 Do you have any knowledge of the
7 business operations of John T. Clark & Son in
8 2003?
9 A. They were the paying agent.
10 Q. Did it employ anyone else in your
11 family in 2003, John T. Clark & Company?
12 MR. LATHROP: Objection to the
13 form of the question.
14 BY MR. MAHONEY:
15 Q. Was anyone else in your family working
16 at John T. Clark & Son in 2003?
17 MR. LATHROP: Objection to the
18 form of the question.
19 A. My brother.
20 Q. Tim?
21 A. Yes.
22 Q. And what was his job title there?
23 A. He was vice president maybe.
24 Q. In 2003 do you know who owned the

Page 11

1 assets of John T. Clark & Son?
2 A. No.
3 Q. Did your brother Timothy own the
4 assets of John T. Clark & Son in 2003?
5 A. I don't know.
6 Q. This John T. Clark, was it, in 2003, a
7 publicly held company? In other words, it had
8 stock that was sold on a stock market, or was
9 it a privately held company? Do you know?
10 A. I don't know.
11 Q. I have a W-2 here from 2003 which
12 indicates that, as far as John T. Clark is
13 concerned, you earned $15,153.
14 Do you see that document?
15 A. Yes.
16 MR. MAHONEY: Let's mark this as
17 the first exhibit, please.
18 (Exhibit-1, 2003 W-2, marked for
19 identification.)
20 BY MR. MAHONEY:
21 Q. When you earned $15,153 from John
22 T. Clark & Company, what were your job
23 responsibilities or duties in 2003?
24 A. I didn't have any responsibilities.

Page 12

1 Q. How many hours a week did you work at
2 John T. Clark & Son Company in 2003?
3 A. Zero.
4 Q. So the $15,153 that you reported as
5 earnings on your federal income tax return in
6 2003 was basically for a no-show job?
7 A. I wouldn't say it was a no-show job.
8 I would just say that my family was taking care
9 of me.
10 Q. When you say your family was taking
11 care of you, what do you mean by that?
12 A. I would get a check every month.
13 Q. From John T. Clark & Son?
14 A. Yes.
15 Q. And how was it, that in receiving a
16 check every month from John T. Clark & Son,
17 that your family was taking care of you?
18 A. By receiving a check every month.
19 Q. How was that facilitated by your
20 family?
21 A. I don't understand the question.
22 Q. How was it that your family managed
23 for you to get a check every month from John
24 T. Clark & Son?

Page 13

1    A.  Because I was part of their family.
2    Q.  What was your family's relationship
3    with John T. Clark & Son Company that enabled
4    them to cut you a check from John T. Clark in
5    2003?
6    A.  They were the owners of the company.
7    Q.  When you say "they," who do you
8    specifically mean?
9    A.  My brothers.  One had passed away.
10   Q.  What was your brother's name, who
11   passed away?
12   A.  Joseph.
13   Q.  When did he pass away?
14   A.  Either 2002 or 2003.
15   Q.  Anyone else in your family that owned
16   the company, John T. Clark & Son?
17   A.  No.
18   Q.  Well, you said your family was taking
19   care of you.
20   A.  My brother Timmy.
21   Q.  Was it your understanding in 2003 that
22   your brother Timmy and brother Joseph owned
23   John T. Clark & Son?
24   A.  Yes.

Page 14

1    Q.  And does your brother Timmy still own
2    the company?
3    A.  I don't know.
4    Q.  Where does he live?
5    A.  He lives in Dennis Port.
6    Q.  Is he currently employed?
7    A.  No, he is retired.
8    Q.  Do you have any understanding of
9    whether or not John T. Clark & Son, given it
10   was your family-owned business, was sold in
11   2003 or 2004?
12   A.  I don't know.
13   Q.  Does John T. Clark & Son still have an
14   office — strike that.
15   In 2003 when you were receiving a
16   check from John T. Clark & Son, where was their
17   office located?
18   A.  At Conley Terminal.
19   Q.  Conley?
20   A.  Yes.
21   Q.  Currently, does John T. Clark & Sons
22   still have an office at Conley Terminal?
23   A.  I don't think so.
24   Q.  When did that office close?

Page 15

1    A.  When my brother retired.
2    Q.  When did he retire?
3    A.  I think after the paying agent changed
4    hands.
5    Q.  That was when?  Approximately 2003,
6    2004?
7    A.  2003, 2004, yes.
8    Q.  Now, Columbia Coastal became the
9    paying agent for the Port of Boston in 2004, is
10   that right, or 2003?
11   A.  Either one of those, yes.
12   Q.  But when you received a check from
13   Columbia Coastal in 2002, it was not the paying
14   agent; is that right?
15   A.  I don't think so.
16   Q.  In 2003, in addition to being the
17   paying agent for the Port of Boston, what other
18   types of things did John T. Clark & Son do in
19   terms of its business operation, if anything?
20        MR. LATHROP:  Objection.
21   A.  They were the paying agent.
22   Q.  In 2002 when you received a check from
23   Columbia Coastal, what type of work were you
24   doing when you received a check from Columbia

Page 16

1    Coastal in 2002?
2    A.  It was out of the union hall.
3    Q.  How many years prior to 2003 did your
4    family run John T. Clark & Son approximately?
5    A.  Fifty maybe.
6    Q.  Clark is a family name in your family
7    background?
8    A.  No.
9    Q.  Prior to your brother Joseph and
10   Timothy Keefe's involvement, did anyone else in
11   your family run the business of John T. Clark &
12   Son?
13   A.  My father, who was the president.
14   Q.  What was your father's name?
15   A.  Timothy.
16   Q.  When did your brother Timothy start in
17   the business at John T. Clark & Son?
18   A.  In the '60s, I think.
19   Q.  When did your brother Joseph start in
20   the business?
21   A.  Probably right after that.
22   Q.  What did you say?  Right after that?
23   A.  Probably right after that.
24   Q.  So the late '60s, '70s?

4  (Pages 13 to 16)

DUNN & GOUDREAU

Page 17

1. A. Yeah.
2. Q. Then he passed in 2002, 2003?
3. A. Yes.
4. Q. And your brother Timothy simply
5. retired, right?
6. A. Yes.
7. Q. So do you remember a few minutes ago,
8. I asked you what you did in 2003 when you were
9. paid earnings of $15,153 from John T. Clark &
10. Sons?
11. Do you remember I asked you that
12. question?
13. A. Yes.
14. Q. You said nothing, is that right?
15. A. Yes.
16. Q. If you weren't doing anything for
17. work, why did you take income from the John
18. T. Clark & Son Company and report it as W-2 --
19. as receiving income in any other way?
20. MR. LATHROP: Objection to the
21. form of the question.
22. BY MR. MAHONEY:
23. Q. For example, a distribution from the
24. profits of the company.

Page 18

1. MR. LATHROP: Objection to the
2. form of the question.
3. BY MR. MAHONEY:
4. Q. You can answer, if you understand it.
5. A. Rephrase it.
6. Q. Sure. Your family owned the business,
7. right?
8. A. Yes.
9. Q. You said that although you received
10. $15,000 in earnings in 2003, you didn't really
11. do anything for that money, is that right?
12. A. Right.
13. Q. So why, then, would you take that
14. money from the company in terms of income
15. rather than a distribution from the profits?
16. MR. LATHROP: Objection to the
17. form of the question. Among other things, it
18. assumes facts not in evidence.
19. MR. MAHONEY: Your objection is
20. noted.
21. A. I don't know anything about profits or
22. anything like that.
23. Q. When you got that $15,000 -- when you
24. signed your tax return in 2004 for your 2003

Page 19

1. income, you signed under the pains and
2. penalties of perjury, right?
3. A. Yes.
4. Q. You indicated that you had received
5. $15,153 as income from John T. Clark & Company,
6. right?
7. A. Yes.
8. Q. You paid income taxes to the State of
9. Massachusetts, right?
10. A. Yes.
11. Q. Also, you paid federal income taxes on
12. it, is that right?
13. A. Yes.
14. Q. Do you own any stocks currently? I'm
15. not interested in what types and what you paid
16. for. I just want to know whether you own stock
17. or not.
18. MR. LATHROP: Just generically?
19. MR. MAHONEY: Yes.
20. A. Yes.
21. Q. And in 2003, did you own stock?
22. A. Yes.
23. Q. And if you received income or
24. distribution from that stock, you understand

Page 20

1. that you have to pay capital gains tax?
2. A. Yes.
3. Q. You then understand that there is a
4. distinction from income that you receive from
5. an investment rather than income that you
6. receive as having been earned, is that right?
7. A. Yes.
8. Q. Now, currently, you said you are
9. employed by Columbia Coastal, is that right?
10. A. Yes.
11. Q. And you got that job out of the union
12. hall; is that right?
13. A. Yes.
14. MR. MAHONEY: Can we mark that as
15. the next exhibit, please?
16. (Exhibit-2, Answers to
17. Admissions, marked for
18. identification.)
19. BY MR. MAHONEY:
20. Q. Mr. Keefe, I'm going to show you what
21. we marked now as Exhibit 2. I want you to look
22. at the very last page of that document, Page
23. 13.
24. Q. Is that your signature, sir?

1   A. Yes.
2   Q. And you understand that these are
3   requests for admissions that were sent by the
4   defendants to you; is that right?
5   A. Yes.
6   Q. And you signed that document under the
7   pains and penalties of perjury; is that right?
8   A. Yes.
9   Q. In so doing and in so signing, you
10  were indicating that the answers in response to
11  the question were truthful as to the best of
12  your knowledge; is that right?
13  A. Yes.
14  Q. And can you turn to Page 9, please?
15  A. Yes.
16  Q. Do you see Request 32?
17  A. Yes.
18  Q. Tell me if I read this incorrectly.
19  "At the February 6, 2003, rules
20  committee meeting, you were suspended for six
21  months and removed from Gang 10 for a violation
22  of your pledge to the union."
23  Did I read that correctly?
24  A. Yes.

1   Q. And you answered "admitted that in
2   February of 2003, the rules committee had a
3   meeting about Keefe's gang status without ever
4   informing Keefe."
5   Did I read that correctly?
6   A. Yes.
7   Q. "The rules committee suspended Keefe
8   for six months and put him back in Gang 12 for
9   supposedly having another job."
10  Did I read that correctly?
11  A. Yes.
12  Q. "Keefe continues to have another
13  income from JTC, not another job, and the rules
14  committee members know this."
15  Did I read that correctly?
16  A. Yes.
17  Q. "Denied that this was done for Keefe's
18  violation of his pledge to the union."
19  Did I read that correctly?
20  A. Yes.
21  Q. All other statements are denied; is
22  that correct?
23  A. Yes.
24  Q. I want to ask you specifically about

1   the statement that you made under the pains and
2   penalties of perjury on January 19, 2006, that
3   you continued to have another income from JTC.
4   Do you see that?
5   A. Yes.
6   Q. JTC, I assume you mean John T. Clark;
7   is that right?
8   A. Yes.
9   Q. What type of income do you receive or
10  were you receiving in January 2006 from John
11  T. Clark?
12  A. Nothing.
13  Q. Well, on Page 9 in response to request
14  Number 32, you said that you were receiving
15  another income from John T. Clark in January of
16  2006; isn't that true?
17  A. This says February 2003.
18  Q. Let's go back to your answer.
19  "Keefe continues" -- do you see those
20  two words?
21  A. Right.
22  Q. -- "to have another income from JTC."
23  I've read that correctly, right?
24  A. Right.

1   Q. "Continues" suggests to me the present
2   tense; that you continue, at the time that you
3   signed this answer to request for admissions,
4   to get income from John T. Clark.
5   Is that not accurate?
6   A. In February of 2006?
7   Q. You signed the document dated January
8   17, 2006; is that right?
9   A. Yes.
10  Q. And in response, in 32 you say, "Keefe
11  continues."
12  That would suggest to me that at the
13  time you signed the document, you were getting
14  income from John T. Clark; that's not correct?
15  A. You asked me in February 6, 2006; that
16  is what you asked me.
17  Q. No. The request says at the February
18  6, 2003, rules committee meeting, you were
19  suspended for six months and removed from Gang
20  10 for a violation to your pledge to the
21  union.
22  And then you say, "Admitted that in
23  February 2003, the rules committee held a
24  meeting about Keefe's gang status without ever

DUNN & GOUDREAU

Page 25

1  informing Keefe."
2      Is that right so far?
3      A. Right.
4      Q. The rules committee suspended Keefe
5  for six months and put him back in Gang 12 for
6  supposedly having another job; is that correct?
7      A. Right.
8      Q. Do you see the tense in the word
9  suspended? That is past tense, wouldn't you
10 agree with that, not meaning that your
11 suspension occurred in the past, not in January
12 of 2006?
13     A. Right.
14     Q. It occurred in 2003, right?
15     A. 2003, I was suspended, right.
16     Q. And the next sentence says, "Keefe
17 continues to have another income from JTC."
18         That would suggest to me that you are
19 getting income from John T. Clark in January of
20 2006.
21     A. No, I'm not.
22     Q. That is not a correct answer in this
23 admission?
24         MR. LATHROP: Objection to the

Page 26

1  form of the question.
2      A. No, I haven't received income from JTC
3  since 2004, I think.
4      Q. You don't --
5      A. Since the last time I went to the
6  rules committee and they asked me to get
7  something from the I.R.S., and I gave them that
8  form.
9      Q. What form is that?
10     A. I don't know. You were on the rules
11 committee.
12     Q. Mr. Sullivan was?
13     A. Yes. You asked me to send something
14 from the I.R.S.
15         MR. MAHONEY: Let me make a copy
16 of this.
17         (Exhibit-3, IRS Form, marked for
18             identification.)
19         (Brief break.)
20     BY MR. MAHONEY:
21     Q. You got Exhibit 3 in front of you,
22 Mr. Keefe?
23     A. Yes.
24     Q. Is that the document that you brought

Page 27

1  into the rules committee in 2003 or a copy of
2  it?
3      A. Yes.
4      Q. It indicates, just as Exhibit 1 does,
5  that you received $15,153 in income in 2003
6  from John T. Clark; is that right?
7      A. Yes.
8      Q. Now, it says -- if you look at the
9  very top left of this, it is sort of cut off,
10 but it looks to me like it says query date
11 August 17, '04; is that right?
12     A. Yes.
13     Q. So you would agree with me that this
14 is a document that would have had to have been
15 produced sometime in '04 to have the total
16 amount that you earned from Clark in 2003; is
17 that right?
18     A. Yes.
19     Q. So is it your memory that sometime
20 after August of 2004 that you handed this
21 document over to the rules committee?
22     A. I handed it, I think, that day or the
23 next day.
24     Q. So either the 17th or 18th of '04?

Page 28

1      A. Yes. There was a rules committee
2  meeting that I had to go to.
3      Q. Let's get back to the admission. And
4  I think we marked that as 2, didn't we? Is
5  that right?
6          It says here in admission that you
7  continue to have another income from JTC, in
8  the response to Request Number 32 on Page 9 of
9  Exhibit 2; is that right?
10     A. In 2003?
11     Q. No. I'm trying to get to the basis of
12 this. You signed this in January of 2006. The
13 way I read it is it says you continued to have
14 another income from John T. Clark. Let me ask
15 you directly.
16         Do you get any money whatsoever,
17 regardless of how it is described, income or
18 distribution or anything, from John T. Clark
19 currently, or were you getting any money from
20 John T. Clark in January of 2006 when you
21 signed these admissions?
22     A. No.
23     Q. So you don't receive a dime from that
24 company, regardless of whether it's W-2 income

7  (Pages 25 to 28)

1    or whether it's a 1099 Form or a K-1 or
2    whatever?
3        A.  No.
4        Q.  On your 2005 tax return, did you
5    report receiving any money, regardless of how
6    it is described, from John T. Clark & Son,
7    2005?
8        A.  No.
9        Q.  So is it your testimony that if we had
10   your tax returns here in front of us from 2003
11   to the most recently filed one of 2005, that
12   the last time that John T. Clark would appear
13   on your federal or state return in any form
14   would be in 2003?
15       A.  As far as I can remember, yeah. When
16   I gave this form, that's when I stopped working
17   for John T. Clark.
18       Q.  I'm not talking about work. I'm
19   talking about any money whatsoever from Clark.
20       A.  No.
21       Q.  So then just to wrap up this issue,
22   the answer in response to Request Number 32 is
23   not correct because you were not receiving
24   income in January of 2006 from John T. Clark;

1        A.  11.
2        Q.  We will talk in more detail about your
3    suspension in a little while. You were
4    suspended in 2003, in the spring of 2003; is
5    that right?
6        A.  I don't even know what date it was.
7        Q.  We can narrow that down later.
8                MR. MAHONEY: Let's mark the
9    complaint.
10           (Exhibit-4, Complaint, marked
11           for identification.)
12       BY MR. MAHONEY:
13       Q.  Let me do a few more housekeeping
14   things. Have you ever had a conversation with
15   any member of the union about your suspension?
16       A.  No.
17       Q.  Have you ever had any conversation
18   with any member of the rules committee who were
19   on the rules committee in 2003 about your
20   suspension?
21       A.  I don't even remember who was on the
22   rules committee in 2003.
23       Q.  When I ask you that question, do you
24   understand that I'm asking you, not about

1    is that right?
2        A.  No, I was not.
3                MR. LATHROP:  I will object to
4    the form of the question. We will stipulate
5    that your interpretation is not correct. That
6    the "continues" didn't mean continues through
7    January of '06; it meant continuing past
8    February of '03.
9                You've elicited everything else in
10   terms of when it ended.
11       BY MR. MAHONEY:
12       Q.  If the statement said Keefe continued
13   through 2003 to receive income from John
14   T. Clark, that would be a correct statement?
15       A.  2003?
16       Q.  Yeah. Right here.
17       A.  Yes. Not for the whole year.
18       Q.  I understand. Were you laid off from
19   Clark in 2003?
20       A.  No. I just stopped working for them.
21       Q.  Why did you do that?
22       A.  So I could get into the union and get
23   straight with them.
24       Q.  Back into Gang -- was it 10?

1    anything that may have been said at a hearing,
2    but outside a hearing process?
3                Did you understand that when I was
4    asking you that question?
5        A.  Yes.
6        Q.  So with that understanding, have you
7    ever had any conversation with Mr. Sullivan
8    about your suspension?
9        A.  No.
10       Q.  Have you ever had any conversation
11   with Mr. Richard Flaherty about your
12   suspension?
13       A.  No.
14       Q.  Have you ever had any conversation
15   with Mr. Picard, Joseph Picard, about your
16   suspension?
17       A.  No.
18       Q.  That's a no?
19       A.  No.
20       Q.  What about Mr. Langin, have you ever
21   had a conversation with him about your
22   suspension?
23       A.  No.
24       Q.  What about Brendon Lee, did you ever

1   have a conversation with him about your
2   suspension in 2003?
3       A. About any suspension, no.
4       Q. When is the last time you spoke with
5   Mr. Lee?
6       A. Two or three months ago maybe.
7       Q. What did you talk to him about?
8       A. He talked to me.
9       Q. He called you?
10      A. He talked to me. I didn't approach
11  him; he approached me.
12      Q. You saw him in person?
13      A. Yes.
14      Q. Where was that?
15      A. Down at the pier.
16      Q. What did he say?
17      A. He asked me why he was getting
18  subpoenaed.
19      Q. And what did you say?
20      A. I said, "You will have to talk to your
21  lawyer."
22      Q. Was that it?
23      A. He then asked me or told me his wife
24  was getting upset about this ordeal. And I

1   said, "You will have to talk to your
2   attorney."
3       Q. Is that it?
4       A. Yes. I would say so, yes.
5       Q. What about Stephen Meigs, M-E-I-G-S?
6       A. No.
7       Q. Mr. Keefe, you have to let me ask the
8   question, even though I know you know where it
9   is going. It makes it easier for the
10  stenographer.
11      What about John Mirand, have you ever
12  had any conversation with him about your
13  suspension?
14      A. No.
15      Q. What about Mark Connelly?
16      A. No.
17      Q. Michael McAvoy, have you ever spoke
18  with him about your suspension?
19      A. No.
20      Q. Have you ever spoken to William
21  McNamara about your suspension?
22      A. No.
23      Q. Have you ever spoken to Gerard Parte
24  (phonetic) about your suspension?

1       A. No.
2       Q. What about Bernie O'Donald, have you
3   ever spoken to him about your suspension?
4       A. Yes.
5       Q. And when did you have a conversation
6   with Mr. O'Donald?
7       A. I don't know what date or what year.
8   It was a couple of years ago.
9       Q. Is that the only one you ever had with
10  him about your suspension, the only
11  conversation?
12      A. Yes.
13      Q. What did you say and what did he say?
14      A. I don't even recall. I just know we
15  talked.
16      Q. Did you make any note to that
17  conversation?
18      A. Any notes?
19      Q. Yes.
20      A. No.
21      Q. Is there any document that would
22  refresh your memory about what you spoke to
23  Mr. O'Donald about regarding your suspension?
24      A. No.

1       Q. Have you ever spoken to Paul
2   McGaffegan about your suspension,
3   M-C-G-A-F-F-E-G-A-N?
4       A. Yes.
5       Q. When did you speak with
6   Mr. McGaffegan?
7       A. It was in the wintertime. It was down
8   the pier. It was just small talk.
9       He said something about Bernie
10  O'Donald, and I said I had just got off the
11  phone with Bernie. And he said, You couldn't
12  have. I said, I did. He said, He was in
13  Florida. I said, I called and talked to him on
14  his cell phone. And that was it.
15      Q. If I was to characterize your
16  conversation with Mr. McGaffegan about your
17  suspension, would it be fair to say that you
18  just spoke to that about calling Mr. O'Donald?
19      A. Right. It wasn't about suspensions.
20      Q. Did I ask you about Mark Keo, have you
21  ever spoken to him about your suspension?
22      A. No.
23      Q. What about Michael Connelly, have you
24  ever spoken to him about your suspension?

1   A. No.
2   Q. How about Conrad Bailey, have you ever
3   spoken to him about your suspension?
4   A. No.
5   Q. How about Michael Pyne, P-Y-N-E, have
6   you ever spoken to him about your suspension?
7   A. No.
8   Q. What about Patrick Flaherty, have you
9   ever spoken to him about your suspension?
10  A. No.
11  Q. You are a member of 805; is that
12  right?
13  A. Yes.
14  Q. You are not a member of 799, right?
15  A. No.
16  Q. And you are not a member of 800,
17  right?
18  A. No.
19      (Exhibit-5, Hall Work, marked for
20      identification.)
21  BY MR. MAHONEY:
22  Q. Now, I've marked as Exhibit 5 a
23  five-page document.
24      Do you recognize this document, sir?

Page 38

1   A. Yes.
2   Q. Do you still have your answers to the
3   admissions in front of you?
4   A. Yes.
5   Q. Would you turn to Page 2, please.
6       Do you see request Number 4 where it
7   says, "Rule 37 of the hiring hall work rules
8   for Local 799, 800, and 805 permits a six-month
9   suspension from a gang or steady job for a
10  member's violation of his pledge or due to his
11  failure to appear before the rules committee
12  when summoned."
13      And you admitted that in your answers;
14  is that right? I'm asking you to look at Page
15  2 of the admissions.
16  A. I know.
17  Q. You admitted that to be a correct
18  statement; is that right?
19  A. Yes.
20  Q. And so you also understood when you
21  admitted that in January of 2006 that that
22  admission was referring directly to what we've
23  now marked as Exhibit 5 as the hiring hall
24  rules, right?

1   A. Yes.
2   Q. At the bottom of Page 2, Request
3   Number 7 on May 25, 2000, you signed a pledge
4   sheet affirming your compliance with hiring
5   hall rule 36 as it existed in May of 2000, and
6   then you answer "admitted"; is that right?
7   A. Yes.
8   Q. And then in Request Number 8 in May of
9   2000, you signed a pledge with Local 805. You
10  were working exclusively at the craft of being
11  a longshoreman. And you answered "admitted,"
12  is that right, on Page 3?
13  A. Yes.
14      MR. MAHONEY: Mark that as the
15  next exhibit, please.
16      (Exhibit-6, Pledge Dated 5/25/00,
17      marked for identification.)
18  BY MR. MAHONEY:
19  Q. We were just talking about the pledge
20  that you signed in May of 2000. I'm going to
21  show you what we now marked as Exhibit 6 to
22  this deposition and ask if that is the pledge
23  that you signed on May 25, 2000, or a copy of
24  it?

Page 40

1   A. Yes.
2   Q. When you read that, those words on
3   Exhibit Number 6, you understood them; is that
4   right?
5   A. Yes.
6   Q. Otherwise, you wouldn't have signed
7   it, right?
8   A. Yes.
9   Q. You understood the capitalized,
10  underlined phrase "working at this craft
11  exclusively," otherwise you wouldn't have
12  signed it, right?
13  A. Yes.
14  Q. John T. Clark & Son, they're contract
15  stevedores and marine terminal operators, is
16  that right, or they were?
17  A. Yes.
18  Q. What type of work did Local 805 do?
19  A. Union work.
20  Q. Are they stevedores?
21  A. No.
22  Q. They are not. Are they longshoremen?
23  A. Yes.
24  Q. What does a longshoreman do?

10  (Pages 37 to 40)

Page 41

1    A.    A variety of things, unload ships, car
2  jobs.
3    Q.    Drive cars off of ships.  Anything
4  else?
5    A.    Salt jobs.
6    Q.    What is a salt job?
7    A.    Unload salt passenger ships.
8    Q.    A longshoreman works down at the dock
9  at a port, regardless of where it is, right?
10    A.    Yes.
11    Q.    And could you generally say that a
12  longshoreman is a laborer who will unload all
13  types of cargo from ships that is brought into
14  the port; is that right?
15    A.    Yes.
16          MR. MAHONEY:  Let's mark this as
17  the next exhibit, please.
18          (Exhibit-7, Letter Dated 5/24/00,
19          marked for identification.)
20  BY MR. MAHONEY:
21    Q.    I'm going to show you, Mr. Keefe, what
22  we've marked as Exhibit 7 and ask if you
23  recognize this document?
24    A.    Yes.

Page 42

1    Q.    What do you recognize it to be?
2    A.    It's a letter from William Horahoa.
3    Q.    Who is William Horahoa?
4    A.    He is the president of John T. Clark
5  or was the president of John T. Clark.
6    Q.    What is the date on the letter?
7    A.    May 24th, 2000.
8    Q.    Who is the addressee on the letter?
9  To whom it may concern?
10    A.    Yes.
11    Q.    Now, in May of 2000, Mr. Horahoa
12  indicated that "Mr. Keefe is employed by our
13  company," meaning John T. Clark & Son, "on a
14  casual basis as a longshoreman working at the
15  Conley Container Terminal"; is that correct?
16    A.    Yes.
17    Q.    Earlier, when you said that your
18  family was taking care of you, had your job
19  duties or responsibilities or any of the work
20  that you did at John T. Clark & Company at any
21  time when you were getting money from them,
22  ever change?
23    A.    At any time?
24    Q.    Yeah.  Why don't I limit the

Page 43

1  question.
2          From 2000 until 2003, did your job
3  duties and responsibilities at John T. Clark &
4  Son change?
5    A.    No.  I was working out of the hall.
6          MR. MAHONEY:  So let's mark the
7  W-2 from 2000 as the next exhibit from John
8  T. Clark.  Actually, there is two of them.
9          For the record, we will do 8A as the
10  76,362 one, and we'll do 8B as the 13,585 W-2
11  from 2000.
12          (Exhibit-8A and 8B, W-2s for
13          2000; Exhibits-9A and 9B, W-2s
14          for 2001; Exhibits-10A and 10B,
15          W-2s for 2002, marked for
16          identification.)
17          MR. MAHONEY:  For the record,
18  Exhibit 1 contains three documents.  One is the
19  W-2 of John T. Clark & Son.  1A, which we are
20  going to mark in a minute, is a W-2 from
21  Columbia Coastal.  And then 1C appears to be a
22  copy of the amount of unemployment compensation
23  that the plaintiff received in 2003.
24          So let's mark 1B and 1C.

Page 44

1          (Exhibit-1B, W-2; Exhibit-1C,
2          Unemployment Compensation, marked
3          for identification.)
4  BY MR. MAHONEY:
5    Q.    We've already talked about Exhibit 1.
6  Let's talk about Exhibit 1B.
7          What is that, sir?
8    A.    Unemployment –
9    Q.    A copy of unemployment compensation?
10    A.    – compensation.
11    Q.    It appears you received more than
12  $19,000 from the Commonwealth for unemployment
13  compensation; is that right?
14    A.    Yes.
15    Q.    You applied for that unemployment
16  compensation as a result of being laid off?
17    A.    Yes.
18    Q.    Who were you laid off by?
19    A.    The union.
20    Q.    Did you have to list a specific
21  employer?
22    A.    P&O Ports, I think.
23    Q.    When did you begin to collect
24  unemployment compensation in 2003?

11    (Pages 41 to 44)

Page 45

1    A. I don't remember. I don't know what
2    month or —
3    Q. All right. Well, if you were
4    suspended in March of '03, would it be fair to
5    infer that you applied for unemployment
6    compensation sometime after March of 2003; is
7    that right?
8    A. I would say yes, but I don't know. I
9    don't know if that is the right date or not.
10   Q. Well, let me try it this way.
11   A. I would have to go back to my records
12   and see.
13   Q. What records are those?
14   A. There is more stuff I have at home for
15   unemployment.
16   Q. You wouldn't have applied for
17   unemployment if you were still working?
18   A. No.
19   Q. And you said a moment ago you applied
20   for unemployment after your suspension from the
21   union; is that right?
22   A. I would say so, yes.
23   Q. With regard to Exhibit 1C, Columbia
24   Coastal, it looks like maybe you got a paycheck

Page 46

1    or less from that company in 2003. It is only
2    $700.
3    A. Right.
4    Q. Do you have any idea when you earned
5    that, what part of the year?
6    A. No, I don't.
7    Q. Do you know what the word "mitigate"
8    means?
9    A. No.
10   Q. You know what the word "reduce" means,
11   right?
12   A. Yes.
13   Q. Would it be fair to say that you
14   applied for unemployment compensation and that
15   reduced the amount of income that you lost from
16   your suspension; is that fair?
17   A. Rephrase the question.
18   Q. Sure.
19      Would it be fair to say that the
20   amount of compensation you received from the
21   state from the Division of Employment and
22   Training of $19,773 reduced the amount of
23   income that you lost as a result of your
24   suspension from the union?

Page 47

1    A. Yes.
2    Q. What is your memory, Mr. Keefe, of
3    when you returned to the union and were then
4    sent out again after the suspension? Was it in
5    the calendar year 2003, or was it in 2004?
6    A. I think it was 2004.
7    Q. Earlier, we marked as Exhibit 3 this
8    document, which was a printout that you
9    provided to the union after your suspension,
10   showing that you were no longer working at John
11   T. Clark; is that right?
12   A. Yes.
13   Q. And is it your memory that you were
14   put back on Gang 11 after you provided that
15   document?
16   A. Yes.
17   Q. And the document is dated August of
18   '04; is that right?
19   A. Yes.
20   Q. Why didn't you attempt to get a
21   document, such as that, if you had a six-month
22   suspension from the union in September of '03?
23   A. I didn't know these existed and they
24   never asked. They just started -- I think the

Page 48

1    rules committee just started getting these
2    around this time.
3    Q. You claim in your complaint that you
4    were suspended for six months, and we will get
5    into the reasons in your allegations later.
6       That is what you are saying, that you
7    were improperly suspended for six months?
8    A. Yes.
9    Q. The suspension occurred sometime in
10   March of '03, regardless of the specific date?
11   A. Around that time.
12   Q. So if it occurred sometime in March of
13   '03, it would have been up some time in
14   September of '03, right?
15   A. Yup.
16   Q. And, yet, you didn't return to the
17   union until August of '04 to be put back on
18   Gang 11; is that right?
19   A. I came back when they said I could
20   come back.
21   Q. So if you came back when they said you
22   could come back and you had a six-month
23   suspension, you would have returned in
24   September of '03; is that right?

12  (Pages 45 to 48)

Page 49

```
1     A.  I don't know.  I don't know the
2   dates.  Whatever the dates --
3             MR. MAHONEY:  Let's go off the
4   record.
5             (Brief break.)
6             BY MR. MAHONEY:
7     Q.  Mr. Keefe, is it your memory or your
8   testimony that -- strike that.
9             Were you not sent out after your
10  suspension in Gang 11?  Were you not sent out
11  in Gang 11 until 2004?
12    A.  I don't know.
13    Q.  Are you being sent out currently from
14  Gang 11?
15    A.  Yes.
16    Q.  And you've given me W-2s for 2004 as
17  well.
18            MR. MAHONEY:  And why don't we
19  just mark these three as the next Exhibit A, B
20  and C, whatever the number is.
21            (Exhibit-11A, 2004 W-2; Exhibit-
22            11B, 2002 W-2; Exhibit-11C, W-2
23            Wage Summary, marked for
24            identification.)
```

Page 50

```
1             BY MR. MAHONEY:
2     Q.  Regardless of the date that you were
3   placed back on Gang 11, Mr. Keefe, after your
4   suspension, had you been working out of Gang 11
5   since that date?
6     A.  11.  11 and now 10.
7     Q.  Now, according to answers that the
8   defendants provided to questions that your
9   attorney asked, which was signed by
10  Mr. McGaffegan in January of '05, he indicated
11  that you were placed back in Gang 11 on August
12  6, 2003.
13            Do you have any reason to disbelieve
14  that that is accurate?  Do you think that is
15  not true, in other words?
16    A.  August 6, '03?
17    Q.  Yup.
18    A.  I would say that's correct, yeah.  I
19  guess.
20    Q.  In 2000, 2001, and 2002, you were
21  getting income from Clark and income from the
22  union, is that right, when you were placed out?
23    A.  Yes.
24    Q.  Let's go to 2003.  You have a copy of
```

Page 51

```
1   Exhibit 1 in front of you, right?
2             In 2003 you earned $15,153 from Clark;
3   is that right?
4     A.  Yes.
5     Q.  And you were paid $19,773 from
6   unemployment; is that right?
7     A.  Yes.
8     Q.  And you got 108.50 from Columbia
9   Coastal; is that right?
10    A.  Yes.
11    Q.  So would it be fair to say that in
12  2003, the only income that you received from
13  having been placed out by the union was
14  $708.50; is that right?
15    A.  Having been placed out of the union
16  hall?
17    Q.  Having been dispatched by the union
18  hall.  The money you got from Columbia Coastal,
19  in other words.
20    A.  I don't see another company down here
21  but I don't know.  I guess, yeah.
22    Q.  That brings up a good point.
23            MR. MAHONEY:  Until I get a
24  formal response on your -- to my request of
```

Page 52

```
1   documents, I'm going to exhaust my questioning
2   today.  Until I get a full response, I'm going
3   to suspend on that issue, just so that I can
4   ascertain that this is the only other income.
5             MR. LATHROP:  I will tell you in
6   advance, what we will say is that we will and
7   have produced any and all W-2s for the years
8   requested.
9             MR. MAHONEY:  Right.  But the
10  request also asks for the tax returns
11  redacted.  Until I get a formal response on
12  that issue, I'm going to suspend.  I'm going to
13  exhaust every other line of questioning that I
14  can today.
15            MR. LATHROP:  Sure.
16            BY MR. MAHONEY:
17    Q.  Let's go to 2002, then, sir.
18            In 2002 you earned $76,362 on one W-2
19  from Clark; is that right?
20    A.  Yes.
21    Q.  And then you also earned $6,444.55 on
22  a second W-2 from Clark; is that right?
23    A.  Yes.
24    Q.  Why did you get two W-2s that year
```

13 (Pages 49 to 52)

DUNN & GOUDREAU

1   from Clark? Is the 6,000 a bonus?
2       A. No. The 6,444 was from the union
3   hall.
4       Q. You were dispatched to Clark and
5   earned $6,444? You were dispatched from the
6   union?
7       A. Yeah.
8       Q. The $76,000 you earned was not as a
9   result of being dispatched by the union; is
10  that right?
11      A. Correct.
12      Q. Additionally, in 2002, it looks like
13  you earned 16,005.19 from Coastal; is that
14  right?
15      A. Yes.
16      Q. That was also as a result of being
17  dispatched by the union hall?
18      A. Yes.
19      Q. And then in 2002, it looks like you
20  earned $1,853 from P&O Ports of New England?
21      A. Yes.
22      Q. Was that as a result of being
23  dispatched by the union hall?
24      A. Yes.

1   for 2002 and 2003, those two years? In other
2   words, excluding any benefits you received or
3   any other money that you received from Clark
4   that was not dispatch related.
5       A. Strictly out of the union hall?
6       Q. Yeah.
7       A. Whatever is down here.
8       Q. You never sat down and figured it out;
9   is that right?
10      A. No.
11      Q. Now, we marked as the most recent
12  exhibits numbered 11A, 11B, and 11C. And these
13  are your W-2s from 2004; is that right? I'm
14  sorry.
15          Let me show you 11A, 11B, and 11C.
16      A. Yes.
17      Q. Those are your W-2s from 2004?
18      A. Yes.
19      Q. Do you have copies of them in front of
20  you?
21      A. Yes.
22      Q. According to 11A, you earned
23  $30,235.16 from Columbia Coastal; is that
24  right?

Page 54                                                                    Page 56

1       Q. You also earned $1,040 from BSA
2   Central Records Bureau.
3           Was that as a result of being
4   dispatched by the union hall in 2002?
5       A. That is from the union. Is there a
6   vacation pay from --
7       Q. That is not dispatch related?
8       A. No. I got it from being dispatched
9   through -- I got my hours but I had a vacation,
10  too.
11      Q. The BSA of New England, that is a
12  benefit payment rather than an income earned?
13      A. Yes.
14      Q. Would that be the same for the $3,328
15  also from BSA paid holidays?
16      A. Yes.
17      Q. That's a benefit, okay.
18          What about this last 2002 from BSA ILA
19  supplemental first container, it looks like.
20          $15,500 in 2002, is that dispatched
21  earned income or is it benefit income?
22      A. Benefit.
23      Q. Do you know, off the top of your head,
24  what your average dispatch earned income was

1       A. Yes.
2       Q. That was income earned as a result of
3   being dispatched in the union?
4       A. Yes.
5       Q. 11B $1,080 is BSA Central Records
6   Bureau, is that a benefit amount rather than
7   dispatched earned income?
8       A. How much was it?
9       Q. 1,080.
10      A. Yes.
11      Q. And then the 11C is $108 from P&O
12  Ports of New England.
13      A. Yes.
14      Q. Is that dispatch or benefit?
15      A. Dispatch.
16      Q. So in 2004, your dispatched earned
17  income was approximately $30,300, is that
18  right, if you add the 108 and the --
19      A. Yes.
20      Q. Tell me about the dispatch procedure.
21  You show up and present yourself as being able
22  to work on any given morning, right?
23      A. Yes.
24      Q. And you have work to do, which usually

14  (Pages 53 to 56)

Page 57

1  consists of unloading ships; is that right?
2      A. Yes.
3      Q. In 2003 when you were suspended, were
4  you in Gang 11 or 10?
5      A. Gang 11.
6      Q. So when you are in Gang 11 -- let's
7  assume that there is whatever, a number of guys
8  down there waiting to be dispatched -- how is
9  the work given out on a morning?
10     A. It is given out by the hiring hall, by
11 the delegates. They call certain gangs. They
12 go down a list.
13     Q. Gang 11, do the members of that gang
14 have any special abilities or duties that
15 members of Gangs 1 through 10 and then 12 don't
16 have -- strike that.
17         What is the difference between Gang 11
18 versus Gang 1 through 10?
19     A. One through 10, they made their
20 hours. They have gone through the process of
21 going through Gang 11 for two years, 10 for one
22 year, and then you go in 1 through 9.
23     Q. Are you telling me that the gang
24 groupings are based on seniority?

Page 59

1  would show up in 2003, if there is a number of
2  guys who were ahead of you in Gangs 1 through
3  10, how would you know when you would be called
4  to do any type of work?
5      A. They would call the gangs. The
6  delegates would call Gangs 1 through 9 and then
7  Gang 10 and then Gang 11.
8      Q. In 2003 what type of work were you
9  doing? You told me about salting. You told me
10 about unloading cargo. And you told me about
11 moving cars.
12         Did you do any of that type of work?
13     A. I never did cars. I never did a salt
14 job, no.
15     Q. What about cargo?
16     A. Container ships, yes.
17     Q. When you did the containers, what type
18 of work did you do?
19     A. I drove.
20     Q. You drove the trucks that the
21 containers were put on the back of?
22     A. Yes.
23     Q. Do you have a CDL, a commercial
24 driver's license?

Page 58

1      A. Yes.
2      Q. And that anybody who is in Gang 1 is
3  one of the most senior members of the union; is
4  that right?
5      A. It revolves through the weeks of how
6  many hours they've worked that week.
7      Q. It revolves weekly or it revolves
8  annually?
9      A. Well, weekly the gangs revolve. One
10 doesn't necessarily mean you have the most
11 seniority. One, you're at the top of the list
12 for that week, and then you will go down to the
13 bottom, because the whole gang has got their
14 hours for that...
15     Q. You don't drop into 11 after you have
16 been in 1, do you?
17     A. No. You are strictly 1 through 9.
18     Q. Are you saying that if you've gotten
19 work and you're 1 through 9 and 1 through 10,
20 then that is it for the week; and then they go
21 down to the next number in the gang? Is that
22 how it works?
23     A. Basically.
24     Q. So when you showed up or when you

Page 60

1      A. No.
2      Q. You don't need a CDL to do that work?
3      A. No.
4      Q. Is that mostly what you would do, is
5  drive the trucks away after a crane would put a
6  container in the back of it?
7      A. Yes.
8      Q. Is that what you still do today?
9      A. Yes.
10     Q. Let's say we have a container ship
11 that pulls in -- how many containers does one
12 of these ships normally have? Hundreds?
13     A. A couple of thousand.
14     Q. And the guys in the Gangs 1 through
15 10, are they capable of doing the same type of
16 work that you do?
17     A. Oh, yeah.
18     Q. You have a couple of thousand ships
19 in; how many gangs would usually apply to one
20 ship?
21     A. Anywhere from one to four.
22     Q. So in order for you to be reached in
23 Gang 11, do you need to have more than one ship
24 in there in the morning?

15  (Pages 57 to 60)

DUNN & GOUDREAU

Page 61

1  A. Not necessarily, no.
2  Q. If you only have one ship, and it
3  takes three or four gangs to unload one ship,
4  how would you expect to be reached if you were
5  in Gang 11 and if the jobs were doled out on a
6  seniority basis?
7  A. How would I get a job?
8  Q. Yeah.
9  A. The same way. They would call out the
10 gangs and then go to 10 and 11.
11 Q. Ships pull in every day; is that
12 right?
13 A. Basically.
14 Q. So how many days does it take to
15 unload one ship?
16 A. It could be from 4 hours to 16 hours.
17 Q. So no more than a day; is that right?
18 A. No.
19 Q. You have four gangs assigned to a
20 ship. Let's say you have Gangs 1 through 4
21 assigned some Monday morning. Tuesday rolls
22 around; you have a new ship that pulls in.
23     Does that mean Gangs 5 to 8 get that
24 one?

Page 62

1  A. It might not be 5 to 8, but basically,
2  you're on the right track.
3  Q. Let's say Gang 5 has only two guys.
4  Are they skipped over and they go to Gang 6?
5  A. No. You would fill in – there would
6  be fill-ins. Say there was only two guys, like
7  you said, in Gang 5, and they needed 18. The
8  delegates would call out those 18 jobs.
9  Q. And the fill-ins would not be taken
10 from another gang; is that right?
11 A. Yes, they could be. Yes.
12 Q. The gangs below them?
13 A. The gangs that weren't working that
14 particular day, those would be the fill-ins
15 first.
16 Q. What about day workers, were they ever
17 used as fill-ins? Guys who aren't in any
18 gang – like Gang 12, those are guys who are
19 two-jobbers, right?
20 A. Yes.
21 Q. Are they used as fill-ins?
22 A. Oh, yeah.
23 Q. You use the guys with more seniority
24 first; is that right?

Page 63

1  A. Yes.
2  Q. So during your suspension of six
3  months, how would you determine whether or not
4  you would have been placed out on any given
5  ship? You would look to see if Gang 11 was
6  called, and you say, If I had been there that
7  day, then I would have been called on Gang 11,
8  and I could have earned money on that shift.
9     Is that how you would go about
10 determining –
11 A. Whoever was in front of me or ahead of
12 me – I know who the guy is that is in front of
13 me.
14 Q. That never changes?
15 A. Not unless I bypass him for a certain
16 reason.
17 Q. When you say "in front of" you, do you
18 mean in your specific gang or the gang in front
19 of you?
20 A. My specific gang or the gang -- you
21 just know who is ahead of you and who is behind
22 you.
23 Q. What is the hierarchy within your
24 specific gang?

Page 64

1  A. At what point?
2  Q. Good question. Say in 2003. You say
3  you knew who was in front of you.
4     What is the name of the guy that was
5  in front of you in 2003?
6  A. 2003 would have been, I think, Brian
7  Manning maybe.
8  Q. And how was it that Manning was in
9  front of you?
10    Did he have more seniority than you?
11 A. He was in a gang, I think.
12 Q. I'm not following you now. You say
13 "he was in a gang." I assumed that he was in
14 Gang 11 when you said –
15 A. He was in Gang 11, yeah.
16 Q. So when you say "he was in a gang," I
17 think you're just speaking aloud that he was in
18 your gang, 11?
19 A. Yes.
20 Q. So Manning was a more senior member of
21 11 than you, and that's why he went out in
22 front of you?
23 A. Yes.
24 Q. How would you determine whether or

16  (Pages 61 to 64)

1  not -- in 2003 when you were out -- whether
2  only part of your gang would have been called
3  on any given date or everyone or up to you?
4      How would you have determined what
5  amount of work is --
6      A. Because the people behind me would
7  have got some.
8      Q. It seems to me that that is the better
9  way to do it.
10     Who was behind you in 2003?
11     A. There were many people behind me. I
12  would have to look at the list.
13     Q. Who maintains those lists?
14     A. The delegates for the union hall.
15     Q. Who was the delegate for Gang 11 in
16  2003 when you were suspended?
17     A. It wasn't for Gang 11. It was just
18  for the South Boston, East Boston. Richie
19  Flaherty was my delegate.
20     Q. Let's say John Jones is behind you.
21     A. All right.
22     Q. During the period of time that you
23  were suspended, it's your contention that if
24  John Jones went out, that you could have been

1  gangs were there.
2      Q. You got up in the morning. You're
3  living in Green Harbor?
4      A. Yes.
5      Q. You get up in the morning and what do
6  you do, in terms of determining whether you're
7  going to work?
8      A. I would call the union phone the day
9  before.
10     Q. What is the union phone?
11     A. The delegates put what work is
12  available on the phone at 4:00 and after, and I
13  would call them to see if there would be work
14  the next day.
15     Q. When they put the work that is
16  available on the phone the day before, do they
17  say ship XXX from wherever is in; it has 4,000
18  containers; and there will be enough work for
19  Gangs X through Y?
20     Is that what they do?
21     A. They just name the gangs that are due
22  on that ship and the gangs that are available
23  and how many jobs there would be for that day,
24  how many fill-ins.

Page 66
Page 68

1  out on that day?
2      A. Could be, yes.
3      Q. That is why I want to narrow it down.
4      When you say "could be," how can you
5  say it is more likely than not that you would
6  have went out?
7      A. I was ahead of him.
8      Q. You answered the question saying
9  "could be."
10     A. I will answer it yes.
11     Q. During that time after you were
12  suspended, you applied for and received
13  unemployment compensation; is that right?
14     A. Yes.
15     Q. Of $19,000.
16     A. Yes.
17     Q. So what's the maximum you can receive
18  in unemployment annually; do you know?
19     A. I don't know.
20     Q. In 2003 was it your practice to report
21  to the union hall for work every day?
22     A. Not every day, no.
23     Q. How many days a week would you go?
24     A. It depends. It depended on how many

1      Q. So you had been in Gang 11 prior to
2  suspension for how long a period of time?
3      A. I don't recall how long it was.
4      Q. However long it was, you must have
5  sort of developed some type of routine or
6  average, in other words, knowing -- you got a
7  week coming up, what would you reasonably
8  expect to -- how many days could you reasonably
9  expect to work?
10     A. You hear the ship is coming.
11  Sometimes it doesn't. The only way that I know
12  is by the phone or by the fill-in.
13     Q. You are on a 24-hour-notice basis.
14  You can't think, say, on some Friday, Gee, I
15  worked 30 or 40 hours this week; next week, I
16  will probably work the same? You just don't
17  know?
18     A. No.
19     Q. Every time that there was work
20  available for you that you heard on the phone,
21  did you go in the next morning, in 2003?
22     A. Not every day, no.
23     Q. So we basically have two categories
24  here; one, you could find out about work the

1  day before; and then, secondly, you would then
2  make up your mind whether or not you were going
3  to report to the union that following morning,
4  right?
5     A. Yes.
6     Q. What were the factors that entered
7  into your decision, if there was work, that you
8  would go to work the next day?
9     A. How many jobs were available. Say
10 there is only one gang with ten jobs, I don't
11 think I would get a job.
12    Q. So in 2000 -- let me get a little bit
13 more foundation.
14       Even though you're in Gang 10 now, is
15 it basically the same type of thing; you listen
16 to see how many jobs are available?
17    A. Oh, yeah.
18    Q. That is the same type of analysis --
19 you use currently the same type of analysis
20 that you did in 2003 in determining whether
21 you're going to report to the hall the
22 following morning, right?
23    A. Yes.
24    Q. So let's go back to 2003. In 2003

1  the hall in the morning thinking that you were
2  going to be put out, and you just didn't get
3  called?
4     A. Yes.
5     Q. How often had that happened in 2003?
6     A. I don't know.
7     Q. So in terms of dispatch records, if
8  they exist, it seems -- tell me whether you
9  agree with me or not.
10       The best way for you to determine
11 whether or not you would have been dispatched
12 would be if the guy behind you, let's call him
13 John Jones, was sent out?
14    A. Yes.
15    Q. If he was sent out, then it's likely
16 that you would have went out?
17    A. Yes.
18    Q. But before we go that far, did you
19 ever in 2003 call that union phone, hear that
20 there was work, hear that there was more than
21 25 jobs available and say, I don't feel like
22 going into work?
23    A. Yes.
24    Q. Even if John Jones was sent out, how

1  when you were in Gang 11, you would listen to
2  how many jobs were available, and then you
3  would make up your mind if you were going to
4  work the following morning; is that right?
5     A. Yes.
6     Q. How many jobs, on the average, would
7  have to be available for you to drive into
8  Boston to go to work in the morning?
9     A. Two gangs maybe.
10    Q. Two or more gangs?
11    A. Yeah. Anywhere maybe from 15 to 25
12 jobs.
13    Q. Educate me a little more, if you
14 would. If you are in Gang 11, and you say 15
15 to 25 jobs, if I do the math on that, I'm
16 obviously not doing it correct.
17       That is like two guys per gang before
18 they would get to you, but it doesn't work that
19 way?
20    A. No. Some people, they might have
21 worked the day before. They might have went
22 after midnight; then those people would go to
23 the back of the line.
24    Q. Have you ever, in 2003, ever gone to

1  can you say it's more likely than not that you
2  would have got that job as well, because you
3  may not have decided to go in that following
4  morning?
5     A. The majority of the time, I went in.
6     Q. Let's do it for the six months prior
7  to your suspension, and your suspension was
8  February 6, 2003. In the six months prior,
9  back to August of 2002, how many days a week
10 did you work? Strike that. Let me ask that in
11 a better way.
12       In the six months prior to February 6,
13 2003, how many days a week did you report to
14 work?
15    A. I don't know.
16    Q. Let's say you had a holiday weekend
17 coming up with Monday off, did you have any
18 regular practice of taking off Fridays as well
19 and make it a four-day weekend?
20    A. Sure. Everybody did.
21    Q. Would you do that routinely? For
22 example, if we use the six months prior to your
23 suspension, that would be August 6, 2002, to
24 February 6, 2003. You would have Labor Day,

Page 73

1  which is a Monday holiday; you would have
2  Columbus Day, which is a Monday holiday.
3      Did you get Veteran's Day off?
4  A. Yeah. If you were working that day,
5  it was a time-and-a-half day; you would work.
6  Q. So did you ever work on any holidays
7  in the six months prior to August of 2002 to
8  February 2003?
9  A. I would say I did, yeah.
10 Q. Generally speaking, on an average, how
11 many hours a week did you work after having
12 been dispatched by the union?
13 A. What period of time?
14 Q. August of 2002 to February of 2003.
15 A. The easy way to do this is to look it
16 up in the hours.
17 Q. You don't have a memory off the top of
18 your head?
19 A. No.
20 Q. When you say "look it up in the
21 hours," after you had been dispatched, would
22 there be any record that you're aware of kept
23 by the union that you were dispatched on any
24 given day?

Page 74

1  A. Yes, the dispatch records, and the
2  time sheets, the payrolls.
3  Q. When you are dispatched, are you paid
4  for a certain block of time regardless of how
5  much you work? You're actually driving or
6  unloading?
7  A. It depends. You might get paid for
8  four hours and work three and a half hours.
9  Q. That's what I'm trying to find out.
10 As a member of the union --
11 A. That doesn't happen too often but it
12 does happen.
13 Q. So it can take anywhere from a whole
14 shift to 16 hours to fully unload a ship; is
15 that right?
16 A. Yes.
17 Q. Let's say you got a number of gangs
18 out there and you have the ship unloaded in six
19 hours, you get paid for a full eight or what?
20 A. No.
21 Q. Is there any minimum amount you're
22 paid?
23 A. The minimum would be four.
24 Q. So you go out at 9:00. If you finish

Page 75

1  at 10:30, you still got four hours?
2  A. Yes.
3      MR. MAHONEY: Let's go off the
4  record.
5      (Brief break.)
6  BY MR. MAHONEY:
7  Q. Your understanding of Gang 12 was that
8  was a group of union members that were called
9  two-jobbers; is that right?
10 A. They had another job, yes.
11 Q. If you were in Gang 12, it would mean
12 that you were not working exclusively at the
13 craft; is that fair?
14 A. Yes.
15 Q. So in order to be in Gang 11, you had
16 to be working exclusively at the craft; is that
17 your understanding?
18 A. That is what it says, yup.
19 Q. Working exclusively at the craft would
20 mean work that you acquired from being
21 dispatched by the union; is that fair to say?
22 A. Yes.
23 Q. And when you received that work, that
24 work was reported on W-2s that you would later

Page 76

1  file with your income tax returns; is that
2  right?
3  A. Yes.
4  Q. And the W-2s were reports of income
5  that you had earned; is that fair to say?
6  A. Yes.
7  Q. And from May 24, 2000, through January
8  7, 2003, you were receiving health insurance
9  benefits from John T. Clark; is that right?
10 A. What's the dates again?
11 Q. It's actually Request Number 13, Page
12 4.
13 A. Yes.
14     MR. MAHONEY: I want to mark this
15 as the next exhibit, please.
16     (Exhibit-12, Letter Dated 4/7/05,
17         marked for identification.)
18     MR. MAHONEY: For the record,
19 Exhibit 12 is a nine-page document I'm going to
20 copy right now.
21     (Brief break.)
22 BY MR. MAHONEY:
23 Q. Mr. Keefe, I'm showing you what's been
24 marked as Exhibit Number 12.

Page 77

1     Have you ever seen the first document
2  in Exhibit 12, which is a letter from Attorney
3  McMann to your attorney?
4     A. Yes.
5     Q. And is the first time that you saw it
6  shortly after April 7, 2005, the date of the
7  letter, in other words?
8     A. Yes.
9     Q. If you turn to the next page, that
10  appears to be a letter from Mr. Picard to
11  Mr. McNamara dated September 20, 2003.
12     Have you ever seen that letter before?
13     A. No.
14     Q. You have never seen this four-page
15  letter that Mr. Picard wrote to Mr. McNamara?
16     A. No.
17     Q. Have you ever seen, after Mr. Picard's
18  letter to Mr. McNamara, the document right
19  behind that that has a note at the bottom
20  labeled Enclosure 14?
21     A. No.
22     Q. Have you ever seen the next document
23  that says Enclosure 11?
24     A. No.

Page 78

1     Q. What about Enclosure 12, the next
2  document?
3     A. No.
4        (Brief break.)
5        (Exhibit-13, Letter Dated 4/7/03;
6        Exhibit-14, Letter Dated
7        12/11/03, marked for
8        identification.)
9     BY MR. MAHONEY:
10     Q. On the request for admissions, which I
11  believe has been marked as Exhibit 2, could you
12  turn to Page 6, please?
13     A. (Witness complying.)
14     Q. Request Number 22, we asked you to
15  admit or deny that on June 21, 2002, there was
16  a portwide vote at which time you were a member
17  of Local 805 that any part-time job violates
18  the member's pledge, that member is working
19  exclusively at the craft as a longshoreman.
20     You answered, "I have insufficient
21  information to admit or deny. I have made a
22  reasonable inquiry. And the information known
23  and readily available to me is insufficient to
24  admit or deny."

Page 79

1     Did I read that correctly?
2     A. Yes.
3     Q. I know that you said you never saw
4  Mr. Picard's letter to Mr. McNamara before
5  today, but you have seen President Bowers'
6  letter to your attorney dated December 11,
7  2003, prior to today, haven't you?
8     A. Yes.
9     Q. We have marked that as Exhibit 14,
10  right?
11     A. Yes.
12     Q. If you turn to Page 2 of President
13  Bowers' letter, in the middle of the first
14  paragraph, first full paragraph, President
15  Bowers states, "In June 2002 the membership, by
16  an overwhelming vote, determined that even
17  holding an outside part-time job would violate
18  the pledge."
19     Did I read that correctly?
20     A. Yes.
21     Q. "Notices were posted in the hiring
22  hall and at all work sites, as well as on the
23  local's answering machine, informing workers
24  and callers that the amended rule was being

Page 80

1  enforced."
2     Did I read that correctly?
3     A. Yes.
4     Q. And then President Bowers went on to
5  say, "If you or your client has information to
6  support a claim that the rule as amended is not
7  being implemented as to particular people, then
8  it should be furnished to the rules committee
9  for its prompt investigation."
10     Did I read that correctly?
11     A. Yes.
12     Q. Now, I started this line of
13  questioning by asking you about Request Number
14  22, which specifically referred to that vote,
15  and you said you had insufficient --
16        MR. LATHROP: Objection.
17     BY MR. MAHONEY:
18     Q. -- you said you had insufficient
19  information to admit or deny that request; is
20  that right?
21        MR. LATHROP: Objection to the
22  form of the question.
23     A. Yes.
24     Q. You did receive a copy of President

20  (Pages 77 to 80)

1  Bowers' letter on December 11, 2003, is that
2  right, that is dated December 11, 2003?
3      A. Yes.
4      Q. Since the time that you received that
5  letter, have you ever sent any documentation or
6  informed anyone at the rules committee that the
7  rule was not being implemented as to particular
8  people?
9          MR. LATHROP: Other than this
10  lawsuit?
11      BY MR. MAHONEY:
12      Q. Other than the pleadings that you've
13  made in this lawsuit.
14      A. No.
15      Q. Let's go to your complaint. Actually,
16  before we go to the complaint, do you agree or
17  disagree that there was a vote in June 2002 in
18  which the union voted overwhelmingly that even
19  holding an outside part-time job would violate
20  the pledge?
21          MR. LATHROP: Objection to the
22  form of the question.
23      BY MR. MAHONEY:
24      Q. Do you agree with that or disagree

Page 82

1  with that?
2          MR. LATHROP: Objection to the
3  form of the question.
4          MR. MAHONEY: What is wrong with
5  the form of the question?
6          MR. LATHROP: It could be, "I
7  don't know." You're forcing him to say --
8          MR. MAHONEY: Now that you've
9  coached him --
10      BY MR. MAHONEY:
11      Q. Can you answer the question --
12          MR. LATHROP: You asked me to
13  verbalize what's wrong with the question.
14          MR. MAHONEY: He just told me
15  that he received President Bowers' letter. So
16  he knows that there was a vote --
17          MR. LATHROP: That's your
18  opinion.
19          MR. MAHONEY: -- despite his
20  answer in the admissions. That will be for the
21  judge to decide.
22      BY MR. MAHONEY:
23      Q. Do you understand my previous
24  question?

1      A. Yes.
2      Q. Do you agree or disagree that there
3  was a portwide vote in which the membership
4  voted overwhelmingly that even holding a
5  part-time job would violate the pledge, in June
6  of 2002?
7          MR. LATHROP: I renew my
8  objection to the form of the question.
9      A. Yes.
10      Q. You agree that there was such a vote?
11      A. I guess there was a vote, yeah.
12      Q. In your complaint in this case,
13  Paragraph 36 -- I think we marked the complaint
14  as 4.
15          Do you see that on Page 6, Paragraph
16  36?
17      A. Yes.
18      Q. You state, "Members of the rules
19  committee, including the current chairman of
20  the rules committee and his relatives, have
21  other jobs and incomes (such as family
22  business, rental income, pension, and cash-
23  paying jobs) while still enjoying the benefits
24  of Gangs 1 through 9."

Page 84

1          Did I read that correctly?
2      A. Yes.
3      Q. This complaint was filed on June 16,
4  2004; is that right?
5      A. Yes.
6      Q. Who were you referring to specifically
7  when you say "members of the rules committee
8  and the current chairman"? Who are you
9  referring to by name?
10      A. That have other jobs?
11      Q. Yeah.
12      A. I think Brendon Lee might have another
13  job, another income.
14      Q. Who else?
15      A. Joe Picard.
16      Q. Who else?
17      A. McGaff.
18      Q. McGaffegan?
19      A. Yeah.
20      Q. Who else, if anyone?
21      A. That are on the rules committee or --
22      Q. I'm just asking you -- you say
23  "members of the rules committee including the
24  current chairman." I'm asking you to identify

Page 85

1   those people who you refer to in Paragraph 36.
2       A. I would say those people that I just
3   mentioned that have other incomes.
4       Q. In 2003 what gang was Brendon Lee in?
5       A. I don't know.
6       Q. What local was he a member of?
7       A. South Boston.
8       Q. 805? Is that 805?
9       A. No. It's 800.
10      Q. And Picard, what local was he a member
11  of?
12      A. 800.
13      Q. And McGaffegan?
14      A. I don't know. 805 maybe.
15      Q. In 2003 what other job are you aware
16  of that Brendon Lee had?
17      A. I think he is an attorney.
18      Q. Do you know who he was working for?
19      A. No.
20      Q. What about Joe Picard, what other job
21  are you aware of that he had in 2003?
22      A. I don't know about what other job, but
23  he has other income.
24      Q. Like what?

Page 86

1       A. Rental property.
2       Q. What else, if anything?
3       A. Legal or illegal?
4       Q. Other income. You say in your –
5       A. I'm saying he has other incomes. Can
6   I name illegal or legal?
7       Q. You ought to consult with your
8   attorney about that. I'm asking you in
9   Paragraph -- with regard to Paragraph 36 where
10  you say "other jobs and incomes."
11      A. I will leave it as rental income.
12      Q. What about McGaffegan?
13      A. Pensions.
14      Q. What else, if anything?
15      A. I don't know of anything else.
16      Q. Now, what do you understand the reason
17  to be for your suspension in 2003?
18      A. I don't know. When the rules
19  committee knows that there are other people
20  that have other incomes, I guess I had another
21  income.
22      Q. In Paragraph 33 at the top of Page 6
23  in your complaint, in your second sentence, you
24  say, "The rules committee suspended Keefe for

Page 87

1   six months and put him back into Gang 12 for
2   supposedly having another job."
3           Did I read that correctly?
4       A. Correct.
5       Q. The next sentence is, "Keefe continues
6   to have another income from JTC, not another
7   job, and the rules committee members know
8   that."
9           Did I read that correctly?
10      A. Yes.
11      Q. That is actually the same response you
12  provided in request for admissions, Number 32,
13  just about; isn't that right?
14      A. Yup.
15      Q. So your understanding of the reason
16  for your suspension was that the rules
17  committee held -- determined that you had
18  another job; is that fair to say?
19      A. Yes.
20      Q. And we already went through all the
21  John T. Clark W-2s.
22          In 2003 you already admitted that you
23  did receive W-2 income from John T. Clark;
24  isn't that right?

Page 88

1       A. Yes.
2       Q. Let me see if I can get right to the
3   main issue.
4           It is your contention that because you
5   received that income, but you really weren't
6   doing any work for it, that that wasn't another
7   job?
8       A. Correct. Like a lot of other union
9   members down there do the same thing.
10      Q. But you understand that you reported
11  the money you received to the federal and state
12  government as income that you earned from
13  working at John T. Clark; is that right?
14      A. Correct.
15          MR. LATHROP: Objection to the
16  form of the question.
17          BY MR. MAHONEY:
18      Q. Leaving aside your claims about
19  Mr. Lee for the moment, but with regard to
20  Mr. Picard and Mr. McGaffegan, you said rental
21  property and then pension, money received from
22  rental property and pension. And I know you're
23  not a tax attorney.
24          That is not reportable income; isn't

Page 89

1  that fair to say?
2        MR. LATHROP: Objection.
3     A. I don't know.
4     Q. Do you get any pension whatsoever?
5     A. No.
6     Q. But we already went over that you know
7  the difference between income received from a
8  stock distribution rather than income. You're
9  familiar with that, right?
10       MR. LATHROP: Objection.
11    A. Yes.
12    Q. Do you have any understanding,
13 Mr. Keefe, generally speaking, of what the
14 phrase "passive income" is?
15    A. No.
16    Q. Do you have any understanding of the
17 word or phrase "unearned income"?
18    A. No.
19    Q. On your tax returns, which we don't
20 have as of yet, did you report any unearned
21 income for, say, 2002 and 2003?
22    A. I don't think so, no.
23    Q. In Paragraph 37 of your complaint, you
24 say, "Other union members have other jobs and

Page 90

1  incomes such as family business, rental income,
2  pension, and cash-paying jobs, while still
3  enjoying the benefits of Gangs 1 through 9."
4        What other members are you referring
5  to specifically?
6     A. I'm not going to name them all.
7     Q. It's a question that's reasonably
8  calculated to lead to the discovery of
9  admissible evidence.
10       Are you going to strike that
11 allegation in your complaint?
12    A. No.
13    Q. Then I want the names.
14    A. All the same names I gave you.
15    Q. The individuals that you referred to
16 in Paragraph 36 are the same individuals that
17 you're referring to in Paragraph 37?
18    A. Yup.
19    Q. Why did you make a distinction?
20       In other words, why did you say "other
21 union members" in Paragraph 37 if they are the
22 same people that you allege in Paragraph 36?
23    A. I don't know.
24    Q. Just so the record is perfectly clear,

Page 91

1  the only other members that you allege that
2  have income earned while not working
3  exclusively at the craft are Brendon Lee, Joe
4  Picard, and Paul McGaffegan?
5     A. No. There is more. I think there is
6  more but...
7     Q. Who are the others?
8     A. I don't want to say.
9     Q. Then why won't you strike Paragraph 37
10 from the complaint if you don't want to name
11 them?
12    A. They will probably come up at the
13 trial.
14    Q. That is the whole point of discovery,
15 is to find out who these people are.
16       You, through your attorney, filed what
17 is called plaintiff's initial disclosures in
18 this case. It was filed on August 18, 2004.
19       In that, there is a paragraph that
20 says, "Individuals likely to have discoverable
21 information," and you listed "Stephen Meigs,
22 the president of Local 805 and on Local 805
23 rules committee."
24       . Is it your testimony today that

Page 92

1  Stephen Meigs is likely to have information
2  relating to either your allegations or the
3  defense of your allegations?
4     A. That he would know other people? What
5  do you mean? I don't know what you mean.
6     Q. Let me try it another way. What
7  information does Stephen Meigs have with regard
8  to this case?
9     A. I would say he knows other people that
10 have other incomes.
11    Q. Have you ever spoken to him about
12 that?
13    A. No.
14    Q. What information does Richard Flaherty
15 have?
16    A. I would say every union member knows
17 that other people have other incomes, and they
18 are not doing anything about it.
19    Q. Have you ever spoken to Mr. Flaherty
20 about that?
21    A. No.
22    Q. So is it your testimony that
23 Mr. Mirand, Mr. Connelly, Mr. Lee, Mr. McAvoy,
24 Mr. Langin, all have information with regard to

23 (Pages 89 to 92)

DUNN & GOUDREAU

Page 93

1   other union members that have other jobs?
2       A. Oh, yeah.
3       Q. Do any of those individuals,
4   Mr. Mirand, Mr. Connelly, Mr. Lee or
5   Mr. McAvoy, have any other information
6   regarding either your case or the defense of
7   the allegations that you've made?
8       A. I don't know.
9       Q. In listing Mr. Mirand, Mr. Connelly,
10  Mr. Lee, Mr. McAvoy, and Mr. Langin, if they
11  would testify, what information would you
12  expect them to testify about at your trial?
13      A. If they were truthful, if they told
14  the truth, they could name people that have
15  other jobs and other incomes up and down the
16  union.
17      Q. Is that it with regard to all of those
18  men?
19      A. Yes.
20      Q. Your address, sir, is P.O Box 726,
21  Green Harbor, Massachusetts 02041; is that
22  right?
23      A. Yes.
24      Q. How long have you had a post-office

Page 94

1   box in Green Harbor?
2       A. That is where our mail is delivered.
3       Q. How long has your mail been delivered
4   to that post-office box?
5       A. Forever.
6       Q. More than 20 years?
7       A. Yeah.
8       Q. Have you ever changed that post-office
9   box in the last 20 years?
10      A. No.
11      Q. Have you ever had any other address
12  that you received mail at in the past 20 years?
13      A. No.
14          MR. MAHONEY: Let's mark these as
15  the next few exhibits.
16          (Exhibit-15, Letter Dated 2/6/03;
17          Exhibit-16, Rules; Exhibit-17,
18          Certificate; Exhibit-18, Letter;
19          Exhibit-19, Letter; Exhibit-20,
20          Letter, marked for
21          identification.)
22      BY MR. MAHONEY:
23      Q. I'm going to show you what we've
24  marked as Exhibit 15 and ask if you have ever

Page 95

1   seen this document before?
2       A. Yes.
3       Q. Did you receive that prior to February
4   6, 2003?
5       A. I think so, yeah.
6       Q. I'm going to show you what has been
7   marked as Exhibit 16 and ask if you have ever
8   seen that before?
9       A. Yes.
10      Q. Did you receive that in February of
11  2003?
12      A. Yes,
13      Q. I'm going to show you what we marked
14  as Exhibit 14 and ask you, do you recognize
15  that to be a copy of a -- you know, those green
16  cards that you get from certified mail?
17      A. One of these, I didn't receive.
18      Q. Is that your signature on that last
19  exhibit that I just showed you?
20      A. Yes.
21      Q. I'm going to show you what we marked
22  as Exhibit 18.
23          Have you ever seen Exhibit 18 before?
24      A. Yes.

Page 96

1       Q. When did you see Exhibit 18 for the
2   first time?
3       A. I don't remember.
4       Q. Was it sometime in March of 2003?
5       A. It could have been.
6       Q. I'm going to show you what we marked
7   as Exhibit 19.
8           Have you ever seen that before?
9       A. Yes.
10      Q. When did you first see Exhibit 19?
11      A. I don't remember.
12      Q. Was it sometime in March of 2003?
13      A. It could have been, yeah.
14      Q. With regard to Exhibit 20, have you
15  ever seen this document before?  I will
16  represent to you that was an attachment that
17  Mr. Picard sent in his letter to Mr. McNamara.
18      A. I don't remember ever getting anything
19  from Joe Picard.
20      Q. Why don't you read what is in Exhibit
21  20, and then I'm going to have some questions
22  about what is contained in that.
23      A. (Witness reviewing document.)
24      Q. By the way, Mr. Keefe, are you suing

Page 97

1  for your legal fees in this case?
2      A. I don't know yet.
3      Q. Have you spent any money in payment to
4  your lawyer in this case?
5      A. Yes.
6      Q. Are you paying Mr. Lathrop yourself?
7      A. No.
8      Q. Who is?
9      A. My brother.
10     Q. That is your brother Tim?
11     A. Yes.
12     Q. Can I see that last exhibit, please,
13 for a moment?
14     A. (Witness complying.)
15     Q. Thank you.
16         Now, you have never spoken to
17 Mr. Picard about this case or your suspension;
18 is that right?
19     A. No.
20     Q. You appeared at a rules committee
21 meeting on March 5, 2003; isn't that true?
22     A. I think so.
23     Q. And what was your understanding of why
24 you had to appear at that rules committee

Page 98

1  meeting on March 5, 2003?
2      Do you want me to repeat the question?
3      A. I don't know why.
4      Q. What is your memory of what occurred
5  at the rules committee meeting that you did
6  attend in March of 2003, specifically with
7  regard to you, not any other issue that they
8  may have discussed?
9      A. I don't know what they discussed.
10     Q. Where was the rules committee meeting
11 held that you attended in March of 2003?
12     A. At the hiring hall.
13     Q. And who was present?
14     A. Picard. I think all the members
15 maybe. I don't know how many people were
16 there.
17     Q. And you don't recall what was
18 discussed?
19     A. I came in afterwards when they tell
20 you to come in.
21     Q. What happened while you were in there
22 after you were called in?
23     A. I don't remember.
24     Q. Did you make any notes of what

Page 99

1  occurred?
2      A. No.
3      Q. Did you speak at all on March 5th,
4  2003, to address the rules committee?
5      A. I don't recall.
6      Q. Now, in 2001 you filed litigation
7  against the same defendants, isn't that true,
8  that are in this case?
9      A. Yes.
10     Q. Do you recall providing testimony in a
11 deposition in that case?
12     A. Yes.
13     Q. And, in fact, in your complaint,
14 Paragraph 32, which I think we marked as
15 Exhibit 4. On Page 5, you stated, "On January
16 27, Keefe was deposed by counsel for Local 805,
17 Local 800, and Local 799 in the
18 above-referenced case."
19         MR. LATHROP: January 7th.
20         MR. MAHONEY: I'm sorry. What
21 did I say?
22         MR. LATHROP: You said 27th.
23         BY MR. MAHONEY:
24     Q. Exhibit 4, Page 5, Paragraph 32. Let

Page 100

1  me know if I read this correctly. "On January
2  7, 2003, Keefe was deposed by counsel for the
3  Local 805, Local 800, and Local 799 in the
4  above-referenced case."
5          Did I read that correctly?
6      A. Yes.
7      Q. "At that time, counsel for Local 805,
8  Local 800, and Local 799 examined Keefe with
9  regard to the fact that during 2001 Keefe had
10 received income from JTC."
11         Did I read that correctly?
12     A. Yes.
13     Q. And in that deposition, you admitted,
14 as is represented today by the W-2s which we've
15 marked as Exhibit 9A and B, that you received
16 income from John T. Clark & Son; is that right?
17     A. Yes, that I had another income.
18     Q. And let's get back to the pledge. You
19 contend that you did not violate the pledge
20 because you didn't do any work to earn this
21 income at Clark?
22     A. Again, I have another income like a
23 lot of other people down there do.
24     Q. I just want to get your allegations

DUNN & GOUDREAU

Page 101

1  correctly.
2      You don't deny that you have another
3  income, right, or had at the time of your
4  suspension?
5      A. I had another income, yes.
6      Q. But you contend that the other income
7  that you had was not income that you earned
8  from working at the craft; is that what you're
9  saying?
10     A. Yes.
11     Q. Despite it being reportable income
12 from a stevedore company, John T. Clark, right?
13     A. Yes.
14     Q. Although Mr. Horahoa did indicate that
15 you worked for Clark on a casual basis as a
16 longshoreman in 2000, didn't he?
17     A. As a longshoreman, yes.
18     Q. You are a member of 805, right?
19     A. Yes.
20     Q. That is the longshoremen's union,
21 right?
22     A. Yes.
23     Q. How long have you been a member of
24 805?

Page 102

1      A. Since 1998, I think.
2      Q. Has any member of the union, any
3  member, threatened you or coerced you about
4  your filing of this second lawsuit?
5      A. Have I had words with anybody; is that
6  what you are saying?
7      Q. Yeah, why don't we start there. Have
8  you had words with anyone about this second
9  lawsuit?
10     You've already told me about Brendon
11 Lee. Other than the discussion that you had
12 with him, anyone else?
13     A. No.
14     Q. Tell me whether you would agree or
15 disagree with this: That you were suspended in
16 2003 because you testified that you had
17 received income from John T. Clark & Son, not
18 because you had filed the 2001 lawsuit.
19     Would you agree or disagree with that?
20     A. I don't know why I was suspended.
21     Q. To this day, you don't know why you
22 were suspended?
23     A. Because they said I had another job.
24 I didn't have another job. I had another

Page 103

1  income like a lot of other union members up and
2  down the list of...
3      Q. But that's essentially your
4  contention, that you had other income which was
5  reported as W-2 income as earnings, but you
6  didn't work for that money?
7      A. What's the question?
8      Q. That's your contention, that you had
9  income but you didn't work for it?
10     A. What's the question?
11     Q. Is that your contention, that you had
12 income but you didn't work for that money?
13     A. I was given a check every month
14 because it was a family business.
15     Q. Given a paycheck?
16     A. Yes.
17     Q. Previously, I asked you if it was a
18 no-show job, and you disagreed with my
19 characterization.
20     Why do you disagree with it if you
21 contend that you were just given a check, but
22 you didn't do anything for it?
23     A. I could go up there for five minutes
24 and leave. I could go up there for an hour and

Page 104

1  leave and not do any work. And Timmy would
2  tell me to get out, go do what you want to do.
3      Q. Did you have any conversation with
4  Mr. Horahoa prior to the time that he wrote
5  what we marked as Exhibit 7?
6      A. What kind of a conversation? About
7  what?
8      Q. About that letter.
9      A. No, I never...
10     Q. How was it that Mr. Horahoa came to
11 write the letter?
12     A. I think my brother mentioned something
13 to him.
14     Q. Was it your understanding that
15 Mr. Horahoa wrote that letter so you could
16 present it to the union?
17     A. I don't know.
18     Q. That's what you did, isn't it?
19     A. Yeah.
20     Q. The letter indicates that you were
21 employed by John T. Clark & Son on a casual
22 basis as a longshoreman working at the Connelly
23 containment terminal; is that right?
24     A. Through the hall, yes.

Page 105

1    Q. When you were employed by John
2  T. Clark & Son, did you also, in addition to
3  the health benefits that you received, receive
4  a motor vehicle?
5    A. Yes.
6    Q. Is that the case right through 2003,
7  which was the last date of the W-2 that you had
8  from that company?
9    A. Yes.
10   Q. Do you still have that car?
11   A. No.
12   Q. What happened to it?
13   A. My wife has got it.
14   Q. When you were driving the car, who was
15 it registered to?
16   A. John T. Clark.
17   Q. Now that your wife is driving the car,
18 who is it registered to?
19   A. John T. Clark.
20   Q. John T. Clark is still in business?
21   A. Not that I know of.
22   Q. Apparently, it still has some assets
23 left, though, right? If it has a car, it has
24 an asset; would you agree with that?

Page 106

1    A. You would have to talk to my brother.
2  I have nothing to do with that.
3    Q. Prior to your suspension, do you
4  contend that you weren't given written notice
5  about the specific charges that you were being
6  summoned to by the rules committee?
7    A. I never received anything from Joe
8  Picard at my post-office box.
9    Q. Even that letter you signed for, which
10 is marked --
11   A. This one, I received. This other
12 stuff -- I've never received anything from Joe
13 Picard. I received stuff from McGaff.
14   Q. About what?
15   A. I don't know what -- I don't know what
16 it was for.
17   Q. When you went to the rules committee
18 on March 5, to that meeting, why did you go?
19   A. I was told to go.
20   Q. By who?
21   A. By the rules committee.
22   Q. In what manner were you told, verbally
23 or in writing?
24   A. In writing.

Page 107

1    Q. So that would be Exhibit 18; is that
2  right?
3    A. Yes.
4    Q. What does Exhibit 18 say? Can you
5  read that into the record, please?
6    A. The whole thing?
7    Q. Yeah.
8    A. "The Allied rules committee, who are
9  empowered by Rule Number 37 of the hiring hall
10 rules, are hereby notifying you to appear
11 before them. The committee summons you on this
12 date of March 5, 2003, at 12 noon to appear at
13 the hiring hall. The purpose of this hearing
14 is for you to show just cause as to why you
15 should not be suspended and placed into Gang
16 12. Please bring with you any resignation, any
17 retirement papers, tax returns or any other
18 documents that you deem pertinent. We have
19 found you to be in violation of not honoring
20 the pledge that you signed. Failure to appear
21 at this hearing could also result in a
22 sanction."
23   Q. And you got that letter?
24   A. I think I got that one, yeah.

Page 108

1    Q. That is what the certified-mail card
2  is?
3    A. It coincides with that, yes.
4    Q. In reading Exhibit 18, do you
5  understand what is being stated in that letter?
6    A. Yeah.
7    Q. Did you understand it when you read
8  it?
9    A. Yes.
10   Q. And you got that on February 18th; is
11 that right?
12   A. Yup.
13   Q. That is about two weeks prior to the
14 meeting?
15   A. Yes.
16   Q. Do you contend that two weeks' notice
17 is an unreasonable amount of time for you to be
18 summoned to a meeting?
19   A. No.
20   Q. When you got into the hearing or the
21 meeting, you waited outside and then you were
22 summoned in; is that right?
23   A. Yes.
24   Q. Given what you've read from Exhibit

1  18, do you recall any discussion as to what the
2  point of view -- being called to the meeting?
3      A.  I don't remember anything about what
4  they were saying at the meeting.
5      Q.  Did you go with an attorney to the --
6      A.  No.
7      Q.  At the time, Mr. Lathrop was
8  representing you, though, wasn't he?
9      A.  Yeah, I think so, right.  Yeah.
10     Q.  Did you inform the rules committee on
11  March 5, 2005, that you were working for John
12  T. Clark as a consultant?
13     A.  I don't know if I said that.
14     Q.  Did you inform the rules committee, or
15  did you state to the rules committee that they
16  knew of your employment at John T. Clark, yet
17  allowed you to move up from 12 to 11?
18     A.  I don't remember.
19     Q.  If you admitted that you were employed
20  by Clark at that rules committee meeting, do
21  you have any memory of saying you were going to
22  resign your position because you wanted to stay
23  in Gang 10?
24     A.  I don't remember.

1      A.  Yes.
2      Q.  When did you know that?
3      A.  I don't know what year or what date.
4  I just know that he was.
5      Q.  You knew before today?
6      A.  Yes.
7      Q.  Did you have any understanding prior
8  to today of why Mr. Consadine had been
9  suspended?
10     A.  Because he had another income.
11     Q.  What about Edward Consadine, do you
12  know him?
13     A.  I know who he is.  I've never talked
14  to him.
15     Q.  Do you know whether or not he had ever
16  been suspended?
17     A.  I don't know.
18     Q.  Do you know Pat Consadine?
19     A.  Yes.
20     Q.  Do you know if he had ever been
21  suspended?
22     A.  Yes.
23     Q.  That is a yes that he had been
24  suspended?

1      Q.  Did you ever go to any subsequent
2  rules committee meeting after that March 5
3  meeting?  Did you ever attend any other rules
4  committee meetings?
5      A.  Yes.
6      Q.  Did you go to the March 20th meeting
7  in 2003?
8      A.  No.  I don't know.
9      Q.  How many rules committee meetings did
10  you go to in 2003?
11     A.  I don't remember.
12     Q.  Do you know William Coachie
13  (phonetic).
14     A.  I know who he is.
15     Q.  Do you know whether or not he was ever
16  suspended from the union?
17     A.  I just read it that he was.
18     Q.  You just read it today?
19     A.  Yeah.
20     Q.  What about Dan Consadine, do you know
21  him?
22     A.  Yes.
23     Q.  Do you know whether or not he was ever
24  suspended from the union?

1      A.  Yes.
2      Q.  Is that prior to your suspension?
3      A.  I think so, yeah.
4      Q.  And do you have any understanding of
5  why Pat Consadine was suspended?
6      A.  Because he had another income.
7      Q.  What about Michael McAvoy, do you know
8  him?
9      A.  I know who he is.
10     Q.  Do you know whether or not he was ever
11  suspended?
12     A.  I read that he just was.
13     Q.  You read that today?
14     A.  Yes.
15     Q.  What about John McLaughlin, do you
16  know him?
17     A.  Yes.
18     Q.  Do you know whether or not he was ever
19  suspended?
20     A.  Yes.
21     Q.  Do you know when he was suspended?
22     A.  I don't know what date.
23     Q.  Did you know prior to today that he
24  had been suspended?

Page 113

1      A. Yes.
2      Q. For what reason? Holding another job?
3      A. Holding another income, having another
4   income.
5      Q. How about Dan O'Brien, do you know
6   him?
7      A. I know who he is.
8      Q. Do you know whether or not he had been
9   suspended from the union?
10     A. I just read that he was, yeah.
11     Q. Today?
12     A. Yeah.
13     Q. Exhibit 18 asked you to bring
14  documentation with you; is that fair to say?
15     A. Yes.
16     Q. Did you bring any documentation with
17  you to that March 5 meeting?
18     A. No.
19     Q. The first documentation that you ever
20  provided to the rules committee, is that what
21  we previously marked as Exhibit 3?
22     A. As far as I remember, yes.
23     Q. Did you ever provide the rules
24  committee with any social security information?

Page 114

1      A. I don't think so.
2      Q. Exhibit 18 asks that you bring
3   resignation and, slash, retirement papers, tax
4   returns or any documents that you deem
5   pertinent.
6          And you told me that you later brought
7   this Exhibit Number 3. Apparently, you deemed
8   this as pertinent; is that right?
9      A. They told me to bring that.
10     Q. I apologize if I asked you this
11  earlier.
12         How did you get this document?
13     A. I went to the social security office.
14     Q. Where is that?
15     A. In Hanover.
16     Q. And they printed this out for you?
17     A. Yes.
18     Q. Mr. Keefe, given that there is a date
19  that is sort of cut off at the top of Exhibit
20  3, which appears to be August 17, 2004, do you
21  have a memory of whether or not you got this
22  document from the social security office in
23  Hanover after you had already been reinstated?
24     A. I got it this date. I don't know what

Page 115

1   date I was reinstated. I think that was the
2   date that I would have got it.
3      Q. All right. In the last ten years,
4   have you ever been convicted of a felony?
5      A. Yes.
6      Q. What was that --
7      A. No, not ten years.
8      Q. This is 2006. Since 1996 have you
9   ever been convicted of a felony?
10     A. No.
11     Q. Since 2001 have you been convicted of
12  a misdemeanor?
13     A. Like what, traffic or something?
14     Q. A misdemeanor would be district court
15  summons; felony would be a superior court
16  summons, criminal.
17     A. Misdemeanor, no.
18     Q. Are you certain of that in the past
19  five years, no misdemeanors, convictions?
20     A. I don't think so.
21     Q. When is the last time that you were in
22  court for any reason?
23     A. I was in court 20 years ago, '86, I
24  think.

Page 116

1          MR. LATHROP: You mean civil
2   also?
3          MR. MAHONEY: Yeah, any reason
4   whatsoever.
5          BY MR. MAHONEY:
6      Q. Last time you were in court was it
7   this trial, the trial from the other case?
8      A. Yes.
9      Q. Prior to that, when was the last time
10  you had been in a courthouse?
11         MR. LATHROP: Your last question
12  was in a courthouse. A court procedure --
13     A. With somebody else or for me?
14     Q. For yourself.
15     A. The last time I remember was 1986, I
16  think.
17     Q. In 2003 do you have any understanding
18  of any appeals process that you could pursue if
19  you thought that you were being treated
20  unfairly by the union?
21     A. No. Other than Brighton, New York, or
22  going to the international.
23     Q. Have you ever had any conversation
24  with any of the Consadines about your case?

29 (Pages 113 to 116)

DUNN & GOUDREAU

1    A. No.

2    Q. Have you ever had any conversation

3  with Dan O'Brien about your case?

4    A. No.

5    Q. John McLaughlin?

6    A. No.

7    Q. Mike McAvoy?

8    A. No.

9    Q. What about William Coachie, have you

10  ever had any conversation with him?

11    A. No.

12        MR. MAHONEY: Let's take a

13  break. I may be finished.

14        (Brief break.)

15        BY MR. MAHONEY:

16    Q. Mr. Keefe, when you became a member of

17  805, did you receive a copy of the

18  constitution.

19    A. Constitution?

20    Q. Yeah.

21    A. No.

22    Q. Do you have any understanding of the

23  availability of the Constitution of the

24  International Longshoremen's Association? Do

1  you know if it is kept at the union hall or any

2  other building?

3    A. The last time I saw a constitution was

4  from 1998 or something, '94.

5    Q. That was before you were a member of

6  805, right?

7    A. (Witness nodding.)

8    Q. Prior to being a member of 805, you

9  were a member of another longshoremen's union,

10  weren't you?

11    A. Yes.

12    Q. That was up in Portsmouth, New

13  Hampshire?

14    A. Yes.

15    Q. What local was that?

16    A. Local 1947.

17    Q. Had you ever been summoned before the

18  rules committee or any hearing officer in 1947

19  while you were a member there?

20    A. Not that I recall. I don't think they

21  had a rules committee.

22    Q. Prior to filing this litigation, Civil

23  Action Number 0411340, did you pursue an appeal

24  of the rules committee's decision with the

1  union?

2    A. For my suspension?

3    Q. Yes.

4    A. I didn't know I could appeal.

5    Q. On April 7, 2003, your attorney wrote

6  a letter to Mr. Bowers, the president of the

7  international; is that right?

8    A. Yes.

9    Q. And that letter was a complaint made

10  on your behalf to Mr. Bowers about your

11  suspension; is that right?

12    A. Yes.

13    Q. Prior to that letter being sent to

14  Mr. Bowers, had you pursued any appeal within

15  the union, either to the district council or

16  any other body in accordance with the

17  constitution?

18    A. I didn't know you could.

19    Q. Prior to filing this civil action, had

20  you pursued any appeal of your suspension

21  within the union, either to the district

22  council or any other body pursuant to the

23  constitution?

24    A. Say that again, please?

1        MR. MAHONEY: Can you read that

2  back, please, Bernadette?

3        (Question read.)

4    A. I didn't know you could.

5    Q. Do you recall when we were talking

6  about Exhibit 5 earlier, which are the hiring

7  hall rules?

8    A. Yes.

9    Q. We were previously talking about the

10  hiring hall rules in regard to the pledge

11  sheet. Do you recall that?

12    A. Yes.

13    Q. What I want to focus your attention

14  now on is Rule 25. You t

15        Tell me if I read this incorrectly. I

16  will try to do it upside down.

17        "All members who have a grievance must

18  go through proper channels first before

19  bringing a lawsuit against the ILA or any

20  local."

21        Did I read that correctly?

22    A. Yes.

23    Q. "(The channels are as follows: First,

24  they must go through their local; next, New

Page 121

1  England Dock & Marine Council or Atlantic
2  District Council; and then the international.)"
3       Did I read that correctly?
4       A. Yes.
5       Q. And these are the hiring hall rules
6  that were in effect in 2003 at the time of your
7  suspension; isn't that right?
8       A. Yes.
9       Q. And prior to filing this lawsuit, did
10 you make any request to the New England Dock &
11 Marine Council or the Atlantic District Council
12 appealing your suspension?
13      A. I never read that rule. I didn't know
14 I could. If I did, I would have went that
15 avenue.
16      Q. Your attorney did write to the
17 president; is that right?
18      A. Yes.
19      Q. And you received Mr. Bowers' response,
20 the president's response, in December 2003;
21 isn't that right?
22      A. Yes.
23      Q. And was it after you received
24 President Bowers' response that you then filed

Page 122

1  this lawsuit? The response was December 15,
2  2003, and the date of your complaint is
3  entitled June 16, 2004.
4       Do you see that?
5       A. It was after.
6       MR. MAHONEY: Okay. Sir, subject
7  to what I said earlier with regard to my
8  suspension, until I receive a formal copy of
9  the responses to the request for documents, I
10 don't have any other questions today.
11      MR. LATHROP: I have none.
12      (Deposition of Stephen Keefe suspended
13 at 1:26 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Page 123

1          CERTIFICATE
2       I, STEPHEN KEEFE, hereby certify under
3  the pains and penalties of perjury that I have
4  read the foregoing transcript of my testimony,
5  and further certify that said transcript is a
6  true and accurate record of my testimony (with
7  the exception of the corrections noted below.)
8  PAGE LINE   CORRECTIONS AND/OR DELETIONS
9  __ __  _____
10 __ __  _____
11 __ __  _____
12 __ __  _____
13 __ __  _____
14 __ __  _____
15 __ __  _____
16 __ __  _____
17 __ __  _____
18 __ __  _____
19
20      Signed under the pains and penalties
21 of perjury this  day of       , 2006.
22
23
24         STEPHEN KEEFE

Page 124

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF MIDDLESEX
I, Bernadette J. D'Alelio, a Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition was taken before me on the 8th day of May, 2006; That the witness named in the deposition, prior to being examined, was by me first duly sworn; That said deposition was taken before me at the time and place hereinafter forth, and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision; That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF I have subscribed my name and affixed my seal this 24th day of May, 2006.

Bernadette J. D'Alelio
Notary Public
Massachusetts
My Commission Expires:
December 12, 2010

PLEASE NOTE:
THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS, UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

DUNN & GOUDREAU