## In The Matter Of:

*Stephen Keefe v.*
*Local 805, ILA, AFL-CIO, et al.*

---

*Joseph J. Picard, Jr.*
*Vol. 1, May 9, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA 02110*
*(617) 426-2432*

Original File PICARD.V1, 74 Pages
Min-U-Script® File ID: 1933237420

**Word Index included with this Min-U-Script®**

Page 1

Volume I
Pages 1 to 74
Exhibits 1 to 10
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEPHEN KEEFE,
   Plaintiff,
vs.   : Civil Action
   : No. 04-11340-DPW
LOCAL 805, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION,
AFL-CIO; LOCAL 800,
INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO; and
LOCAL 799, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION,
AFL-CIO,
   Defendants.

DEPOSITION OF JOSEPH J. PICARD, JR., a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Valerie L. Shand-Safama, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Mullen & McGourty, 52 Temple Place, Fourth Floor, Boston, Massachusetts, on Tuesday, May 9, 2006, commencing at 10:21 a.m.

PRESENT:
   Scott A. Lathrop & Associates
     (By Scott A. Lathrop, Esq.)
   122 Old Ayer Road, Groton, MA 01450,
     for the Plaintiff.
   Mullen & McGourty
     (By Michael L. Mahoney, Esq.)
   52 Temple Place, Fourth Floor,
   Boston, MA 02111, for the Defendants.

Page 2

PRESENT (Continued):
   Law Offices of Bernicle, McNelley & Nugent
     (By Edward J. McNelley, Esq.)
   101 Tremont Street, Suite 700,
   Boston, MA 02108, for the Deponent.
ALSO PRESENT: Stephen Keefe

Page 3

INDEX
| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSEPH J. PICARD, JR. | | | | |
| BY MR. LATHROP | 7 | | 69 | |
| BY MR. McNELLEY | | 61 | | |
| BY MR. MAHONEY | | 65 | | 71 |

EXHIBITS
| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Copy of a document headed "Hiring Hall Work Rules" | 15 |
| 2 | Copy of a letter to William R. McNamara, Vice President ILA from Locals 799, 800, and 805, signed by Joseph Picard, Chairman Rules Committee, dated September 20, 2003, with enclosures | 24 |
| 3 | Copy of a document stamped "Enclosure 16" sent to William McNamara from Rules Committee, Locals 799, 800, and 805 | 33 |
| 4 | Copy of a document from Rules Committee, Locals 799, 800, and 805 to Union Member Stephen Keefe | 39 |

Page 4

EXHIBITS, Continued
| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 5 | Copy of a document from Rules Committee Locals 799, 800, and 805 sent to Stephen Keefe | 45 |
| 6 | Copy of a document from Rules Committee, Locals 799, 800, and 805 sent to Union Member Stephen Keefe | 45 |
| 7 | Copy of a domestic return receipt for an article sent to Stephen Keefe, Article No. 7002 2030 0006 6975 9853 | 45 |
| 8 | Copy of a document from Rules Committee, Locals 799, 800, and 805 to Union Member Stephen Keefe | 50 |
| 9 | Copy of a two-page article dated June 23, 2005, from the Website www.SouthBostonOnline.com | 51 |
| 10 | Copy of a document headed "PACER Service Center, Transaction Receipt" | 65 |

Page 5

[1] PROCEEDINGS
[2] MR. LATHROP: Stipulations?
[3] MR. MAHONEY: Usual.
[4] MR. LATHROP: And do you want him to read
[5] and sign?
[6] MR. McNELLEY: Also, that you've had a
[7] chance to examine the tax returns from Mr. Picard
[8] and Mrs. Picard from 2002 and, with the exception of
[9] one Federal ID number from the year 2004,
[10] No. 043209245 reporting income of $429, you're
[11] satisfied that all of those salaries came from his
[12] work as a longshoreman.
[13] MR. LATHROP: I have no evidence to the
[14] contrary based upon that.
[15] MR. McNELLEY: Well, either it is or it
[16] isn't.
[17] MR. LATHROP: Yeah. That's what I said.
[18] MR. McNELLEY: Okay. Then it is.
[19] Then, we're satisfied that all of his
[20] income has been derived from his income working as a
[21] longshoreman in the Port of Boston.
[22] MR. LATHROP: No, I won't stipulate to
[23] that. I'll stipulate that you produced income tax
[24] returns, and I'm satisfied with income tax returns.

Page 6

[1] MR. McNELLEY: You're satisfied that they
[2] are showing that all of his income was produced from
[3] his work as a longshoreman for the Port of Boston.
[4] MR. LATHROP: From his income tax returns,
[5] yes.
[6] MR. McNELLEY: Okay. That's all we need to
[7] stipulate.
[8] MR. LATHROP: But the stipulation I was
[9] seeking was stipulations for the deposition.
[10] MR. McNELLEY: Fine. The usual.
[11] MR. LATHROP: And what do you call the
[12] "usual"?
[13] MR. McNELLEY: Whichever, you know, you
[14] find satisfactory. It's your show.
[15] MR. LATHROP: Reserve all objections,
[16] except as to form, and motions to strike until time
[17] of trial. He'll read and sign within 30 days of the
[18] presentation, and we can waive the requirement that
[19] it be signed before a notary. Is that acceptable?
[20] MR. McNELLEY: Fine.

Page 7

[1] JOSEPH J. PICARD, JR.
[2] a witness called for examination by counsel for the
[3] Plaintiff, having been satisfactorily identified by
[4] the production of his driver's license and being
[5] first duly sworn by the Notary Public, was examined
[6] and testified as follows:
[7] DIRECT EXAMINATION
[8] BY MR. LATHROP:
[9] Q: Could you please state your full name and
[10] address for the record.
[11] A: Joseph J. Picard, Jr.
[12] Q: And your address?
[13] A: 134 Potter Street, Melrose, MA.
[14] Q: And what's your date of birth?
[15] A: 7/16/54.
[16] Q: Briefly describe your educational
[17] background.
[18] A: Graduated high school.
[19] Q: Which high school?
[20] A: South Boston High.
[21] Q: When?
[22] A: 1973.
[23] Q: Could you describe your employment history
[24] over the last 20 years.

Page 8

[1] A: I've been working for Boston I.L.A. for the
[2] last 29 years.
[3] Q: And for the uninitiated, what is the
[4] "Boston I.L.A."?
[5] A: International Longshoremen's Association.
[6] For Local 800.
[7] Q: Do you hold any positions with any
[8] employers?
[9] A: Yeah. Related to the Boston longshoremen
[10] or anywhere else?
[11] Q: Anyplace.
[12] A: Yeah. I get paid for Columbia Coastal.
[13] Q: Say it again?
[14] A: Columbia Coastal.
[15] Q: And what position, if any, do you hold with
[16] Columbia Coastal?
[17] A: I'm a stevedore.
[18] Q: Is that the only position you hold with
[19] Columbia Coastal?
[20] A: Yes.
[21] Q: Have you held any positions with the
[22] I.L.A.?
[23] A: That I get paid for, no.
[24] Q: Have you held any nonpaying position with

Local 805, ILA, AFL-CIO, et al.
Case 1:04-cv-11340-DPW   Document 24-13   Filed 08/25/2006   Page 4 of 20
Joseph J. Picard, Jr
Vol. 1, May 9, 2006

Page 9

[1] the I.L.A.?
[2] A: Rules Committee.
[3] Q: And could you tell the uninitiated what the
[4] Rules Committee is?
[5] A: The Rules Committee was created to uphold
[6] all the bylaws that we have in our union. We have
[7] three men from each local that meets once a month
[8] and go through all the rules.
[9] Q: Is there more than one local that
[10] participates in the Rules Committee?
[11] A: Locals 799, 800, and 805.
[12] Q: What's the jurisdiction of Local 800?
[13] MR. MAHONEY: Object to the form.
[14] Q: What is the jurisdiction of Local 800?
[15] A: What do you mean "jurisdiction"?
[16] Q: Well, does it cover a specific geographical
[17] territory?
[18] A: Just Boston I.L.A., all three locals.
[19] Well, the 800 doesn't affect 799 and 805. We'd have
[20] no rights, so we don't go to their meetings. It's
[21] just our local meetings.
[22] And all three locals, just to make sure, if
[23] you want to get moved to a new gang, you'd need to
[24] go through all nine guys. There's three each.

Page 10

[1] Q: Does Local 800 cover the Port of Boston?
[2] A: (Nods head)
[3] Q: Is that a yes?
[4] A: Yes.
[5] Q: Does 799 cover the Port of Boston?
[6] A: Yes.
[7] Q: Does 805 cover the Port of Boston?
[8] A: Yes.
[9] Q: How does one become a member of one
[10] particular local as opposed to another?
[11] A: I don't know how 799 and 805 run. It's
[12] only Local 800 I know. If you get 400 hours, you
[13] get into the union. You put your name on a list.
[14] And if we need more people, we pick them up, or
[15] applications.
[16] Q: Do you have any understanding of how
[17] someone becomes a member of, for example, Local 800
[18] as opposed to Local 799?
[19] A: No. Their rules are different than ours.
[20] Q: Do you have any understanding as to the
[21] difference as to how one becomes a member of Local
[22] 800 as opposed to a member of Local —
[23] A: Right now, no. I don't know how they do
[24] it.

Page 11

[1] Q: Have you at any point had any
[2] understanding?
[3] A: Yes.
[4] Q: And when did you have this understanding?
[5] A: Years ago, you could pick man of the year.
[6] You got one man of the year to take in. Or if
[7] you're father died, you'd pick your father's card
[8] up.
[9] Q: And become a member of that same local?
[10] A: Right.
[11] Q: How did you become a member of Local 800?
[12] A: Man of the year.
[13] Q: When were you man of the year?
[14] A: 1977.
[15] Q: And what did you have to do to become man
[16] of the year in 1977?
[17] A: (Shakes head) I was man of the year in
[18] 1977. I didn't do anything.
[19] Q: You have no understanding as to how you
[20] were designated man of the year in 1977?
[21] A: No, I don't.
[22] Q: Do you have any understanding as to who
[23] designated you man of the year?
[24] A: My father told me I'd get in the union in

Page 12

[1] 1977. I was picked man of the year.
[2] Q: Was your father in the local?
[3] A: Yes.
[4] Q: Did he ever serve in any position in the
[5] local?
[6] A: No.
[7] Q: Now, you said you were on Rules Committee?
[8] A: Uh-huh.
[9] Q: Is that a yes?
[10] A: Yes. I'm sorry.
[11] Q: And over what period of time were you on
[12] the Rules Committee?
[13] A: Oh, I've been in there ten years now maybe.
[14] Q: Are you still on the Rules Committee?
[15] A: Yes, I am.
[16] Q: And you think you began in the Rules
[17] Committee approximately ten years ago?
[18] A: Yeah, maybe ten years ago, eight years ago.
[19] I stepped off for a year, and then I went back on.
[20] Q: Do you recall what year it was that you
[21] stepped off?
[22] A: No. Five years ago?
[23] Q: How did you become a member of the Rules
[24] Committee?

Page 13

[1] A: Had an election. We had an election and I
[2] was picked for the Rules Committee. My local had an
[3] election.
[4] Q: So is it fair to say that members of the
[5] Rules Committee are elected by their respective
[6] unions?
[7] A: Yes.
[8] Q: And there are three Local 800 members on
[9] the Rules Committee?
[10] A: Yes.
[11] Q: Has that been true throughout the ten years
[12] you've been on the Rules Committee?
[13] A: Yes.
[14] Q: When you were elected, how long was the
[15] term for?
[16] A: Two years.
[17] Q: So you've been reelected approximately five
[18] times?
[19] A: Yes.
[20] Q: And you said you stepped down one year?
[21] A: Yeah. I didn't run one year.
[22] Q: Do you recall when that was?
[23] A: It was three or four — four years ago.
[24] I'm not sure.

Page 14

[1] Q: Have you ever been chairman of the Rules
[2] Committee?
[3] A: Yes.
[4] Q: At what point in time have you been
[5] chairman of the Rules Committee?
[6] A: Four years ago approximately.
[7] Q: How did you become chairman?
[8] A: When the new elections, the new officers
[9] met, they appointed me chairman.
[10] Q: Are you saying that the other members of
[11] the Rules Committee nominated or elected you as the
[12] chairman of the committee?
[13] A: Yes.
[14] Q: How long did you serve as chairman?
[15] A: About four years.
[16] Q: From when —
[17] A: Six years, 2001, maybe, to 2004.
[18] Q: You mentioned that you had stepped down at
[19] some point in time.
[20] A: Yeah, I didn't run.
[21] Q: Was that prior to you being chairman of the
[22] Rules Committee?
[23] A: I think it was after.
[24] Q: Sometime since 2004?

Page 15

[1] A: Yeah. At the election in 2004 I didn't
[2] run.
[3] Q: But you currently are on the Rules
[4] Committee?
[5] A: Yes.
[6] MR. LATHROP: Would you please mark this as
[7] the first exhibit, No. 1.
[8] (Document marked as Picard
[9] Exhibit 1 for identification)
[10] MR. LATHROP: Would you like to see this?
[11] MR. MAHONEY: Hiring Hall Rules?
[12] MR. McNELLEY: Yeah.
[13] Q: Mr. Picard, I'm showing you what's been
[14] marked as Exhibit 1, which purports to be Hiring
[15] Hall Work Rules with five pages, Rules 1 through 38.
[16] I ask you, can you identify that document?
[17] A: Yes.
[18] Q: Have you seen that document before?
[19] A: Yes.
[20] Q: And, indeed, is that the Hiring Hall Work
[21] Rules applicable to Locals 799, 800, and 805?
[22] A: Yes.
[23] Q: Now, let me draw your attention to Rule 36.
[24] Are you familiar with Rule 36?

Page 16

[1] A: (Reviewing document) Yes.
[2] Q: Could you read into the record Rule 36.
[3] A: "If a member wishes to move from gang 12 to
[4] Gang 11, they must sign a pledge sheet and appear
[5] before the Rules Committee. They must bring
[6] significant proof that they are working exclusively
[7] at the craft, such as notarized retirement or
[8] resignation papers, tax returns or any other
[9] documents that are pertinent. The burden of proof
[10] rests with the bargaining unit member."
[11] Q: Okay. Do you have any understanding as to
[12] how that rule came into effect?
[13] A: I guess the port voted on it, the port-wide
[14] vote voted on it.
[15] Q: What do you mean by "the port"?
[16] A: The Rules Committee don't make the rules
[17] up. The whole port makes the rules up.
[18] Q: I'm unfamiliar with your — when you say
[19] the port, do you mean —
[20] A: All three locals.
[21] Q: All three locals at a single meeting?
[22] A: Yes. A single vote.
[23] Q: When you say "a single vote," is that at a
[24] single meeting?

Local 805, ILA, AFL-CIO, et al.
Case 1:04-cv-11340-DPW    Document 24-13    Filed 08/25/2006    Page 6 of 20
Joseph J. Picard, Jr
Vol. 1, May 9, 2006

Page 17

[1] A: Yes.
[2] Q: Do you recall when Rule 36 was voted?
[3] A: No.
[4] Q: You note the date of this document?
[5] A: September '99.
[6] Q: So this rule was in effect —
[7] A: At least as of September '99.
[8] Q: — as of September '99?
[9] A: Yeah.
[10] Q: You said you believed you joined the Rules
[11] Committee in approximately 1996. Was this rule in
[12] effect in 1996?
[13] A: I don't have any rules on that. Maybe.
[14] Yeah, I wasn't on the Rules Committee the first
[15] four years, four to six, four years.
[16] Q: Let me ask the question in a different way:
[17] When you first joined the Rules Committee, was
[18] Rule 36 in effect?
[19] A: Yes. So I might have joined in September.
[20] Not ten years. Maybe eight years, six years.
[21] Q: Okay. Do you know if there is any document
[22] defining how Rule 36 should be applied by the Rules
[23] Committee?
[24] A: Do I have any documents? No.

Page 18

[1] Q: Are you aware of any documents that define
[2] how Rule 36 should be implemented by the Rules
[3] Committee?
[4] A: No.
[5] Q: Okay. Would you agree with me that Rule 36
[6] talks about working exclusively at the craft?
[7] A: Uh-huh.
[8] Q: That's a yes?
[9] A: Yes.
[10] Q: It does not talk about having another
[11] income?
[12] A: Right.
[13] Q: And in fact, during your tenure as a member
[14] of the Rules Committee, you personally have had
[15] other income other than working as a longshoreman,
[16] correct?
[17] A: I'm not sure what you're talking about.
[18] Q: You own certain rental properties, do you
[19] not?
[20] A: Oh, sure, yes.
[21] Q: And you have income from that?
[22] A: Yes.
[23] Q: And during your tenure on the Rules
[24] Committee, at least you personally did not deem that

Page 19

[1] rental income to be violating this "working
[2] exclusively at the craft" rule —
[3] A: Right.
[4] Q: — correct?
[5] A: Right.
[6] Q: Why is that?
[7] A: It's not a job.
[8] Q: So it has to be a job?
[9] A: A job.
[10] Q: And what are the characteristics of the job
[11] that would violate working exclusively at the craft?
[12] A: Work for somebody and getting paid for it.
[13] Q: What about being self-employed?
[14] A: Or self-employed.
[15] Q: If someone is self-employed in another
[16] occupation, at least in your opinion, that's not
[17] working exclusively at the craft, correct?
[18] A: Right.
[19] Q: During the course of your tenure in
[20] Local 800, have you ever been self-employed?
[21] A: No.
[22] Q: Have you ever been involved in the heating
[23] insulation business?
[24] A: Heat and insulation, no.

Page 20

[1] Q: Building and construction?
[2] A: Yes.
[3] Q: What was the nature of your involvement in
[4] the building and construction business?
[5] A: I'd buy a piece of property and build it,
[6] have someone build it.
[7] Q: Give me an example.
[8] A: I'd buy a vacant land, build a house on it,
[9] and sell it.
[10] Q: Were you actively involved in the
[11] management of that building of that property?
[12] A: How I say it? I fronted the money, yes.
[13] Did I do any work on the building? Is that what
[14] you're asking me?
[15] Q: I'm asking several different things. Let's
[16] break it apart.
[17] A: Sure.
[18] Q: Over the time that you've been on the Rules
[19] Committee, how many pieces of property have you so
[20] purchased?
[21] A: Oh, let's see. Pieces of property? One
[22] while I've been on the Rules Committee.
[23] Q: Where is that located?
[24] A: 238 Breman Street, East Boston.

Page 21

[1] Q: And were you the sole purchaser of that
[2] piece of property?
[3] A: Uh-huh.
[4] Q: Is that a yes?
[5] A: Yes.
[6] Q: And what, if anything, did you do with that
[7] piece of property?
[8] A: It was a three-family. It wasn't a piece
[9] of land. It was a three-family.
[10] Q: What, if anything, did you do to that
[11] that —
[12] A: I rehabbed it, fixed up the bathroom and
[13] kitchens.
[14] Q: Who did that work?
[15] A: I did.
[16] Q: Personally?
[17] A: Personally.
[18] Q: How long did it take you to do that work?
[19] A: Two months, a month — two months.
[20] Q: Did you employ anyone else to assist you in
[21] rehabbing the house?
[22] A: No.
[23] Q: What other work, if any, did you do on the
[24] property?

Page 22

[1] A: Put a gutter, fixed the gutter, and put
[2] some windows in, new windows.
[3] Q: Okay. Have you done any other work on the
[4] piece of property?
[5] A: I painted it. That's it. That's about it.
[6] Q: Okay. And you did this while you were on
[7] the Rules Committee?
[8] A: Yes.
[9] Q: And, I'm sorry, is it your thought that
[10] your tenure with the Rules Committee essentially
[11] coincides with the existence of Rule 36?
[12] A: Uh-huh.
[13] Q: And that's a yes?
[14] A: Yes.
[15] Q: Okay. This piece of property — I think
[16] you said in South Boston — what, if anything, have
[17] you done with it?
[18] MR. MAHONEY: East Boston.
[19] MR. LATHROP: Thank you.
[20] Q: East Boston. What, if anything, have you
[21] done with it?
[22] A: Nothing.
[23] Q: Do you still own it?
[24] A: I still own it.

Page 23

[1] Q: Do you rent it?
[2] A: Yes.
[3] Q: Do you receive an income from that rental?
[4] A: It pays for itself, yes.
[5] Q: I mean, you rent it out for a certain fixed
[6] amount of money, yes?
[7] A: Yes.
[8] Q: Do you do any maintenance work on the
[9] house?
[10] A: Do I do maintenance on it?
[11] Q: Yes.
[12] A: If it needs it, yes.
[13] Q: You physically do that yourself?
[14] A: Yes.
[15] Q: What other kind of — what kind of physical
[16] maintenance work do you do on the house?
[17] A: On that house?
[18] Q: Yeah.
[19] A: Fix the sink if the sink breaks. Fix the
[20] tub if the tub breaks. Change a light bulb.
[21] Q: You deem that to be work?
[22] A: What do you mean "work"? Labor?
[23] Q: Well, Rule 36 says "working exclusively at
[24] the craft"?

Page 24

[1] A: Right.
[2] Q: Do you deem your physical efforts in — at
[3] the East Boston property to be work?
[4] A: No.
[5] Q: Why not?
[6] A: Because I'm exclusively at the craft
[7] because I don't work anywhere else.
[8] Q: That's your conclusion. But why do you
[9] believe that that is not working?
[10] A: I just believe that.
[11] Q: Oh, okay. That's your belief. Okay.
[12] MR. LATHROP: Please let's mark this as the
[13] next exhibit in line.
[14]   (Document marked as McGaffigan
[15] Exhibit 2 for identification)
[16] MR. MAHONEY: Do you have all of the
[17] enclosures that were attached to this letter?
[18] MR. LATHROP: These are what you — yes.
[19] Put it —
[20] MR. MAHONEY: But they're not attached to
[21] this document now.
[22] MR. LATHROP: Let me state it differently.
[23] This is everything — this is the way you used it
[24] yesterday, Michael.

Local 805, ILA, AFL-CIO, et al.
Case 1:04-cv-11340-DPW    Document 24-13    Filed 08/25/2006    Page 8 of 20
Joseph J. Picard, J
Vol. 1, May 9, 200

Page 25

[1] MR. MAHONEY: Okay.
[2] MR. LATHROP: It does not have Attorney
[3] McMahon's cover letter. But otherwise it's in the
[4] entirety as the exhibit you used yesterday.
[5] MR. MAHONEY: Okay. And so —
[6] MR. McNELLEY: I'd just like to put on the
[7] record here this is the deposition of Mr. Joseph
[8] Picard, not what occurred yesterday.
[9] MR. LATHROP: I understand. I was just
[10] responding to —
[11] MR. McNELLEY: I'd just like to make it
[12] clear that what occurred between you or another
[13] attorney yesterday is really none of my concern or
[14] Mr. Picard's concern. So could we please direct
[15] your focus to what we're dealing with here today.
[16] MR. LATHROP: I would like to. Direct
[17] your questions to Mr. McMahon. He asked a question.
[18] MR. McNELLEY: I would suggest if you two
[19] have a dispute, you should probably take it outside
[20] and square it away.
[21] MR. LATHROP: I don't think we have a
[22] dispute.
[23] MR. McNELLEY: Okay.
[24]

Page 26

[1]              BY MR. LATHROP:
[2]    Q: In any case, Mr. Picard, I'm now showing
[3] you a document that's been marked as Exhibit 2 for
[4] the purposes of this deposition, which purports to
[5] be a letter with attachments from yourself to a
[6] William R. McNamara dated September 20, 2003.
[7]    Do you recognize this document?
[8]    A: (Reviewing documents)
[9]    MR. McNELLEY: Could I just go back here.
[10] Are you saying that this document is from
[11] Mr. Picard? Could you show me where that is,
[12] please?
[13]    (Discussion off the record)
[14]    MR. MAHONEY: It's signed on Page 4.
[15]    MR. McNELLEY: Okay, great.
[16]              BY MR. LATHROP
[17]    Q: Let me try this again. Mr. Picard, I'm
[18] showing you Exhibit 2, which purports to be a
[19] four-page letter from yourself to Mr. McNamara dated
[20] September 20, 2003, with certain attachments.
[21]    After you've had a time to review that,
[22] I'll ask you whether or not you recognize the
[23] letter.
[24]    A: Uh-huh. I recognize this letter.

Page 27

[1]    Q: Okay. Now, at least the first four pages
[2] are, in fact, your letter to a William McNamara
[3] dated September 20, 2003, correct?
[4]    A: Yes.
[5]    Q: Now, let me ask you: There are certain
[6] documents that have been marked as enclosures that
[7] are, at least currently, attached to this document.
[8]    Were these enclosures to your letter to
[9] Mr. McNamara?
[10]    A: Yes.
[11]    Q: And looking at what is been marked on the
[12] bottom as "Enclosure 14" —
[13]    A: 14.
[14]    Q: — that's a document you created?
[15]    A: No.
[16]    Q: Do you know who created that document?
[17]    A: No. It was in the hiring hall. These are
[18] records from the hiring hall.
[19]    Q: "These" being also Enclosure 11 and
[20] Enclosure 12?
[21]    A: Yes.
[22]    Q: Okay. Now, I want to direct your attention
[23] to Page 3 of the letter. In approximately the third
[24] line, you state, quote, the Rules Committee is

Page 28

[1] required to investigate each and every individual
[2] that wants to stay in Gangs 1 through 11."
[3]    A: Yes.
[4]    Q: During your tenure on the Rules Committee,
[5] what investigation does the Rules Committee
[6] undertake?
[7]    A: Well, we don't — we don't head hunt and
[8] look for everybody and try to track everybody down.
[9] We're not doing that. We actually took anybody that
[10] comes into the new local, asked them for their
[11] Social Security papers — first their taxes. And
[12] nobody wanted to give taxes because their kids'
[13] Social Security numbers is on there and stuff like
[14] that.
[15]    So we came up with the Social Security
[16] papers from the Social Security office, stamped.
[17] And they'd have to come in and produce those to us.
[18] And that shows where everybody — where you worked.
[19]    Q: Do I understand correctly that this is a
[20] requirement that you have only of new members?
[21]    A: First, for the new members coming in. And
[22] then we went to Gangs 10 and 11, and then we went to
[23] 1 through 9, and then we went to all the steady
[24] help. Everybody in the Port of Boston had to go

Page 29

[1] through this.
[2] Q: When did everybody in the Port of Boston
[3] have to go through this?
[4] A: Oh, at least three years ago, four years
[5] ago — at least four years ago, 2001, 2002 they did
[6] that.
[7] Q: And I'm sorry. Could you state again
[8] exactly what you required everyone in the port to go
[9] through?
[10] A: You must have your Social Security papers
[11] given to the Rules Committee or to the president of
[12] your local. The president of the local would give
[13] it to the Rules Committee. The Rules Committee has
[14] to have everybody's Social Security papers.
[15] Q: Looking further down the page, you see the
[16] name William Cocchi?
[17] A: Cocchi?
[18] Q: C-o-c-c-h-i.
[19] A: What page is that?
[20] Q: The same page.
[21] MR. McNELLEY: (Indicating)
[22] A: Oh, okay.
[23] Q: Do you have any understanding of how it was
[24] discovered that he was working full time for the

Page 30

[1] U.S. Post Office?
[2] A: He worked — Billy Cocchi, I don't know
[3] who he is. Oh, yes. I know who he is. Yes.
[4] Q: Do you have any understanding of how it was
[5] come to be believed that he was working full time
[6] for the U.S. Post Office?
[7] A: We didn't know he was working full time. I
[8] didn't know he was working full time.
[9] Q: You wrote this letter, did you not?
[10] A: Well, the Rules Committee wrote this
[11] letter. I guess I was chairman, so I signed it.
[12] But the Rules Committee wrote this, you know.
[13] Q: Do you have any understanding as to whether
[14] or not Mr. Cocchi was, in fact, at some point in
[15] time working full time for the U.S. Post Office?
[16] A: Yes.
[17] Q: What's the basis of your understanding?
[18] A: That I think he got Social Security
[19] papers — must have got Social Security papers, or
[20] he jumped out of Gang 11 because he got another job.
[21] I don't know if he was suspended or not. Before he
[22] was — he never got back to work. Since this
[23] happened, he just left. Never come back.
[24] When he came in and signed a pledge sheet,

Page 31

[1] he signed a pledge sheet that he did not work
[2] another job.
[3] Q: Do you know a Daniel Considine?
[4] A: Yeah.
[5] Q: Do you have any understanding as to what
[6] other job he held?
[7] A: Boston Water and Sewer.
[8] Q: Do you have any understanding as to how the
[9] Rules Committee came to learn that he had another
[10] job?
[11] A: No. I don't know how. He said — he got
[12] suspended, I think. I don't know how they found
[13] out. I'm not sure how they found out.
[14] Q: Edward Considine. Do you have any
[15] understanding as to —
[16] A: Same way. I think he's Boston Water — I'm
[17] not sure where he is. He's Boston Water and Sewer,
[18] too, I think.
[19] Q: My question to you, sir, with regard to
[20] Edward Considine is, do you have any understanding
[21] as to how —
[22] A: No.
[23] Q: Let me finish my question. — how the Rules
[24] Committee came to understand that he had a full-time

Page 32

[1] job for the State?
[2] A: I don't know how they found out.
[3] Q: The next name?
[4] A: Pat Considine, yeah.
[5] Q: Now, the line here says "Sheriff's
[6] department full time, full benefits, paren,
[7] disability, close paren."
[8] (Cell phone ringing)
[9] Q: What did you mean to convey by that?
[10] A: The disability? I don't know.
[11] Q: Was he receiving disability payments?
[12] A: Yes. He was on disability. He got hurt.
[13] I think it was worker's comp. I don't think it's
[14] disability. It was workers' compensation.
[15] Q: And he was receiving either workers'
[16] compensation or disability from the State?
[17] A: Uh-huh.
[18] Q: Yes?
[19] A: Yes.
[20] Q: And because of his receipt of that, he was
[21] deemed to be not working exclusively at the craft?
[22] A: He has a full-time job at the sheriff's
[23] department, yes.
[24] Q: Well, I'm sorry. I don't understand.

Page 33

[1] A: He has a — he admitted he had a full-time
[2] job at the sheriff's department.
[3] Q: But was he on disability or not —
[4] A: He is now.
[5] Q: — from the sheriff's department? He is
[6] now? At the time that he was receiving — do you
[7] know when his disability began?
[8] A: No.
[9] Q: Do you know the Rules Committee considered
[10] him to be violating the "working exclusively at the
[11] craft" requirement whether he was receiving
[12] disability or workers' compensation?
[13] MR. MAHONEY: Object to the form. You can
[14] answer.
[15] A: I'm not sure if — if he holds a job,
[16] disability or not disability, he violates the
[17] Rule 36.
[18] Q: Even if you're receiving disability, in
[19] your opinion, from another job —
[20] A: Well, he had another job, too. It
[21] wasn't — he admitted he worked for the Boston
[22] Gardens.
[23] Q: Okay. That's not listed in this document,
[24] is it?

Page 34

[1] A: No, it's not. But he said he had another
[2] job, plus he gave us his resignation that he
[3] resigned from the Boston Gardens. So he had that
[4] and so did Mr. — well, all three Considines worked
[5] for Boston Gardens. Now they work for Boston
[6] Yachts.
[7] Q: As you understood it.
[8] A: He came to Gang 11. Came to the Rules
[9] Committee and wanted to be put in Gang 11. He said
[10] he resigned from the sheriff's department. He gave
[11] a letter of resignation that he resigned. Now he's
[12] in Gang 11. Disability or not disability, he
[13] doesn't work there anymore.
[14] Q: So was he ever suspended for violating
[15] Rule 36?
[16] A: Yes.
[17] Q: What were the circumstances of his
[18] suspension, then?
[19] A: I wasn't on the Rules Committee then, when
[20] he was suspended.
[21] Q: Was that during the year you took off or
[22] prior to you serving —
[23] A: Prior. It was prior. It was prior to
[24] that.

Page 35

[1] I never suspended any of these people here
[2] or was involved in the suspension of most of these
[3] people here.
[4] Q: What do you mean you were not involved in
[5] it?
[6] A: I wasn't on the Rules Committee when these
[7] people were suspended except Mr. Keefe.
[8] Q: So just to be clear here, all of these
[9] people except Mr. Keefe were suspended —
[10] A: Before I came on the committee.
[11] Q: So the only person suspended during your
[12] tenure on the Rules Committee for violating Rule 36
[13] is Mr. Keefe?
[14] A: No. No, I'm just saying these people here
[15] (indicating).
[16] Q: At least the people on this list —
[17] A: Yeah.
[18] Q: Okay. Can you think of anybody else that
[19] been suspended while you've been on the Rules
[20] Committee?
[21] MR. MAHONEY: That's not on the list?
[22] MR. LATHROP: Other than Mr. Keefe.
[23] A: Bob Seals. I think it's Bob Seals — well,
[24] he wasn't suspended. He was thrown back into

Page 36

[1] Gang 12. He was put back in Gang 12 from Gang 11.
[2] Q: Not suspended?
[3] A: Not suspended.
[4] Q: Anyone else?
[5] A: That's the only one I know.
[6] Q: And do you know the circumstances for which
[7] Mr. Seals was put back to Gang 12?
[8] A: Yes. He come in — he signed a pledge
[9] sheet. He worked one day over Old Colony Terminal.
[10] He worked one day for us. The next day he come in
[11] with a — he came in with a car dealership. He had
[12] dealers plates on his car.
[13] They said, "You can't do that. You can't
[14] have two jobs. You signed a pledge sheet." He
[15] never come back. Never suspended but never come
[16] back. He worked one day — probably worked four
[17] hours.
[18] Q: Okay. And so it's your interpretation that
[19] owning a business violates Rule 36?
[20] A: If you work there...
[21] Q: Okay. Could you look at the next page.
[22] A: (Witness complies)
[23] Q: Looking at the first full paragraph, the
[24] second sentence, "To date, all members in Gangs 1

Page 37

[1] through 11 are required to bring tax returns and/or
[2] Social Security information."
[3]  A: Uh-huh.
[4]  Q: Did I read that accurately?
[5]  A: Yes.
[6]  Q: Does the Rules Committee keep all the
[7] documents or copies of all the documents brought to
[8] it by members in Gangs 1 through 11?
[9]  A: No, not necessarily.
[10]  Q: Okay. Do you ask people to bring in
[11] Schedule Cs to their tax returns?
[12]  A: Nope.
[13] We had a lot of problems with this taxes
[14] because their wives are on there, and that's none of
[15] our business what their wives do, and their
[16] children's Social Security is are on there. So we
[17] had a problem with taxes in.
[18]   So then we said you only need to bring in
[19] Social Security papers, so we really don't bring in
[20] taxes anymore, just Social Security papers.
[21]  Q: Do you know what a Schedule C is?
[22]  A: No.
[23]  Q: Well, what investigation do you do to see
[24] whether or not someone is self-employed?

Page 38

[1]  A: I don't.
[2]  Q: The Rules Committee does not do any
[3] investigation to see whether or not someone is —
[4]  A: No.
[5]  Q: — self-employed in another occupation?
[6]  A: No.
[7]  Q: Even though being self-employed in another
[8] occupation would be a violation of Rule 36?
[9]  A: Right.
[10] MR. LATHROP: Please mark this as the next
[11] exhibit in line.
[12]   (Document marked as Picard
[13] Exhibit 3 for identification)
[14] MR. LATHROP: This is Enclosure 18. This
[15] is my only copy.
[16]  Q: Mr. Picard, I'm showing you what's been
[17] marked as Exhibit —
[18] MR. McNELLEY: May I see it first, please?
[19] MR. LATHROP: Sure.
[20]  Q: Mr. Picard, I'm showing you what's been
[21] marked as Exhibit 3, which purports to be a letter
[22] from yourself to Mr. McNamara, undated.
[23]  A: Right.
[24]  Q: Do you recognize that?

Page 39

[1]  A: Yes.
[2]  Q: And are all your statements in that letter
[3] true and accurate?
[4]  A: Uh-huh.
[5]  Q: That's a yes?
[6]  A: Yes, yes.
[7] MR. LATHROP: Please mark this as the next
[8] exhibit in line.
[9]   (Document marked as Picard
[10] Exhibit 4 for identification)
[11] MR. MAHONEY: What number was 3 from
[12] yesterday?
[13] MR. LATHROP: I don't have them organized
[14] like that.
[15] MR. MAHONEY: Well, what is that copy on
[16] that sticker? What is that number?
[17] MR. McNELLEY: This is your Exhibit 20.
[18] MR. MAHONEY: 20, thank you. Okay.
[19] MR. McNELLEY: And this is your Exhibit 15
[20] from yesterday, the next document.
[21]  Q: Mr. Picard, I'm showing you Exhibit 4,
[22] which purports to be a notice from the Rules
[23] Committee to Union Member Stephen Keefe with regard
[24] to a summons for February 6, 2003.

Page 40

[1] Do you recognize Exhibit 4?
[2]  A: (Reviewing document) Yes.
[3]  Q: Now, looking at Exhibit 3, the first
[4] sentence references the fact that "On January 28,
[5] 2003, I, Joseph Picard, mailed a summons to
[6] Stephen Keefe, P.O. Box 726, Green Harbor, Mass.
[7] 02041, Letter A. The letter was sent by regular
[8] mail."
[9] Is that a reference to what's now been
[10] marked as Exhibit 4?
[11]  A: I think so, yes.
[12]  Q: So Exhibit 4 you sent by regular mail to
[13] Mr. Keefe?
[14]  A: Uh-huh.
[15]  Q: That's a yes?
[16]  A: Yes.
[17]  Q: And do you have any proof that Mr. Keefe
[18] ever received Exhibit 4?
[19]  A: Well, I sent a registered letter to sign.
[20]  Q: So you did not send it by regular mail?
[21]  A: I sent the first one by regular mail.
[22] The second one I sent —
[23]  Q: We're going to limit the question at this
[24] time to this one.

Local 805, ILA, AFL-CIO, et al.
Case 1:04-cv-11340-DPW    Document 24-13    Filed 08/25/2006    Page 12 of 20
Joseph J. Picard, Jr.
Vol. 1, May 9, 2003

Page 41

[1] A: Right.
[2] Q: Do you have any evidence that Mr. Keefe
[3] received this —
[4] A: No.
[5] Q: Just let me finish. — particular letter,
[6] Exhibit 4?
[7] A: No.
[8] Q: No, okay. Now, the next sentence in
[9] Exhibit 3 says, "On February 6, 2003, Stephen Keefe
[10] was suspended for six months in violation of
[11] Rule 37. Mr. Keefe did not attend the meeting."
[12]     Were you present at that —
[13] A: Yes.
[14] Q: — meeting? Were you chairman?
[15] A: I was chairman.
[16] Q: Okay. And when you say "Rule 37," do you
[17] actually mean Rule 36?
[18] A: Yes — let me see Rule 36. (Reviewing
[19] document) Right, 36.
[20] Q: And why did you send it out in the first
[21] place, Exhibit 4?
[22] A: Why did I call him in?
[23] Q: Yeah.
[24] A: The delegates — one of the delegates,

Page 42

[1] something came to our desk that he had a deposition,
[2] and in his deposition he stated that he had another
[3] job.
[4] Q: Did you read the deposition?
[5] A: I've read parts of that, yes. Not the
[6] whole thing.
[7] Q: At the time?
[8] A: Uh-huh.
[9] Q: And you believe it stated that he said he
[10] had another job?
[11] A: It said he had another job, yes.
[12] So we called him in because we didn't want
[13] to just read — we wanted to get his version of it.
[14] Q: Please recall as best you can everything
[15] that was said and done on February 6, 2003, with
[16] regard to Mr. Keefe.
[17] A: Oh, I can't recall.
[18] Q: Do you have any memory of what was said or
[19] done at that meeting?
[20] A: Well, it was brought up that in the
[21] papers — that he had he stated in a deposition that
[22] he had another job. So then because he said that in
[23] a deposition and he was under oath, he was
[24] suspended.

Page 43

[1] Q: And who is the "they" that said that he had
[2] another job?
[3] A: We had a deposition in our hands from the
[4] delegates. I don't know what you want me to —
[5] someone gave us the papers.
[6] Q: Who are the "delegates"?
[7] A: There's three men in all locals, one in
[8] each local that's — business agents.
[9] Q: Can you name them.
[10] A: Well, I didn't get it personally. They
[11] didn't hand it to me. They handed it to one of the
[12] other Rules Committee members, and they brought it
[13] up at the meeting.
[14] Q: Who else was on the Rules Committee at the
[15] time?
[16] A: Mark Keho (phonetic). I think William
[17] Sullivan.
[18] Q: Patrick Garrity?
[19] A: Yes.
[20] Q: Bernard O'Donnell?
[21] A: Bernie O'Donnell, okay.
[22] Q: Michael Pine?
[23] A: Yeah, Michael Pine.
[24] Q: Conrad Bailey?

Page 44

[1] A: Yes.
[2] Q: I'm not sure if you mentioned
[3] Michael Connolly?
[4] A: Oh, okay. Mikey Connolly, yes.
[5] Q: Was Paul McGaffigan —
[6] A: I'm not sure.
[7] MR. MAHONEY: We've previously produced the
[8] minutes of that meeting.
[9] Q: In the next paragraph in Exhibit 3, you
[10] state, "On February 16, 2003, I, Joseph Picard,
[11] mailed a suspension letter and summons to
[12] Stephen Keefe, P.O. Box 726, Green Harbor, Mass.,
[13] 02041, to appear at the next meeting on March 5,
[14] 2003, Letters B and C. The letters were sent by
[15] certified mail."
[16]     Why was that action taken?
[17] A: Because we wanted to talk to him and see if
[18] he had another job.
[19] Q: But he had already been suspended, had he
[20] not?
[21] A: He was suspended. If he wanted to appeal
[22] it, he could have came and told us.
[23] MR. LATHROP: Would you mark this as the
[24] next exhibit in line.

Page 45

[1]  (Document marked as Picard
[2] Exhibit 5 for identification)
[3]  MR. LATHROP: And these, please.
[4]  (Documents marked as Picard
[5] Exhibits 6 and 7 for identification)
[6]  MR. McNELLEY: Do you have copies?
[7]  MR. LATHROP: No, unfortunately.
[8]  MR. MAHONEY: You can have mine.
[9]  Q: Mr. Picard, I'm showing you what's been
[10] marked for this deposition as Exhibit 5, which is a
[11] Rules Committee notice to Stephen Keefe with a
[12] Letter B on it; Exhibit 6 for identification, which
[13] is Rules Committee notice with the Letter C on it;
[14] and Exhibit 7, which is a certified receipt signed
[15] by Stephen Keefe.
[16]  Do you see that — those?
[17]  A: Yes.
[18]  Q: In Exhibit 3, you referenced Letters B and
[19] C. Are these, in fact, the two exhibits I've just
[20] put in front of you?
[21]  A: Yes.
[22]  Q: And the certified receipt, is that the —
[23]  A: Yes.
[24]  Q: — receipt that you used to send B and C to

Page 46

[1] Mr. Keefe?
[2]  A: Yes.
[3]  Q: And this is what you've mailed on
[4] February 16th of 2003?
[5]  A: Yes.
[6]  Q: Exhibit 3 goes on to say, "On March 5,
[7] 2003, a vote was passed to possibly reinstate
[8] Stephen Keefe into Gang 10 before April 1, 2003.
[9] Mr. Keefe must bring in more proof that he did not
[10] violate Rule 37. Mr. Keefe did attend that
[11] meeting."
[12]  Do you see that paragraph?
[13]  A: Yes.
[14]  Q: Other than what's written there, do you
[15] recall what was said at that meeting?
[16]  A: A little bit.
[17]  Q: What do you recall?
[18]  A: We asked Mr. Keefe if he had another job.
[19]  Q: And what did Mr. Keefe say?
[20]  A: "Yes."
[21]  Q: Do you recall anything else?
[22]  A: He said he's going to resign next month or
[23] the month after that.
[24]  Q: Did he describe this job to you?

Page 47

[1]  A: No.
[2]  Q: He did not describe —
[3]  A: A "no-show job" he might have said. I'm
[4] not sure.
[5]  (Mr. Keefe is laughing)
[6]  Q: But he might have said "no-show job"?
[7]  A: Yeah.
[8]  Q: Did anybody from the Rules Committee ask
[9] him what he meant by a no-show job?
[10]  A: I don't know.
[11]  Q: Do you know why a vote was taken to
[12] possibly reinstate Mr. Keefe?
[13]  A: Well, we wanted to get his version on
[14] whether or not he had another job or not, if those
[15] papers were true. I asked him directly, "Do you
[16] have another job?" He said, "Yes."
[17]  Q: Would you consider a no-show job to be a
[18] violation of Rule 36?
[19]  A: Yes.
[20]  Q: Why?
[21]  A: He's not exclusively at the craft.
[22]  Q: Even if he doesn't have to show up to work?
[23]  A: It's not exclusive to the craft. I asked
[24] him how much did he make. He said $5,000 a month.

Page 48

[1]  Q: So the issue is the amount of money he
[2] makes?
[3]  A: Not at all. Not at all.
[4]  Q: Okay. So it's how much he works at
[5] something other than the craft?
[6]  A: No. "Exclusively at the craft" is
[7] exclusively at the craft.
[8]  Q: How about if you rehab buildings?
[9]  A: I'm still exclusive to the craft.
[10]  Q: Even though you're rehabbing residential
[11] homes?
[12]  A: (Nods head)
[13]  Q: In your opinion?
[14]  A: My opinion.
[15]  Q: Okay. With regard to — do you own
[16] property that you rent out or lease out other than
[17] in East Boston?
[18]  A: South Boston.
[19]  Q: I'm sorry. I did it again. South Boston.
[20] How many properties do you lease or rent
[21] out?
[22]  A: Two.
[23]  Q: Do you maintain all of them?
[24]  A: Uh-huh.

Local 805, ILA, AFL-CIO, et al.
Case 1:04-cv-11340-DPW   Document 24-13   Filed 08/25/2006   Page 14 of 20
Joseph J. Picard, Jr.
Vol. 1, May 9, 2006

Page 49

[1] Q: Is that a yes?
[2] A: Yes.
[3] Q: Do you hire anyone to manage these
[4] properties?
[5] A: No. It's a two-family, my mother and
[6] father — it's my father's house. My father lives
[7] there.
[8] Q: But you manage it?
[9] A: Yes.
[10] Q: And you manage both the properties you've
[11] now mentioned?
[12] A: I don't understand about "manage."
[13] Q: You don't pay anyone —
[14] A: No.
[15] Q: — to manage it?
[16] A: No. I look after them myself.
[17] Q: Does anyone else besides yourself look
[18] after the property?
[19] A: No — my father.
[20] Q: You go on to state "On March 12, 2003, I
[21] Joseph Picard, Jr., mailed Stephen Keefe a summons
[22] to appears — to appear at the next monthly Rules
[23] Committee meeting March 20, 2003, Letter D. That
[24] letter was sent by regular mail."

Page 50

[1]     Is that in fact the letter that was
[2] included?
[3] A: (Reviewing document) Yes.
[4] MR. LATHROP: Okay. May we have this
[5] marked as the next exhibit, please.
[6]     (Document marked as Picard
[7] Exhibit 8 for identification)
[8] MR. MAHONEY: What was it yesterday?
[9] MR. LATHROP: Yesterday it was 19.
[10] MR. MAHONEY: What was 7 yesterday, Scott?
[11] MR. LATHROP: I don't have it organized
[12] that way, I'm sorry.
[13] MR. MAHONEY: Well, do you have 7 in front
[14] of you?
[15] MR. LATHROP: Someplace, yeah.
[16] Off the record.
[17]     (Discussion off the record)
[18] MR. LATHROP: Back on the record.
[19] Q: The next sentence (indicating) in
[20] Exhibit 3, Mr. Picard says, "On March 20, a motion
[21] was passed to rescind the vote taken on March 5,
[22] 2003, that Mr. Keefe did violated the Rule No. 37.
[23] Mr. Keefe did not attend the meeting."
[24] A: Uh-huh.

Page 51

[1] Q: Other than what's written there, do you
[2] recall anything else about that particular vote or
[3] meeting?
[4] A: No.
[5] Q: Do you know a longshoreman by the name of
[6] Danny Conroy?
[7] A: A little bit.
[8] Q: Do you know what gang he's in?
[9] A: I don't think he's a longshoreman. I think
[10] he's a clerk.
[11] Q: Do you know whether or not he has his own
[12] business?
[13] A: I don't think he's a longshoreman, is he?
[14] I don't know him as a longshoreman.
[15] Q: How do you know him?
[16] A: I think he's a clerk.
[17] MR. LATHROP: Mark this as the next exhibit
[18] in line.
[19]     (Document marked as Picard
[20] Exhibit 9 for identification)
[21] A: Conroy, I don't think he's a longshoreman.
[22] I don't know.
[23] Q: Mr. Picard, I'm showing you what's been
[24] marked as Exhibit 9, which purports to be an article

Page 52

[1] in the SouthBostonOnLine dated June 23, 2005, that
[2] references a Danny Conroy.
[3] A: I know him (indicating).
[4] Q: Do you recognize the picture?
[5] A: I recognize the picture, yeah.
[6] Q: Do you see where in the very last phrase on
[7] the first page it says, "He is a longshoreman."
[8] A: Okay. Yes.
[9] Q: Okay. Do you know whether or not he's ever
[10] been investigated for —
[11] A: He's not a longshoreman.
[12] Q: You believe this representation in the
[13] article is incorrect?
[14] A: Clerks will say they're longshoreman. Line
[15] handlers say they're longshoreman. To my knowledge,
[16] he's not a longshoreman.
[17] Q: Is he a member of —
[18] A: 1066.
[19] Q: What is 1066?
[20] A: Local 1066.
[21] Q: Do you know a person by the name of
[22] Brendan Lee?
[23] A: Yes.
[24] Q: Who is that?

Page 53

[1] A: He's a member in — I don't know which gang
[2] he is in. One of the gangs.
[3] Q: Okay. Do you know whether or not he has
[4] another occupation?
[5] A: Another job? No. He was investigated.
[6] Q: Why was he investigated?
[7] A: We all were investigated in the — he holds
[8] a law degree.
[9] Q: Do you know whether or not he practices
[10] law?
[11] A: No, I don't.
[12] Q: Did you make any effort to find out?
[13] A: Yes.
[14] Q: What did you do?
[15] A: We got his Social Security taxes, and we
[16] called up the place he used to work, and he doesn't
[17] work there.
[18] Q: And do you have any idea if he's
[19] self-employed as a lawyer?
[20] A: No, I don't.
[21] Q: What efforts did you make to find out
[22] whether or not he ws self-employed as a lawyer?
[23] A: What efforts did I make personally?
[24] Q: The Rules Committee.

Page 54

[1] A: I don't know what they did.
[2] Q: Are you familiar with a Robert McNeil?
[3] A: Robert McNeil? A longshoreman?
[4] Q: Are you familiar with a Robert McNeil?
[5] A: Yes.
[6] Q: And who is he?
[7] A: A friend of mine.
[8] Q: Okay. Is he a longshoreman?
[9] A: No.
[10] Q: Is he a member of a local?
[11] A: No.
[12] Q: Has he ever worked in the Port of Boston?
[13] A: I don't know. Maybe. One time or another
[14] maybe. He probably did years ago.
[15] Q: Do you know a Robert Patrino?
[16] A: A friend of mine.
[17] Q: Has he ever worked for the Port of Boston?
[18] A: Yes.
[19] Q: Is he a member of any of the locals?
[20] A: No.
[21] Q: What position has he held — what work has
[22] he done?
[23] A: He's a Wag.
[24] Q: A "Wag"?

Page 55

[1] A: A Wag is whatever job comes around, he will
[2] take.
[3] Q: Do you know what businesses he's worked
[4] for?
[5] A: No.
[6] Q: Do you know a Mr. Sadogren?
[7] A: Uh-huh.
[8] Q: Who is he?
[9] A: A friend of mine.
[10] Q: Has he worked in the port?
[11] A: Yes.
[12] Q: In what position?
[13] A: Whatever we needed. Driver. Whatever he
[14] need.
[15] Q: Is he a member of the local?
[16] A: No.
[17] Q: To your knowledge, have they ever been
[18] issued paychecks by any business working out of the
[19] Port of Boston?
[20] A: Did they ever receive any what, paychecks?
[21] Q: Have any paychecks ever been issued to any
[22] of them?
[23] A: Probably.
[24] *Q. Have you ever signed any of their

Page 56

[1] paychecks?
[2] *A. Yeah.
[3] *Q. And have you ever deposited the money from
[4] those paychecks?
[5] *A. Sure.
[6] MR. McNELLEY: Joe —
[7] *Q. And you deposited it into your own bank
[8] account?
[9] MR. McNELLEY: I'm going to object to the
[10] question. Obviously, there are other matters
[11] pending here, and I just don't feel that we need to
[12] get into this right now.
[13] I don't think this has anything to do with
[14] the purpose of what this deposition was, and we're
[15] going to restrict the questioning.
[16] MR. MAHONEY: Well, I'm going to agree with
[17] Mr. McNelly. It's not clear to me how these last
[18] few questions are reasonably calculated to lead to
[19] the discovery of admissible evidence in this case.
[20] MR. LATHROP: Well, first, we can certainly
[21] argue relevance and so forth. But I want to
[22] understand your instruction.
[23] Are you telling him not to answer?
[24] MR. McNELLEY: That's correct.

Local 805, ILA, AFL-CIO, et al.
Case 1:04-cv-11340-DPW    Document 24-13    Filed 08/25/2006    Page 16 of 20
Joseph J. Picard, Jr.
Vol. 1, May 9, 2005

**Page 57**

[1] What I am telling you is that this has gone
[2] far afield. We're here. You asked for documents.
[3] We've produced the documents. You asked him the
[4] question as his duties relate to the Rules
[5] Committee. He has informed you that these people
[6] are not longshoreman; that they work as Wags.
[7] You're going far afield.
[8]   MR. LATHROP: Well, you don't have the
[9] benefit of understanding the full lawsuit here. We
[10] are contending that Mr. Keefe only had another
[11] source of income and that he was suspended for that.
[12]   And I'm getting into the issue of other
[13] income —
[14]   MR. McNELLEY: Again —
[15]   MR. LATHROP: — by Mr. Picard.
[16]   MR. McNELLEY: Again, there are other
[17] matters that you —
[18]   MR. LATHROP: You may have concerns about
[19] other matters, but —
[20]   MR. McNELLEY: We are not going to address
[21] them.
[22]   MR. LATHROP: — I'm concerned about this
[23] lawsuit.
[24]   MR. McNELLEY: Well, we are not going to

**Page 58**

[1] address them.
[2]   MR. LATHROP: You're not going to address
[3] the issue of other income —
[4]   MR. McNELLEY: Not where you're going with
[5] those questions, no.
[6]   MR. LATHROP: Let me —
[7]   MR. McNELLEY: If you have other
[8] questions —
[9]   MR. LATHROP: Let me —
[10]   MR. McNELLEY: — you can pursue...
[11]   MR. LATHROP: Please, you're interrupting.
[12] I want to at least state for the record —
[13]   MR. McNELLEY: I didn't interrupt you. You
[14] stopped and I answered.
[15]   MR. LATHROP: Well, let me continue on,
[16] then, so that it's clear for the record because this
[17] deposition, obviously, will not be finished today.
[18] It will be suspended.
[19]   But I would want to make inquiry into other
[20] sources of income that Mr. Picard has just as
[21] Mr. Keefe had sources of income.
[22]   And the questions I'm asking relate to
[23] other income whether reported, quite frankly, or
[24] not, to the IRS. And that's the purpose of my line

**Page 59**

[1] of questioning.
[2]   MR. McNELLEY: Right.
[3]   MR. MAHONEY: Well, let me add that we had
[4] a hearing before the court on this case, and it's my
[5] recollection — Mr. McNelley was in attendance as
[6] well — that the judge severely restricted the line
[7] of questioning on these issues and cut back on the
[8] subpoenas that were issued to Mr. Picard and others
[9] and instructed counsel from the bench that he was
[10] not going to tolerate a fishing expedition.
[11]   So I also think that the questions as
[12] recently posed are in violation of the court's
[13] order, which, when it turns to me to ask questions,
[14] I'm going to mark as an exhibit.
[15]   MR. LATHROP: Well, you can certainly do
[16] that. In fact, I invite you to do that. Because,
[17] as you recall, the order had to do with a subpoena.
[18] It had nothing to do with, in advance, questions at
[19] a deposition.
[20]   So, please, I would invite you in light of
[21] your —
[22]   MR. MAHONEY: I accept your invitation.
[23]   MR. LATHROP: Thank you.
[24]   MR. MAHONEY: Scott, you're really

**Page 60**

[1] splitting hairs because the judge came down on you,
[2] and you know it. He said he wasn't going to allow
[3] fishing expeditions; and, in fact, this is exactly
[4] what's going on now.
[5]   All right. Let's take a break now. I'm
[6] going to go get the order.
[7]   MR. LATHROP: Please.
[8]   Off the record.
[9]   (A brief recess was taken)
[10]   MR. LATHROP: Back on the record.
[11]   I have no further questions of this
[12] witness.
[13]   MR. McNELLEY: Could I ask that the last
[14] couple of questions and answers be read back.
[15]   *(Questions and answers read)
[16]   MR. LATHROP: I have no further questions.
[17]   MR. McNELLEY: I'd just like to put on the
[18] record that I object to the last three questions as
[19] far exceeding the scope of permissible discovery.
[20]   MR. LATHROP: Anything else?
[21]   MR. McNELLEY: If we could have a minute.
[22]   (Counsel confers with witness)

Page 61

**CROSS EXAMINATION
BY MR. McNELLEY:**

Q: I just have a couple of questions of you, Mr. Picard. Mr. Picard, there's been some reference made of a couple of properties, one in East Boston and one in South Boston.
   Are these properties that you and your wife have bought as investment properties?

A: Yes.

Q: And do you maintain the properties in the normal course of owning some investment properties?

A: Yes.

Q: And do you also live in a home up in Melrose?

A: Yes.

Q: And do you maintain that home as you do the properties in East Boston and South Boston?

A: Yes.

Q: Is there any difference from maintaining your own home that you live in and your investment properties?

A: No.

Q: Do you derive any Social — do you derive any W-2s from owning these properties?

Page 62

A: No.

Q: Is the income that you derive from the properties reported on your tax returns as rental income?

A: Yes.

Q: And then are certain deductions made accordingly for taxes and mortgage interest and other issues?

A: Yes.

Q: Do you know the difference between passive and active income?

A: No.

Q: One being if you work at a job, in other words, as a longshoreman, where you would do — perform labors and receive a W-2 form as opposed to investment properties, interest in bank accounts, stock accounts.

MR. LATHROP: Objection to the form of the question.

A: Yes.

Q: The income that you derive from the income property, you would consider that to be active or passive income?

MR. LATHROP: Objection as to the form of

Page 63

the question.

A: Passive.

Q: Could you define to me, because I'm a little miffed in all my years on this earth, what a "no-show job" is?

A: You get paid for not being there, I guess.

Q: If you get paid for not being there, would that be considered larceny, or stealing?

A: Yes.

Q: I mean, are there many of these no-show jobs? Because I think I've missed the boat here for a lot of years.

A: No. We don't know anybody else that has a no-show job down there.

Q: But, I mean, you would consider somebody that has a no-show job that was deriving -- and I think it was said $5,000 a month —

A: Right.

Q: — would you consider that stealing from somebody?

A: Well, you got two places at the same time, so I don't know — I don't know much about it, what his hours are.

Q: Okay. But that's how the job that

Page 64

Mr. Keefe had was at least reported to you from Mr. Keefe; isn't that right?

A: Yes.

Q: As a no-show job for $5,000 a month?

A: A no-show job.

Q: You brought certain documents here today, those documents being your tax returns —

A: Yes.

Q: — for the years 2002 up to 2005?

A: Yes.

Q: Do you remember the conversation that we've had over the last couple of weeks and more particularly on Friday and Monday?

A: Yes.

Q: And do you remember that I told you that the court order would have us dedact, or black out, everything other than any income that was reported from another source, a 1099 or a W-2?

MR. LATHROP: Excuse me. Are you waiving attorney-client privilege?

MR. McNELLEY: Nope. I'm just asking him a question, if he's aware of the —

MR. LATHROP: You're asking him a question about the conversation the two of you had?

Local 805, ILA, AFL-CIO, et al.
Case 1:04-cv-11340-DPW   Document 24-13   Filed 08/25/2006   Page 18 of 20
Joseph J. Picard, Jr
Vol. 1, May 9, 2006

Page 65

[1] Q: Are you aware that on —
[2] MR. McNELLEY: As a matter of fact, strike
[3] it. No more questions.
[4] MR. LATHROP: Okay. I have some followup.
[5] MR. MAHONEY: Well, I have some questions.
[6] MR. LATHROP: Okay.
[7] MR. MAHONEY: Can we mark the court order
[8] as the next exhibit, please.
[9] MR. McNELLEY: Yup.
[10]     (Document marked as Picard
[11] Exhibit 10 for identification)
[12]         CROSS EXAMINATION
[13]         BY MR. MAHONEY:
[14] Q: Mr. Picard, are you aware that you were
[15] subpoenaed, and then the subpoena was a subject of a
[16] motion for protective order and then a resulting
[17] court order regarding what documents you had to
[18] bring to today's deposition?
[19] A: Yes.
[20] Q: You're aware of that?
[21] A: Yes.
[22] Q: And you brought the documents with you?
[23] A: Yes.
[24] MR. MAHONEY: Okay. The documents have not

Page 66

[1] been marked, but so the record is clear, Mr. Picard
[2] has complied with the subpoena?
[3] MR. LATHROP: I think we already
[4] established that at the beginning.
[5] MR. McNELLEY: Right.
[6] Q: Mr. Picard, I'm going to show you a number
[7] of exhibits that were marked at yesterday's
[8] deposition. The first is Exhibit 1. Have you ever
[9] seen that exhibit before today? And that document,
[10] for the record, is the Exhibit 1 from Mr. Keefe's
[11] deposition.
[12] A: I'm not sure.
[13] Q: That's a W-2 from 2003 from Mr. John T.
[14] Clark; is that right?
[15] A: Yes, yes.
[16] Q: What's your understanding of a W-2? Why is
[17] it issued?
[18] A: You work at this job, and they give you a
[19] W-2 at the end of the year.
[20] Q: When you spoke with Mr. Keefe at one of the
[21] Rules Committee meetings, do you recall whether or
[22] not he told you that he also received full health
[23] benefits from John T. Clark as well?
[24] A: And a car also, I think.

Page 67

[1] MR. LATHROP: Objection as to the form of
[2] the question.
[3] Q: All right. I'm going to show you — can I
[4] have that one back, please — what was marked
[5] yesterday as Exhibit 1B at Mr. Keefe's deposition.
[6] Have you ever seen that document before?
[7] A: I'm not sure.
[8] Q: Were you aware that —
[9] A: Yes.
[10] Q: — in 2003 that Mr. Keefe collected
[11] unemployment compensation from the Commonwealth?
[12] A: Yes.
[13] Q: When were you aware of that?
[14] A: He come in and showed us his unemployment
[15] card.
[16] Q: At the Rules Committee meeting?
[17] A: Yes.
[18] Q: Who did he tell you that he had recently
[19] been unemployed by, if he told you that?
[20] A: John T. Clark.
[21] Q: His suspension by the Rules Committee was
[22] for six months, do you recall?
[23] A: I think so.
[24] Q: And was he ever informed, to the best of

Page 68

[1] your knowledge, that if he provided documentation
[2] that he was no longer working at John T. Clark & Son
[3] that he would be put back into Gang 11?
[4] A: Right, yes.
[5] Q: What's your memory? Was it he was
[6] suspended for six months regardless, or if he came
[7] in with documentation, he would be put back on
[8] sooner than the six-month suspension?
[9] A: He'd be suspended regardless.
[10] Q: Okay. And then subsequent to serving out
[11] the suspension, he had to prove to the Rules
[12] Committee that he was no longer employed —
[13] A: No longer employed.
[14] Q: — by John T. Clark & Son; is that correct?
[15] A: Yes.
[16] Q: Are you aware of any provision in the
[17] I.L.A. constitution or any provision in the Hiring
[18] Hall Rules that mandate that you when send out a
[19] notice or a summons to a member to appear at the
[20] Rules Committee that it has to be sent by certified
[21] mail?
[22] A: No, I don't know that.
[23] MR. MAHONEY: That's all I have. Thank
[24] you.

Page 69

[1]         REDIRECT EXAMINATION
[2]           BY MR. LATHROP:
[3]   Q: Mr. Picard, when Mr. Keefe was suspended,
[4] he was actually in Gang 10 at that point; is that
[5] correct?
[6]   A: I don't know what gang he was in.
[7]   Q: Let me show you Exhibit 3, your own letter
[8] to Mr. McNamara. Does that refresh your memory that
[9] he was in Gang 10 at the time of his suspension?
[10]   A: Okay. Yes.
[11]   Q: Okay. And so when the suspension was over,
[12] he was put in what, Gang 11?
[13]   A: Gang 11.
[14]   Q: How long after his suspension was over did
[15] he — if ever, did he make it back to Gang 10 where
[16] he was before his suspension?
[17]   A: I imagine you have to go two years in
[18] Gang 11 and then one year in Gang 10.
[19]   Q: Okay. So as a result of the alleged
[20] violation of Rule 37, he was removed from Gang 10 on
[21] the order of two years?
[22]   MR. MAHONEY: Objection to the form. You
[23] said "37." It's 36.
[24]   MR. LATHROP: You're right. It's 36. That

Page 70

[1] says Rule 37, so I got confused.
[2]   A: 36, yes.
[3]   Q: Yes?
[4]   A: Yes.
[5]   Q: Okay. Now, in terms of this, you were
[6] asked by your attorney whether or not you deemed it
[7] stealing for this no-show job? You know, in fact,
[8] that the no-show job that Mr. Keefe was talking
[9] about was from a family business, right?
[10]   A: Well, his brother owned the business.
[11]   Q: Yeah. John T. Clark?
[12]   A: John T. Clark, right.
[13]   Q: Right. And is it really your belief and
[14] representation to the court that you considered that
[15] stealing because he had a no-show job with his
[16] brother?
[17]   A: He signed a pledge sheet.
[18]   Q: That's not the question.
[19] Is it really your representation under oath
[20] to the judge and the jury that you deemed that
[21] stealing because he had a no-show job with his
[22] brother's company?
[23]   A: I never said "stealing."
[24]   Q: Okay. So you didn't believe that? You

Page 71

[1] didn't believe that to be stealing, to have a
[2] no-show job with his brother's company?
[3]   A: I never said stealing. He had another job,
[4] yes.
[5]   Q: It was a no-show job, as you understood it,
[6] with his brother's company?
[7]   A: Right. That's what he said. No-show job.
[8]   Q: But I'm emphasizing "with his brother's
[9] company"?
[10]   A: His brother's company.
[11]   Q: And you knew that at the time?
[12]   A: That it was his brother's company, yes.
[13]   MR. MAHONEY: Well, just to the form. At
[14] what time, the time of the suspension?
[15]   MR. LATHROP: At the time of the
[16] suspension, yes.
[17]   Q: You knew that at the time of the
[18] suspension?
[19]   A: Yes.
[20]   MR. LATHROP: Okay. I have nothing
[21] further.
[22]         RECROSS EXAMINATION
[23]           BY MR. MAHONEY:
[24]   Q: You viewed his employment with John T.

Page 72

[1] Clark & Son as a violation of his pledge, right?
[2]   A: Yes.
[3]   Q: And you viewed that as dishonest; is that
[4] right?
[5]   A: Yes.
[6]   MR. MAHONEY: That's all I have.
[7]   MR. LATHROP: I have nothing further.
[8]   MR. McNELLEY: That's it. You're done.
[9]   (Whereupon, the deposition was
[10] suspended at 11:46 a.m.)

Local 805, ILA, AFL-CIO, et al.
Case 1:04-cv-11340-DPW    Document 24-13    Filed 08/25/2006    Page 20 of 20
Joseph J. Picard, Jr
Vol. 1, May 9, 2006

Page 73

[1]                CERTIFICATE
[2]   I, JOSEPH J. PICARD, JR., do hereby certify that
[3] I have read the foregoing transcript of my
[4] testimony, and further certify under the pains and
[5] penalties of perjury that said transcript
[6] (with/without) suggested corrections is a true and
[7] accurate record of said testimony.
[8]      Dated at ___, this day of ,
[9] 2006.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 74

[1]        COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS. )
[3]      I, Valerie L. Shand-Salama, Professional
[4] Shorthand Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, do hereby certify
[6] that there came before me on the 9th day of May 2006
[7] at 10:21 a.m., the person hereinbefore named, who
[8] was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]      I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]      In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this day of May
[21] 2006.
[22]
[23]      Notary Public
[24] My commission expires 12/15/2011