```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


_____
STEVEN KEEFE,                 )
     Plaintiff,               )
                              )
                              )           CIVIL ACTION NO.
          v.                  )           04-11340-DPW
                              )
LOCAL 805, INTERNATIONAL      )
LONGSHOREMEN'S ASSOCIATION,   )
AFL-CIO,                      )
LOCAL 800, INTERNATIONAL      )
LONGSHOREMEN'S ASSOCIATION,   )
AFL-CIO,                      )
LOCAL 799, INTERNATIONAL      )
LONGSHOREMEN'S ASSOCIATION,   )
AFL-CIO,                      )
     Defendants.              )
_____)
```

<u>MEMORANDUM AND ORDER</u>
August 23, 2007

   The plaintiff, Stephen Keefe, a member of Local 805 of the International Longshoremen's Association, AFL-CIO ("ILA"), brings this action against three Boston-area ILA locals--Local 805, Local 800, and Local 799--alleging violations of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §401 et seq., and seeking injunctive and monetary relief.

   Specifically, Counts I through III allege that the defendant Locals violated 29 U.S.C. § 411(a)(4),[1] a provision protecting

---

[1] The statue provides under the heading "(4) Protection of the right to sue":

No labor organization shall limit the right of any member thereof

plaintiff's right to sue, and 29 U.S.C. § 529,[2] which prohibits certain discipline by a labor organization against a member who exercises protected rights, including the right to sue.  Counts IV through VI similarly allege separate violations by the defendant Locals of 29 U.S.C. § 411(a)(5),[3] a procedural due

---

to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: And provided further, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

29 U.S.C. § 411.

[2] The state provides:

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

29 U.S.C. § 529.

[3] The statute provides under the heading "(5) Safeguards against improper disciplinary action":

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

process provision guaranteeing union members adequate notice and a fair hearing before certain disciplinary actions are undertaken against them by, or on behalf of, a labor organization.[4]

The defendant Locals have moved for summary judgment on all counts, and have additionally filed a Motion for Leave to Amend their original answer to include an affirmative defense of non-exhaustion of internal remedies.  For the reasons discussed below, I will deny both the Motion for Leave to Amend and the Motion for Summary Judgment.

## I. BACKGROUND

### A.   Parties

Plaintiff Stephen Keefe has been a member of the ILA for more than 23 years.  At the time this case was filed, Keefe was a member of Local 805.

The defendants are local unions of the ILA.  Each is a labor organization as defined in 29 U.S.C. § 152(5).  Defendant Local 805 is headquartered in East Boston, Massachusetts.  Defendant Local 800 is headquartered in South Boston, Massachusetts.  Defendant Local 799 is headquartered in Charlestown, Massachusetts.  The three defendants jointly operate the ILA

---

29 U.S.C. § 411.

[4] Counts IV through VI also allege a violation of 29 U.S.C. § 529, but it is unclear how this anti-retaliation provision, which affords substantive protection for a *plaintiff* exercising a protected right, is implicated when a *defendant* violates the procedural due process provision of 29 U.S.C. § 411(a)(5).  In any event, the due process issues are fully addressed by consideration of § 411(a)(5).

Hiring Hall for the port of Boston, Massachusetts (the "Hiring Hall").

**B.   Procedural History**

The instant case is the second dispute between Keefe and defendants Local 805, 800, and 799 presented to this Court. Keefe filed suit against the same defendants on February 1, 2001, seeking damages for an alleged breach of the ILA Constitution and local Hiring Hall rules under 29 U.S.C. § 185.  See *Keefe v. Local 805*, 01-10194-DPW ("*Keefe I*").  Late in the development of *Keefe I*, nearly nine months after a Motion for Summary Judgment as to liability had been decided, Keefe moved to amend his complaint to allege that the actions of the union since the filing of *Keefe I* had been retaliatory.  I denied the belated Motion for Leave to Amend the complaint in *Keefe I* on October 21, 2003, and a new complaint initiating the present action followed on June 16, 2004.

**C.   Factual History**[5]

Keefe moved from New Hampshire to Massachusetts in 1993.  At the time of his move, he was a member in good standing of Portsmouth, New Hampshire ILA Local 1947.  Starting in 1993, Keefe worked as a supervisor at John T. Clark & Sons ("Clark & Sons"), a family-owned stevedore and terminal operating business at Conley Terminal in Boston, Massachusetts.  The parties dispute the duration of Keefe's employment with Clark & Sons, but agree

---

[5] Unless otherwise noted, the Factual History is drawn from the parties' statements of undisputed facts.

that Massport did not renew Clark & Sons' lease in 1998, and that the amount of work available to Keefe there was consequentially reduced.  As a result, in August of 1998, Keefe requested a transfer of his ILA membership from Local 1947 in Portsmouth, New Hampshire to Local 805 in East Boston, Massachusetts.

Keefe's transfer request was initially denied.  Keefe wrote to Local 805 asking them to reconsider the denial, and Keefe's attorney subsequently wrote directly to ILA President John Bowers, alleging that Local 805 had denied Keefe's transfer request on insufficient grounds.  After various interventions from President Bowers, detailed in Part I.B.2 of my Memorandum and Order in *Keefe I* issued today, Local 805 accepted Keefe's transfer request, effective on or about January 15, 2000.

### 1.  The Hiring Hall System

Once Keefe was a member of Local 805, his union-gang status, a key factor determining the order in which individual longshoremen are sent to work sites each day--and consequently the likelihood and amount of compensation--was controlled by the ILA Hiring Hall.  The Hiring Hall, jointly operated by Defendants Local 805, 800, and 799, is governed by a Rules Committee composed of nine members, three from each local union.  Under the Hiring Hall Work Rules, Local 805, 800, and 799 members are placed into one of twelve "gangs," based on seniority and whether the member is working exclusively as a longshoreman.

Gangs 1-9 are dispatched first, and are made up of the most

senior members of the local unions.  All new members are automatically placed into Gang 12, the last gang to be dispatched.  To move into Gang 11, a new member must sign a pledge sheet and provide documentation to the Rules Committee that he is "working exclusively at the craft."  The burden of proof rests with the new member, who may be required to provide "notarized retirement or resignation papers, tax returns or any other documents that are pertinent."  To enter Gang 10, a member must work at least 650 hours in Gang 11 for two consecutive years.  To enter Gangs 1-9, a member must work three consecutive years of 650 hours or more.  Any member of Gangs 1-11 who "fails to sign a pledge sheet and comply with it" may be removed from his gang or from a steady job and suspended for up to six months.

The Hiring Hall Work Rules also purport to establish an internal grievance procedure, stating that "All members who have a grievance must go through proper channels first before bringing a lawsuit against I.L.A. or any local.  (The channels are as follows.  First the member must go through his local, next New England Dock and Marine Council or Atlantic District Council, and then the International.)."  Additionally, the Work Rules give the Rules Committee enforcement power, allowing the Committee to summon members before it to explain apparent Work Rule violations, and to impose sanctions, including suspensions of up to six months, for confirmed violations.

When Keefe transferred to Local 805 in January of 2000, the Rules Committee placed him in Gang 12.  On May 25, 2000, Keefe

signed the required pledge sheet, acknowledging that he agreed to work exclusively as a longshoreman, and submitted a letter from Clark & Sons President William Horahoa, indicating he was employed on a casual basis as a longshoreman with the company. In October of 2000, the Rules Committee placed Keefe in Gang 11, where he remained until October of 2002, when he moved to Gang 10. As discussed in more detail below, questions arose about whether Keefe was working exclusively at the craft, and the Rules Committee called a series of meetings in early 2003. Keefe was ultimately suspended for six months and then reinstated and placed into Gang 12 on August 6, 2003.[6]

2. The Progress of *Keefe I*

Keefe alleges that he was suspended and placed back in Gang 12 in retaliation for filing suit in *Keefe I*. Defendants argue that Keefe was suspended as a result of the facts disclosed in his sworn deposition testimony in *Keefe I*. To understand the basis of the parties' respective positions, I must discuss the progress of *Keefe I* in some detail.

Keefe brought suit in *Keefe I* on February 1, 2001. On February 6, 2002, Keefe was deposed on a variety of topics,

---

[6] I recognize Plaintiff's Statement of Disputed Facts and Relevant Facts Ignored by Defendants ¶ 32 makes a blanket denial of Defendants' Statement of Undisputed Facts ¶ 32, which includes Keefe's reinstatement into Gang 12 on August 6, 2003. The basis for the denial appears to be only the latter half of the paragraph, the portion pertaining to Gang 11, so I have taken Keefe's readmission into Gang 12 to be undisputed.

including the duration of his employment with Clark & Sons.[7]  On October 18, 2002, I granted partial summary judgment for the defendants in *Keefe I*, but denied summary judgment on one count, requiring a bench trial on that count.  Keefe was deposed again on January 7, 2003.  In that deposition, Keefe acknowledged currently receiving health insurance from Clark & Sons.  He also discussed his W-2 tax forms from prior years.  The W-2s indicated he had received $283,704.79 in income from Clark & Sons for tax years 2000 to 2003.[8]

3. The Rules Committee Hearings and Mailings

Following Keefe's January 7, 2003 deposition, the Rules Committee decided to meet with Keefe to discuss whether he had ongoing outside employment.  Defendants claim notice was sent by regular mail to Keefe of the impending hearing, scheduled for February 6, 2003.  Keefe claims not to have received the mailing.  In any event, Keefe did not appear at the February 6, 2003 hearing, where the Rules Committee voted to suspend him for six months, and then reinstate him into Gang 12.

On February 16, 2003, the Rules Committee sent a copy of the

---

[7] Keefe's answers were somewhat inconclusive, but seem to acknowledge he continued to do non-longshoreman work for Clark & Sons until May 24, 2000, but not thereafter.

[8] Keefe disputes ¶ 22 of Defendants' Statement of Undisputed Facts which references the W-2s but the response does not directly address whether their validity is in question.  I will assume that the interpretation, rather than the existence, of the Clark & Sons W-2s for 2000 to 2003 is at issue, although Keefe himself appears to have provided only a W-2 for 2001 at the January 7, 2003 deposition.

suspension letter and a summons to a March 5, 2003 hearing to Keefe, via certified mail.  Keefe signed for the certified letter on February 18, 2003, and appeared at the March 5, 2003 hearing.  At this hearing, the Rules Committee voted to reinstate Keefe into Gang 10, if he supplied the Committee with additional evidence that he was working exclusively as a longshoreman.  On March 12, 2003, the Rules Committee sent Keefe a third summons, via regular mail, to a hearing on March 20, 2003.  Keefe claims not to have received this mailing.  Keefe did not appear at the March 20, 2003 hearing, and the Rules Committee voted to reinstate his suspension through August 6, 2003.  As of August 6, 2003, Keefe was reinstated and placed into Gang 12.  Defendants claim Keefe was placed in Gang 11 on August 10, 2003, but Keefe disputes this assertion.

## II. DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists.  *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995), *cert. denied*, 515 U.S. 1103 (1995).  Once the movant makes such a showing, the nonmovant must point to specific facts

demonstrating that there is, indeed, a trialworthy issue.  *Id.*

A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000), and a "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party."  *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir. 1996)). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact.  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

**B.   Keefe's Claims**

Keefe's complaint essentially alleges that Defendants Local 805, 800, and 799 retaliated against him for filing suit in *Keefe I* and failed to provide adequate procedural due process before disciplining him.

Specifically, Keefe's complaint states two distinct grievances.  First, he alleges in Counts I, II, and III that each of the local unions undertook to limit his right to sue, guaranteed by 29 U.S.C. § 411(a)(4), and retaliated against him for exercising this right, in violation of 29 U.S.C. § 529. Second, in Counts IV, V, and VI, Keefe alleges that each defendant disciplined him without adequate procedural due process, in violation of 29 U.S.C. § 411(a)(5).  I will group

Counts I, II, and III and Counts IV, V, and VI together for the purpose of analysis.

1. <u>Right to Sue/Retaliation (Counts I, II, III)</u>

Keefe claims that each of the local unions violated 29 U.S.C. § 411(a)(4) and 29 U.S.C. § 529, respectively, by limiting his right to sue and retaliating against him for exercising this right in *Keefe I*. I address each of these claims separately.

a. *Right to Sue (29 U.S.C. § 411(a)(4))* - Defendants contend that Keefe's right to sue was not limited, as evidenced by the fact that he did, in fact, file a second lawsuit. However, to limit is not necessarily to prohibit successfully. If Keefe can successfully demonstrate to a trier of fact that the local unions disciplined him in retaliation for filing his original lawsuit, it is evident that his right to sue was burdened. See *Service Employees Int'l Union, AFL-CIO v. Service Employees Int'l Union, Local 1199 N.E.,* 70 F.3d 647, 654 (1st Cir. 1995) ("If a union member's right to sue is to have any meaning, courts must be ever vigilant in protecting that right against indirect and subtle devices as well as against direct and obvious limitations."). For Keefe personally, filing an additional lawsuit would be riskier after the retaliation, since he might reasonably perceive his livelihood to be at stake. In a more general sense, other union members considering filing a suit against the union might reasonably reconsider, fearing similar retaliation. For these reasons, Keefe's allegations of retaliation in response to *Keefe I*, if proven, could support a

finding that his right to sue in the future was abridged in violation of 29 U.S.C. § 411(a)(4).

   b.   *Retaliation (29 U.S.C. § 529)* - The crux of Keefe's retaliation claim is a dispute over whether he was suspended for legitimate reasons (because he could not, or would not, demonstrate that he was working exclusively as a longshoreman, as required by his pledge sheet and the ILA Hiring Hall Work Rules) or as payback for filing suit in *Keefe I*. Defendants contend that the suspension, and subsequent placement in Gang 12, was a legitimate, neutral response to Keefe's violation of the Hiring Hall Work Rules. Keefe argues that the asserted rationale is pretextual, and that he alone was singled out for punishment when Local 805, 800, and 799 members commonly held other jobs while remaining in Gangs 1-11.

   As evidence, Keefe offers several assertions, at least one of which is backed up by a letter directly contradicting the deposition testimony of one of defendants' witnesses. Keefe first argues that Joseph Picard, a member of the Rules Committee, had outside income from rental property that he purchased and renovated during his tenure on the Rules Committee, and consequentially was not working "exclusively at the craft." In his deposition testimony, Picard acknowledged buying and renting out a three-family property at 238 Breman Street, East Boston, but denied that his involvement in the rental business constituted "work." Given Picard's admission, the underlying

facts are not in dispute.  What is at issue is whether Picard's actions constitute work under the Hiring Hall Work Rules, and, if so, whether the Rules Committee's failure to discipline Picard while disciplining Keefe could be construed as retaliation against Keefe.

    Keefe's second example concerns the activities of Brendan Lee.  This presents a more significant factual issue, but a less ambiguous legal one.  Keefe alleges that Lee, a member of Local 800 since 1989 or 1990, and a member of Gang 11 or lower since at least 2001, also works as a lawyer for compensation.  In his deposition testimony, Lee flatly denied receiving any legal income since 2001.  However, Keefe as submitted evidence that Lee billed and was paid over $50,000 a year between 2001 and 2006 by the Committee for Public Counsel Services for his services as an attorney.  Assuming, as I must for the purposes of summary judgment, that Lee was working as a lawyer from 2001 to 2006 while remaining in Gangs 1-11, Keefe has presented significant evidence to support his allegation that he was treated differently from other union members with outside jobs.  Defendants claim they could not have been aware of Lee's second job, but this claim is undercut by the fact that Lee openly listed himself in the Lawyer's Diary into at least 2006.  Because a genuine issue exists with respect to whether Keefe was disciplined when other, similarly situated, union members were not, and a reasonable fact finder could conclude that this disparity in discipline is evidence of retaliation, I will deny

summary judgment on Counts I, II, and III.

   2.   Procedural Due Process (Counts IV, V, VI)

Keefe's second set of claims, Counts IV, V, and VI, allege that he was disciplined without the due process required under 29 U.S.C. § 411(a)(5), which mandates that a union member be served with specific written charges, given a reasonable time to prepare his defense, and afforded a full and fair hearing before certain disciplinary actions are taken.[9]  The basis of this claim is Keefe's allegation that he did not receive two of the three hearing summons sent to him by the Rules Committee.

Various cases have held that the mere act of sending notice of a union hearing is insufficient to meet minimum procedural due process requirements.  See, e.g., *Int'l Bhd. of Elec. Workers, Local No. 46 v. Mitchell*, 98 Wash. App. 700, 704-06 (Div. 1, 2000); *Int'l Bhd. of Elec. Workers, Local No. 399 v. Zoll*, 482 N.E. 2d 446, 450 (Ill. App. Ct., 4th Dist. 1985).  Keefe acknowledges receiving the second summons, sent by certified mail, but claims not to have received either the first or third summons.  Defendants allege that the summons were mailed, but present no evidence that Keefe actually received the letters sent by regular mail.[10]  For the purpose of summary judgment, I must

---

[9] Defendants argue that Keefe's suspension was not "discipline," but 29 U.S.C. § 529 precludes this argument by specifically enumerating a suspension as one of the actions a union is forbidden to take without adequate notice.

[10] Keefe's was asked at his May 8, 2006 deposition whether he received the first and third summons, and his answers were ambiguous.  Keefe denied receiving the first and third summons in

assume, as Keefe asserts, that Keefe did not receive notice of the first or third Rules Committee hearing. The question then arises whether this lack of notice prejudiced Keefe's rights, given that he attended the second hearing. I find that it did.

The March 5, 2003 hearing that Keefe attended was called to allow him to appeal his February 6, 2003 suspension (imposed at a meeting he did not attend, and of which he claims to have had no notice). It is beyond dispute that Keefe was suspended at the February 6, 2003 hearing. Because he claims not to have had notice of this hearing, he could not have been "served with specific charges" or "given a reasonable time to prepare his defense," as required by 29 U.S.C. § 411(a)(5). Therefore, Keefe has made out at least a *prima facie* case that he was disciplined without adequate procedural due process, and summary judgment on Counts IV, V, and VI will be denied.

**C.   Leave to Amend**

Defendant Locals 805, 800, and 799 filed a Motion for Leave to Amend their Answer to the Complaint to add an affirmative defense of failure to exhaust internal union remedies. For the reasons detailed below, this motion will be denied.

   1.   Timeliness of Motion

Federal Rule of Civil Procedure 8(c)[11] makes clear that

---

his answers to Defendants' request for admissions, however, so I must resolve this ambiguity in favor of Keefe, the nonmoving party, for the purposes of summary judgment.

   [11] (c) Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively accord and

affirmative defenses should generally be raised in the relevant responsive pleading, the Answer to the Complaint, in this case. While F.R.C.P. 15(a)[12] does allow the court to grant leave to amend the pleadings "when justice so requires," First Circuit decisions consistently hold that failure to plead an affirmative defense generally results in waiver of the defense and its exclusion from the case. *Conjugal Partnership Comprised by Jones v. Conjugal Partnership Comprised by Pineda*, 22 F.3d 391, 400 (1st Cir. 1994). *See also Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d 444, 450 (1st Cir. 1995) (denying leave to amend pleadings to raise ERISA preemption as affirmative defense

---

satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

Fed. R. Civ. P. 8(c).

[12] (a) Amendments. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Fed. R. Civ. P. 15(a).

shortly before trial).

The rationale behind Rule 8(c) is simple--it exists to give the parties, and the court, "fair warning that a particular line of defense will be pursued."  *Williams v. Ashland Eng'g Co., Inc.*, 45 F.3d 588, 593 (1st Cir. 1995) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971); *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir.1994)), *cert. denied*, 516 U.S. 807 (1995).  This timely notice allows the parties to focus their discovery efforts on issues that are likely to arise at trial and, in the case of an exhaustion defense, to take timely steps to remedy any deficiency.  Discovery in this case closed on June 10, 2006.  Defendants' Motion for Summary Judgment, the first motion to mention failure to exhaust as an affirmative defense, was not filed until July 31, 2006.  Despite--or perhaps because of--the fact that a large percentage of the Memorandum of Law in Support of Defendants' Motion for Summary Judgment focuses on this defense, the *Wolf* court's recognition that "[i]t is well within a court's discretion to find prejudice where the amendment 'substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation'" seems directly on point.  71 F.3d at 450.  Because Defendants failed without explanation to raise an affirmative defense of failure to exhaust internal union remedies in the original Answer to the Complaint, or at any other point before discovery closed and

summary judgment motions were filed, leave to amend may properly be denied.

   2.   Non-dispositive Nature of Defense

In addition, I note that the proposed affirmative defense is unlikely to be dispositive on any count. The basis of Counts IV, V, and VI is 29 U.S.C. § 411(a)(5), which does not require the exhaustion of internal remedies. Even 29 U.S.C. § 411(a)(4), which forms the basis of Counts I, II, and III, and states that a union member "may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time)" has been read by the Supreme Court simply to give courts the discretion to stay proceedings for four months, not to force them to require the exhaustion of internal remedies. *N.L.R.B. v. Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO, Local 22*, 391 U.S. 418, 426 (1968).

In any case, union members may implicitly exhaust internal remedies without following all of the procedures specified by the union. See *Doty v. Sewall*, 908 F.2d 1053, 1061 n. 7 (1st Cir. 1990) ("'[a] concentrated effort to comply with the spirit of intraunion remedies available,' will satisfy § 411(a)(4)'s exhaustion requirement") (internal citation omitted). In this case, the Hiring Hall Work Rules outlined only the vaguest procedure for internal grievances, and the ILA Constitution is not much clearer. Keefe followed a procedure similar to the one he followed to resolve his original grievance when his attorney wrote to ILA President Bowers. Bowers failed to respond for

eight months.  In these circumstances, even were the Motion for Leave to Amend granted, I would hold as a matter of law that Keefe made a concentrated effort to comply with the spirit of the internal remedies, and satisfied any exhaustion requirement of 29 U.S.C. § 411(a)(4).  Consequently, any dispute about exhaustion has effectively been rendered moot in this case.

### III. CONCLUSION

For the reasons set forth more fully above, I deny Defendants' Motion for Leave of Court to Amend Answer (#26) and deny Defendants' Motion for Summary Judgment (#23).

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE