United States District Court
District of Massachusetts

| | |
|---|---|
| Steven Keefe,<br>        Plaintiff<br><br>v.<br><br>Locals 805, 800, 799,<br>International Longshoremen's<br>Association, AFL-CIO, et.al.<br>        Defendants | ) Docket No. 04-CV-11340DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS',
LOCALS 805, 800, 799, &
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION
AFL-CIO'S MOTION PURSUANT TO FED. R. CIV. P. 50
FOR JUDGMENT AS A MATTER OF LAW
AT CLOSE OF PLAINTIFF"S CASE**

Now come the Defendants are hereby move this Honorable Court to grant it judgment as a matter of law. Judgment as a matter of law is appropriate only when a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

In support of this motion the Defendants state as follows.

## I.    LEGAL OVERVIEW

The plaintiff, Stephen Keefe, brought this suit against Locals 805, 800, and 799 alleging violations of Title I and Title VI of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(4)[1], 29 U.S.C. § 411(a)(5)[2], and 29 U.S.C. § 529[3]. Although

---

[1] The relevant portion of 29 U.S.C. § 411(a)(4) states, "PROTECTION OF THE RIGHT TO SUE – No labor organization shall limit the right of any member thereof to institute an action in any court.... *Provided*, That such member may be required to exhaust reasonable hearing procedures (but not to exceed a four month lapse of time) within such organization, before instituting legal or administrative proceedings against such organization or any officer thereof...."

Case 1:04-cv-11340-DPW    Document 47    Filed 12/17/2007    Page 2 of 14


LMRDA was enacted to protect union members from abuse by union officials, the legislative history of the Act shows that "[t]he LMRDA was not intended to permit courts to rewrite union constitutions or to 'prescribe detailed procedures and standards for the conduct of union business.'" Laborers' International Union of North America, AFL-CIO v. National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of the Laborers' International Union of North America, AFL-CIO, 880 F.2d 1338, 1395 (D.C. Cir. 1989) (quoting S. Rep. No. 187, 86th Cong., 1st Sess. 7, U.S. Code Cong. & Admin. News 1959, p. 2323 (1959)). The Supreme Court has been clear, that "[r]esponsible union self-government demands, among other prerequisites, a fair opportunity to function." National Labor Relations Board v. Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO, and Its Local 22, 391 U.S. 418, 429 (1968) (Harlan, J., Concurring) (citing to Destroy v. American Guild of Variety Artists, 286 F.2d 75, 79 (2nd Cir. 1961).

In the present case, motion for judgment as a matter of law is warranted on three grounds: (1) The plaintiff has admitted that at no point did Locals 805, 800, 799 or the ILA limit the plaintiff's right to institute a court action in any manner; (2) The plaintiff admitted that his suspension was a direct result of his knowing and willful violation of Hiring Hall Rule #36; and (3) The plaintiff admitted he was provided sufficient due process in regard to any action taken by the Rules Committee.

---

[2] The relevant portion of 29 U.S.C. § 411(a)(5) states, "SAFEGUARDS AGAINST IMPROPER DISCIPLINARY ACTION – No member of any labor organization may be . . . suspended . . . by such organization or by any officer unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

[3] The relevant portion of 29 U.S.C. § 529 states, "It shall be unlawful for any labor organization . . . or other representative of a labor organization . . . to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act.

## II.   ARGUMENT

### A.   The Defendants Never Limited the Plaintiff's Right to Institute a Court Action in Any Manner.

The plaintiff claims that by suspending him and returning him in Gang 12, the defendants "limited his right to bring suit" as protected by 29 U.S.C. § 411(a)(4). Essentially, the plaintiff's argues that his suspension was in retaliation for his first suit against the defendants, and that the suspension thereby "limited his right to bring suit." Id. However, even assuming the plaintiff's suspension was invalid, the plaintiff's and his attorney's own statements on his behalf prove, that the suspension in no way limited the plaintiff's right to bring suit. The plaintiff's attorney, in his April 7, 2003 letter to ILA President John Bowers, (admitted in evidence) states:

> As it occurred, Local 805 did final[ly] permit Mr. Keefe to transfer to that Local on or about January 15, 2000. However, since that date Local 805 and its Rule Committee has continued to harass and discriminate against Mr. Keefe by placing him in lower Gangs than he should be. As a result, on *February 1, 2001*, I filed a complaint on Mr. Keefe's behalf in Federal District Court here in Boston, Massachusetts, against Local 805.
>
> . . . .
>
> On September 29, 2000, the Rules Committee by a vote of 5 to 3 allowed Mr. Keefe to move from Gang 12 to Gang 11 . . . . Mr. Keefe then spent the next two years in Gang 11. In *October 2002*, he moved into Gang 10. The problems start thereafter (when the Federal Court ruled against Local 805).[4]

The plaintiff's attorney's letter reveals that the plaintiff was promoted on two occasions after his initial lawsuit was filed. Id. It is quite illogical to assert, that the union "limited his right to bring suit" by subsequently promoting him during the pending litigation. The plaintiff's attorney attempts to attribute his suspension to the Federal Court's ruling against the defendant's motion

---

[4] The attorney's statements in this letter are admissions of Keefe because, "(1) the attorney is . . . the [Keefe's] agent with regard to the making of the statement; (2) the statement concerns a matter of the attorney's employment; [and] (3) the statements are adopted adopted by [Keefe]." Wechsler v. Hunt Health Systems, Ltd., 2003 WL 22764545 (citing to United States v. Margiotta, 662 F.2d 131, 142-143 (2nd Cir. 1981).

to dismiss in October 2002. Id. However, this assertion is a misrepresentation of what actually occurred. The Rules Committee did not initiate any proceedings or investigations against the plaintiff until after he voluntarily admitted that he was in violation the Hiring Hall Work Rules and his Exclusively at the Craft Pledge, in his January 7, 2003 deposition.

Furthermore, in 1995 the First Circuit Court of Appeals was confronted with the issue of determining whether actions taken by the Service Employees International Union, limited the Local unions right to sue, in violation of 29 U.S.C. § 411(a)(4)[5]. Service Employees International Union, AFL-CIO v. Local 1199 N.E., SEIU, AFL-CIO, CLC, 70 F.3d 647 (1st Cir. 1995). In Service, a dispute arose between a local union and the International, which eventually led to the Local's refusal to pay its per capita taxes to the International. Id at 649. Immediately following a suit brought by International against the Local, several members of the Local sued both the Local and International for rescission of a contract between the Local and International "on the grounds that the contract was entered into without fully informing the members . . . ." Id at 650. In regards to the International suit against the Local, the District Court ordered arbitration, and the arbitrator found, inter alia; that the Local was liable to the International for per capita taxes, but "reserved decision on various remedial issues, including . . .late fees . . . in order to give the parties a chance to reach a negotiated resolution." Id. During the subsequent negotiations, the International "refused to negotiate over a reduction in or a reasonable payment schedule for the per capita taxes or a waiver of the late fees, unless the Local arranged for the withdrawal of the [Local members'] lawsuit . . . ." Id at 653.

---

[5] Although the dispute in the Service Employees International Union was between the International and the Local; whereas here, the dispute is between the local and a union member, for the purposes of 29 U.S.C. § 411(a)(4), the analysis is the same and the distinction is of no relevance. See American Postal Workers v. M. Frank, 968 F.2d 1373, 1375 (1st Cir. 1992) (applying the test of organizational standing to sue to the case of a Local asserting the rights of its members under the LMRDA).

4

The Court held, that because the per capita taxes [were] routine, non-negotiable payments, to which the International [was] entitled to, and "failure to negotiate or reschedul[e] them [could not] . . . be said to be a penalty on the right to sue." Id at 654. However, the Court decided, because the International routinely waives late fees in other cases, that "the subsequent refusal to grant a waiver of [the] late fees as the International usually has done, unless the suit was withdrawn," might have been a violation of 29 U.S.C. § 411(a)(4), if it was done in an attempt to coerce the union members to withdraw their suit. Id. Like the per capita taxes which were routine and never waived, suspensions for failure to work exclusively as a longshoreman are also non-negotiable and have been applied consistently to anyone found violating the Hiring Hall Rules.

Accordingly, inasmuch as Locals 805, 800, 799 and the ILA have never limited the plaintiff's right to bring suit in any manner, the LMRDA claim should be dismissed, and judgment as a matter of law granted to the defendants.

**B.    The Plaintiff's Suspension was the Direct Result of His Admitted Knowing and Willful Violation of Hiring Hall Rule 36.**

**1.    The Plaintiff Admitted his Violation of Union Regulations**

The plaintiff claims that the Rules Committee suspended him for exercising his right to bring suit under 29 U.S.C. § 411(a)(4) and suspended/disciplined him without providing him with sufficient due process, thereby violating 29 U.S.C. § 529. Although similar, the distinction between the plaintiff's claims under 29 U.S.C. § 411(a)(4) and 29 U.S.C. § 529 merits explanation. The plaintiff's claim under 29 U.S.C. § 411(a)(4) alleges that his suspension limited his right to sue. Whereas the plaintiff's claim under 29 U.S.C. § 529 alleges that his suspension/discipline was in retaliation for the plaintiff exercising his right to bring suit under 29 U.S.C. § 411(a)(4).

5

However, by the plaintiff's own admission, his suspension was not in retaliation for his initial lawsuit. At the plaintiff's May 8, 2006 deposition, the plaintiff admitted that in May 2000, he signed the Union pledge affirming that he was working exclusively as a longshoreman. In addition to signing the pledge, at the same time the plaintiff also submitted a letter from JTC indicating that he working only working with JTC on a casual basis as a longshoreman. However, Keefe's W-2 from 2002 indicates that he earned $76, 362 from JTC, and Keefe expressly stated that his suspension had nothing to do with his previous lawsuit, but rather for a violation of Hiring Hall Rules. [In addition to his trial testimony; See May 8, 2003 deposition testimony of Stephen Keefe, pgs 87-88]. The plaintiff was questioned, and testified as follows:

> Q: So your understanding of the reason for your suspension was that the rules committee held – determined that you had another job; is that fair to say?
> A: Yes
> Q: And we already went through all the John T. Clark W-2s. In 2003 you already admitted that you did receive W-2 income from John T. Clark; isn't that right?
> A: Yes
>
> . . . .
>
> Q: [Y]ou understand that you reported the money you received to the federal and state government as income that you earned from working at John T. Clark; is that right?
> A: Correct
>
> . . . .
>
> Q: [Y]ou know the difference between income received from a stock distribution rather than income. You're familiar with that, right?
> A: Yes

Id. The distinction the plaintiff attempts to make; that he wasn't doing any work for the income he received at JTC, and therefore did not have another job, is an attempt to circumvent the intent of the rule. ILA President Bower's letter (admitted into evidence) indicates that "[t]he avowed purpose of the Rules was to assure that those individuals who are committed to working in the industry as the source of their livelihoods would have the opportunity to make a living as well as

to make the necessary hours to qualify for their health and other benefits and in order to maintain a steady and reliable workforce." Id. The material fact is not that the plaintiff may not have worked for the money he received from JTC, but rather the money he received from JTC was *reported as earned income*, and opposed to unearned income. By claiming that he had a "no-show job", the plaintiff is attempting to defeat the purpose of the rule; because the "source of his livelihood" was not from working exclusively as a longshoreman. The Rules Committee's interpretation that Keefe's position with JTC was in violation of the Hiring Hall Rules is reasonable, and should therefore be upheld. Millinery Workers' Union Local 55/56 of United Hatters, Cap & Millinery Workers' Intern. Union v. United Hatters, Cap & Millinery Workers' Intern. Union, 495 F. Supp. 60, 62 (1980). "[C]ourts should . . . accept the correctness of reasonable, lawful interpretations by the union's authorized officials of the Constitution and By-Laws. Id (citing to English v. Cunningham, 282 F.2d 848, 850 (D.C. Cir. 1960). Just as the Rules Committee had suspended other members not working exclusively at the craft, the application of the Hiring Hall Rules to Keefe was equally consistent and reasonable.

    2.    **The Plaintiff's Suspension is not Defined as Discipline**

The plaintiff's suspension does not fall within the statutorily defined meaning of the term discipline. Macaulay v. Boston Typographical Union No. 13, 474 F.Supp. 344, 346 (D. Mass. 1979). The court held that "[u]nion action which adversely affects a member is 'discipline' only when (1) it is undertaken under the color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing." Id. Macaulay provides a similar fact pattern to the present case. In Macaulay, the plaintiff had his union status reclassified due to his failure to seek a sufficient level of work, which caused him to lose his

priority status within the union. Id at 345. Thus there will be certain union actions undertaken which may "adversely affect' a member, but still do not constitute discipline as proscribed by statute. Id. Further the Macaulay court stated, the "plaintiff has offered no evidence that he has been directly penalized or singled out from other comparable members for special treatment. The union has fairly applied a reasonable union regulation . . . ." Id.

Like the plaintiff in Macaulay, here, Keefe was not treated differently than any other member found in violation of the Hiring Hall Rules. Additionally, at his May 8, 2006 deposition Keefe admitted knowing that a violation of the Hiring Hall Rules could result in a six-month suspension. [See May 8, 2003 deposition testimony of Stephen Keefe, pg. 38]. The plaintiff was asked, and responded as follows:

> Q: "Rule 37 of the hiring hall work rules for Local 799, 800, and 805 permits a six-month suspension from a gang or steady job for a member's violation of his pledge or due to his failure to appear before the rules committee when summoned." You admitted that to be a correct statement; is that right?
> A: Yes

Id.

Additionally, the evidence bears out that there were many other members suspended for violation of their pledge to work exclusively at the craft; and following the plaintiff's suspension, including Brendan Lee. Thus the plaintiff was neither singled out or treated differently than any other member who was caught violating the pledge, nor retaliated against. Accordingly, inasmuch as the plaintiff's suspension was the direct result of his knowing and willful violation of the Hiring Hall Rules, the LMRDA claim should be dismissed.

C.  **The Rules Committee Adhered to the Due Process Requirements of the LMRDA at all Relevant States of its Investigation and Suspension of the Plaintiff.**

It is well settled in this Circuit, that when a union seeks to suspend one of its members it may do so provided it follows the requirements of the LMRDA, 29 U.S.C. § 411(a)(5). Stein v. Mutual Clerks' Guild of Massachusetts, Inc., 560 F.2d 486, 491 (1st Cir. 1977). Namely, the union must, (1) serve the member with written specific charges; (2) give the member a reasonable time to prepare a defense; and (3) afford the member a full and fair hearing. Id. The defendant's motion for judgment as a matter of law should be granted because based on the all the evidence at trial in this case no reasonable jury find that the Rules Committee violated any provision of law; or that the Rules Committee did anything other than adhere to its constitution in charging the plaintiff and suspending him from membership in the ILA. In this case the Rules Committee properly drafted specific written charges against the plaintiff; served the charges on the plaintiff with due notice in advance of the hearing on the charges; permitted the plaintiff to testify and present evidence during the Rules Committee hearing; and based its decision on substantial evidence which warranted the plaintiff's six-month suspension.

1.  **The Plaintiff Admits he was Served with Specific Charges of Misconduct Warranting Suspension**

To satisfy the requirements of the LMRDA, charges made against a union member must provide sufficient detail of the conduct forming the basis of the suspension. International Brotherhood of Boilermakers v. Hardeman, 401 U.S. 233, 244-245 (1971) (holding that union charges of discipline satisfy the LMRDA provided that the union member is given "specific" information about discipline). The attached hearing summonses irrefutably prove that the plaintiff was served with specific charges of misconduct on three separate occasions. Any argument by the by the plaintiff that he did not receive written notice of the charges is futile. A

certified mail receipt, signed by the plaintiff on February 18, 2003 proves that he received a copy of the hearings summons. This summons, received by the plaintiff two weeks before the scheduled hearing, stated:

> THE COMMITTEE SUMMONS YOU ON THIS DATE OF MARCH 5, 2003 AT 12 NOON TO APPEAR AT THE HIRING HALL. THE PURPOSE OF THIS HEARING HIS FOR YOU TO SHOW JUST CAUSE AS TO WHY YOU SHOULD NOT BE SUSPENDED AND PLACED INTO GANG #12. PLEASE BRING WITH YOU ANY RESIGNATION AND RETIREMENT PAPERS, TAX RETURNS OR ANY DOCUMENTS THAT YOU DEEM PERTINENT. WE HAVE FOUND YOU TO BE IN VIOLATION OF NOT HONORING THE PLEDGE THAT YOU SIGNED.

Here, the plaintiff was provided with clear charges that informed him of the basis for the Rules Committee's suspension.

Assuming arguendo, plaintiff's assertion that he never received the Rules Committee's notice of the February 6, 2003 hearing is true, it still does not rise to the level of a violation of due process. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 319 (1950). "[N]otice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all . . . . We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable." Id. Here, the Rules Committee sent each notice via mail, to the plaintiff's address, and therefore has satisfied due process. Id. "However it may have been in former times, the mails today are recognized as an efficient and inexpensive means of communication." Id. Thus, the defendants were under no obligation to send the charges to the plaintiff via certified mail. Moreover, the plaintiff admitted having the same address for over twenty years. The charges were mailed to that address on three occasions. Further, even if the plaintiff did not receive the first notice, he appeared on March 5, 2003, and

therefore the fact of receipt of the charges is not material. Consequently the plaintiff cannot establish any violation of this provision of the LMRDA.

### 2. The Plaintiff was Given a Reasonable Amount of Time to Prepare his Defense

Although the plaintiff initially stated in his complaint, that he was not given a reasonable amount of time to prepare his defense, his subsequent admission at his May 8, 2006 makes this issue moot. The plaintiff was asked, and responded,

> Q: And you got the [March 5, 2003 hearing notice] on February 18th; is that right?
> A: Yup.
> Q: That is about two weeks prior to the meeting?
> A: Yes
> Q: Do you contend that two weeks' notice is an unreasonable amount of time for you to be summoned to a meeting?
> A: No

[See May 8, 2003 deposition testimony of Stephen Keefe, pg. 108]. Furthermore, the ILA Constitution, Article XVIII, Section 3 provides for, and the plaintiff received a minimum of five days prior notice of the time, date, and location of the Rules Committee hearing. Union officers are entitled to latitude in applying their own rules. Hardeman, 401 U.S. at 243. Here, two weeks notice to the plaintiff is reasonable in light of the specific charges filed against him. If it is true, as the plaintiff states that he was always working exclusively as a longshoreman it should have been very simple for him to defend this contention at the Rules Committee hearing. For all the Rules Committee requested, and he would have had to supply, was any documentation that indicated that he was no longer working at JTC.

### 3. The Plaintiff was Given a Full and Fair Hearing as Defined Under the LMRDA

The First Circuit has made clear that the essential requisite for a fair hearing is an unbiased tribunal. Stein, 560 F.2d at 491 A review of the Rules Committee Meeting Minutes and

11

ILA President Bower's letter to the plaintiff's attorney demonstrate that the plaintiff received a full and fair hearing. Although the plaintiff was not present at the February 6, 2003 Rules Committee hearing, he was present at the March 5, 2003 hearing where he was given an opportunity to respond to the charges against him. Id. At the March 5, 2003 hearing, the plaintiff stated that he was working for JTC as a consultant, and that he was going to resign his position because he wanted to remain in Gang 10. Id. Based on the plaintiff's statement, the Rules Committee voted to stay his suspension and reinstate him into Gang 10, provided that he furnish documents to prove that he no longer worked outside the industry. Id. Ultimately, after three hearings, the plaintiff failed to provide the Rules Committee with any documentation to prove he was working exclusively at the craft, and the Rules Committee reinstated his suspension on March 20, 2003. Id. The Rules Committee's willingness to temporarily stay the plaintiff's suspension and provide the plaintiff with three hearings to defend himself indicates that the Rules Committee was not biased towards the plaintiff in any manner. In Stein, the First Circuit Court of Appeals held that where the union's attorney takes part in the union member's hearing, an inherent risk of bias is present. Stein, 560 F.2d at 491. Here, the plaintiff's hearings were conducted in a neutral and detached manner, with only members of the Rules Committee present. Consequently, the plaintiff received a full and fair hearing, with an adequate opportunity to present his defense, thus satisfying the requirement of the LMRDA.

    4.  **The Rules Committee's Decision was Based upon Substantial Evidence**

Unions are free to define what conduct warrants discipline under their rules and regulations and to determine appropriate penalties. Hardeman, 401 U.S. at 243-244. The decision of the Rules Committee to suspend the plaintiff was based on specific testimony of the plaintiff at his January 7, 2003 deposition, and the plaintiff's failure to provide any

documentation to prove he was working exclusively at the craft. Indeed, the March 20, 2003 hearing was called specifically to discuss why the previous Rules Committee moved the plaintiff to Gang 11 when he had outside employment, and to allow the plaintiff to present documentation indicating he was not working outside the craft. Id. Earlier Rules Committee members stated that they had relied on the May 24, 2000 letter from JTC, which they believed was proof that he did not hold a job outside the craft. Id. Based on the testimony of previous Rules Committee members, the current Rules Committee concluded that the plaintiff was not being honest with the previous Committee, and like all other longshoremen, he had knowledge of the rules and potential consequences if found in violation of his exclusivity pledge and violation of Hiring Hall Rules. Id. After finding sufficient evidence to prove the plaintiff was not working exclusively as a longshoreman (i.e. his own deposition testimony), and the actions taken by previous Rules Committees which had suspended any member found working outside of the craft, the current Rules Committee determined that it was "bound by this past practice and that it had to be consistent in administering these rules for all members similarly-situated." Id. Consequently, the plaintiff's suspension was based on substantial evidence and not in violation of the LMRDA. Hardeman, 401 U.S. at 243-244

## IV.   CONCLUSION

For all the forgoing reasons and authority and upon all papers submitted in this action, Locals 805, 800, 799, and the ILA's motion for judgment as a matter of law should be granted.

13

Dated: December 17, 2007

Respectfully submitted,
The Defendant,
By their attorney,

Michael L. Mahoney
Mullen & McGourty
52 Temple Place, 4th Floor
Boston, MA 02111
(617) 338-9200
BBO# 557562

## CERTIFICATE OF SERVICE

I, Michael L. Mahoney, hereby certify that I have served a true copy of the within document this 17th day of December 2007, via email, postage prepaid upon the following:

Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450

Michael L. Mahoney